1          <u>IN THE UNITED STATES DISTRICT COURT</u>

2          <u>FOR THE NORTHERN DISTRICT OF TEXAS</u>

3                <u>DALLAS DIVISION</u>

4

5
   QUINTIN LEE ALONZO      (    3:07-CV-399-O-BH

6            Petitioner,  (  Referred to U.S.
                    (      Magistrate Judge

7                      (
   VERSUS                (

8                      (  DALLAS, TEXAS

9                      (
   RICK THALER,         (

10    Director, Texas Department (
   of Criminal Justice,    (

11    Institutional Division   (
          Respondent.  (   April 1, 2010

12

13

14                 VOLUME 1

15       TRANSCRIPT OF EVIDENTIARY HEARING

16      BEFORE THE HONORABLE IRMA RAMIREZ

17    UNITED STATES DISTRICT MAGISTRATE JUDGE

18

19  <u>A P P E A R A N C E S</u>:

20

21

   FOR THE PETITIONER:   WILLIAM REYNOLDS BIGGS
22                   SAM OGAN
                  Federal Public Defender's Office

23                   525 Griffin St
                  Suite 629

24                   Dallas, TX 75204
                  214/767-2746

25                   Email: william_biggs@fd.org

```
 1

 2

 3   FOR THE RESPONDENT:     JON R. MEADOR
                             Office of the Texas Attorney General
 4                           300 W 15th St
                             Austin, TX 78701
 5                           512/936-1400
                             Email: jon.meador@oag.state.tx.us
 6

 7

 8                           LESLIE K. KUYKENDALL
                             Office of the Texas Attorney General
 9                           300 W 15th St
                             8th Floor Clements Bldg
10                           Austin, TX 78701
                             512/936-1400
11                           Email:leslie.kuykendall@oag.state.tx.us

12

13

14

15

16

17

18

19   COURT REPORTER:         PAMELA J. WILSON, RMR, CRR
                             1100 Commerce Street, Room 1535
20                           Dallas, Texas 75242
                             214.662.1557
21                           pam_wilson@txnd.uscourts.gov

22

23        Proceedings reported by mechanical stenography,

24   transcript produced by computer.

25
```

| 1 | $\text{P R O C E E D I N G S}$ |
|---|---|

1           P R O C E E D I N G S

2                Volume 1 - Evidentiary Hearing

3           THE SECURITY OFFICER:  All rise.

4           THE COURT:  Good morning.

5      Please be seated.

6           THE SECURITY OFFICER:  You may be seated.

7      We are here in the matter of Quintin Lee Alonzo versus

8  Rick Thaler.

9      This is civil action 3:07-CV-399-O.

10     We are here for purposes this morning of an evidentiary

11 hearing.  If counsel would make their appearances for the

12 record.

13          MR. MEADOR:  John Meador for respondent.

14          MS. KUYKENDALL:  Leslie Kuykendall for respondent.

15          MR. BIGGS:  William Biggs for petitioner.

16          MR. OGAN:  And Sam Ogan for the petitioner also.

17          THE COURT:  All right.  Do we have any prehearing

18 matters to take up?

19          MR. MEADOR:  Your Honor, I didn't know if we wanted

20 to try to swear in the witnesses first, before we did -- we

21 went on the record with any sort of testimony?

22          THE COURT:  Well, then that's one of the things --

23 is the rule going to be invoked?

24          MR. BIGGS:  We would like to invoke the rule, Your

25 Honor.

1          MR. MEADOR:  Your Honor, we have two exceptions

2    that we would like to make an argument for, Carl Hays and

3    David Alex.  Both of them are -- I mean, there's three

4    claims.  The first two claims have to do with prosecutorial

5    misconduct and the third claim has to do with ineffective

6    assistance of counsel for failure to call -- call certain

7    witnesses.

8          We think they can be excluded from the rule to hear

9    testimony relevant to the third claim.  David Alex could be

10   an expert or just otherwise give an opinion about the

11   reasonable -- the probability of -- of -- reasonable

12   probability of the outcome of the trial had these witnesses

13   testified.

14         The same with Carl Hays.

15              THE COURT:  Are both of those prosecutors?

16              MR. MEADOR:  David Alex is a prosecutor.

17        Mr. Hays is the defense attorney.

18              THE COURT:  All right.  Counsel.

19              MR. BIGGS:  Your Honor, these are the key players

20   in this inquiry today and we would be opposed to excepting

21   either from the rule.

22         In terms of Carl Hays and some of the witnesses that

23   might be called, potentially exonerating witnesses, the State

24   is free to inform Carl Hays of what they claim occurred and

25   see how he would respond to that.  He doesn't need to be in

1    here for the testimony of those witnesses.

2         And in terms of whether or not either of them can make a

3    legal determination as to the outcome of a trial, I -- I

4    would say that they -- their testimony is irrelevant on that

5    ground, because that's a legal determination that the court

6    should make in light of all the evidence before it and the

7    record.  Whether or not they view a reasonable probability of

8    a different result seems irrelevant to me.

9         THE COURT:  Have either of these witnesses been

10   designated as experts prior to --

11        MR. MEADOR:  No, Your Honor.

12        THE COURT:  -- right this minute?

13     All right.  So Mr. Biggs has had no notice that you

14   intended to use them as experts?

15        MR. MEADOR:  That's correct.

16        THE COURT:  I'm going to go ahead and find that

17   they are subject to the rule.

18     If all of the witnesses would please stand, I'm going to

19   swear you in as a group and then ask that you step outside.

20   Are there any other witnesses outside?

21        MR. BIGGS:  Yes, Your Honor.  We have a few.

22        THE COURT:  You can put your hand down.  We'll wait

23   for all the witnesses.

24        MR. BIGGS:  I would like to move to except Joe

25   Saal, our investigator, from the rule.  I have spoken with

1    the respondent about that.

2              THE COURT:  Is he going to be a witness?

3              MR. BIGGS:  He will be, yes.  To -- he was going to

4    testify to several open records requests he made with Dallas

5    County.  His testimony is limited in that regard, but --

6              THE COURT:  So it's -- it's not substantive

7    testimony, it's -- it's about the efforts that were made --

8    is it substantive testimony?

9              MR. BIGGS:  I would actually say it is -- it is

10   substantive testimony, because since we are talking about

11   cause and prejudice at this hearing as well, it is

12   substantive, and leave it to the court.

13             THE COURT:  All right.  And you -- you're in

14   agreement?

15             MR. MEADOR:  Yeah.  Based on my understanding that

16   he was just going to testify to just I guess the records.  If

17   it's going to be substantive we would request that he be

18   excluded as well.

19             MR. BIGGS:  Your Honor, I'll withdraw the move.

20             THE COURT:  All right.  Are there any witnesses

21   that are not in the courtroom right now that either side

22   intends to call?

23       All right.  If all of the witnesses would please raise

24   your right hands and be sworn.

25       (Witnesses sworn.)

1          THE COURT:   All right.  The rule has been invoked.

2   That means that each of you will be excluded from hearing the

3   testimony until you testify.  You should not discuss the

4   matter with each other or with anyone.  Your testimony should

5   not be discussed with anyone.

6        Are there any questions about that?

7        All right.  Then I'm going to ask all of you to please

8   step outside and we will be calling you as you are needed.

9        Thank you.

10          MR. BIGGS:  Your Honor --

11          THE COURT:  Yes.

12          MR. BIGGS:  -- two of our witnesses have not

13   arrived yet.  One of our witnesses came to the courthouse and

14   did not bring her ID.  She's coming -- it's my understanding

15   she's on her way, from the investigator.

16        And the other witness was not actually subpoenaed and

17   was in -- in Austin, and I do not know whether or not he's on

18   his way or not.

19          THE COURT:  All right.  Well, any -- please remind

20   me as to whether a witness has or hasn't been sworn and I'll

21   be sure that we swear them on the record and we'll ask each

22   one if they were sworn before the hearing.

23        All right.  What are the matters that we needed to take

24   up?

25          MR. MEADOR:  We talked about some stipulations, and

1    I think William has put them on paper and I think we were --

2    he was going to try to read them into the record and I had --

3    he's got a couple more stipulations than I had agreed to, or

4    I would have problems with, but I think -- is that right, did

5    you want to read them into the record?

6              MR. BIGGS:  Yes, I would.

7              THE COURT:  And let's only read the ones that Mr.

8    Meador has agreed to.

9              MR. BIGGS:  Has agreed to?

10             THE COURT:  Yes.  Because it's not a stipulation

11   otherwise.

12             MR. BIGGS:  Right.

13        All right.  It's my understanding and respondent would

14   agree these are statements we both agree are misleading, the

15   legal significance of at least the prosecutor's closing

16   argument I think the respondent has a different view on that,

17   but I think he does agree that the statement itself is

18   misleading and that is -- that is the fourth statement I will

19   read to the court.

20        The first statement comes from trial volume 3, page

21   138 --

22             MR. MEADOR:  Well, Your Honor, one second.

23        Did you want only the stipulations that we agreed to?

24             THE COURT:  Yes.

25             MR. MEADOR:  The only ones we technically agree to

```
 1  are 2 and 3.
 2                      (Conferring)
 3            MR. BIGGS:   The 2nd and 3rd one?
 4            MR. MEADOR:   Yes.
 5            MR. BIGGS:   Your Honor, I apologize.
 6       There's three statements we agree are misleading, but
 7  the legal significance of the third statement, am I right, is
 8  in dispute?
 9       That is a closing statement by the prosecutor?
10            MR. MEADOR:   Right.
11            MR. BIGGS:   So the first statement that we agree is
12  misleading is -- comes from trial volume 3, page 167, lines 9
13  through 13.
14       And Mr. Alex, the prosecutor, asks:  "And as a result of
15  your investigation did you have any evidence that supports
16  that he --" and from the context of the record it's clear
17  that's Licho Escamilla, "-- shot easy (sic) Israel Martinez?"
18       Detective Berry responds:  "No, none of the evidence we
19  collected indicates that Licho Escamilla was the one who shot
20  Santos Gauna, Israel Martinez or Cynthia Martinez."
21       The second statement we both agree is misleading, trial
22  volume 3, page 168, lines 22 through 25, Mr. Alex asks
23  Detective Berry:  "And did anybody else -- and did anybody
24  exclude the defendant as being the person who killed Santos
25  Gauna or committed the aggravated assaults?"
```

1        Detective Berry responds:  "No."

2        The third statement is --

3             MR. MEADOR:  Your Honor, I think that's all we can

4    agree to.  I mean, the last one is -- is closing argument,

5    and it's not within the parameters of the claim.

6        The claim was prosecutorial misconduct eliciting false

7    testimony, and we don't think the last -- the last excerpt

8    here goes to that claim.  It only goes to prejudice and harm

9    as opposed to the other prongs of the -- of the analysis.

10            THE COURT:  So there --

11            MR. MEADOR:  Right.  I mean, we didn't really agree

12   that that was part of the substantive prosecutorial

13   misconduct, the eliciting or failing to correct false

14   testimony, because it's not -- it's closing argument, it's

15   not evidence.

16            THE COURT:  Okay.  So there's no stipulation as to

17   that statement?

18            MR. MEADOR:  No.

19            THE COURT:  All right.  Any other prehearing

20   matters that we need to take up?

21            MR. MEADOR:  Not from respondent, Your Honor.

22            THE COURT:  All right.

23            MR. BIGGS:  Nothing from the petitioner, Your

24   Honor.

25        THE COURT:  Would counsel like to make opening

1  statements or would you prefer to begin with the testimony?

2          MR. BIGGS:  I would prefer to begin with the

3  testimony.

4          MR. MEADOR:  Yes.

5          THE COURT:  All right.  And just for planning

6  purposes, do we have an estimate of how long we'll be here

7  today?

8          MR. BIGGS:  I'm honestly not certain about that.

9          THE COURT:  Will we finish today?

10          MR. BIGGS:  I think we will finish today.

11          THE COURT:  All right.  Mr. Meador.

12          MR. MEADOR:  That's my question to you.

13      Were you going to be in session tomorrow?

14      I believe we have some people that may have some

15  religious objections.  That's maybe something we can look at

16  this afternoon.

17          THE COURT:  Let's -- let's try, if we need to stay

18  a little later today, to avoid having to come back, let's do

19  that.  But I'll ask you to move it along.

20      We'll take -- we'll take a few breaks, but not many.

21      All right.  Mr. Biggs, you may call your first witness.

22          MR. BIGGS:  Your Honor, we'll call Bill Cox to the

23  stand.

24          THE COURT:  All right.  All right.  Mr. Cox, you

25  were part of the group that was sworn in; is that correct?

```
 1              THE WITNESS:  Yes, Your Honor.
 2              THE COURT:  All right.  Please be seated, please.
 3                         DIRECT EXAMINATION
 4    BY MR. BIGGS:
 5    Q.    Hi, Mr. Cox.
 6    A.    How are you?
 7    Q.    Have we spoken before on the phone?
 8    A.    We have.
 9    Q.    Have we ever met before?
10    A.    No.
11    Q.    Did you represent Mr. Alonzo on his state habeas
12    petition?
13    A.    I did.
14    Q.    Have you had a chance to review the petition you filed
15    in that case?
16    A.    I did.
17    Q.    And when did you file his petition?
18    A.    Three or four years ago.
19    Q.    Okay.  Do you remember filing the petition?
20    A.    I do remember filing it.  I don't know the specifics,
21    because it's been a number of years, but I do -- I do
22    remember filing the brit -- writ.
23    Q.    Who first contacted you about filing a writ on behalf of
24    Mr. Alonzo?
25    A.    Someone in his family.
```

1    Q.    Someone in his family.

2          And did they bring to you documents that you used in

3    support of your petition -- or as a basis to file a petition?

4    A.    Yes.

5    Q.    Do you --

6    A.    I believe -- I believe they brought me Carl Hays' file.

7    Q.    Did they bring you any other documents?

8    A.    Transcripts maybe.

9    Q.    Was there anything -- any court records that you

10   obtained that were not obtained through -- any -- you

11   obtained independently from the family?

12   A.    I don't believe so.  I believe I had all the records.

13   Q.    And after you filed the petition did you keep any of

14   those records?

15   A.    I believe they were turned back to the family.

16   Q.    Do you have anything in your office that had been given

17   to you by the family in regards to this petition?

18   A.    I might.  We moved recently and we have a number of

19   boxes that are not in place, and I don't have -- couldn't

20   locate his file.

21   Q.    Would -- would those be -- if you do have them would

22   those be copies of things?

23   A.    They would be -- they would be -- I'm sure they would be

24   copies of things.  I'm sure my secretary would copy something

25   before giving it back.

1   Q.    And did you say you have -- you have had a chance to

2   review his petition recently?

3   A.    Briefly.  I glanced over it.

4   Q.    Within the last couple of days?

5   A.    Within the last couple of days.

6   Q.    Mr. Cox, do you recall us having a conversation maybe

7   three or four months ago --

8   A.    Yes.

9   Q.    -- in regards to this petition?

10  A.    Yes.

11  Q.    And do you recall my faxing you a document?

12  A.    Yes.

13  Q.    I'm going to show it to you.  It's actually

14  Defendant's -- it's Petitioner's Exhibit 1.  The stickers say

15  Defendant's.  I apologize for that, Your Honor.

16      I would like to show it to the witness, if I may

17  approach.

18          THE COURT:  You may approach.

19          THE WITNESS:  Yes.

20          MR. BIGGS:  And, Your Honor, this exhibit is

21  Detective Berry's police report dated June 27, I believe,

22  2001, in which he recounts a conversation with Priscilla

23  Rodriguez where she identified Licho Escamilla as the person

24  who shot Santos Gauna.  I think both parties stipulate to the

25  admissibility of that document.

```
 1              MR. MEADOR:  No objection.

 2              MR. BIGGS:  Move that it be admitted.

 3              THE COURT:  It is admitted.

 4    BY MR. BIGGS:

 5    Q.   Did you have a chance to review that document?

 6    A.   I have.

 7    Q.   Do you recall ever seeing that document prior to filing

 8    Mr. Alonzo's writ?

 9    A.   I do not.

10    Q.   Do you -- do you not recall whether or not, or you --

11    you do not think you saw it?

12    A.   I -- I don't think I saw it, because if I had seen it I

13    probably would have attached it to the writ, as an exhibit.

14              MR. BIGGS:  I have no further questions of this

15    witness.

16         Pass the witness.

17              THE COURT:  Any questions?

18              MR. MEADOR:  Oh, Yes, Your Honor.

19                        CROSS EXAMINATION

20    BY MR. MEADOR:

21    Q.   Hi, Mr. Cox.  My name is John Meador.

22         Regarding that particular document, so you've never seen

23    that before, prior to filing it?

24    A.   Filing a writ?

25         I don't believe so.
```

1   Q.   Right.   Okay.   Now, you did attach a document to the

2   writ from Priscilla Rodriguez; is that correct?

3        Do you recall that?

4   A.   I don't recall that, but if you say I did, I did.

5             MR. MEADOR:   Your Honor, may I approach?

6             THE COURT:   You may.

7             MR. MEADOR:   Your Honor, by the way, we've provided

8   a notebook.   I think you should have it.   I'm going to be

9   looking at tab 11.   Most of the documents in the notebook are

10  just record excerpts, they're not going to be exhibits per

11  se.   I just wanted to sort of maybe have something that you

12  could reference.

13            THE COURT:   Thank you.

14  BY MR. MEADOR:

15  Q.   Again, I'm on tab 11.

16  A.   Okay.

17  Q.   Do you recall that?

18  A.   Yes.   Part of my writ, yes.

19  Q.   That was part of your writ.

20       Okay.   As far as -- have you had a chance to read it?

21  A.   Not in several years.

22       Okay.

23  Q.   You've had a chance to read Mr. Biggs' Exhibit 1?

24  A.   Yes.

25  Q.   Would you say that in substance the -- the exhibit that

1    I just had you read and that exhibit are nearly identical?

2    A.    Yeah, they're pretty close.

3    Q.    And in both of those statements -- or both those -- I

4    guess statements by Priscilla Rodriguez, doesn't she say that

5    she gave a police report to Detective -- or at least had

6    spoken to Detective Berry on June 27th, 2001?

7    A.    She did.

8    Q.    Is there a particular reason why you didn't attempt to

9    discover or obtain that police report at the time?

10   A.    Well, I didn't know of the existence of it.  And I guess

11   that affidavit -- I thought that affidavit was sufficient.

12   Q.    Okay.  Are you familiar with the claim -- the

13   prosecutorial misconduct claim, a claim that might be

14   something like failure to correct misleading testimony?

15       An Napue or Giglio claim?

16       Does that sound familiar?

17   A.    No.

18   Q.    Also in your writ you had indicated that you had -- had

19   obtained this affidavit, the one that I just showed you from

20   Carl Hays' file.  Is that correct?

21   A.    I'm sure, yes.

22       MR. MEADOR:  Your Honor, I need to approach.

23   Sorry.

24   BY MR. MEADOR:

25   Q.    Do you remember when the trial -- trial date was?

```
1   A.   I think in early 2000s.

2   Q.   2003, February 2003, would that sound right?

3   A.   I guess so.

4   Q.   Okay.  Can you point out the -- the date this was

5   signed, the affidavit?

6   A.   February 11th, 2006.

7   Q.   And the 6 is penciled in, right?

8   A.   Yeah.

9   Q.   Or penned in, it's definitely been altered?

10  A.   Right.

11  Q.   Is it your testimony then that you got this document out

12  of Carl Hays' file some three years after --

13  A.   I had to have, yes.

14  Q.   Okay.  No other source?

15  A.   No other source.

16  Q.   Do you think Carl Hays would have continued to

17  investigate this case some three years after the murder trial

18  was over?

19  A.   I don't think so.

20         THE COURT:  Please speak up.

21         THE WITNESS:  I don't think so.

22         THE COURT:  Thank you.

23  BY MR. MEADOR:

24  Q.   And you had mentioned when Mr. Biggs' was talking to you

25  that you don't use only the documents that you receive from
```

1    the family.

2        How did -- how were you sure that you had everything?

3        Were you just relying on what the family --

4    A.    Yeah.  I mean, it looked like it was all in order to me.

5    It came, it was, you know, from another lawyer.  I assumed

6    that Mr. Hays would have all the files, since he was the

7    trial lawyer.

8    Q.    Now, if you had other documents would you have attached

9    them to your writ?

10   A.    Well, it depends on what other documents they are.

11   Q.    Okay.  At one point in your writ you had indicated

12   that -- that there was several witnesses that Mr. Hays failed

13   to -- to interview or bring into trial.  Do you recall that?

14   A.    I do recall that.  Some witnesses that were intimidated,

15   I believe.

16   Q.    In addition to other witnesses that could have -- that

17   were ready, willing, and able to -- sort of to testify.

18        Also at one point that you had said that you had

19   mentioned in your -- in the writ --

20            MR. MEADOR:  And, Your Honor, this is, again, tab

21   11.

22   BY MR. MEADOR:

23   Q.    Also contained in Mr. Hays' trial file was an assortment

24   of sworn affidavits.  Their affidavits are attached to this

25   memorandum as Exhibit H.

1    If you had more than one would you have attached them to

2    exhibit -- in exhibit -- Exhibit H?

3    A.    Probably.

4    Q.    Okay.  So if Exhibit H only had one affidavit, would

5    that have been the only one that you had?

6    A.    That's correct.

7    Q.    So when you used the word "affidavits" you were just

8    maybe using --

9    A.    Right.

10   Q.    -- the plural as opposed to the singular?

11   A.    Right.  Yes.  Maybe a typo.  I don't know.

12            MR. MEADOR:  I'll pass the witness.

13            THE COURT:  Any redirect?

14            MR. BIGGS:  Nothing further -- further from this

15   witness, Your Honor.

16            THE COURT:  All right.  Can the witness be excused?

17            MR. BIGGS:  Yes, Your Honor.

18            MR. MEADOR:  Yes, ma'am.

19            THE COURT:  All right.  Thank you very much.

20       Mr. Cox, you are excused.

21            THE WITNESS:  Thank you.

22            THE COURT:  Call your next witness.

23            MR. BIGGS:  Yes, Your Honor.

24       If we may approach and retrieve our exhibit.

25            THE COURT:  You may.

1     MR. BIGGS:  Your Honor, we'd like to call Carl Hays

2  to the stand.

3     THE COURT:  And just to verify, Mr. Hays, you were

4  in the courtroom when all of the witnesses were sworn in

5     THE WITNESS:  Yes, I was.

6     THE COURT:  Thank you.  Please speak up into the

7  microphone.  You may proceed.

8                    DIRECT EXAMINATION

9  BY MR. BIGGS:

10  Q.    Good morning, Mr. Hays.

11  A.    Good morning.

12  Q.    Have we met before?

13  A.    No, we have not.

14  Q.    Have we spoken on the phone a few times?

15  A.    Yes, we have.

16  Q.    And have you met with the State in regards to this case?

17  A.    I'm not sure I understand what you mean.

18  Q.    Have you had any meetings with Mr. Meador or Ms.

19  Kuykendall in regards to this -- this case?

20  A.    Yes, I have.

21  Q.    So are -- would it be fair to say you're familiar with

22  the allegations that we're here before the court today?

23  A.    Yes, I am.

24  Q.    Mr. Hays, you represented Mr. Alonzo in his state trial

25  for murder and aggravated assault; is that correct?

1   A.    That is correct.

2   Q.    And have you spoken or seen Mr. Alonzo since that time?

3   A.    No, I have not.

4         MR. BIGGS:  Permission to approach, Your Honor.

5         THE COURT:  You may.

6   BY MR. BIGGS:

7   Q.    Mr. Hays, I'm showing you Petitioner's Exhibit 1, which,

8   am I right, that you've already reviewed this document

9   before?

10  A.    Yes, I have.

11  Q.    And in that document Priscilla Rodriguez -- Detective

12  Berry recounted a meeting with Priscilla Rodriguez where she

13  identifies Licho Escamilla as the shooter of Santos Gauna?

14  A.    That's what the statement says, yes.

15  Q.    And would you agree that the core -- the heart and soul

16  of the defense for Mr. Alonzo was mistaken identification?

17  A.    Yes.

18  Q.    And would you agree that the defense was calculated to

19  laying the blame at the feet of Licho Escamilla?

20  A.    Actually, when we first took the case it was Frank

21  Hernandez, it was another person.  And, yes, both of those

22  people were supposedly the shooter.

23  Q.    But-- But at the trial itself we didn't -- you didn't

24  talk about Frank Hernandez, am I right?

25  A.    No, we did not.

1    Q.    Mainly relied on pinning it on Licho Escamilla?

2    A.    That's correct.

3    Q.    Do you ever recall seeing that document?

4    A.    I cannot say one hundred percent sure whether I saw that

5    document or not.  I don't remember seeing that document.

6    Q.    Given the -- that Mr. Escamilla was the person that we

7    were -- Mr. Alonzo was trying to blame the murder on, don't

8    you think you would have remembered if you had come across a

9    document where someone else identifies Licho Escamilla as the

10   person who shot Santos Gauna?

11   A.    No, I would not.

12   Q.    You do not think you would -- that would not -- that

13   would not stick out in your mind?

14   A.    No, it would not.

15   Q.    Someone that -- evidence if true, if believed, would

16   completely exonerate Mr. Alonzo?

17         You would not have noticed that if you had come across

18   it?

19   A.    It probably would not have stood out, because I had been

20   told that there were at least 20, 25 people, that would say

21   that Mr. Escamilla did the shooting, and when I talked with

22   those people they were not able to verify that.

23         So, no, that would not have stood out, because I had

24   talked to, as I said, at least 20, 25 people that told me the

25   exact same thing.

1  Q.    You're saying you talked to 20 to 25 people that had

2  based their statement on rumors, is that -- is that a fair

3  statement?

4  A.    No, not necessarily rumors.  I had talked to at least 15

5  to 20 witnesses that told me that Licho Escamilla did the

6  shooting.

7  Q.    But did any of those witnesses tell you that you -- that

8  they saw Licho Escamilla shoot Santos Gauna?

9  A.    Some of them did, yes.

10  Q.    And you just regarded those witnesses as not credible?

11  A.    Their stories contradicted each other or either they

12  were not in the position based on the other evidence that was

13  available to be credible.

14  Q.    But a statement to a detective identifying Mr. Escamilla

15  out of a photo lineup, I mean, you would agree that the --

16  that that did occur, would you not, based on that document?

17  A.    According to the statement, yes.

18  Q.    Wouldn't that have brought to your attention that

19  someone had actually picked Licho Escamilla out of a photo

20  lineup as the person who shot Santos Gauna?

21  A.    What's your question?

22  Q.    My question is:  That would have -- coming across that

23  document, that would have been something that distinguished

24  that document from the testimony of other witnesses that said

25  they had maybe or seen or not seen Licho Escamilla shoot

1    Santos Gauna.

2    A.    Not in my opinion, considering the number of people that

3    had told me the exact same thing.

4    Q.    Do you think it's possible that you did not receive that

5    document?

6    A.    That's possible.

7    Q.    But -- and it's also possible that you did have the

8    document but didn't think twice about it?

9    A.    That's also possible.

10    Q.    You just don't -- you don't remember?

11    A.    I don't remember seeing this document.

12    Q.    And do you remember ever having a conversation with your

13    investigator about that document or about -- about Priscilla

14    Rodriguez identifying Licho Escamilla to a police detective?

15    A.    I had a -- a conversation with the investigator about

16    Priscilla Rodriguez, as well as I did 15 to 20 other

17    witnesses that had stated they saw someone else do the

18    shooting other than Quintin Alonzo.

19        I don't recall specifically discussing this document

20    with him.   I do know we did discuss Priscilla Rodriguez and

21    the fact that it was conveyed to us that she had made such a

22    statement.

23    Q.    Well, you agree though during trial when Detective Berry

24    said on the stand -- perjured himself on the stand and said

25    no witness had identified Licho Escamilla as the person who

1   shot Santos Gauna, that that would be a false statement based

2   on that document?

3   A.   It -- apparently.

4   Q.   And that would be something that you would want to

5   object to, would it not?

6   A.   Yes.   Absolutely.

7   Q.   The prosecutor -- at least the detective, committed

8   perjury?

9        MR. MEADOR:   Your Honor, that calls for a legal

10   conclusion.   That's not established.

11        THE COURT:   Sustained.

12   BY MR. BIGGS:

13   Q.   But said something on the stand that was affirmatively

14   false, that no one had identified Licho Escamilla as the

15   shooter, you agree that that would be something to object to?

16   A.   If that were true, yes.

17   Q.   If it were true -- if what were true?

18   A.   If the officer knew at the time that he made that

19   statement, then yes.

20   Q.   And if you had the document in your possession and you

21   were aware of it, that would -- that would be something you

22   could object to, his testifying that no one else had done

23   so?

24   A.   Sure.

25   Q.   And it could be something that you could impeach

1   Detective Berry on as well, am I correct?

2   A.   That's true.

3   Q.   In addition to objecting you could also have impeached

4   him with that?

5   A.   That's true.

6   Q.   And at closing argument that would be something that you

7   could have raised to the jury.   Am I correct?

8   A.   That's correct.

9   Q.   And it would not only be a statement that completely

10   exonerates Mr. Alonzo, exculpatory evidence, but also

11   evidence that shows that Mr. Berry affirmatively lied on the

12   stand, am I right, that would be something that you could

13   mention at closing argument?

14   A.   Your question said something about exoneration.   I don't

15   think that standard alone would constitute exoneration.

16   Q.   Would you agree though the statement would be more than

17   just exculpatory, that it would also suggest that the

18   prosecution had been -- had been affirmatively misleading the

19   jury?

20   A.   If he were aware of the statement, yes.

21   Q.   Well, if he were aware of what statement?

22   A.   The Priscilla Rodriguez statement.

23   Q.   But under either -- whether he was aware of it or not,

24   it's misleading to the jury since it did in fact happen, am I

25   right?

1  A.   If the officer said he had not taken the statement, then

2  yes.

3  Q.   Whether or not he's aware of it, it's false.

4  A.   I can't say that, because I would have to go into the

5  mind of the officer.  I don't know what he was thinking at

6  the time.  I -- I know --

7  Q.   But --

8  A.   -- I specifically asked him that question and -- that's

9  just like if you ask me a question about something that

10  happened yesterday, I may not remember.  I don't know.  I

11  can't say.  I can't speak for him.

12       MR. BIGGS:  Your Honor, I --

13  BY MR. BIGGS:

14  Q.   I mean, Mr. Hays, I'm not speaking in terms of his

15  awareness of the truthfulness of his statement.

16       I'm saying objectively it is a false statement that no

17  one else had identified Licho Escamilla as the shooter, that

18  one had identified Licho Escamilla, that is an objectively

19  false statement given that document.  Is that right?

20  A.   According to the document, yes.

21  Q.   Whether or not he's aware of it, it's --

22       MR. MEADOR:  Your Honor, this has been asked and

23  answered.

24       It's also leading.

25       THE COURT:  It has been asked and answered.

1    BY MR. BIGGS:

2    Q.    But, as -- as -- as I was indicating, do you agree

3    though at -- at closing argument --

4              MR. MEADOR:   Object to leading.

5              MR. BIGGS:   Your Honor, this whole proceeding is

6    about whether or not Mr. Hays was ineffective.   Necessarily I

7    would say a hostile witness, someone that we're going to have

8    to -- to lead to explore any testimony at all.

9              THE COURT:   Well, you haven't really demonstrated

10   that he's hostile to you yet, so let's -- the objection is

11   sustained.

12   BY MR. BIGGS:

13   Q.    All right.   Well, let me ask a more general question

14   then.

15        What could you have argued about that document to a jury

16   at sentencing -- I mean at closing argument?

17   A.    That if in fact the officer was aware of it when he

18   testified that I could argue that he was not truthful.

19   Q.    That he was not truthful?

20   A.    That's if he was aware of that document when he answered

21   the question no.

22   Q.    And if he wasn't aware of it, then what?

23   A.    Then he wouldn't have been lying.

24   Q.    And it would -- it would have been a true statement if

25   he was not aware of it?

1    A.    I didn't say that.

2    Q.    Okay.  Well, what would be the significance of the

3    statement if he hadn't been aware of it to a jury when they

4    say that no one had identified anyone else?

5          Whether or not they're aware of it do you need to -- is

6    that something to -- to bring out at closing argument?

7    A.    I'm not sure I understand your question.

8    Q.    My question is:  Does it really change the need to bring

9    out this testimony whether or not you can show that Detective

10   Berry was aware of this statement?

11         Does it change the false -- the falsity of the

12   statement?

13   A.    No.

14   Q.    How many witnesses did you call at trial that

15   eyewitnessed the shooting and said Licho Escamilla shot

16   Santos Gauna?

17   A.    I don't recall.

18   Q.    Do you remember calling any witnesses -- any witnesses

19   that identified Licho Escamilla as shooting Santos Gauna?

20   A.    I don't recall.

21   Q.    Would you -- would you disagree if I said that it was

22   zero?

23   A.    No, I would not disagree.

24   Q.    Do you recall making a pretrial motion -- an omnibus

25   pretrial motion where you basically requested all Brady

1   material or anything that could be exculpatory to Mr. Alonzo?

2   A.   Yes, I do.

3         MR. BIGGS:   May I approach the witness, Your Honor?

4         THE COURT:   You may.

5   BY MR. BIGGS:

6   Q.   Let me show you Petitioner's Exhibit 4.

7   A.   Yes, sir.

8   Q.   Does that appear to be the document you filed?

9   A.   Yes.

10        MR. BIGGS:   Your Honor, I would move for

11  Petitioner's Exhibit 4 to be admitted into evidence.

12        MR. MEADOR:   No objection.

13        THE COURT:   Petitioner's 4 is admitted.

14  BY MR. BIGGS:

15  Q.   On that filing date does it say January 17th, 2003.

16       Maybe it's January 16th.

17  A.   January 16th, 2003.

18  Q.   And that was approximately two to three weeks before

19  trial.  Is that -- is that right?

20  A.   Yes, sir.

21  Q.   When were you appointed -- or when were you retained for

22  this case?

23  A.   It was pretty much a pro bono representation.  I was not

24  paid, so . . .

25       I probably first met with Mr. Alonzo 2001, the summer of

1    2001.

2    Q.    And do you think that it was a little late in the game

3    to be asking for Brady material?  Just a few weeks before

4    trial?

5    A.    No.

6    Q.    After a year and a half of this percolating?

7    A.    I pretty much had everything that the prosecutor gave me

8    prior to filing the motion.

9         Filing the motion was pretty much just a formality to

10   make sure that our -- those things that he had not given me

11   would be on record.

12   Q.    So when did the first -- when did the prosecution turn

13   over any documents to you?

14   A.    I can't say for sure, but the normal practice is shortly

15   after we notified the prosecutor that we were on the case.

16   That's the normal practice.

17   Q.    Do you recall receiving those document in 2001?

18        If this case occurred in 2003 --

19   A.    Normally we would receive those documents at the first

20   or second setting, so that probably would have been -- I

21   don't think this case was actually in court until 2002,

22   because there was a period of time that Mr. Alonzo was -- I

23   mean Mr. Alonzo was a fugitive.  I don't recall exactly when

24   he was arrested.  But I don't think we started doing any work

25   on the case until 2002.

1    Q.    And do you recall when you received documents?

2    A.    No.

3    Q.    Do you recall what documents you received at that time?

4    A.    I had received the probable cause affidavits, police

5    reports, and things of that nature.

6    Q.    Did you receive -- at this time was Dallas County an

7    open file system?

8          Are you familiar with the open file policy?

9    A.    Dallas County in my opinion is still not an open file

10   system.

11   Q.    And what is your understanding of an open file policy?

12   A.    Well, I do some practice in Tarrant County, where

13   everything that's -- the prosecutor has is available to the

14   defense.  In Dallas County that's not the case.

15   Q.    And what -- what does that include?

16         What kind of things would Dallas County not provide you?

17   A.    It varies.  It would depend on who the prosecutor is.

18         Some prosecutors will give you everything, some

19   prosecutors will not unless you actually file motions for

20   those things you need.  Most prosecutors will.

21   Q.    Among those prosecutors that don't provide you

22   everything, what kind of things would they not provide you?

23   A.    Exculpatory evidence, witness list, things of that

24   nature.

25   Q.    What kind of documents -- assume -- even after you filed

1    your pretrial motion, what kind of documents may a prosecutor

2    withhold from a defense attorney in a -- in a county that

3    does not have an open file policy?

4    A.    I'm not aware of anything other than its work product.

5    Q.    What about police reports?

6    A.    No.  I've always gotten police reports.

7    Q.    You've always gotten every police report?

8    A.    I can't say that, because I don't know.

9          In most cases I get the police report.  I don't recall a

10   situation where there was a police report withheld.

11   Q.    But are you -- are you relying -- I mean, you're not

12   independently obtaining police reports, are you?

13   A.    Well, Dallas County has had for most of my career a

14   policy of putting the police report in the file, the probable

15   cause affidavit and the police report.

16   Q.    And at the time was that the case in 2003, 2002, 2001?

17   A.    Yes.

18   Q.    And is it your understanding that contains every

19   document generated by the police department --

20   A.    No.

21   Q.    -- in regards to a case?

22   A.    I can't say that.

23   Q.    And -- and you're not -- do you obtain documents

24   independently of the prosecutor's office?

25   A.    Yes.

1   Q.   And I -- and I should be more specific:   Police reports?

2   A.   Yes.

3   Q.   How else do you go about obtaining police reports?

4   A.   They're generally in the court's file.

5   Q.   In the court's file?

6   A.   Yes, sir.

7   Q.   Okay.   Other than from the court or the prosecutor, is

8   there anywhere else you obtain police documents for cases?

9   A.   There have been times when I would actually subpoena the

10  custodian of records for the police department.

11  Q.   Would you have done that in around this time, 2001,

12  2002?

13  A.   I don't recall.

14  Q.   Is that something you do now?

15  A.   It depends on the case.

16  Q.   Would you have done that back then?

17  A.   I don't recall.

18  Q.   So you had obtained some documents prior to actually

19  filing the motion requesting Brady material?

20  A.   That's correct.

21  Q.   But you don't -- you do not remember when, am I correct

22  about that?

23  A.   No, I don't.

24  Q.   Do you remember --

25  A.   It would probably have been early 2002.

1   Q.   I'm sorry, I didn't mean to speak over you.

2   A.   It probably would have been early 2002.

3   Q.   And I think I might have asked you, but I can't -- I

4   can't recall you -- you answering.

5        What documents do you remember obtaining from the

6   prosecutor at that time, prior to filing this motion sometime

7   in 2002?

8   A.   I believe I received the police report, some witness

9   statements.  I don't recall exactly what all.

10  Q.   Would you have received supplements to -- to police

11  reports?

12  A.   I don't recall.

13  Q.   Do you think -- would you agree that "police report" is

14  a pretty general statement?

15  A.   Some are.  Some are very specific.

16  Q.   But it may not -- when you refer to a police report,

17  some may say a police report is sort of the -- the bare bones

18  of an -- of an investigation, while others would say it's

19  every document generated by the police department in regards

20  to a certain case.

21       Am I right about that?

22       That people would categorize police reports differently?

23  A.   Correct.

24            MR. BIGGS:   May I approach, Your Honor?

25            THE COURT:   You may.

```
 1    BY MR. BIGGS:

 2    Q.    I'm going to show you Petitioner's Exhibit 2.

 3          This is a document that I recently received from the

 4    respondent, but I believe it's from the prosecutor's file,

 5    noting things that were turned over to you on 1/16/2003.

 6          Does that appear to be your signature?

 7    A.    It does appear to be my signature.

 8    Q.    And what -- what items are identified on there as having

 9    been turned over to you?

10    A.    You want me to read the whole list?

11    Q.    Just on the first page.

12    A.    Prosecution report.

13          Autopsy report.

14          P and S report.

15          Supplement 1 SWIFS report.

16          Ballistic report.

17          Report supplement number 4 SWIFS report.

18          Report supplement number 3 SWIFS report.

19          DNA.

20          DNA supplement.

21          Trace clothing.

22          And looks like housings (sic).

23    Q.    Do you remember receiving those documents?

24    A.    I remember receiving a package from the prosecutor.

25    Q.    Do you remember -- do you remember receiving a package
```

1  from the prosecutor on that day, several weeks before trial?

2  A.   I can't remember exactly what day it was, but I do know

3  he turned over a package to me.

4  Q.   And those were -- but were those documents additional to

5  what you had received already?

6  A.   I believe they were.

7  Q.   Do you recall looking through each of those documents?

8  A.   Not at the time that he gave them to me, no.

9  Q.   When did you look through them?

10  A.   Probably when I got back to the office.

11  Q.   And did you give everything that was turned over to you

12  over to Mr. Rosa, your investigator?

13  A.   Yes.

14  Q.   Would he have had an opportunity to review everything in

15  your file?

16  A.   Yes.

17  Q.   Would he have had -- would he have had an opportunity to

18  review everything in your file throughout this -- preparing

19  for this case?

20  A.   There were a number of meetings with Mr. Rosa and there

21  were a number of times he reviewed the file.  He would make a

22  report, I would make his report a part of the file.

23       So, yes, he had an opportunity to review the file.

24  Q.   When you spoke with Mr. Alex did he identify material as

25  potential Brady material or did he just give you the whole

1    pile of documents?

2    A.    He gave me a package.   We didn't discuss the package.

3    He just gave me a package.

4          As a matter of fact, I don't even remember whether he

5    was there or not.   I think he left the package for me.

6    Q.    Was it your understanding that that document was made in

7    response to your request for Brady material, et cetera, in

8    your omnibus trial motion?

9    A.    I'm not sure.

10   Q.    It wasn't -- but I believe you picked -- if that's

11   correct you picked that document -- those documents up the

12   day of you filed the motion.

13   A.    I'm not sure.   I don't -- I don't recall.

14   Q.    But do you agree you did pick the documents up the day

15   after you filed the motion, according to those documents?

16   A.    I'm not sure when I picked the documents up.   I picked

17   the documents up, but I'm not sure what -- as to what date.

18   Q.    But do you have any reason to believe that's wrong when

19   it says that you picked them up on 1/17/03?

20   A.    No, I don't have any reason.

21   Q.    Mr. Hays, I want to draw your attention to some

22   testimony, the transcript from the trial immediately before

23   the trial began.   I believe it was after voir dire.

24              MR. BIGGS:   If I may approach, Your Honor?

25              THE COURT:   You may.

1  BY MR. BIGGS:

2  Q.    Petitioner's Exhibit 5.

3          MR. BIGGS:  Your Honor, I believe that the

4  respondent doesn't have any dispute of the authenticity of

5  the state transcripts.  Am right?

6          MR. MEADOR:  That's correct.

7          MR. BIGGS:  Or the prosecution letter.

8      So I would move for Exhibits 2 and 5 to be admitted.

9          MR. MEADOR:  No objection.

10          THE COURT:  No objection.

11      2 and 5 are admitted.

12  BY MR. BIGGS:

13  Q.    If you would take a moment just to move through those

14  few pages?

15      Mr. Hays, have you had a chance to review the

16  transcripts or do you need a few more minutes?

17  A.    I'm still reading it.  (Pause.)

18      Okay.

19  Q.    And have you had a chance to review the transcript?

20  A.    Yes, sir.

21  Q.    And in the transcript, this is immediately prior to the

22  trial commencing, you state on the record that you've been --

23  you were promised by the State that I would be permitted to

24  review the detective's notebook, at this point I have not

25  reviewed that notebook.

1        What notebook is that in regards to?

2   A.   I was concerned that there had been some notes made by

3   the detective that had not been turned over to us, so those

4   were the notes that I was -- I was referring to.

5   Q.   What had been the basis for your concern?

6   A.   I was just concerned that there may have been something

7   that we didn't have.

8   Q.   Do you -- At the time -- this was immediately prior to

9   trial you say that you had not reviewed the notebook.  Is

10  that right?

11  A.   Not the officer's personal notes, no, I had not.

12  Q.   This is Detective -- Detective Berry's notebook; is that

13  correct?

14  A.   That's correct.

15  Q.   Do you recall reviewing the notebook?

16  A.   No, I do not.

17  Q.   Do you know -- YOU don't know whether you ever reviewed

18  the notebook?

19  A.   I don't remember.

20  Q.   But it's possible you never actually took a look at the

21  notebook?

22  A.   That's possible.

23  Q.   And Mr. Alex states on the record that -- in reference

24  to the notebook that it has nothing to do -- this is on page

25  11, it has nothing to do with the exculpatory notion because

1  I believe everything that's exculpatory has been turned over

2  to counsel.

3       Was it your understanding that nothing in that notebook

4  would have -- could have been exculpatory?

5  A.   I wouldn't know, unless I saw the notebook.

6  Q.   But at the time of this proceeding were you -- were you

7  under the under -- impression that everything that was

8  exculpatory had been turned over to you?

9  A.   That's what was represented to me.

10 Q.   That was what was represented to you.

11      And did you believe that to be true?

12 A.   I had no reason not to believe it to be true.

13 Q.   And it was your understanding that nothing in that

14 notebook was exculpatory?

15 A.   That's what was represented to me.

16 Q.   And did you believe that?

17 A.   I had no reason not to believe that at the time.

18 Q.   Had they told you something was exculpatory in there, do

19 you think you would have taken a look at the notebook?

20 A.   What was the question?

21 Q.   Had they told you that something was exculpatory in the

22 notebook, would you have taken a look at the notebook?

23 A.   Absolutely.

24      MR. BIGGS:  May I have a moment, Your Honor?

25      THE COURT:  You may.

1  BY MR. BIGGS:

2  Q.   Mr. Hays, I'd now like to direct you to your trial file,

3  which you provided to me.

4       MR. BIGGS:  If I may approach, Your Honor?

5       THE COURT:  You may.

6  BY MR. BIGGS:

7  Q.   I'm going to just go ahead and bring the whole binder up

8  here, since it's quite a few documents.

9       Did you bring your trial file with you today?

10 A.   Yes, I did.

11 Q.   Do you have it up there at the stand with you?

12 A.   Yes.

13 Q.   Okay.  I'm going to show you the trial file you sent me

14 and let you take a look at it and confirm that the two

15 documents are the same, that everything in your file was

16 given to me.

17      So I'm --

18      MR. BIGGS:  If I may approach, Your Honor?

19      THE COURT:  You may.

20 BY MR. BIGGS:

21 Q.   It's tab 9.

22 A.   If you want me to do this, this is going to take a

23 considerable amount of time.  There are a lot of documents in

24 there, so I don't know . . .

25 Q.   Well, I'm just -- do you recall providing the same

1    documents to me, everything in your file?

2    A.    Yes, sir.

3    Q.    Provided to me?

4    A.    Yes, sir.

5    Q.    Do you want to just take a quick look just to confirm

6    that nothing has been altered in this -- this exhibit?

7    A.    Again, that would take a considerable amount of time.

8    Q.    Well, I'm going to need to --

9    A.    If you tell me specifically what you're looking for --

10   Q.    Well, you know, it's about admitting this document --

11         MR. BIGGS:  Will you stipulate to the authenticity

12   of this trial file?

13         MR. MEADOR:  Your Honor -- Which tab is it?

14         MR. BIGGS:  This is tab 9.

15         MR. MEADOR:  I think Mr. Hays' concern is -- I

16   don't know if -- are you asking him whether he wants to

17   compare it page by page?

18         THE COURT:  I understand Mr. Hays' concern.

19      Can you be a little more specific?

20         MR. BIGGS:  My concern is just authenticating the

21   document provided to me as being his trial file.

22         THE COURT:  Are there specific documents within the

23   trial file that you want to ask him about?

24         MR. BIGGS:  Eventually, yes.

25         THE COURT:  Why don't we start with those.

 1          MR. BIGGS:  All right.

 2          THE COURT:  And maybe at a break you can have him

 3    compare it.

 4    BY MR. BIGGS:

 5    Q.    Mr. Hays, you do have your original file there; is that

 6    correct?

 7    A.    Yes.

 8    Q.    Within that file do you have a document -- the document

 9    we spoke of earlier where Detective Berry's report -- where

10    Priscilla Rodriguez identifies Licho Escamilla as being the

11    shooter?

12          Is that contained in your file?

13    A.    No, it's not.

14    Q.    It's not in your file.

15          You know that for a fact.

16    A.    If it's in there, it was given to me afterwards.

17          It was not in there when I first was asked to give you a

18    copy of it.

19    Q.    Okay.  So it certainly wouldn't be in the copy you gave

20    to me?

21    A.    If I did give you a copy, it was a copy that someone had

22    given to me after.

23    Q.    Right.  And you know for a fact that prior to this

24    proceeding you did not have that document in your file.

25    A.    My file was given to Mr. Alonzo's mother to make copies

1   of.   There's a number of documents that are missing, so I

2   can't say one hundred percent sure that that document was not

3   there.   It was not there when I reviewed it for this hearing.

4   Q.   Could you please recount the circumstances surrounding

5   Mrs. Alonzo obtaining a copy of your file?

6   A.   What specifically are you asking?

7   Q.   I'm asking:   When did she contact you?

8   A.   She made contact with me sometime probably in 2003.

9        And I explained to her that she needed to pay to have

10   the copies made.

11        She called back again and said that she didn't have to

12   pay to have the copies made.

13        I told her I was not charging her for the file, but I

14   did feel that I should be paid to make the copies.

15        She apparently contacted, I don't know if it was the

16   Attorney General's office or someone and said that I refused

17   to give her the file.   That was not the case.   I told her she

18   would have to pay for the copies.   I had not been paid for

19   the representation.   I most certainly wanted to get paid if I

20   was going to go out and make these copies.

21        So finally she -- there was -- there was a period of

22   time when I couldn't contact her, because I don't think she

23   had a phone, so I would call and leave messages for her, I

24   believe it was her father.   And I finally left a message that

25   she could come over and copy the file.

1    Q.    Where did she -- and did you -- did you give her the

2    file, the original file?

3    A.    I don't recall if I personally gave her the file or my

4    office manager gave the file, but she did sign a statement

5    that she had received the file.

6    Q.    Okay.   And she didn't just receive a copy of the file?

7    A.    I don't recall.

8    Q.    Do you recall whether you had made copies or -- or

9    someone in your office had made copies for her of the file?

10   A.    I don't recall.   I was in trial at that time.   I know

11   that I was not there, I don't think, when she came to pick up

12   the file.   I -- I just don't recall.

13   Q.    Do you know -- I mean, did she -- you don't know one way

14   or the other whether she took your original file for any

15   period of time?

16   A.    I don't recall that.

17   Q.    But is it possible that someone on your staff just made

18   copies of all the documents and that she picked those up?

19   A.    That's a possibility.

20   Q.    And you said that there are some files missing.

21   A.    Yes, sir.

22   Q.    What -- what documents do you know are missing from the

23   file?

24   A.    I know that there were some medical reports that are

25   missing.   There was some of the reports that was given to me

1    by my investigator that are missing.  So I know those

2    documents are missing.

3    Q.    And when did Ms. Alonzo -- Ms. -- I'm sorry, Ms. Vazquez

4    come pick up those documents?

5    A.    According to my records she picked them up on April

6    21st, 2005.

7    Q.    And had you taken a look at that file between the trial

8    and 2005?

9    A.    No, I had not.

10   Q.    When did you first take another look at this file to

11   determine that some documents were missing?

12   A.    Probably when you made a request for it.

13   Q.    And when I made a request did I offer to come and take

14   the file and make copies for you?

15   A.    Yes, you did.

16   Q.    And did you decide instead to just make copies of the

17   file and send them to me?

18   A.    I had a staff member do that, yes.

19   Q.    What conversations do you remember having with your

20   investigator about Priscilla Rodriguez?

21   A.    We had several meetings.  Prior to my having an

22   investigator appointed to this case I had several meetings

23   with Mrs. Vazquez, Mr. Alonzo's mother, and at each meeting

24   she promised she would have a number of witnesses there that

25   would exonerate her son.  No witnesses ever showed up.  We

1     had several meetings.

2         We finally went to the point of actually opening the

3     office on weekends, because she thought maybe if I was

4     available on weekends she could get the witnesses there.   No

5     witness showed up.

6         So we got the court to appoint an investigator.   The

7     investigator went out with her on several occasions to locate

8     witnesses.

9         He came back with a list of witnesses, one being

10    Priscilla Rodriguez.   And he indicated to me that he could

11    not locate her, because I believe she was living with her

12    grandmother at the time.   The grandmother was not very

13    cooperative, wouldn't give him any information on her.

14        But he was able to through his investigation find out

15    that she was incarcerated in Galveston, Texas.   So I believe

16    after she was released he went back again to try to locate

17    her and was never able to locate her.

18        He gave me the number to the grandmother's home.   I did

19    call the grandmother.   I believe her name was Rosa Rodriguez.

20    Ms. Rodriguez indicated to me that she didn't know where the

21    grandmother was.   She did not want me calling there anymore.

22    She did not want her granddaughter to have anything to do

23    with Mr. Alonzo because he was bad news.

24    Q.   Were you -- is it fair to say that you were relying on

25    Mr. Rosa to find Ms. Rodriguez?

1  A.    Not totally, because once I discovered that she was

2  incarcerated I obtained a subpoena and issued a subpoena to

3  have her present at his trial.

4       She was a juvenile at the time, so there's a special

5  procedure you have to go through.  I had to subpoena the

6  director of the facility where she was located.  And he

7  indicated to me that issuing a subpoena to her would

8  apparently not follow proper procedure, so I had to issue a

9  subpoena to him.  We did issue that subpoena.  He called me

10 back and said she was released the same day that he got the

11 subpoena.

12      So that's when we went back and relied on Mr. Alonzo --

13 I'm sorry -- Mr. Rosa to try to locate her.

14 Q.    Okay.  And what time period was that when she had been

15 released?

16 A.    It was -- I'm -- I'm not sure.

17      I can look at the subpoena and tell you when the

18 subpoena was issued.

19      Her subpoena was issued on the 10th day of June, 2002.

20 Q.    And at that time it was your understanding that she had

21 been incarcerated?

22 A.    That is correct.

23 Q.    And that was after a conversation with the warden; is

24 that correct?

25 A.    That's correct.

1  Q.   And he told you that a subpoena directly to her could

2  not issue; is that correct?

3  A.   It was some special procedure, because she was a

4  juvenile that I had to go through some special procedure --

5  some special procedure to get her subpoenaed, so I should

6  subpoena according to his instructions.

7  Q.   So you -- you did undertake the special procedure for

8  her?

9  A.   Yes.

10  Q.   And -- but you were not able to execute it because she

11  had left the day before you were going to serve it; is that

12  correct?

13  A.   The day the subpoena arrived it's my understanding in

14  talking to the warden that she had been released.

15  Q.   Now, was the only reason for a special procedure because

16  she was incarcerated in juvenile detention?

17  A.   I believe the fact that she was a juvenile, yes.

18  Q.   So did you after that proceed to issue a normal, regular

19  subpoena that you would to juveniles not incarcerated?

20  A.   No, we did not, because we didn't know her location.

21       After she was released we were unable to find her.

22  Q.   And is it your understanding that a criminal subpoena in

23  Texas is a statewide subpoena, there's no mileage

24  restrictions?

25  A.   Yes.

1  Q.    And no subpoena, you got -- you obtained no more

2  additional subpoena for Priscilla Rodriguez in the eight

3  months between when she was released and the trial; is that

4  correct?

5  A.    We had no address on her.

6  Q.    Is it required that you have an address in state court

7  for a subpoena to issue?

8  A.    I think we would have to know -- I mean give some

9  directions as to where she is.  I mean, I couldn't just issue

10  a subpoena without --

11  Q.    Is it required under state law that an address be

12  provided for someone?

13  A.    I don't know whether it is or not, but I doubt if you

14  would get a subpoena served if you didn't have an address.

15  Q.    Can you subpoena someone from their last known address?

16  A.    Absolutely, but it -- I did that and it came back,

17  unserved.

18  Q.    Could you provided the address of the grandmother's

19  house where she had previously been living?

20  A.    I could have, but in my opinion it would have been a

21  waste of time because she was not there.  At least we were

22  told she was not there.

23  Q.    Did Mr. -- did Mr. Rosa undertake any additional --

24  additional measures to find Priscilla Rodriguez subsequent to

25  her release from incarceration?

1   A.   No.   Once he reported to me that she was incarcerated,

2   then I -- I took over and issued the subpoena.

3   Q.   And after you were not able to execute the subpoena,

4   were any additional steps taken to find her?

5   A.   Yes.   I believe Mr. Rosa went out several times trying

6   to find her.   I made phone calls personally trying to locate

7   her.

8   Q.   And this would have been prior to receiving the material

9   from the State after your omnibus pretrial motion; is that

10   right?

11   A.   Yes.

12   Q.   In the interregnum between then and June and January

13   '03, June '02 and January '03?

14   A.   I'm sorry?

15   Q.   In the interregnum between June '02 and January 2003 you

16   took additional steps to locate Ms. Rodriguez?

17   A.   Yes, we did.

18   Q.   And did you have any notion that she had identified a

19   witness to a detective -- she had identified Licho Escamilla

20   as the shooter to a police detective?

21   A.   She was among the 20 or 30 other witnesses that I had

22   been told would say that, so she didn't stand out as any

23   particular -- for any particular reason, because we had been

24   given a list of, as I said earlier, at least 15 or 20 that

25   would say that someone else did the shooting.   So her name

1    was, in my opinion, like the rest of 'em.

2    Q.    Well, were the names -- were the other names people that

3    actually had personal -- that claimed to have personal

4    knowledge of the shooting?

5    A.    Initially, yes.

6    Q.    So among those 15 or 20 some said they actually saw it

7    and that Licho Escamilla shot --

8    A.    They either saw him do the shooting or they saw Mr.

9    Alonzo at the time of the shooting.

10   Q.    And some of -- and you're saying -- and your testimony

11   is that some of those witnesses said -- or you heard rumors

12   that they said they personally witnessed the shooting of

13   Santos Gauna?

14   A.    Yes.

15   Q.    And but for those witnesses -- do you recall which

16   witnesses that -- those are?

17   A.    I was initially told that Ashley Martinez, Priscilla

18   Rodriguez, Francisco Perez, Lucy Montoya, Alex Tovar, Sandra

19   Tovar, Tony Garza, Joe Martinez, Juan Lucio, Antonio Garza,

20   Alex Torres, Edward Guzman.

21   Q.    What list were you reading from there, Mr. Hays?

22   A.    This was a list of witnesses that I had been told

23   initially that either saw who did the shooting or saw Mr.

24   Alonzo at the time of the shooting.

25   Q.    And who was this list given to you?

1   A.   I'm sorry?

2   Q.   Who gave you this list?

3   A.   Mrs. Vazquez.

4   Q.   Mrs. Vazquez provided you those names?

5   A.   Not necessarily.  She didn't give me a list.  These were

6   people we had discussed.

7   Q.   Did any of those witnesses actually give a statement to

8   a police officer identifying Mr. Escamilla out of a photo

9   lineup?

10   A.   No, I don't believe so.

11   Q.   And it's your testimony that you can't remember whether

12   or not you received a document from a witness who identified

13   Mr. Escamilla out of a photo lineup to a police detective?

14   A.   No, I cannot.

15   Q.   You cannot recall whether or not you ever saw this

16   (indicating) document?

17   A.   That is correct.

18   Q.   And seeing -- seeing this document even now, this would

19   not make Priscilla Rodriguez stand out as a witness to you

20   from all the other witnesses?

21   A.   For impeachment purposes, yes, but for the -- the

22   truthfulness of that statement, no.

23   Q.   But do you have -- did you ever actually speak to

24   Priscilla Rodriguez?

25   A.   No, I have never talked to Priscilla Rodriguez.

1    Q.    So how were you able to determine that she wouldn't have

2    been credible?

3    A.    Because of the other 20, 25 witnesses that I talked

4    to.

5    Q.    But those people -- you agree those aren't the same

6    people as Priscilla Rodriguez?

7    A.    I'm sorry?

8    Q.    That's not the same person as Priscilla Rodriguez.

9    A.    Her name was given with the other 20 or 25 people that I

10   did talk to.

11   Q.    So you're assuming that because the other witnesses

12   didn't pan out that Priscilla Rodriguez wouldn't have panned

13   out either?

14   A.    That's a fair assumption.

15   Q.    I mean, what other basis would there be to conclude that

16   Priscilla Rodriguez did not have reliable information?

17   A.    Well, we had spent a considerable amount of time talking

18   to witnesses that I was told saw something, after reviewing,

19   going through all those witnesses and then discovering they

20   really did not, throwing another name in the hat didn't

21   impress me.

22   Q.    But that's based on having interviewed the other

23   witnesses?

24   A.    Mainly, yes.

25   Q.    There's no independent basis for that with regard to

1   Priscilla Rodriguez?

2   A.    No.

3   Q.    And did you -- and you never actually spoke with

4   Priscilla Rodriguez?

5   A.    No.

6   Q.    Did you ever speak to anyone in -- in Priscilla

7   Rodriguez's family?

8   A.    Yes, I did.

9   Q.    Who did you speak with?

10  A.    Rosa Rodriguez.

11  Q.    And that is -- how is she related to Ms. Rodriguez?

12  A.    She related to me that she was the grandmother.

13  Q.    And what did Ms. Rodriguez -- Rosa Rodriguez have to

14  say?

15  A.    That she did not know where Priscilla was, she did not

16  want me calling her house anymore because she did not want

17  her granddaughter getting involved with Quintin Alonzo

18  because he was bad news.

19  Q.    And did you speak with Priscilla Rodriguez's sister,

20  Alejandra Rodriguez?

21  A.    No, I did not.

22  Q.    Do you know whether you ever instructed Investigator

23  Rosa to go speak with her?

24  A.    No, I did not.

25        Well, let me take that back.  I instructed him to talk

1  to any witness out there that he could find that knew

2  something about the case.

3      Ms. Vazquez was pretty much directing us to what

4  witnesses we should talk to.

5  Q.   So were you -- were you relying on Ms. Vazquez to

6  provide you witnesses?

7  A.   She was the main source, yes.  She had a list of

8  witnesses that she wanted us to talk with, so . . .

9      But the investigator was instructed to locate any

10 witness that he could find that knew something about the

11 case.

12 Q.   And do you have any idea what other measures he may have

13 taken, beyond Ms. Vazquez?  Other sources?

14 A.   Well, when he was initially appointed one of the first

15 things we did was we went up to the jail to talk to Mr.

16 Alonzo, so we had also talked with him about possible

17 witnesses.

18     The only witness that Mr. Alonzo gave me at the time was

19 Frank Hernandez.  Of course, Frank Hernandez was

20 incarcerated, so I had to go through proper procedures to

21 talk with him.  So initially the defense was going to be

22 based on Mr. Frank Hernandez.

23 Q.   And you testified earlier that Ms. Vazquez fell behind

24 in her payments; is that true?

25 A.   Fell behind?

1          She never paid.

2    Q.    So you never received a single payment from her?

3    A.    No.  I received the initial down payment, but nothing

4    afterwards.

5    Q.    How much that was?

6    A.    $1,000.

7    Q.    And what was your agreement?

8    A.    $5,000.

9    Q.    And was there any timetable within which that $5,000 was

10   to be paid to you?

11   A.    There was a contract.

12   Q.    Do you have that contract?

13   A.    No, I don't believe so.  No.

14   Q.    Go ahead.  I'm sorry.

15   A.    No, I do not.

16   Q.    Okay.

17             MR. BIGGS:  I will pass the witness.

18             THE COURT:  I think this is a good time for a

19   morning break.

20        Let's take a ten minute -- and ten minute only recess,

21   and we will start back up.

22             THE SECURITY OFFICER:  All rise.

23                   (Recess taken at 10:25.)

24                   (Proceedings resumed at 10:35.)

25             THE COURT:  Mr. Meador, you may proceed.

CROSS EXAMINATION

BY MR. MEADOR:

Q.    Picking up with Priscilla Rodriguez's credibility, do you recall in her affidavit -- well, you remember reading in her police report regarding her witnessing the shooting and whatnot?

A.    Yes, I do.

Q.    In your mind would her testimony contradicted any other witnesses that you had that night or at the time of trial?

A.    Yes, it would have.

Q.    Would that have affected her credibility?

A.    Yes, it would.

Q.    How would that have affected your case?

A.    We had a number of witnesses that we interviewed.  Each witness that we interviewed did what they could -- attempted to do what they could to help Mr. Alonzo, but the problem is each witness said he was either with them or they saw him and they put him in different places.

She would have put him in just a different place that would have contradicted what the other witnesses had said.

Q.    Now, would her statement have put him sort of out front and in the middle of the fray?

A.    Yes, it would have.

Q.    What about her statement regarding him throwing bottles, how would that have affected?

1    A.    That would have corroborated what one of the state

2    witnesses said.

3         One of the state witnesses had testified that the person

4    that was throwing the bottles was the person that did the

5    shooting.

6    Q.    So would it have been your concern then that Priscilla

7    Rodriguez's testimony might have undercut testimony in which

8    people put Mr. Alonzo somewhere else on the property?

9    A.    Yes.  I most certainly think that her testimony put him

10   out front, would have corroborated the State's case.

11   Q.    Would actually have helped the State's case?

12   A.    I believe so.

13   Q.    Getting back to when you first met with Mr. Alonzo, and

14   I think you mentioned that the defense was that you were

15   looking to tag either Licho Escamilla with the offense or

16   Frank Hernandez?

17   A.    Yes.

18   Q.    Did Mr. Alonzo indicate to you any -- what did he say to

19   you about Frank Hernandez?

20   A.    He indicated that Frank Hernandez -- Frank Hernandez

21   could exonerate him, that he and Frank Hernandez had gone to

22   the party together, that the gun that Frank Hernandez was

23   using during the shooting was a gun that he had taken to the

24   party and it was the gun that he had given to Frank

25   Hernandez.

1   Q.   So "he" being Quintin Alonzo --

2   A.   That's correct.

3   Q.   -- had given the gun to Frank Hernandez?

4   A.   That's correct.

5   Q.   Also there was some questions asked about the -- I guess

6   all the witnesses that could have come to trial on Mr.

7   Alonzo's behalf.  Do you recall that?

8   A.   Yes.

9   Q.   Mr. Alonzo has alleged that a man by the name of Juan

10  Lucio would have -- could have attended the trial.  Do you

11  recall whether he was sworn in, whether he attended the trial

12  or what his status was?

13  A.   I know he was there at the beginning of the trial.  When

14  we called him he had disappeared.  I believe that he

15  disappeared.

16  Q.   That he wasn't -- he was sworn in and then just up and

17  left or something to that affect?

18  A.   That's correct.

19  Q.   What about a man by the name of Francisco Perez?

20  A.   Mr. Perez was also present I believe and for whatever

21  reason at the time of the trial he was not available.

22  Q.   What affect on your -- your case would Mr. Perez's

23  testimony have been if, quoting Mr. Alonzo, Perez was willing

24  to say that he was -- he was with me behind the tree?

25  A.   I think it would have probably caused the jury to have

1    the impression that most of the witnesses were trying to help

2    him but they were contradicting other witnesses.

3         One witness said he was with the DJ.

4         One witness said he was in the back.

5         One witness said he was behind the tree.

6         One witness said he was out front.

7         Each witness put him in a different location.

8    Q.   So far as you can see he can't be in two or three or

9    four different places at once?

10   A.   No.

11   Q.   How would you have explained that?

12        How would you have explained that had that come out at

13   trial?

14   A.   It would have been very difficult.

15   Q.   What about witnesses who would have identified, for

16   example, a Hispanic male running to a Cadillac and shooting

17   basically from across the street or running backwards and

18   shooting, would that have exonerated Quintin Alonzo?

19   A.   No.  I think what it did, it gave a picture of more than

20   one shooter, but I don't think it had anything to do with

21   whether Mr. Alonzo was shooting or not.

22   Q.   There was testimony at trial, wasn't there, that there

23   were multiple shooters?

24   A.   That's correct.

25   Q.   Licho being probably one of them?

1    A.    That's correct.

2    Q.    Now, as far as you -- concerning the Brady material, the

3    exculpatory material, is it your understanding that the State

4    has an obligation to give you Brady material whether you ask

5    for it or not?

6    A.    Yes.

7    Q.    Do they then have to go and identify what's exculpatory

8    or what's not or -- when they hand over documents in regular

9    discovery do they have to pinpoint what's exculpatory, or do

10   you know whether --

11   A.    No.   No.

12   Q.    So the -- so the pretrial motion was -- you had

13   mentioned and you said it was a formality.

14   A.    That's correct.

15   Q.    Was that just to get something in the record so at least

16   you made some attempt?

17   A.    That is correct.

18   Q.    Now, regarding police reports, isn't it true that the

19   law in Texas is that you don't -- the State does not have to

20   turn over police reports until the witness has testified?

21   A.    That's correct.

22   Q.    Have you ever had experience dealing with David Alex, in

23   particular, on other cases where he didn't turn over --

24   A.    I've had many cases with Mr. Alex.

25   Q.    Okay.   Have you ever had an example of where he didn't

1    turn over material or --

2    A.    I have not.

3    Q.    Tell me, why did you hire John Rosa?

4    A.    Two reasons.

5         One, I was overwhelmed with the number of witnesses that

6    my client and his mother kept bringing to me, that I was -- I

7    needed some help.

8         Number two, because some of the witnesses may have had a

9    problem speaking English, so I wanted someone that was

10   bilingual, so that's why Mr. Rosa -- as a matter of fact,

11   there was another bilingual investigator that turned down the

12   case because she didn't want to get involved because of the

13   gang activity involved in the investigation.  So Mr. Rosa was

14   chosen because of that.

15   Q.    What were your instructions to him?

16   A.    Initially I wanted him to go up to the jail to meet with

17   Mr. Alonzo; then secondly, come by the office to pick up the

18   files, go over the files, and then meet with Ms. Vazquez and

19   then go out with her and locate as many witnesses as he could

20   that knew something about this case.

21   Q.    Okay.  So he was going to do some leg work for you --

22   A.    Yes.

23   Q.    So up to that point Mr. Alonzo's mother had told you

24   that she would be bringing witnesses to you?

25   A.    Yes.   There were a number of meetings where she was to

1    have ten or 12 witnesses in my office, and no one would ever

2    show up.

3    Q.    So when they didn't show -- show up, that's when you

4    hired -- or felt like you needed to hire John Rosa?

5    A.    That's correct.

6    Q.    You indicated that you may have given Ms. Vazquez or Ms.

7    Vazquez, I think Julia Vazquez, Quintin's mother, your

8    original file.  Is that possible?

9    A.    That's possibly.

10   Q.    Would that have been a mistake you think looking back?

11   A.    Looking back, yes.

12   Q.    So you think there were some documents when it came back

13   to you that were possibly missing?

14   A.    It was in disarray.  And, as I said, I'm not one hundred

15   percent sure whether Ms. Vazquez did that or whether a staff

16   member.

17   Q.    Okay.  Now, as far as locating Priscilla Rodriguez, you

18   indicated that you had issued a subpoena or attempted to

19   issue a subpoena for her?

20   A.    That is correct.

21             MR. MEADOR:  Your Honor, may I approach?

22             THE COURT:  You may.

23   BY MR. MEADOR:

24   Q.    Let me show you what I --

25             MR. MEADOR:  This is a new exhibit for us.

 1        Respondent's Exhibit 3, is that what you -- is that the

 2   subpoena?

 3              THE WITNESS:  That's correct.

 4              MR. MEADOR:  We move it.

 5              THE COURT:  Any objection?

 6              MR. BIGGS:  No objection.

 7              THE COURT:  It is admitted.

 8   BY MR. MEADOR:

 9   Q.    So you did attempt to issue some legal summons to get

10   her there?

11   A.    We did everything possible to get Ms. Rodriguez to

12   trial.

13   Q.    So as far as her particular address is concerned, would

14   a process server want to know an address for her?

15   A.    Absolutely.

16   Q.    Okay.  And if it were to come back undelivered --

17   A.    I have issued subpoenas with incorrect addresses.  They

18   always come back.  They will not issue a subpoena without an

19   address.  I mean, they may issue it; you won't get a witness

20   there.

21   Q.    Now, as far as you -- you mentioned that you had spoken

22   with grandma about --

23   A.    Yes.

24   Q.    -- was it your impression -- was it your impression that

25   Priscilla Rodriguez was a minor at the time?

1   A.    Yes.

2   Q.    Do you know whether you could have compelled her --

3   would -- would the grandmother have had some say in whether

4   she would have testified or not?

5   A.    I think as the guardian, yes.

6   Q.    But did the -- did you also mention the grandmother

7   didn't know where she was; is that correct?

8   A.    Grandmother -- grandmother told me she did not know

9   where she was.  She did not want me calling there anymore.

10   She did not want to have anything to do with this case.

11   Q.    Also, you mentioned that you had entered into a contract

12   with Mr. Alonzo's mother; is that correct?

13   A.    That's correct.

14          MR. MEADOR:   Your Honor, may I approach again?

15          THE COURT:   You may.

16          MR. MEADOR:   This will be Respondent's Exhibit 4.

17   Again, this is new.

18   BY MR. MEADOR:

19   Q.    Can you identify that for the record?

20   A.    Yes, it is the contract.

21   Q.    Is that the contract you were looking for and couldn't

22   find?

23   A.    Yes.

24          MR. MEADOR:   We would move to admit Respondent's 4.

25          MR. BIGGS:   No objection.

```
 1          THE COURT:   Number 4 is admitted.
 2  BY MR. MEADOR:
 3  Q.   Now, have you had occasion to see a -- didn't Mr. Rosa
 4  write a memo to you sort of detailing his hours and
 5  participation and whatnot in the --
 6  A.   Yes, he did.
 7  Q.   Do you recall whether or not in that memo he mentioned
 8  that he actually interviewed Priscilla Rodriguez or not?  Was
 9  able to identify -- I mean -- excuse me -- locate her?
10  A.   I believe -- I believe in the memo he listed a number of
11  witnesses -- he would give me a memo each day that he would
12  go out, and on one occasion he came back with a list of
13  witnesses that he had interviewed, and I believe he indicated
14  that Priscilla Rodriguez was one of those witnesses.
15  Q.   You also mentioned that you were -- you were hired
16  initially possibly in July of 2001.  Does that sound about
17  right?
18  A.   I believe that's correct.
19  Q.   Okay.  And who did you deal with mostly at the time?
20  A.   Ms. Vazquez.
21  Q.   Okay.  And did you ever meet with Mr. Alonzo?
22  A.   Yes.
23  Q.   Okay.  Do you know at the time whether he was -- whether
24  there was a warrant for his -- his arrest at the time or not?
25  A.   The initial meeting with Mr. Alonzo was when he was
```

 1   still a fugitive.  I met with him at an apartment complex.

 2   And at that meeting I encouraged him to turn himself in,

 3   so . . .

 4   Q.    And do you know if he did?

 5   A.    No, he did not.

 6            MR. MEADOR:  If I may have a moment, Your Honor.

 7            THE COURT:  You may.

 8   BY MR. MEADOR:

 9   Q.    One last thing.  How often did you meet with Ms.

10   Vazquez, do you recall?

11   A.    Early on it was on a weekly basis, initially.

12         Then at some point I don't know if she -- I know there

13   were some problems going on.  Her husband was incarcerated at

14   one point and he was released and he was re-incarcerated.  I

15   believe she lost her home or had to move, because there were

16   times that I couldn't locate her, because I would make phone

17   calls and her -- I believe it was her father who would have

18   to go and find her.  She would sometimes return the phone

19   calls, sometimes she would not.

20         But we met on a regular basis initially.

21   Q.    And that was -- she was providing you witness

22   information?

23   A.    She was providing witnesses and making appointments for

24   witnesses to show up.

25            MR. MEADOR:  Your Honor, may I approach again?

1          THE COURT:  You may.

2    BY MR. MEADOR:

3    Q.    I'm going to refer to my tab 12.

4          Could you look that over, please?

5          Do you recognize that?

6    A.    Yes, I do.

7    Q.    Do you see a document there in which -- that might bear

8    your signature?  Or your -- I'm sorry, your writing?

9    A.    Yes.  Yes.

10   Q.    Can you describe that for the court?

11   A.    Mr. Rosa went out and talked to a number of witnesses,

12   and he would make a summary of what those witnesses would

13   testify to.  I reviewed each one of those witness statements

14   and I would rate them, whether they were good, fair, poor.

15         And on this particular statement I wrote this was a very

16   good witness.  And this was one of the witnesses that we had

17   intended to call at the trial.

18   Q.    Where you had indicated it said very good did you --

19   there -- was there any other notation on that?

20   A.    Not here.

21         I made a note, when I got ready to call this witness he

22   was not available.

23   Q.    Okay.  Okay.  So, again, that -- that is your

24   testimony -- I mean your handwriting?

25   A.    That is correct.

1    MR. MEADOR:  We'll pass the witness.

2    THE COURT:  Any redirect?

3    MR. BIGGS:  Just a brief, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. BIGGS:

6    Q.   Mr. Hays, you testified that Mr. Lucio, Juan Lucio, was

7    unavailable; is that correct?

8    A.   I'm not sure.

9         There were a couple of witnesses that were there, but

10   when it was time for them to testify they were not available,

11   and I believe he was one of the ones that was not there.

12   Q.   But didn't -- didn't you just testify that the witness

13   you were being asked about was unavailable?

14   A.   If I have on there that he was not available, then he

15   was not available.

16   Q.   No, it -- there's no documentation of him being

17   unavailable.

18        This is the same witness, Mr. Lucio, you say had very

19   good testimony and you had intended to call at trial but he

20   was unavailable.

21   A.   If I --

22   Q.   Was he unavailable?

23   A.   If I put not available he was not there when I called

24   him.

25   Q.   There is no documentation of him being unavailable on

1   this document.

2   A.   It's not a -- "not here" on that document.

3   Q.   There's nothing on this document that says that Mr.

4   Lucio was unavailable.  I'm asking if you are testifying that

5   he was unavailable?

6   A.   I'm testifying that if I put "not here" that meant he

7   was not there when I called him.

8           MR. BIGGS:   Your Honor, I object as nonresponsive.

9           THE COURT:   Overruled.

10   BY MR. BIGGS:

11   Q.   Do you -- do you know how he was unavailable?

12   A.   During the course of the trial -- well, before the trial

13   started we had all of the witnesses there in the defense

14   witness room.  I went down the list, called on the witnesses.

15       When I called that particular witness he was not there.

16   Q.   Do you -- you went -- you went back to the witness room

17   and you asked for him and he was not there?

18   A.   Right.  Plus, I had the investigator back there with

19   them.  I would go out and call the next witness, he was

20   nowhere to be found.

21   Q.   So am I correct that you viewed this witness as a good

22   witness?

23   A.   Well, he was -- he had some testimony that I thought

24   would be --

25   Q.   And he was subpoenaed to testify?

1    A.    I don't believe he was subpoenaed.

2    Q.    He was not subpoenaed?

3    A.    I don't believe any of the witnesses were subpoenaed.

4    Q.    So you relied on them to come voluntarily?

5    A.    All the witnesses indicated that they would be there.

6    If a witness tells me that they will be there, there doesn't

7    seem to be a problem with them showing up, I don't subpoena

8    them.

9    Q.    Did you take Mr. -- did you take all of the witnesses

10   into court and have them sworn in?

11   A.    I believe we did.

12   Q.    So Mr. Lucio was sworn in?

13   A.    I believe he was.

14   Q.    When you went back to the jury room and found that he

15   was unavailable, did you come into court and make a record of

16   that, that he was unavailable?

17   A.    I believe we called his name as the next witness and

18   then he was not there, so I don't recall whether any record

19   was made of that or not.

20   Q.    Did you bring to the court's attention that he was not

21   available?

22   A.    I'm sure if I called his name and he was not there, then

23   I'm sure it was brought to the court's attention.   I

24   don't --

25   Q.    Did you --

1    A.    I know we didn't make a separate record on that, no.

2    Q.    Did you move for a continuance in light of that fact?

3    A.    No, we did not.

4    Q.    Did you consider moving for a continuance?

5    A.    No, we did not.

6    Q.    You stated earlier that Priscilla Rodriguez, based on

7    her statement to the police, that she may have testified that

8    Mr. Alonzo was in the -- the front and not the back.

9         Did -- did you make an independent credibility

10   determination of Priscilla Rodriguez?

11   A.    No.  I never talked to Priscilla Rodriguez.

12   Q.    Did you find -- did you believe that the witnesses you

13   did call were particularly credible?

14   A.    No, I did not.

15   Q.    And if you had interviewed Ms. Rodriguez and found her

16   to be credible, that might have changed the defense you

17   decided to present?

18   A.    I'm sorry?

19   Q.    If -- if you had interviewed Ms. Rodriguez and found her

20   to be more credible than any of the other witnesses, couldn't

21   that have influenced whether or not you decided to bring her

22   as a witness instead of the witnesses you did call?

23   A.    The witnesses that I interviewed, I rated them as good,

24   poor, unacceptable witnesses.

25        I don't know, without having talked with her, whether I

1   would have or not.

2   Q.   But -- and your testimony is you do not remember whether

3   you possessed that investigative report where Priscilla

4   Rodriguez informed a detective that Licho Escamilla had shot

5   Santos Gauna?

6   A.   What was the question again?

7   Q.   You cannot remember whether or not you saw that

8   document?

9   A.   No, I cannot.

10  Q.   And you believe it's possible that you never obtained

11  that document?

12  A.   It's possible.

13  Q.   And if you did obtain that document do you agree that

14  you accorded it no significance?

15       If -- in the event that you did receive that document,

16  given that you cannot remember it, would you agree that you

17  didn't accord it any particular significance?

18  A.   I'm not sure I understand the question.

19  Q.   Well, if you had received it -- you don't remember it,

20  correct?

21  A.   That's correct.

22  Q.   And if you had received it, and you found it to be

23  credible, or particularly probative, you probably would

24  remember it.

25  A.   No, because, as I said -- as I said earlier, that

1    document was typical of all the other statements I had heard

2    from all the other witnesses that had been presented to me.

3        There was nothing that stood out about her statement.

4    Q.    So regardless of whether you received it or did not,

5    would it be fair to say this document had no influence on the

6    way you investigated your case?

7    A.    I wanted to talk with her, yes, because she was a

8    potential witness, but so far as it having any influence on

9    how I handled the case, no.

10   Q.    Okay.

11        MR. BIGGS:  No further questions, Your Honor.

12        THE COURT:  Any recross?

13        MR. MEADOR:  Yes, Your Honor.

14       One more thing, Your Honor.

15                    RECROSS EXAMINATION

16   BY MR. MEADOR:

17   Q.    If you had a choice at trial, just sort of along those

18   lines, you had a witness who was going to say that he was

19   participating in the -- in the altercation out front and a

20   witness who was willing to say that he was with me in the

21   back or behind a tree or with a DJ or in the garage or

22   mingling, which would you have preferred?

23   A.    I would most certainly would -- prefer someone who is

24   going to take him from where the crime took place.

25        MR. MEADOR:  Thank you.

```
 1              THE COURT:  Is there any reason that Mr. Hays may
 2   not be excused at this time?
 3              MR. MEADOR:  Your Honor, I believe he's on our
 4   witness list and we do have some additional witnesses I think
 5   they're going to call and he may be able to address some of
 6   their testimony.
 7              THE COURT:  So you intend to re-call him?
 8              MR. MEADOR:  Yeah.  I've got him in my case in
 9   chief.
10              THE COURT:  Well, can we go ahead and present his
11   testimony to minimize him having to come back?
12        I'm sure he's got other things to do.
13              MR. MEADOR:  Well, I'm not sure what their
14   witnesses are going to say.
15              THE COURT:  All right.  Mr. Hays, I'm sorry.  You
16   will have to go back to the witness room.
17              THE WITNESS:  Okay.
18              THE COURT:  You may call your next witness.
19              MR. BIGGS:  Maybe he could perhaps be released on
20   standby, within a certain number of minutes from the
21   courthouse.
22              THE COURT:  How far is your office?
23              THE WITNESS:  10 minutes.
24              THE COURT:  When will we know if he needs to be
25   re-called?
```

1          MR. MEADOR:  I'll have to see the order in which

2     you call your witnesses.

3          THE COURT:  How many more witnesses do we have from

4     Mr. Alonzo?

5          MR. BIGGS:  I'll have to count them.

6          THE COURT:  More than five?

7          MR. BIGGS:  Approximately five, probably.

8          THE COURT:  Is there any objection to him going

9     back to his office?

10         MR. MEADOR:  Re-call is fine with me, as long as

11    we've got some notice.

12         THE COURT:  Okay.  If you could just be close to a

13    telephone, Mr. Hays.  Thank you.

14       Call your next witness.

15         MR. BIGGS:  Yes, Your Honor.

16       We would like to call John Rosa to the stand.

17         THE COURT:  All right.

18         MR. MEADOR:  We want to make sure we have his

19    number.

20         THE COURT:  While we're waiting for Mr. Rosa, do we

21    know which witnesses have any objection to coming back

22    tomorrow?

23       Maybe we could take those witnesses out of order, in

24    case we need to go on tomorrow?

25         MR. BIGGS:  I have not looked into that, but I

 1    will, Your Honor.

 2              THE COURT:   Okay.  At -- during the lunch break,

 3    Mr. Meador, if you would look into that as well.

 4        All right.  Mr. Rosa, if you would please step forward

 5    to the witness stand.

 6        And you were here when the witnesses were sworn this

 7    morning; is that correct?

 8              THE WITNESS:   Yes.

 9              THE COURT:   All right.  Please be seated and please

10    speak into the microphone.

11                        DIRECT EXAMINATION

12    BY MR. BIGGS:

13    Q.   Hi, Mr. Rosa.

14    A.   Hi.  Hello.

15    Q.   Have we met before?

16    A.   No.  I mean, telephonically we've met.

17    Q.   We've spoken a few times?

18    A.   Yeah.  Yeah.

19    Q.   And were you the investigator in charge of investigating

20    Mr. Alonzo's defense for Mr. Hays?

21    A.   Yes.

22    Q.   I want to --

23              MR. BIGGS:   If I may approach, Your Honor?

24              THE COURT:   You may.

25    BY MR. BIGGS:

1   Q.   I'm going to show you Petitioner's Exhibit 1.

2   A.   Okay.

3   Q.   Do you recall my faxing that document to you about a

4   week ago?

5   A.   Yeah.

6   Q.   And that is a document where Priscilla Rodriguez

7   identifies Licho Escamilla as the shooter of Santos Gauna.

8   It's a police report --

9   A.   Yes.

10  Q.   -- of Detective Berry.

11  A.   Yes.

12  Q.   What was your reaction when you first saw that document?

13  A.   I've never seen this document, other than the time you

14  sent it to me.

15  Q.   So you had never seen this document before?

16  A.   No.  Never.

17  Q.   And would it be -- how -- how would (sic) you respond

18  when you received it?

19  A.   Well, I was -- I was just surprised, because I -- I was

20  at Carl's office and I made a copy of the file he had and it

21  was -- it was not in there.  It was pretty monumental.

22  Q.   And do you ever remember seeing that document at the

23  time of trial?

24  A.   No.

25  Q.   And in investigating the case?

1   A.   No.

2   Q.   Did you have any idea that Priscilla Rodriguez had

3   identified Licho Escamilla out of a photo lineup?

4   A.   No.

5   Q.   What had been your -- information you had received in

6   regards to Priscilla Rodriguez at the time?

7   A.   That she had been at the party and that she -- word had

8   it that she would state that she was there and she did not

9   see Quintin shooting.

10  Q.   Did you know anything else beyond that?

11  A.   No.

12  Q.   And had you received that document would you have

13  investigated the case differently?

14  A.   Well, yeah.  I would have -- you know, there was a lot

15  of folks that I went to interview that I never got return

16  calls from and that kind of thing, but after not getting a

17  call from her I would have, of course, you know, having that

18  document in hand, we would have -- we would have pounded a

19  lot harder to -- to locate her.

20       MR. BIGGS:   I have no further questions of this

21  witness.

22       THE COURT:   Mr. Meador.

23                    CROSS EXAMINATION

24  BY MR. MEADOR:

25  Q.   Hi, Mr. Rosa.  My name is John Meador.

1    A.    Hi, John.

2    Q.    Did you provide -- at any point did you remember saying

3    in an affidavit that you interviewed a person by the name of

4    Priscilla Rodriguez?

5    A.    You know, I just got this -- this -- the affidavit, and

6    also my activity report.  And I saw that in that affidavit

7    that I signed for I'm going to say Bill Cox, had Priscilla's

8    name on there, but I got her mixed up with this girl named

9    Lucy Montoya.

10        Yeah, but I did sign that, that I spoke with her, but

11   that was not -- that was not -- that was not correct.  Yeah.

12   Q.    Okay.  So that portion of the -- of your affidavit, "I

13   interviewed several witnesses, including," and then Priscilla

14   Rodriguez, that's not true?

15   A.    Yeah.  I interviewed all the names that were on there

16   were on my activity report, but it should have been Lucy

17   Montoya and not -- and not Priscilla.  So that name should

18   have been changed to Lucy Montoya.  Because all the other

19   names are correct, except that one that was switched out.

20   Q.    Okay.  Do you recall in your activity report, I guess

21   along those same lines, that you had -- you encountered some

22   trouble with getting ahold of Priscilla Rodriguez?

23   A.    Yes.

24   Q.    Or finding her?

25   A.    Yeah.

1  Q.    What was your experience in trying to locate her?

2  A.    Well, I had -- I had learned that she had been

3  incarcerated, I want to say TYC, and so, you know, I passed

4  that information on to Carl and he was going to get a

5  subpoena down there, and that kind of thing.

6        But I know that I had gone over, you know, to interview

7  her grandma, and the grandma -- grandma was pretty nervous

8  about that whole thing.

9        I think they lived not too far, maybe up the street or

10 two from where the fellow was shot, Santos, and I know the

11 grandma, you know, was real scared for her granddaughter.

12       She asked me, she said my granddaughter doesn't know

13 anything or, you know, she -- leave her alone, that kind of

14 thing.

15 Q.    Now, do you recall -- do you know whether you

16 interviewed an Alexandra Rodriguez?

17 A.    I don't think I interviewed anybody out of that

18 household.  I know I went there, according to my activity

19 report, you know, looking for -- I think there were three

20 sisters, I could be wrong, but they were all residing at that

21 same household, and I don't think I was successful in

22 interviewing anybody.

23       I left my card there, but I -- I never got a return call

24 or anything.

25 Q.    And so is that what you normally do if they don't -- you

1    just leave your card and it's up to them to contact you?

2    A.    Well, yeah.   I mean, there was so many people involved

3    in here that I went -- that I went to visit, and, you know,

4    if they have something to say, you know, they will -- they

5    will contact me back.   I've had a few of them contact me back

6    out.   One guy I went to interview he put up his finger and

7    goes and jumps out the window and he takes off.   Well, I was

8    aware he didn't want to talk to me.

9         You know, if I leave my card and I let them know what

10   I'm there for, then if they want to talk they -- they

11   normally call me back.

12   Q.    So that's the impression, you say if you want to talk

13   about this case, did you leave any mistaken -- did you let

14   people know that you were working, you know, for Mr. Alonzo?

15   A.    Yes.   Yes.   In fact, I was -- on a few of those

16   instances I -- I know that I went over to Priscilla's house

17   with Alonzo's mom, and so they already -- you know, folks

18   already knew.   We went over to Santos' house, you know,

19   attempted to interview the -- the stepdad.   But, you know,

20   they were pretty upset and they asked us to leave.

21                  MR. MEADOR:   We'll pass the witness, Your Honor.

22                  THE COURT:   Any redirect?

23                  MR. BIGGS:   Nothing further, Your Honor.

24                  THE COURT:   Is there any reason this witness cannot

25   be excused?

```
 1              MR. BIGGS:  Not from petitioner.

 2              MR. MEADOR:  He may be excused, yes.

 3              THE COURT:  All right.  Thank you, Mr. Rosa, you

 4    are excused.  You may leave.

 5         Mr. Biggs, call your next witness.

 6              MR. BIGGS:  Your Honor, the State would call -- I

 7    mean the petitioner would call David Alex to the stand.

 8              THE COURT:  Does Mr. Alex know he's being called to

 9    the stand?

10              THE WITNESS:  Good morning.

11              THE COURT:  Good morning.

12         Mr. Alex, you were here when I swore all the witnesses,

13    were you not?

14              THE WITNESS:  Yes, ma'am.

15              THE COURT:  All right.  Please be seated and please

16    speak into the microphone.

17         I've had to remind the lawyers more than anyone else.

18              THE WITNESS:  Okay.  Thank you, ma'am.

19              THE COURT:   You may proceed.

20                        DIRECT EXAMINATION

21    BY MR. BIGGS:

22    Q.   Morning, Mr. Alex.

23    A.   Morning.

24              MR. BIGGS:  Your Honor, if I may approach, I have a

25    copy of the transcripts from volumes 3 and 4.
```

1   BY MR. BIGGS:

2   Q.   I don't know if you have a -- do you have a copy?

3   A.   I've got certain excerpts that I pulled out that I've

4   been reading, and that will help.

5           MR. BIGGS:  I also have the complete volumes here,

6   in case we don't have the excerpts.

7       This is not an exhibit.

8       You want to take a look?

9           MR. MEADOR:  Oh, no.

10          THE WITNESS:  Thank you.

11  BY MR. BIGGS:

12  Q.   There should be a tab.

13      Mr. Alex, you were the prosecutor -- chief prosecutor in

14  this case of Mr. Alonzo regarding the aggravated assault of

15  Israel Martinez and Cynthia Martinez and the murder of Santos

16  Gauna?

17  A.   I was the lead prosecutor on it.  The chief in the court

18  was actually Eric Mountain.

19  Q.   Eric Mountain.

20      And do you -- Have you had a chance to review the

21  transcripts from the trial?

22  A.   I reviewed certain excerpts of the transcript.  I can't

23  honestly say that I've read the whole trial transcript.  I

24  think the trial probably was at least a week, maybe more.  So

25  I've read a bit of it.

1   Q.    Have you met with Mr. Meador or Ms. Kuykendall in

2   regards to this case?

3   A.    Yes, sir, I have.

4   Q.    Have you spoken with them on the phone and met in person

5   or --

6   A.    Yes, sir, I have.

7   Q.    So are you aware of the allegations that -- at issue in

8   this case?

9   A.    I believe I'm aware of the allegations.  I'm -- I'm

10  primarily a trial lawyer, so the trial issues I understand a

11  lot more than writ issues.  But I think I've got a grasp of

12  what the issues are, and I think they have done a good job of

13  explaining to me, you know, what the issues are.

14           MR. BIGGS:  Your Honor, if I may approach?

15           THE COURT:  You may.

16  BY MR. BIGGS:

17  Q.    I'm showing you Petitioner's Exhibit 2, in which I

18  believe is from the prosecutor's file.

19        Does that -- does that document look familiar to you?

20  A.    That's correct.  That's the document that I found in the

21  file after I think it was Mr. Meador had asked me to review

22  the file for anything that I -- that I thought might have

23  been important.  And I found this document and I think I may

24  have scanned it and -- and e-mailed it or faxed it or

25  something to that effect.

1    Q.    Do you recall actually making that document?

2    A.    You know, seven years ago -- this is my handwriting, and

3    I know that I had started a practice of having people sign

4    for things when I gave it to 'em.  And this probably would

5    have been around the time I started that practice.

6         But to be totally honest with you, if I told you I

7    remembered actually writing these things down, I'd say no.

8         Looking at the document I can be a hundred percent sure

9    that this is my writing and I created it though.

10   Q.    And was this document made in response to a -- Mr. Hays'

11   omnibus pretrial motion for any and all Brady evidence?

12   A.    In all likelihood it was not.

13        In the Crowley Courthouse many times you don't go on the

14   record for pretrial until the day of trial, and it's my guess

15   that we did not have a formal pretrial prior to trial.

16        What we had a practice of doing, it's a little different

17   now, is anything that -- the defense would come to us, they

18   would look through the file.  If they wanted copies, they

19   could make copies.  If we were going to give them something,

20   we would give it to them.  Many times they never signed for

21   it.

22        I got in the habit of making them sign for it, and

23   apparently this was one of those situations.  It would not --

24   it would not have been in response to an order from the

25   court, I don't believe.

1  Q.    Okay.  So the fact that he filed an omnibus motion on
2  the 16th and this was turned over the 17th is really more of
3  a formality; is that -- is that correct?
4  A.    It would be -- yeah -- well, it's probably not a
5  formality.  The formality would be when the judge orders to
6  turns things over, then obviously anything that hadn't been
7  turned over at that point we would have been ordered to turn
8  over.
9        This would have just been as a matter of course.  I knew
10 he was going to get the stuff.  I knew whatever he didn't
11 have I would give it to him, and in this particular instance
12 evidently I had him sign for it.
13 Q.    And do you recall giving him any documents prior to that
14 date?
15 A.    My specific memory would be I don't, other than what --
16 other than what I'm looking at here, I wouldn't have any
17 specific memory, but I can -- I can be pretty confident that
18 anything he would have asked me for out of the file he would
19 have got.
20       And I can tell you I've looked through the file and I
21 saw the redactions, and typically I'm not going to redact --
22 I'm going to redact stuff when it's going to get turned over.
23       And so I know that there were other things given to him
24 other than what's here.
25 Q.    You know there were other things given but you just

1    don't know exactly what?

2    A.    If you show me a document I can probably tell you

3    whether he got it based on whether it was redacted or not,

4    from my -- the way I did business back then.

5    Q.    Do you recall-- Well, you spoke a second -- a minute ago

6    that the system is different now.

7          How is the system different now than it was back in 2003

8    when this trial occurred?

9    A.    Well, when this trial occurred we didn't -- the office

10   did not have a policy on discovery.  Every prosecutor did it

11   a little different.  And a lot of times it depended on who

12   your chief was and the guidance that you -- that you

13   received.

14         Nowadays, since the new administration, Mr. Watkins, our

15   policy is to copy everything that's not work product and to

16   turn it over when it's requested, even if it's not set for

17   trial.  If they want it, they can come look at it.  If they

18   want copies of it, they can get it at their own expense or we

19   can scan it or however it's done.  But that was not a formal

20   policy back then.

21   Q.    So when you say everything other than work product, what

22   documents would that -- would that be every document in the

23   prosecutorial file?

24   A.    Are you talking about now or then?

25   Q.    Now.

1    A.    Now?

2          Well, I mean, I could -- I could probably read to you

3    what's in the -- in the -- in the policy manual, but work

4    product takes on a different meaning whether you're

5    talking -- legally a police report, if I looked it up in the

6    code, it would probably be work product, but we still turn

7    that over.

8          So when I say work product I'm typically talking about

9    my mental impressions, if I'm speaking to another lawyer

10   about my strategy in the case, the kind of things that you

11   would think about that is not really a part of the case, it's

12   more a part of what your strategy is, what you're thinking,

13   those kind of things.

14         And today as our policy is, if you came to me for

15   discovery or if you wanted to look in a file, those kind of

16   things should be separated and anything else you're free to

17   look at or get a copy or a digital copy.

18   Q.    Do you have access -- do you receive every document

19   generated by the police in regards to any particular

20   arrestee?

21   A.    Today or back then?

22   Q.    Today.

23   A.    Today?

24         That's an interesting question.  It's -- we are at the

25   mercy of the filing agencies.  I can tell you there are

1    times, most recently, when they tell me I have everything but

2    I have to go down and look for myself.  Because they're human

3    beings just like we are, and when they tell me I have

4    everything, oftentimes I will go and I will find things that

5    they will think is unimportant, but they have a different

6    purpose than I have.

7        So the answer to that question is I would like to think

8    I have everything that they have, but oftentimes I do not.

9    Q.   Sometimes just by accident you might not have

10   everything?

11   A.   Yeah.  Oftentimes it is by the fact that we're all human

12   beings.

13   Q.   And how -- how is it different -- how was it different

14   back then?

15       You said that today that's the case, that you receive

16   every document unless some mistake, what about back then?

17   A.   A -- a -- a lot of it has to do with training.

18       Back then you -- you -- you were probably trained by

19   your chief, and if you had a good chief he would have told

20   you on a serious case you need to go down to the police

21   station, you need to look at that folder, you need to make

22   the copy yourself, and you need to know everything that's in

23   it.

24       Today -- I -- I supervise about eight courts and it

25   is -- it's not just an option, it's what they must do.  They

1    have got to go down and look at the folder and the file, and

2    whatever is there get a copy of.

3         It's a lot more formalized than it was back then.

4    Q.    When you say "they" do you mean prosecutors or . . . ?

5    A.    Prosecutors.  The investigators many times will do it.

6         But, again, the prosecutor is going to be held

7    accountable for it and so they know if they have somebody

8    else do it they're still not going to be able to stand back

9    and say I didn't -- I didn't have that.  They will still --

10   they will still be held accountable for it, so . . .

11   Q.    Is it more likely that every document generated by a

12   police agency is going to be in the prosecutor's file now

13   than it was back then?

14   A.    Is it more likely now?

15        I think it's going to depend on the people involved, to

16   be honest with you.  I mean --

17   Q.    Has -- has your personal policy changed since the

18   policy -- the officewide policy has changed?

19   A.    Since it's changed?

20   Q.    I mean, are your procedures different now that the

21   policy of the entire office has changed, your personal

22   procedures you used?

23   A.    Well, my procedures had to be in line with what the

24   policy is now, if that's what you're asking me.

25   Q.    So did -- were -- did you change your procedures in

1    light of the policy?

2    A.    You know, I'll tell you, the -- there -- there are times

3    when -- and I don't know if you really want me to explain

4    that or not, but I -- my procedures have -- have changed

5    since the new policy is in place, yes.  And I can explain

6    that if you want me to.

7    Q.    What do you do now that you didn't used to do?

8    A.    Well, I'll give you a perfect example.

9              MS. KUYKENDALL:  Objection, Your Honor.  On

10   relevance grounds.

11        I mean, what -- what's relevant is what he was doing at

12   the time of this trial, and -- as opposed to what he does

13   now.

14             THE COURT:  Mr. Biggs.

15             MR. BIGGS:  Well, Your Honor, if -- if -- the

16   relevance is -- okay.  Well, I can ask it maybe a little more

17   direct way.

18             THE COURT:  All right.

19   BY MR. BIGGS:

20   Q.    What -- what procedures did you have in place prior to

21   the policy being changed, in terms of obtaining police

22   documents for your file?

23   A.    Okay.  And during this time frame?

24        Because I'll tell you, Mr. Biggs, my procedures evolved

25   over time as -- as a felony prosecutor's procedures evolve,

1    without a -- a clear-cut guidance.  Okay?

2         So at the time that this case came about I would -- as

3    you see here, I had started making a list of this things that

4    I would give to somebody and have them sign for it, as it is

5    here.  But if you came in my workroom and I had ten lawyers

6    standing out in the hall and you came in and you said, hey, I

7    know there's a confession or there's a statement by Juan

8    Escamilla or by Frank Hernandez or something like that, or

9    there's a note or something, and you wanted it, you could

10   come in, I'd give it to you, you could go make a copy of it,

11   and I may make -- I may have an intention of having you sign

12   for it and it never happen.  So those things happened all the

13   time.

14   Q.    But that would be after it came into your possession in

15   your file?

16   A.    Right.

17   Q.    Is that right.

18   A.    Right.

19   Q.    What were your procedures back then in terms of

20   obtaining documents from the police agencies, the filing

21   agencies back then?

22   A.    At the time that this case occurred, I could be pretty

23   confident that Detective Berry would have copied the file

24   and -- and gave it to me.  I mean, that's -- and I'll be

25   honest with you, I don't have specific memory of that.

1     Detective Berry was very active in this case and if I

2  had said to him, Rick, would you get a copy of the file, I

3  would have felt comfortable with that, because I had worked

4  with Detective Berry for a number of cases and I -- I felt

5  confident that if it was in the file I would have had it.

6  Q.    But when it comes down to it you're never really going

7  to know for certain, right, whether you ever have everything,

8  and that's true now as it was back then?

9  A.    Yes.   I mean, you're never -- you're never going to

10 know -- I mean, yeah.   Yeah.   That's correct.

11 Q.    Okay.   I want to show you what's been identified as

12 Petitioner's Exhibit 1.

13 A.    Okay.

14 Q.    Do you -- do you -- have you reviewed that document

15 before?

16 A.    Yes, sir, I have.

17 Q.    When was the last time you reviewed that document?

18 A.    Probably while I was sitting in the waiting room waiting

19 to come in here.

20 Q.    When -- when did you -- in the last year when did you

21 first see that document?

22 A.    In the last year?

23 Q.    Yeah.

24 A.    You're not talking about starting from January.   You're

25 talking about the last 12 months, from when I first saw it?

1    Q.    Sure.   Sure.

2    A.    Now you're really testing my memory.

3    Q.    Did -- did the -- did the Attorney General bring it to

4    your attention?

5    A.    An attorney general brought it to my attention, but it

6    wasn't these two Attorney Generals.

7    Q.    Okay.   Were you -- do you remember that document back

8    when you prosecuted this case?

9    A.    This document --

10    Q.    Did you remember the -- yeah.

11          Did you remember that document as being in existence at

12    the time of the case?

13    A.    I'm confident this was in existence and probably -- oh,

14    yeah, it was in existence.

15    Q.    Do you remember having reviewed that document prior

16    to -- prior to trial?

17    A.    I can tell you that not only did I review it but I would

18    have been the person who redacted it before I turned it over.

19    Q.    How do you know -- how do you know that?

20    A.    Because I can -- I can probably pull out every document

21    that was redacted and it's all going to be redacted this same

22    way.

23          This is what I would have done back in -- at that time.

24    Q.    But how are you able to tell that that document was

25    redacted by you, as opposed to someone else?

1    A.    Well, I'll give you a perfect example.

2          All right.  I'm assuming here I redacted out -- I mean,

3    I'd have to pull out the unredacted -- I was kind of anal.

4    Not only did I redact birth dates, Social Security numbers,

5    driver's license, but any identification information.  Unless

6    that witness told me it was okay to turn that over, I

7    redacted it.  And everybody didn't do that.

8          And I always used a black marker like this back then.

9    At one point I experimented with white-out.  I mean, at the

10   D.A.'s office we weren't quite in the 20th Century yet with

11   redaction software and all that.

12         But different people have different styles.  And if I

13   look through a file that I handled and I see the redactions

14   here, Eric Mountain didn't do it, my investigator didn't do

15   it, I don't have a legal assistant, I don't have a secretary.

16   This would have been my work.

17   Q.    You're sort of inferring from the circumstances that

18   that was probably redacted by you?

19   A.    I'm -- I'm -- I'm confident of that, yes, sir.

20   Q.    Do you -- And I know it's been a long time.

21         Do you recall actually turning that document over to

22   Carl Hays?

23   A.    Like I said, I mean, honestly speaking I don't recall

24   turning -- I don't recall the moment when I turned anything

25   over to Carl Hays, including this document.

1    But what I can say to you is just from the documents I

2    have in front of me right now, the things that he signed for

3    I know he would have gotten, and the things that were

4    redacted by me I can say for certain he would have gotten,

5    and the things that weren't redacted, he may or may not have

6    gotten

7    Q.   Well, do you -- do you agree that that document probably

8    does not fall under any of the categories in the exhibit

9    which -- where you list the documents that were turned over

10   to the defense?

11   A.   Now, there's a -- there's a good question.

12       Because, I'll tell you, there was a time -- when I

13   organized a file, if I had an affidavit and there was a note

14   associated with that affidavit -- in other words, many times

15   a person will say to the police X, Y, and Z, in their

16   affidavit, but when you get the note, the note sometimes will

17   say Xish, Yish, and Zish, and I will always include the two

18   of those together in my own documentation.  And this very

19   well could have been attached with any notes relating to what

20   Priscilla Rodriguez said with her affidavit.

21       Do I know for sure that's the way it happened?  No.

22       So the answer to your question:  I'm not sure.

23   Q.   You're not sure whether that would have been under any

24   of those categories?

25   A.   Right.

1          It could have very well been attached with the affidavit

2    of Priscilla Rodriguez, because my practice back then would

3    be to check whether the note is consistent with the

4    affidavit, because there's always going to be an impeaching

5    moment if it is not.

6    Q.    So, but you agree that document is not an affidavit, the

7    detective's report?

8    A.    It is not an affidavit, that's correct.

9    Q.    And are you aware that -- of whether Ms. Rodriguez did

10   in fact sign an affidavit in this case?

11   A.    She did.

12   Q.    Okay.

13              MR. BIGGS:   I'd like to approach, Your Honor.

14              THE COURT:   You may.

15   BY MR. BIGGS:

16   Q.    Show you Petitioner's Exhibit 7.

17        Have you had a chance to review that document?

18   A.    Yes, sir.

19   Q.    And that is a copy of the affidavit that she gave the

20   night of the shooting.  Is that correct?

21   A.    That's correct.

22   Q.    And are most of the affidavits on that list of documents

23   that you -- on the list of names under the category

24   affidavits that you turned over, are most -- are most of

25   those affidavits affidavits that were signed that night, the

1  night of the shooting?

2  A.   Without reviewing them, it's hard for me to say.

3      I believe there may have been some affidavits that --

4  I'm sorry, I'm not speaking into the microphone.

5      There may have been some affidavits that were given -- I

6  mean, let me -- do you want me to review this list?

7  Q.   Sure.

8  A.   I may be able to tell you from reviewing the list.

9      And I don't believe this is what I gave to Mr. Hays.

10     I think what I gave to Mr. Hays, the LF and the birthday

11  would have been redacted.  So this would probably -- the

12  document I gave to him I think is in -- in this box here, is

13  probably going to have that identifying information redacted.

14  Q.   But if we had -- I mean, if we obtained that affidavit

15  from -- it's directly from the police department, would that

16  be redacted?

17  A.   No.  Unless the police department redacted it.

18      If you obtained it from my file it would -- well, the

19  police department would have -- I don't know if they would

20  have redacted it or not.  I would assume not, if -- depending

21  on if it was requested after the trial was over, I mean, I

22  don't know what their procedure -- what their -- what their

23  policies are.

24  Q.   Well, would you agree that that -- the document that

25  lists all the things that were turned over, that does not

1  include every police report generated in the case?

2  A.   It -- it included the prosecution report.  And, again, a

3  prosecution report, when it comes to me in a folder it's

4  going to say prosecution report across the top, and it's

5  going to have everything stapled to it, including --

6  everything the police decide to give us at the time they file

7  the case is going to be there.

8       And then it's taken apart, it's subdivided.

9       And so when I see "prosecution report" here, it could

10 mean that all he got was just the printed prosecution report,

11 it could mean that he got everything I had in the folder at

12 that time.

13 Q.   But there is a document that the police department

14 creates that's entitled prosecution report; is that correct?

15 A.   That's correct.

16 Q.   And what typically comes on a prosecution report?

17 A.   The prosecution report, it's -- it's sort of a misnomer,

18 because what you're going to have is -- you're going to have

19 all stapled together, it's going to say prosecution report,

20 it's going to be what they generated to give to us.  Included

21 in that is going to be a police incident report.  It's going

22 to be an arrest report, if there's one.  It's going to

23 include witness statements.

24      And a lot of times it all depends on the detective and

25 what they include with that prosecution report when they file

1    it.  Some detectives won't give you anything, you got to go

2    over there and make all the copies.  Some of them will give

3    you everything that they have at the time right there in your

4    prosecution report.

5              MR. BIGGS:  I'd like to -- may I approach, Your

6    Honor?

7              THE COURT:  You may.

8    BY MR. BIGGS:

9    Q.   I'll show you defendant -- Petitioner's Exhibit 8, and

10   that is a copy of a prosecution report that was obtained

11   through an open records request of the Dallas Police

12   Department.

13        If you wouldn't mind taking a minute just to review

14   that.

15        I believe that document is how many pages?  Four pages?

16   A.   It's four pages.

17   Q.   And on each page of that document it says the words

18   "prosecution report," is that correct?

19   A.   Yes, sir.

20   Q.   So would there be anything -- what documents beyond the

21   documents that actually have the words "prosecution report"

22   on them would -- would be in a prosecution report that was

23   turned over from the prosecutor?

24   A.   The police incident report would be included in that.

25        The police arrest report.

1        The warrant and affidavit for the arrest.

2        The magistrate form would be included in that.

3        We're -- we're talking about semantics right now.

4        The prosecution report -- if I had a brand-new file that

5    I just got from the police today it would say "prosecution

6    report" on the front and all of that would be stapled

7    together.  And if you asked me for the prosecution report,

8    you would get that whole thing and the title of it would be

9    prosecution report.

10   Q.   But it's not going to have all the supplements from

11   every police report?

12   A.   It could.  I mean, it's not going to have -- it depends

13   on the type of case it is and it depends on the detective.  I

14   mean, I'm just being honest with you.  That's what it --

15   that's what it would be.  I mean, some detectives make you go

16   out and get it all.  Some of them give you a little bit, and

17   you know from reading the report that there's more there.

18       I think the -- the notion of calling it a prosecution

19   report is that we want them to summarize what they're giving

20   us.

21   Q.   So is -- does Dallas Police Department -- does their --

22   does their document entitled prosecution report differ in any

23   way from what the District Attorney's Office would call a

24   prosecution report?

25       Is it the same document?

1        Are we referring to the same document?

2   A.    You're referring to the same document, but, again,

3   you're talking semantics.  Because if you ask the police

4   officer -- we have this problem all the time when we're

5   talking to the police.

6        You could go down in a misdemeanor court right now and

7   ask for a prosecution report -- or a police officer -- they

8   will be -- they will tell the police officer, okay, did you

9   read your report.  And they're talking about the prosecution

10  report.

11       The police officer is reading the incident report that's

12  included in it and many times it's got a lot more details,

13  and they're not even on the same page.

14       So we have to -- sometimes we have to tell them I need

15  you to review the whole report, that includes everything

16  that's stapled to this prosecution report.  If that makes

17  sense.  I don't know.  It's kind of difficult to -- to

18  explain.

19       But for the fact that if you ask the prosecutor many

20  times about the -- the report, the prosecution report, you

21  could get two or three different answers, because of what's

22  stapled to it and what's included with it.

23  Q.    But when -- when you wrote down "prosecution report" is

24  it fair to say that that may or may not have included that

25  detective's report?  With Priscilla Rodriguez identifying

1   Licho Escamilla as the shooter?

2   A.    This statement -- I mean Defense --

3   Q.    Exhibit 1.

4   A.    Would it have included this?

5   Q.    Yeah.

6   A.    I mean, there's no way for me to tell you that.

7   Q.    Would that have fallen under the category of prosecution

8   report?

9   A.    If it had been -- and I -- and I hate to keep

10  digressing, but when I look in the file right now, clipped to

11  the prosecution report is a number of documents, but it's

12  been handled by a bunch of people.

13       If it was included with the prosecution report when I

14  got it, it's -- it's possible that when I gave him this, and

15  he signed for it, it would have been a part of that.

16            MR. BIGGS:   Your Honor, may I approach?

17            THE COURT:   You may.

18  BY MR. BIGGS:

19  Q.    I'd like to show you Petitioner's Exhibit 5.

20       This is a copy of the transcript immediately prior to

21  the beginning of testimony.   I believe it was after the voir

22  dire.

23       Just take a second to review that, please.

24  A.    Okay.   Did you mean to give me this part with

25  Investigator Rosa's time card --

1    Q.    Oh, no.  Sorry about that.

2    A.    That's all right.  (Pause.)

3          Okay.

4    Q.    Did you have a chance to read through that?

5    A.    Well, I didn't read it all, but I -- I recognize what it

6    is.

7    Q.    Okay.  In there it appears that you and Mr. Hays put on

8    the record that you turned over all Brady material, at least

9    to your knowledge, to him prior to trial.  Is that correct?

10         That he had filed a motion.

11   A.    I'm sorry, could you repeat the question?

12   Q.    My question was:  There at -- it was really as to the

13   content of that transcript.  It basically discusses on the

14   record the pretrial motion filed by Mr. Hays and your

15   representation that all Brady material had been turned over.

16   Is that correct?

17   A.    That's correct.

18   Q.    And it also says that you were going to give Mr. Hays an

19   opportunity to review his -- Investigator Berry's notebook.

20   A.    Correct.

21   Q.    What is the investigator notebook?

22   A.    It's going to be everything in the file -- everything

23   related to the case that -- the lead detective's job is to

24   collect any report connected to the case.

25         It would be what I would have copied if I had gotten a

1   copy from Detective Berry, and it would have all been in a

2   notebook much like this (indicating).

3        And what we're referring to here is the practice back

4   then was when a lead detective took the stand under our rule,

5   state rule 612, after they testified they would hand the

6   notebook over to the defense lawyer and everything as it

7   related to this case he had an opportunity to look at.  And

8   it was really a courtesy back then if they got a chance to --

9   to peruse it beforehand.

10        And I think what we said here was that I didn't have any

11   objection to him looking at it right now, beforehand, or

12   whenever he wanted to, which would have included everything

13   in the case

14   Q.   So what documents would have been in the investigator's

15   report that would not have been in the documents you turned

16   over?  Back then.

17   A.   I mean, who -- there's no way for me to tell you that.

18        I mean, for instance, there will be pages and pages

19   of -- of maybe a Lexis search.  If you're looking for a

20   witness and you're not able to find them, there may be 20 or

21   30 pages of where they tracked this person to this house or

22   to that location or to this car and to that.  There could

23   be -- I mean, there could be a myriad of things that I didn't

24   get from Detective Berry, and quite frankly didn't want.

25        But for the most part I would imagine anything that was

1    of substance would have been what I had and what I would have
2    turned over to him.
3    Q.    Did you independently look at Detective Berry's file and
4    pluck things that you thought might have been important or
5    might have been exculpatory evidence, do you recall?
6    A.    I don't recall doing that, but -- You know, the problem
7    I have right now is - seven years later - is the prosecutor I
8    am now is not the prosecutor I was back then, meaning I have
9    a lot more experience now, I've been through a lot of things.
10   And -- and as it stands now I probably, you know, at some
11   point in my career decided that I would double-check for
12   myself.  Whether I did that back then or not, I can't say.
13   Q.    So is it possible that you might have relied on
14   Detective Berry to turn over whatever you -- he thought was
15   exculpatory or germane to the prosecution?
16   A.    Well, no.  Because it's my duty to turn it over.  He
17   obviously -- and I don't think the police quite understand
18   that duty.  It's one of the things we're having talks about
19   right now.
20         But it's my duty to turn it over if it's favorable to
21   the defense.  And I would have been -- if -- if I didn't look
22   through his notebook and there was something there that was
23   exculpatory, then that would be on me, that wouldn't be on
24   him.
25   Q.    But -- but it's possible that you did not look through

1    the notebook and find -- and -- look through the notebook?

2    A.    I -- I would say that would be not very likely.  I would

3    have looked through the notebook.  Even -- even back then, if

4    he would have showed up with a notebook I would have had

5    everything in the notebook, I would have felt confident,

6    because I knew Detective Berry, but I -- it would have been

7    in my nature to look through that.

8         I'll give you a perfect example.  The lineups that we

9    use in trial, I would want to put in the original.  I

10   wouldn't want to put in the black and white.  Back then they

11   would give us black and whites, I'd have to request specially

12   color copies.  The lineups I would get out of the notebook --

13   and I would look through everything in there.  He would have

14   a whole section of photographs.  Many times I would look

15   through the photographs, just to make sure there was

16   something, you know, that's going to help me that I didn't

17   see before.

18   Q.    Would you agree that the detective's notebook is

19   relatively voluminous?

20   A.    It's -- it's most certainly voluminous, yes, sir.

21   Q.    So it's possible, I mean, you might miss something?

22   A.    That's possible, yes, sir.

23   Q.    And do you know whether Carl Hays in fact ever looked at

24   the detective's notebook which you made available to him?

25   A.    I would say from -- from personal memory I don't know.

1    But I would say from looking from the record that you just

2    gave me, he made it a point to say that he hadn't looked

3    through it yet but he wasn't waiving that and he wanted to

4    look at it.  And I didn't object to him looking at it right

5    then and there.  And from the records that I saw in reading

6    the transcripts, Rick had the notebook up there with him --

7    I'm sorry, Detective Berry had the notebook up there with him

8    and when he was passed we took a break.

9         So my best guess would have been he either would have

10   looked at it before and after direct or one or the other

11   would have been my -- my best guess.

12   Q.   And given that it's fairly voluminous, do you agree it

13   would probably take a considerable amount of time to actually

14   cull through that document?

15   A.   I would agree with that, yes, sir.

16   Q.   And is there any indication that any sort of recess

17   was -- there was any sort of recess in the proceedings so he

18   could look through that?

19   A.   There is an indication -- I think when we passed Rick on

20   cross there was a break -- I mean Detective Berry.  I'm

21   sorry, Your Honor, I -- when I -- I mean Detective Berry.

22        And many times what will happen is the lawyer will ask

23   the judge to look at it over the lunch hour and as long as

24   they didn't walk out of the building with it many times they

25   would look at it in the D.A.'s workroom or -- or anything

1    like that.

2         So I would say -- I would say he probably did look at

3    it, but I couldn't say for certain.

4    Q.   And in -- in the transcript we were just talking about,

5    I believe you said on the record that all exculpatory

6    information had been turned over to the defense but that you

7    were also making available Detective Berry's report but that

8    that was a separate deal; is that correct?

9    A.   I'm not sure if I understand your --

10   Q.   Well, if you could just --

11   A.   -- question.

12   Q.   -- take a look at the transcript.

13   A.   Okay.

14   Q.   I think it's the third or fourth page where you're --

15   you speak about his pretrial motion.

16   A.   Let me -- let me catch up with you here.

17        Tell me which page it is.

18        I see it.  I see it.

19   Q.   Yeah.   Page 11.

20   A.   Okay.  Actually, starting on page 10 the conversation is

21   "For the purpose of the record, we filed pretrial motions.  I

22   think the State has complied with all.  We've also filed an

23   exculpatory motion.  I've been promised by the State that I

24   would be permitted to review the detective's notebook."

25        That tells me Mr. Hays was dead set on looking at it.

1    "At this point we have not reviewed the notebook but I

2    don't -- but I don't want in any way our exculpatory motion

3    to be waived."

4    Okay.  And then my response is:  "The State has turned

5    over all the evidence in its possession that was exculpatory

6    and it has turned over quite a few pretrial items that were

7    signed off on by the defense attorney and the offer by the

8    State to look at the detective's folder was in advance of him

9    testifying," and I go on to say that I don't -- I don't have

10   any objections to that.

11   So, I don't know if I answered your question or not.

12   Q.   Do you -- do you also say in there that that's a

13   separate matter, that the detective's notebook is separate

14   and apart from the exculpatory information in there?

15   A.   You can say that.

16   I mean, my representation to the court was anything that

17   I had in my possession that was exculpatory I turned over.

18   Now, sort of the catchall is it's all here.  I mean,

19   there -- there could be some things that the defense knows is

20   favorable to them -- to them, because they know their case

21   better than I know it, and so if there's anything in there

22   that's favorable to him, he's got the right to look at it,

23   make copies, whatever he wants.  And that's primarily the

24   reason that we change things the way we do it now, is because

25   if they get it all I don't have to secondguess what his

1    theory of his case is and what's favorable to him.

2    Q.    But -- but would you agree that you were making the

3    representation that everything to your knowledge that was

4    exculpatory had been turned over already.

5    A.    Anything that was in my possession, yes, sir, that's

6    what I said.

7    Q.    And that additionally you were allowing them as a

8    courtesy to look at the detective's notebook?

9    A.    That's correct.

10   Q.    And back then you weren't required to turn that over but

11   it was a courtesy?

12   A.    That's correct.

13   Q.    I'm sure you've reviewed the testimony that -- have you

14   had occasion to review your direct and cross and -- or

15   redirect of Detective Berry in this case?

16   A.    I have.

17   Q.    And would you agree that the testimony that Detective

18   Berry gave was misleading?

19   A.    Well, I would agree -- I would agree that some of it

20   was, yeah.  I would agree that in the context of the cold

21   record, yes, it was.

22   Q.    I mean, when -- when you asked him:

23          "Q.    As a result of your investigation did you have

24   any evidence that supports that he --" this is on trial

25   volume 3, 167, lines 9 through 13:

1          "Q.   Did you have any evidence that supports that

2     he --" and it's clear from the context that's Licho

3     Escamilla, "-- shot Israel Martinez?"

4          And Detective Berry says:

5          "A.   No, none of the evidence we collected

6     indicates that Licho Escamilla was the one who shot Santos

7     Gauna, Israel Martinez, or Cynthia Martinez."

8          Do you agree that that is a false statement?

9     A.   Well, I would agree that that is not grammatically

10    correct as it relates to what he just said.

11         But if you'll look at the question prior to that, the

12    context of it, Mr. Biggs.  At line 4, when I said

13    "investigation" I was talking about the 17 people that they

14    interviewed that night.  And I don't know if you want me to

15    explain it or not.

16         I mean, I do -- I do agree with you that when you read

17    that question and that answer that that totally disregards

18    what Priscilla Rodriguez had told Detective Rodriguez -- I

19    mean Detective Berry.

20         But, you know, to go back seven years and to -- and to

21    try and -- and get back in the zone that I was in then, my

22    thoughts as best as I can recreate them, when I asked in the

23    previous question, "And from your question -- and from your

24    investigation talking to those 17 people," now, I didn't say

25    that night, but that's the zone that I was in, "-- did you

1    have any opinion of whether he was shooting out there?"

2         And he says yes.

3         And then to go on, "And as a result of your

4    investigation," no, I didn't say that investigation or that

5    investigation that night, but my recollection of what I would

6    have been thinking would have been the investigation on that

7    night talking to those 17 people.

8         And to -- to be quite frank with you -- with you, the

9    more that I read this, the more that I was thinking, well,

10   that was a pretty boneheaded question and answer.  But when

11   you think about the heat of the battle that you're in and

12   when you're asking the questions, I was combating the theory

13   of the case that when -- when something -- when -- when you

14   go out there the night of the offense and nobody points to

15   the defendant or nobody mentions the defendant's name as

16   being the person who shot him, that night, in my mind part of

17   my theory is to rebut that.  And nobody pointed Licho out, or

18   anybody that knew Licho didn't say that Licho was out there

19   shooting, and that's the context in which I read this.  I

20   know that that's not on the written page and therefore to 12

21   people in a box it could have been misleading.

22   Q.   Do you agree that Priscilla Rodriguez was one of those

23   17 witnesses that was brought in to the police station that

24   night?

25   A.   I do agree.

1    Q.    I'd like to direct your attention to your closing

2    argument.    This is Volume 4, lines 9 -- or pages 199 to 200.

3    A.    Could you tell me the lines one more time?

4    Q.    That was at page 199 to 200, lines 15 to 25, and then 1

5    through 5 on the following page.

6          So 15 to 25 on page 199, beginning there.

7          And you testified that the detective in this case told

8    you that when those 15 people -- 17 people were brought down

9    to the police station and talked to, none of them could

10   eliminate Santos Gauna, none of them could tell him -- that

11   must be Licho Escamilla.

12         Is that actually in the transcript?

13         None of them could tell him that he was the man that --

14   that shot Santos Gauna.   And I understand your testimony that

15   you might have been referring in the heat of battle to that

16   night, but then when you say he showed lots of photo lineups

17   to lots of people and none of those people identified this

18   man as shooting Israel Martinez, Santos Gauna, or Cynthia

19   Martinez, were there any photo lineups actually shown to any

20   of the witnesses that night, the night of the shooting?

21   A.    I don't believe that they had anybody's name, other than

22   Licho Escamilla at that time, and I don't believe there were

23   any photo lineups shown that night.

24   Q.    So, I mean, in this closing argument we're sort of

25   conflating the night of the incident with subsequent photo

1  identifications of -- throughout the investigation, am I
2  right?
3  A.  I'm sorry, could you repeat that?
4  Q.  I mean, are you -- are you not conflating the night of
5  the incident when 17 people came down to the police station
6  with subsequent photo lineups that were administered to
7  witnesses?
8  A.  There was certainly that addition to that in my closing
9  arguments.  Yes, sir.
10  Q.  All right.  I wanted to direct you to volume 3, line
11  168 -- page 168, lines 22 through 25, just to jump back.
12  A.  I'm sorry, which volume?
13  Q.  Volume 3 --
14  A.  Okay.
15  Q.  -- pages 163 -- page -- page 168.
16  A.  Is this going to be the rebuttal of Mr. Berry?
17  Q.  You say did anybody exclude the defendant as being the
18  person who killed Santos Gauna or committed the aggravated
19  assaults.
20      And Detective Berry said no.
21  A.  Okay.  I'm sorry.  I'm not at the same place you are.
22      Are you in volume --
23  Q.  I'm on volume 3.
24      See, it's a little tricky because volume 3 the pages are
25  in the 160s and volume 4 they also happen to be in the 160s.

1    A.    Right.

2    Q.    It's volume 3, page 168, is what I'm referring to.

3    A.    All right.  All right.  Okay.  Let me go to -- I thought

4    I had it all here in front of me.

5          So we're not talking about the rebuttal, are we not?

6    Q.    We're not at this point.

7    A.    Okay.

8    Q.    And I apologize for jumping back.

9    A.    That's okay.  We're talking about the direct.

10         And volume 3, page 168, lines --

11   Q.    22 through 25.

12   A.    Okay.  All right.  I'm with you.

13   Q.    Okay.  And you say -- you ask Detective Berry did

14   anybody exclude the defendant as being the person who killed

15   Santos Gauna or committed the aggravated assaults.

16         And Detective Berry says no.

17         Do you agree that that statement is not in the context

18   of the photo -- or the 17 witnesses interviewed that night?

19   A.    I agree with that, yes, sir.

20   Q.    Okay.  I wanted to direct your attention to one --

21   another colloquy you had with Detective Berry, and this

22   actually is in volume 4 during the redirect, and it is pages

23   164 and 165 of volume 4.

24   A.    164 and 165; is that what you said?

25   Q.    Yes, sir.

1    A.    Volume 4.   Okay.

2    Q.    And this is beginning at lines 18 through 21 and going

3    on to lines 2 through 10 on page 165.

4        You say:  "And did anybody positively identify Licho

5    Escamilla as being out there, being the person who shot

6    Santos Gauna?

7        "No.   No one identified Licho Escamilla as shooting

8    Santos Gauna.

9        "And you showed this lineup to Frank Hernandez?

10       "I did.

11       "And you showed lineups of who else?

12       "Of Jose Escamilla, of Juan Escamilla, and the

13   defendant, Quintin Alonzo.

14       "And did anybody out of all the 17 people that you

15   talked to identify any of those people as the person who shot

16   either Santos Gauna, Cynthia Martinez, or Israel Martinez?"

17       Berry:  "No, they didn't."

18       And you say:  "Did anybody exclude the defendant as

19   being the person that shot either Israel Martinez, Cynthia

20   Martinez or Santos Gauna?"

21       Detective Berry says:  "No."

22       Do you agree that that colloquy is misleading?

23   A.    I agree by including the lineup information there then

24   that is -- that is misleading, under the mindset that I was

25   in at the time, yes, sir.

1    Q.    But you agree that you are conflating the night of the

2    shooting with subsequent photo lineups, whether intentional

3    or -- or unintentional?

4    A.    Well, I'll tell you, in -- in -- we're going back seven

5    years, but I'll tell you what my mindset was.

6         If I was asking this question today my question would

7    have been was there any credible person that you showed the

8    lineup.  Because when I look at it -- when I look at it

9    today, and again I'm going back seven years, when I look at

10   it today Priscilla Rodriguez, if she knew who Licho Escamilla

11   was at the time she talked to them, she would have said Licho

12   Escamilla shot Santos, because that's what she said two weeks

13   later, after she had talked to Mr. Guzman who told her who

14   was out there shooting.

15        So the thought -- the thought process, it's just a bad

16   worded question and it is adding stuff on to it with the

17   lineups.  And if -- if I had just said credible witnesses it

18   wouldn't have been misleading, but because I didn't say

19   credible witnesses that is misleading.

20   Q.    And were you aware -- were you aware that Priscilla

21   Rodriguez had identified Licho Escamilla as shooting Santos?

22        Did you remember that?

23        Are you aware of that?

24   A.    Am I aware of it now?

25   Q.    Were you aware of it at the time of trial?

A.     Yeah.   At the time of the trial, yes, sir.

And, in fact, I probably -- we were trying to get
Priscilla Rodriguez there to trial.  I wanted to talk to her.
I mean, there's lots of notes in there of tracking her down.
Because my thoughts of Priscilla Rodriguez was just what I
said to you, was she there, was she not there, did she see
this, did she not see this.

It was -- it was very incredible to me that two weeks
later or three weeks later when she was shown the lineup that
she would know Licho not only by name -- not only by sight
but by name, would know who his cousins was and would
volunteer to the detective that she talked to Mr. Guzman, who
was out there shooting, and he told her that Licho was out
there shooting.  And the fact that she didn't know this back
at the time, that night, which was kind of stuck in my brain,
she didn't know any of this that night, but after the rumors
on the street were that Licho -- Licho did it, she very well
could have thought that she was helping the case out after
Mr. Guzman told her Licho was the one out there shooting by
pointing to him and saying, yeah, that's Licho, he's the one
who did it, that kind of thing.  So, mean, that's -- that's
sort of the mindset that I think I had with Priscilla
Rodriguez.

Q.     But you were -- you were aware that she was someone who
had in fact told Detective Berry that Licho Escamilla had

1    shot Santos?

2    A.    That's correct.

3    Q.    Okay.  And I want to show you -- shifting gears to 2007.

4          Do you recall --

5                THE COURT:  Mr. Biggs, I'm sorry to interrupt you,

6    but just for planning purposes, how much longer do you think

7    that you have?

8                MR. BIGGS:  Not -- not very much longer, Your

9    Honor.

10               THE COURT:  All right.  Mr. Meador, is Mr. Alex

11   going to be someone that you're going to call in your case in

12   chief?

13               MR. MEADOR:  We do have him listed and we might --

14   Leslie is going to be handling him.  We might be able to go

15   into our direct, possibly.

16               THE COURT:  Well, if he's going to have to stay all

17   afternoon anyway we'll go ahead and break between the two

18   examinations.

19               MR. MEADOR:  Right.  Right.

20               THE COURT:  That's basically my question.

21               MR. MEADOR:  Yes.

22               MS. KUYKENDALL:  Your Honor, I believe that Mr.

23   Alex may have testimony that's relevant after the remainder

24   of Mr. Biggs' witnesses testify, so . . .

25               THE COURT:  Okay.  Well, then we'll go ahead and

1    finish the direct and then break.

2         MR. BIGGS:   May I approach, Your Honor?

3         THE COURT:   You may.

4    BY MR. BIGGS:

5    Q.   I want to show you Petitioner's Exhibit 6, which is an

6    investigative report, as well as an e-mail on the following

7    page.

8         It's a two page document which we obtained through an

9    open records request from the Dallas custodian of records.

10        MR. BIGGS:   And I don't think the respondent has

11   any challenge to the authenticity of the document.

12        Move to have that exhibit admitted.

13        THE WITNESS:   This says 6.

14        MS. KUYKENDALL:   Exhibit 6, we have no objection,

15   Your Honor.

16        THE COURT:   Exhibit 6 is admitted.

17   BY MR. BIGGS:

18   Q.   In that document one of the detectives, I believe it's

19   Detective Waller, received word from Alexandra Rodriguez, who

20   is Priscilla Rodriguez's sister, and she came forward in

21   April of 2007 with some information regarding this case.

22        And she said that she had some information and that Ms.

23   Rodriguez had witnessed Mr. Escamilla shoot Santos Gauna.   Do

24   you recall having a conversation with anyone regarding this

25   matter, one of the -- anyone in law enforcement?

1    A.    No, I don't recall the conversation.  No, sir.

2          But let me finish reading the note, if you don't mind.

3    Q.    Okay.

4    A.    Okay.

5    Q.    Do you recall that conversation at all?

6    A.    I don't recall it, no, sir.

7    Q.    You have no recollection of anyone coming forward about

8    this case in 2007?

9    A.    That's not what I said.

10         In 2007, in 2006, and in 2005, and in 2004, the victim's

11   family would call me regularly and say people are contacting

12   me and the witnesses on this case, and it's the defendant's

13   mom, and trying to get them to change their story and what

14   can we do about that.

15         So people were constantly contacting me about this case.

16         And I can tell you, if I had this conversation with the

17   detective, that would not have surprised me, because it would

18   have been on the heels of Alexandra Rodriguez telling

19   Detective Berry that she wasn't nowhere around when the

20   shooting happened, she was in the back, and now she's coming

21   forward and saying she knew Licho committed this murder and

22   not Quintin, to me that smacked right of the defendant's mom

23   talking to her and having her call the police.

24         And this was happening on a monthly basis.

25   Q.    Did you -- but you did not follow-up on that particular

1    witness coming forward; is that correct?

2        Alexandra Rodriguez.

3    A.    That she said she had information that Licho committed

4    the murder and not Quintin?

5    Q.    Right.

6    A.    No, sir.

7            MR. BIGGS:   No further -- pass the witness.

8            THE COURT:   We're going to go ahead and break for

9    lunch.   Let's take a 45 to 50 minute break and we'll be ready

10   to start.

11                    (Recess taken at 12:15.)

12               (Proceedings resumed at 1:00 o'clock.)

13           THE SECURITY OFFICER:   All rise.

14           THE COURT:   Please be seated.

15       You may proceed, Ms. Kuykendall.

16           MS. KUYKENDALL:   Thank you.

17       Your Honor, may I approach the witness?

18           THE COURT:   You may.

19           MS. KUYKENDALL:   For the record, I've already shown

20   this to Mr. Biggs.

21                    CROSS EXAMINATION

22   BY MS. KUYKENDALL:

23   Q.    Take a look at that.

24       Mr. Alex, could you identify that document for me?

25   A.    This would be the personal information sheet.

1     When a detective talks to a witness he will fill this

2  out.  And it's regarding Alexandra or Alejandra Rodriguez,

3  who would have been somebody associated with this case.

4  Q.   Okay.  So the same Alexandra Rodriguez that Mr. Biggs

5  just asked you about before the break?

6  A.   Yes, ma'am.

7         MS. KUYKENDALL:  Your Honor, I would move to admit

8  this as State's 5 or Respondent's 5.

9         MR. BIGGS:  No objection.

10        THE COURT:  It is admitted.

11  BY MS. KUYKENDALL:

12  Q.   Okay.  Well, when you look at that document and going

13  back to Mr. Biggs' question about Alexandra's subsequent

14  phone call after trial --

15  A.   Yes, ma'am.

16  Q.   -- do you think that the Exhibit 5 that I just showed

17  you affected your decision whether to follow-up?

18  A.   Well, I'm -- I'm sure it did.

19  Q.   Could you go -- explain?

20  A.   Yes, ma'am.

21     The -- I was aware that Alejandra Alexandra Rodriguez

22  was the sister of Priscilla Rodriguez and her statement in

23  this information sheet said that she was in the back and she

24  didn't see the shooting.

25     She went on further to say that she -- she heard Jesse

1    Baron, lives at the corner, say to someone else that they

2    were about to start shooting the place up and then he left

3    before the shooting.  But she clearly stated that she wasn't

4    even in the front where the shooting was happening.

5    Q.    And so when you received a call after trial was over

6    informing you that Alexandra Rodriguez had called saying

7    somehow that she had information about the case, what would

8    have gone through your mind?

9    A.    Well, what would have gone through my mind -- what had

10   been -- what had been going through my mind for some times,

11   the -- the surviving complainant in this case, Mr. Martinez

12   and his wife, had called me on a number of occasions,

13   including some of the witnesses who had affidavits in this

14   case, and they would tell me that the defendant's mom was

15   calling them trying to get them to change their story.  And

16   they wanted me to do something about it.

17        And I basically told them, you know, she's just doing

18   what a mother is going to do.

19        And I was convinced, based on what she said at the

20   beginning, was that she was not in the front, and she didn't

21   see what had happened, and that this was just more of the

22   same that was going on.

23   Q.    Okay.  And according to the date on that document when

24   did she give that statement?

25   A.    This would have been the same night of the shooting.

1      And -- and let me just -- can -- can I say this?

2      I don't really and truly have a specific memory of

3   talking to somebody from the Dallas Police Department, but I

4   am -- I am saying to you what I believe happened.   Okay?

5      I -- I'm not document -- I'm not doubting the document

6   that was shown to me that that happened, I just don't recall

7   it happening.   But if it did happen, I would have probably

8   treated it the way I treated a couple of the other calls that

9   I got that was referencing that same kind of information.

10  Q.   Okay.   All right.   Very good.   Thank you.

11     All right.   Well, going back, I'm going to try to take

12  this in mostly chronological order.

13     When you stated that all exculpatory evidence had been

14  turned over, was that statement true to the best of your

15  knowledge at that time?

16  A.   To the best of my knowledge it would have been true at

17  that time.

18  Q.   Okay.   Did you -- I mean, you certainly were aware of

19  your duties under Brady.

20  A.   Yes, ma'am.

21  Q.   Okay.   And understanding those duties, would you have --

22  would you have turned over anything exculpatory?

23  A.   I would have turned over everything that was in my

24  possession that was exculpatory.

25     And -- and, you know, part of the problem with a case

1   like this is after the shooting happened people were calling

2   the police on anonymous calls, and all of that was in the

3   notebook, saying I saw this, I saw this person, and I -- I

4   think there's -- there's probably stuff in the -- in the

5   record about, you know, Licho did it.  I think there was a

6   call that maybe Frank Hernandez was out there shooting.

7   There was lots of calls of people out there shooting.

8       So having the notebook there for him to look through,

9   anything that would have been important to his case -- I

10  wouldn't know if he was going to say Frank Hernandez did it

11  or Juan did it or Licho did it.  I had a good feeling that --

12  that his theory was going to be Licho did it.  But the -- the

13  notebook would have been there for anything that was

14  favorable to him that he was aware of.

15  Q.   Okay.  Let's see.  To go back, we discussed work product

16  a little bit, about your understanding of what work product

17  is.

18      And when you were speaking about in terms of your file

19  and what you turned over, just to clarify, is it fair to say

20  that your sort of working definition of work product was

21  attorney work product rather than something that had maybe

22  been turned over by the police?

23  A.   Yes, ma'am.

24  Q.   Okay.  And if I understood you correctly Ms.

25  Rodriguez -- Priscilla Rodriguez's affidavit, the one that's

1   been central to the testimony here, if I recall correctly you

2   are not absolutely sure that it was attached to the

3   prosecution report but you do believe that it very well could

4   have been.

5   A.   And when you say "the affidavit" we're talking about --

6   Q.   I'm sorry.  We're talking about Priscilla Rodriguez's

7   affidavit that -- the photo ID of -- of Licho.

8   A.   Okay.  Yes, ma'am.

9        I mean, either one of these documents could have been

10  attached.  I can't say for sure.

11  Q.   Okay.  And I know that you said that a lot of times that

12  depended on the detective working the case.  And in this case

13  that was Detective Berry.

14  A.   Yes, ma'am.

15  Q.   What was his typical practice?

16  A.   Detective Berry was very thorough, and he would have --

17  let's see, I think I had worked two other murder cases with

18  Detective Berry, and I don't -- I think that he would put

19  witness statements in his prosecution report.  It would be --

20  when I got the folder it would be there, but it would not be

21  all of them.  I mean, I wouldn't get -- obviously if I had

22  gotten all of them it -- my prosecution report would be this

23  big (indicating)

24       But the typical -- the typical murder case that I would

25  get, and from experience it was probably my second or third

1    one with Detective Berry, it would be a folder similar to

2    this one, in my hand, and it would have some statements from

3    witnesses, but probably not all of them.

4    Q.    Okay.  So would a report indicating that Licho was the

5    shooter and not Alonzo have been turned over?

6    A.    Yes, ma'am.

7    Q.    Okay.  And we've talked about Priscilla a lot.

8          What was your plan?

9          I know you've touched on this, but if you could go over

10   it one more time.

11         What were you planning to do if Priscilla Rodriguez

12   testified?

13   A.    Well, in the trial it was kind of interesting, because

14   the defense put on multiple witnesses that said that the

15   defendant, Quintin Alonzo, was not even in the front when the

16   shooting happened.

17         There was a Lucy Montoya who had basically said I was

18   looking at him, he was with me, we were in the back.  And

19   that was their so-called star witness.

20         And there were other multiple witnesses that said, no,

21   he couldn't have been in the front where the shooting

22   happened.

23         And at some point I, in my mind, when I think back, I --

24   there was a lot of witnesses in the hall, many of whom had

25   never given statements before, like Lucy Montoya.  She didn't

1    give a statement that night after it happened, never talked

2    to the police, never gave them a statement, wouldn't talk to

3    me.

4         And so it would have been easy if Priscilla Rodriguez

5    had taken the stand, she would have impeached every witness

6    he put on the stand who said that Quintin Alonzo wasn't even

7    in the front.

8         And I believe that if I was able to talk to her she

9    would have -- she would have admitted, yeah, I spoke to Mad

10   Dog, Mr. Guzman, before I looked at this lineup and he told

11   me that Licho was out there shooting.  And I think in her

12   mind she thought she was helping.  And she would have put the

13   defendant in the front, throwing bottles, which is what

14   Israel Martinez said he did before he pushed him.

15        Israel Martinez says the defendant threw a bottle at

16   him, he got angry and pushed him, and he, the defendant, came

17   up with a pistol less than five feet away and shot him and

18   his family.

19        And she would have -- she would have corroborated that.

20   She would have said Licho was out there shooting, I'm sure,

21   because --

22            MR. BIGGS:  Your Honor, I'm going to object to the

23   speculation.

24            THE COURT:  Sustained.

25   BY MS. KUYKENDALL:

1   Q.   Okay.  Well, are there -- is it a fair statement to say

2   that there are many points that you could have brought out,

3   not only on cross-examination, that would have impeached

4   other parts of Mr. Hays' case?

5   A.   I think it would have impeached his whole case.

6        His theory of his case was the defendant was nowhere

7   near the shooting.  And I do believe it would have -- her

8   testimony would have been consistent with the other witnesses

9   who said they saw Licho shooting from behind a Cadillac, but

10  that would have been after the victim and his wife and his

11  son had been shot.

12  Q.   And are those points that you would have brought out in

13  your closing argument?

14  A.   Yes, ma'am.

15           MS. KUYKENDALL:  Okay.  Thank you.

16       Your Honor, may I have a moment?

17           THE COURT:  You may.

18           MS. KUYKENDALL:  Your Honor, I pass the witness.

19           THE COURT:  Any redirect?

20           MR. BIGGS:  Briefly, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. BIGGS:

23  Q.   Mr. Alex, you would agree that if Carl Hays had chosen

24  to call Priscilla Rodriguez to the stand he might not have

25  chosen to call the other witnesses that he did call?

1   A.   I would agree that it would have been a choice.   It

2   would have been a choice by a lawyer who was trying to figure

3   out what the truth was.   And he would have had to have made a

4   choice.

5   Q.   Or not only make a choice what the truth was but what

6   would be the best case for his client?

7   A.   Well, as a prosecutor I think my answer would be figure

8   out what the truth was, not what was best for the case.

9   Q.   But you -- you would agree that a -- an end goal of a

10   defense lawyer and end goal of a prosecutor are two very

11   different things.

12       Isn't the goal of a prosecutor that justice be done?

13   A.   Yes, sir.

14   Q.   And the goal of a defense attorney is to do whatever is

15   in the best interest of his client?

16   A.   I would disagree with that.

17       When you say "whatever" what do you mean?

18       Does that mean putting on testimony that's not true?

19   Q.   I apologize.   No.

20       I qualify the statement, besides from knowingly putting

21   forth false testimony, isn't a defense attorney entitled to

22   present the best case for his client?

23   A.   I would -- I would agree with that, yes, sir.

24   Q.   And in the affidavit that you were referencing, I

25   believe it's Exhibit 7 --

1    A.    Yes, sir.

2    Q.    -- does Priscilla Rodriguez actually say that Quintin

3    was in the front yard?

4    A.    In Defendant's Exhibit 7 she doesn't mention Quintin by

5    name at all.  She describes --

6    Q.    Oh, I'm sorry.  I'm sorry.  Exhibit 1.  I apologize.

7    A.    Okay.  Defendant's Exhibit 1?

8          She says -- she pointed at Alonzo's photo and says him,

9    he was throwing bottles before the shooting started, and

10   then, him, he was -- okay, and then identified the photo of

11   Licho.

12         So no.

13         She said that he was throwing bottles.  And my point was

14   that's exactly what the victim said happened.  He said the

15   guy threw a bottle at me, I got mad, I pushed him, and that's

16   when that same guy came up and shot me.

17   Q.    But she never said he was in the front yard throwing

18   bottles?

19   A.    Well, nobody in the whole trial said that anybody was

20   bottles in the back of the yard right before the shooting and

21   that's why the shooting happened.

22              MR. BIGGS:  Your Honor, I would object as

23   nonresponsive.

24              THE COURT:  Answer the question, Mr. Alex.

25   BY MR. BIGGS:

1  Q.   That report she never says -- Priscilla Rodriguez never

2  says that he was in the front yard?

3  A.   That's correct.

4  Q.   And when you testified on cross, I guess, you said that

5  this document would have been turned over, but I believe on

6  direct you said that it -- it would have been turned over had

7  you been aware of it.  Is that correct?

8  A.   I'm sorry?

9  Q.   If -- is it possible that you were never aware of that

10  document?

11  A.   Which document are you speaking of?

12  Q.   I'm talking about Exhibit 1.

13  A.   Okay.  The one in which she says that Licho shot Santos?

14       That's what you're asking me?

15  Q.   Yes.

16  A.   I think what I told you on direct was I was confident

17  that this was turned over to Mr. Hays.

18  Q.   Would you agree that you're inferring from the

19  circumstances and not testifying to a direct recollection of

20  turning that document over?

21  A.   I would agree with that, yes, sir.

22  Q.   Do you agree you also said on direct that you didn't

23  regard Priscilla Rodriguez as particularly a credible

24  witness?

25  A.   That's correct.

1    Q.   And if she's not a credible witness is her testimony in

2    your view necessarily exculpatory?

3    A.   I'm sorry?

4    Q.   Is her -- is her testimony exculpatory?

5    A.   This Defense Exhibit 1, as written, is exculpatory, yes,

6    sir.  If that's what you're asking me.

7    Q.   And that would have been something that you would have

8    considered to be exculpatory Brady material?

9    A.   Yes, sir.

10   Q.   And is it your testimony that you believe that document

11   was not in the -- well, let me rephrase.

12        Is it your testimony you believe that document was

13   turned over to Carl Hays separate and apart from allowing him

14   to look at the investigator's notebook the day of trial?

15        That was turned over --

16   A.   Yes, sir.

17   Q.   And it wasn't a matter of just allowing him to see

18   the -- the notebook?

19   A.   No, sir.  To the best of my recollection.  Yes, sir.

20             MR. BIGGS:   No further questions.

21             THE COURT:   Any recross?

22             MS. KUYKENDALL:   Just a couple, Your Honor.

23                        RECROSS EXAMINATION

24   BY MS. KUYKENDALL:

25   Q.   From your perspective as the prosecutor on the case

1   would you have preferred Mr. Hays to present a case with

2   Alonzo throwing bottles out front or placing Alonzo in

3   testimony -- witnesses who say he was out front throwing

4   bottles or in the back hiding, nowhere near the -- the scene

5   of the shooting?

6   A.   The case would have been simpler for me if Priscilla

7   Rodriguez was the only person who testified for the defense,

8   because at that point it would have been her word in a

9   dark -- in a very dimly lit place versus the word of a man

10  who was five feet from the shooter who looked the guy in the

11  eye.

12       And it would have been easier for me, because the first

13  statement that she gave she never talked about Licho by name

14  or knowing him.   And if she saw Licho shoot the complainant

15  she would have said that on the night and not two weeks later

16  after listening to the rumors and talking to Mr. Guzman.

17  That would have been an easier case for me to try, yes,

18  ma'am.

19  Q.   Okay.   But nonetheless, her -- from what we understand

20  her proposed testimony would have been, she would have placed

21  him in the front throwing bottles?

22  A.   That's what I -- that's what I take from looking at the

23  totality of the case and what I know about the facts of the

24  case, yes, ma'am.

25  Q.   Okay.   Was there other -- you know, was there other

1    testimony at trial that if believed would have placed all the

2    bottle throwing at the gate, where the shooting occurred?

3    A.    That's what the testimony at the trial was, is that --

4    that's what precipitated -- it was -- it was the throwing of

5    gang signs.  The defendant and his group was yelling Vagos.

6    The other guys were yelling Ledbetter.  They were being put

7    out because there was going to be a fight.  And the bottle

8    was thrown at Mr. Martinez because he was escorting the

9    defendant out.  And after he threw the bottle, that's when

10   Mr. Martinez pushed him and then got shot.

11       So the bottle throwing in the testimony that I was aware

12   of from reading everything and knowing the case was in the

13   front directed at Mr. Martinez in the yard.

14   Q.    Okay.  So to your knowledge there was no testimony

15   placing any kind of bottle throwing anywhere else around the

16   scene of the shooting?

17   A.    Yes, ma'am.

18             MS. KUYKENDALL:  Okay.  Thank you.

19       I pass the witness.

20             MR. BIGGS:  Nothing further, Your Honor.

21             THE COURT:  All right.  And I believe the State

22   wanted to have Mr. Alex remain?

23             MS. KUYKENDALL:  Yes.  At least be available on

24   call, if you would like to go back to your office.

25             THE WITNESS:  Is that okay?

1        THE COURT:  That's fine, Mr. Alex, as long as

2   you're going to be there where we can get you here quickly.

3        THE WITNESS:  Yes, ma'am.

4        THE COURT:  You may call your next witness, Mr.

5   Biggs.

6        MR. BIGGS:  Your Honor, we'll call Julie Vazquez.

7        THE COURT:  Ms. Vazquez, you were in the group that

8   was sworn this morning, correct?

9        THE WITNESS:  Yes.

10       THE COURT:  Please be seated and please speak up

11  into the microphone.

12       MR. BIGGS:  Your Honor, if you like I can clear

13  some of that stuff off there -- the ledge.

14       THE COURT:  It's up to you.  If you think your

15  witness will need it, that's --

16       MR. BIGGS:  No.

17                    DIRECT EXAMINATION

18  BY MR. BIGGS:

19  Q.   Hello, Ms. Vazquez.

20  A.   Hello.

21  Q.   Please state your name for the record.

22  A.   Julie Vazquez.

23  Q.   How are you related to Quintin?

24  A.   I'm his mother.

25  Q.   Did you retain Carl Hays as his attorney to represent

```
 1    him --
 2    A.    Yes, I did.
 3    Q.    -- when he got arrested?
 4    A.    Yes.
 5    Q.    Do you remember about when that occurred?
 6    A.    Shortly after -- I'd say within maybe a couple -- couple
 7    of months.
 8             THE COURT:  I'm going to need you to speak up a
 9    little bit.
10             THE WITNESS:  Around a couple of months.
11    BY MR. BIGGS:
12    Q.    Did you sign a contract with Mr. Hays?
13    A.    I don't recall.  I believe making an agreement but I
14    don't remember there being a contract.
15    Q.    Did you pay him some kind of retainer fee?
16    A.    Yes.
17    Q.    And how was your relationship with Mr. Hays at the
18    outset of your -- of his representation of Mr. Alonzo?
19    A.    I'm sorry?
20    Q.    At the beginning.
21          At the beginning, how was the relationship at the
22    beginning --
23    A.    Oh, it was fine.
24    Q.    -- of the case?
25    A.    It was fine.  He communicated with me.  He would answer
```

1    my phone callings.  I talked to him, quite often.

2    Q.    And how far along was it before things began to sour a

3    little bit?

4    A.    Well, I was paying Mr. Hays my -- my -- every pay

5    period.  I did fundraisers to raise money to also continue to

6    pay my lawyer fees.

7         I know it was I would say maybe almost a year as I was

8    paying him and -- and -- and the trial kept getting

9    postponed, he would -- he wouldn't return my phone calls as

10   often.  I seemed to have -- really having a hard time

11   reaching him and him calling me back.  Just seemed to me that

12   he was losing interest.

13   Q.    Did you fall a little behind in your payments to Mr.

14   Hays?

15   A.    Yes, I did.

16   Q.    And did you feel he became less interested in the case

17   as you fell behind in the payments?

18   A.    Absolutely.

19   Q.    Can you testify, about when did you fall behind in your

20   payments?

21   A.    Actually, it was probably a year -- I know we had a -- a

22   trial date and at that time it was postponed, and so I had

23   to -- I had six children to take care of.  I was a single

24   parent.  So he was okay me paying him a certain amount every

25   pay period.  It just got really tough and got behind.

1    He mentioned it to me once, about him needing some

2  money.

3    And I also -- I remember borrowing some money from my

4  parents to try to give him some more money.  And it was

5  probably, I want to say maybe six months to a year right

6  before his trial.

7  Q.   Did Mr. Hays ever provide you with any documents related

8  to Mr. Alonzo's case?

9  A.   The only --

10  Q.   Prior -- prior to the trial?

11  A.   Yes.  The only documents that he gave me were

12  affidavits, because I -- I wanted to help and try to find

13  some of the witnesses and because I knew some of the people

14  that were there, he gave me the affidavits that he had and

15  told me I could make copies.  So I made copies of them.

16  Q.   Prior to Mr. Hays hiring Mr. Rosa, were you aware of

17  whether Mr. Hays had anyone else working on the case to

18  investigate?

19  A.   No.  No.  I was not aware.  I just knew that he told me

20  that his daughter was helping him -- helping him with the

21  case.

22        MR. MEADOR:  Your Honor, I object to hearsay.

23        THE COURT:  Sustained.

24  BY MR. BIGGS:

25  Q.   Did you --

1          THE COURT:  Wait a minute.  Wait a minute.  I'm

2    sorry.  I didn't give you an opportunity to respond.

3          MR. BIGGS:  I'll withdraw the question.

4          THE COURT:  Okay.

5    BY MR. BIGGS:

6    Q.    Did you -- did you receive any -- did you conduct your

7    own investigation of this case?

8    A.    Yes, I did.

9    Q.    And did you base that on the affidavits you received

10   or -- or other information or --

11   A.    I based that on not just the affidavits but the people

12   that I knew that were at that party.  And I took it upon

13   myself to try to do everything I could to get witnesses.

14   Q.    Was Carl Hays relying on you to -- to find witnesses for

15   him?

16   A.    Yes.  Yes.

17   Q.    And did you have occasion to meet with Carl Hays on a

18   Saturday afternoon at his office?

19   A.    Yes.  He asked me to get the witnesses that I knew, the

20   witnesses that I was able to gather, and meet at his office

21   on a Saturday morning and -- so that he could talk to them.

22   Q.    And were you aware of whether he was doing any other

23   independent investigation of your case?

24   A.    No.

25   Q.    And what happened when -- what happened that Saturday?

1    Did any of the witnesses come?

2    A.   A couple of witnesses came that Saturday morning.

3    Q.   And after that -- was that once or twice?

4    How many times did that occur?

5    A.   One time.

6    Q.   And then did Mr. Hays hire Investigator Rosa?

7    A.   Yes, he did.

8    Q.   And did you work with Investigator Rosa?

9    A.   Yes, I did.

10   Q.   What was the nature of your relationship with

11   Investigator Rosa?

12   A.   My relationship like -- I met him -- Mr. Hays introduced

13   me to Mr. Rosa and told me that he had gotten an

14   investigator.

15   And at that point Mr. Rosa called me and we got

16   together.   And I had -- I had copies of affidavits, and I

17   helped Mr. Rosa find -- get -- get ahold of some of these

18   people.

19   Q.   Did Mr. Rosa -- was he undertaking -- was he relying on

20   you to bring witnesses to him as well?

21   A.   Yes.

22   Q.   Were there any witnesses that Detective Rosa found that

23   you didn't bring to his attention?

24   A.   No.

25   Q.   To your knowledge?

1    A.    To my knowledge, no.

2    Q.    And would you repeat, what were the documents you

3    obtained from Carl Hays prior to the trial?

4    A.    The only documents that I got from Mr. Hays were the

5    affidavits.

6    Q.    And shifting gears toward -- to after the trial.

7          Did you ask Mr. Hays at some point for a copy of his

8    trial file?

9    A.    Yes, I did.

10   Q.    And how did you -- how did you ask him?

11         Did you call him?

12   A.    I called Mr. Hays and I asked him if I could get a copy

13   of Quintin's file.  And he told me to give him a couple of

14   days, two or three days, because he couldn't get it to me,

15   because he had to make copies because those were his original

16   files.

17         And so I waited about three days.  And I called him and

18   he said, yeah, you can come by the office and pick it up.

19         And so I went by the office.  He doesn't -- he didn't

20   have a secretary at that point, because he told me what time

21   would be a good time to go pick 'em up, when he would be

22   there, and I went and picked 'em up.

23   Q.    So did you ever clap eyes on the original file?

24   A.    No, I did not.

25   Q.    You never saw the original file?

```
 1   A.   No, I didn't.

 2   Q.   And did you pick -- pick up the file?

 3   A.   The copies that he had made, yes, I did.

 4   Q.   Did you review that file?

 5        Did you look through all the documents in that file?

 6   A.   I looked through the -- through the documents, yes, I

 7   did.

 8   Q.   I'd like to direct your attention to Petitioner's

 9   Exhibit 1, which I'll --

10             MR. BIGGS:   If I may approach, Your Honor?

11             THE COURT:   You may.

12             MR. BIGGS:   I apologize for that.

13        May I approach again, Your Honor?

14   BY MR. BIGGS:

15   Q.   Ms. Vazquez, please take a look at that document.   That

16   is a police report written by Detective Berry in which he

17   recounts a interview with Priscilla Rodriguez, where

18   Priscilla Rodriguez identified Licho Escamilla as the -- as

19   the shooter of Mr. Gauna, Santos Gauna.

20        Have you had a chance to look it over?

21   A.   This one here?

22   Q.   Yes.

23   A.   No, I don't recall seeing this one here.   I recall

24   seeing an affidavit that's something similar, but not this --

25   not this.
```

1   Q.   So you don't recall seeing that document in the file?

2   A.   No, I don't.

3   Q.   But you do recall seeing an affidavit of Ms.

4   Rodriguez?

5   A.   Yes.  Because it was -- it was just in a different form.

6            MR. BIGGS:  Your Honor, may I approach again?

7            THE COURT:  You may.

8            MR. BIGGS:  I'm sorry, Your Honor.  I think our

9   witness might have taken a few of our exhibits on accident.

10           THE COURT:  So what you showed her was not an

11  exhibit that has been admitted into evidence but a copy of an

12  exhibit that's been entered into evidence?

13           MR. BIGGS:  Yes.  Yes, Your Honor.

14           THE COURT:  Was it an exact copy?

15           MR. BIGGS:  Yes.  Yes, Your Honor.

16           MR. MEADOR:  It was, Your Honor.

17           MR. BIGGS:  Your Honor, this is a copy of an

18  exhibit I had tendered to the government prior to this

19  proceeding.  I believe it has already been admitted into

20  evidence.

21       If I may approach?

22           THE COURT:  You may.

23       I don't have a Petitioner's 7.

24           MR. BIGGS:  You don't have a 7?

25           THE COURT:  No.

1          MR. BIGGS:   Move to admit Exhibit 7.

2      I don't think there's any dispute as to authenticity.

3      We obtained this from an open records request of the

4  Dallas Police Department.  And it's an affidavit from the

5  night of the shooting from Priscilla Rodriguez given to a

6  police officer.

7          THE COURT:   Mr. Meador, any objection to admission

8  of number 7?

9          MR. MEADOR:   No, Your Honor.

10          THE COURT:   Number 7 is admitted.

11  BY MR. BIGGS:

12  Q.   Ms. Vazquez, have you had a chance to review that

13  exhibit?

14  A.   Yes.

15  Q.   Exhibit 7?

16      Does that look like the document that was in the file?

17  A.   No.  It would -- the document was formatted different.

18  It wasn't like this at all.

19  Q.   And when you went to -- let me ask you.

20      Do you know who Bill Cox is?

21  A.   Yes, I do.

22  Q.   And who is Bill Cox?

23  A.   Bill Cox is the attorney that we retained to do my son's

24  writ.

25  Q.   And how did you come to find Mr. Cox?

1    A.    Through a friend.

2    Q.    Referred through a friend?

3    A.    Um-hum.

4    Q.    And did you ever meet with Mr. Cox?

5    A.    Yes, I did.

6    Q.    Did you provide him a copy of the file you had obtained

7    from Carl Hays?

8    A.    Yes, I did.

9    Q.    Did you give him your copy or did you make copies of

10   that -- of the copy you -- in your possession?

11   A.    I gave him what I had gotten from Carl Hays.

12   Q.    Did you also make an open records request of Dallas

13   Police Department?

14   A.    Yes, I did.

15            MR. BIGGS:   Your Honor, if I may approach?

16            THE COURT:   You may.

17   BY MR. BIGGS:

18   Q.    I'm going to show you Petitioner's Exhibit 10, which

19   appears to be an open records request from the Dallas Police

20   Department.

21       Is this -- is that your signature right there at the

22   bottom?

23   A.    Yes, it is.

24   Q.    Do you recall making that request?

25   A.    Yes.

1    MR. BIGGS:  Your Honor, I move to admit

2    Petitioner's Exhibit 10 into evidence.

3            MR. MEADOR:  No objection, Your Honor.

4            THE COURT:  Number 10 is admitted.

5    BY MR. BIGGS:

6    Q.   And would you please relay to the court what -- what you

7    exactly requested on that document.

8            What did you request on the document?

9    A.   On here?

10   Q.   Um-hum.

11   A.   The reports.

12           I don't recall the -- exactly what it was, but I knew

13   that whatever I was requesting I needed everything that they

14   had.

15   Q.   So what were the exact words you used in asking for --

16   A.   When I went to ask for the -- for the records I asked --

17   I wanted -- I needed everything, from what happened at the

18   police report to what happened on -- at the scene.  I wanted

19   all the documents.

20   Q.   And what are the exact words that you wrote down on that

21   document, right in front of you?

22   A.   I would like complete report.

23   Q.   For case --

24   A.   For case numbers, because these were the case numbers

25   that when I asked -- when I -- because I didn't know about

1    case numbers, and when I went to the police department I gave

2    them the incident, the date that it happened, and so they're

3    the ones that gave -- that's why I wrote these numbers

4    down.

5    Q.    How many case numbers are there?

6    A.    There was three.

7    Q.    And how many charges was --

8    A.    Three.

9    Q.    And did you ultimately receive documents from the Dallas

10   Police Department?

11   A.    Yes, I did.

12          MR. BIGGS:   Your Honor, if I may approach.

13          THE COURT:   You may.

14   BY MR. BIGGS:

15   Q.    I'm going to show you an invoice receipt from the Dallas

16   Police Department which has already been tendered to

17   respondent.

18          Is that your signature there below?

19   A.    Yes.

20   Q.    And the date is December 3rd, 2002?

21   A.    Um-hum.

22   Q.    Does that appear to be the invoice receipt that came

23   with the records you obtained?

24   A.    Yes.

25   Q.    Did you sign that receipt --

```
 1   A.    Yes, I did.
 2   Q.    -- when you picked up the documents?
 3   A.    Yes, I did.
 4         MR. BIGGS:  Your Honor, I would move to admit
 5   Petitioner's Exhibit 11 into evidence.
 6         MR. MEADOR:  No objection, Your Honor.
 7         THE COURT:  Number 11 is admitted.
 8   BY MR. BIGGS:
 9   Q.    Ms. Vazquez, how many documents does that receipt say
10   that you received?
11   A.    It says I received two documents, the arrest and the
12   offense report.
13   Q.    And -- and how many pages did -- on -- on each report?
14   A.    On the arrest report it was 19 pages and on the offense
15   report it was 23.
16   Q.    And how much did -- did you have to pay for that?
17   A.    $4.20.
18   Q.    Were those records given to Mr. Cox as well?
19   A.    Yes.
20   Q.    Was everything -- and what was the date on that records
21   request?
22   A.    On the records request was --
23   Q.    Or on the receipt of records.
24   A.    Oh, on the receipt.
25         12/3/02.
```

1    Q.    And do you recall when you obtained Mr. Cox to represent

2    your son on a state habeas petition?

3    A.    I don't recall the exact date.  I don't recall the exact

4    date.

5    Q.    And when you retained Mr. Cox were there any documents

6    in your possession pertaining to your son's case that you did

7    not provide to Mr. Cox?

8    A.    No.

9    Q.    You gave him everything?

10   A.    I gave him everything that -- that I had, that was given

11   to me.

12   Q.    And after the petition was filed and denied did you

13   re -- reacquire those files?

14   A.    No.

15   Q.    You did not?

16         You did not pick the files up?

17   A.    Well, yeah I got them.  I picked them up after he

18   finished, yeah.

19   Q.    And did you pick up everything?

20   A.    I -- I assumed it was everything, because I didn't go

21   through it over again, because I was thinking that he had

22   given everything back to me.

23   Q.    Was it your understanding -- did he -- did he provide

24   you the same documents you provided him or did he give you

25   copies?

1      Did you get back what you gave him?

2  A.   It appeared that he -- that I got back what I had given

3  him.

4  Q.   Okay.  Did you also make an open records request of

5  Detective Berry's personnel file?

6  A.   Yes, I did.

7  Q.   And --

8           MR. BIGGS:  Your Honor, may I approach?

9           THE COURT:  You may.

10  BY MR. BIGGS:

11  Q.   Ms. Vazquez, I'm showing you Exhibits 12 and 13, if you

12  would take a look at each Exhibit.  Exhibit 12 is a copy of

13  an open records request that was made to the Dallas Police

14  Department regarding Detective Berry's personnel file.

15      And who's that signature right there?

16  A.   That's my sister.

17  Q.   It's your sister?

18  A.   Um-hum.

19  Q.   And would you describe Exhibit 13?

20      Is that -- is that an invoice receipt --

21  A.   That's an invoice receipt --

22  Q.   -- for --

23  A.   -- for Detective Berry's --

24  Q.   And is your -- is your signature at the bottom of that?

25  A.   Yes, it is.

1          MR. BIGGS:  Your Honor, I would move to admit

2     Petitioner's Exhibits 12 and 13 into evidence.

3          MR. MEADOR:  No objection, Your Honor.

4          THE COURT:  Admitted.

5     BY MR. BIGGS:

6     Q.   What date did you receive these documents?

7     A.   May 5th, 2004.

8     Q.   And how many pages is that document?

9     A.   Personnel time, four pages.

10         Machine copies was 648.

11         And one affidavit.

12    Q.   And did you review that -- those documents as well?

13    A.   Yes.

14    Q.   And was Exhibit -- what we've shown you as Exhibit 1,

15    the Detective Berry's report, was that in those documents?

16    A.   I don't recall.

17    Q.   You don't recall?

18    A.   I don't recall if they were in there.

19    Q.   Did you ever remember seeing -- or you -- do you -- are

20    you confused about which exhibits --

21    A.   Yeah, I'm -- I'm thinking this is it here; is that

22    correct?

23    Q.   Yes.  Yes.  Yes.

24    A.   No --

25    Q.   Do you recall --

1   A.   -- that was not --

2   Q.   -- seeing that document?

3   A.   No.

4   Q.   When was the first time you laid eyes on that document?

5   A.   The document --

6   Q.   Exhibit 1 that -- that -- that you just had in your

7   hand.

8   A.   Oh, I've not seen it until now.

9   Q.   Did we have a meeting a few days ago?

10   A.   Oh, yeah.   Yeah.

11        As far as this document here?

12   Q.   Yes.

13   A.   Yeah, you showed it to me.

14   Q.   And --

15        MR. MEADOR:   Pardon me, Your Honor.

16        Can -- can you identify the exhibit that you're

17   referring to, just for the record?

18        MR. BIGGS:   Exhibit 1.

19        MR. MEADOR:   Thank you.

20        THE WITNESS:   I don't know -- oh, I see the numbers

21   now.   I didn't realize that.   They're at the bottom.

22        MR. BIGGS:   I apologize for that.

23   BY MR. BIGGS:

24   Q.   Do you -- do you recall reviewing Exhibit 1 with me last

25   week?

1    A.    Yes.

2    Q.    And prior to that time do you remember having seen that

3    document?

4    A.    No.

5              MR. BIGGS:   Pass the witness.

6              THE COURT:   Cross-examination?

7              MR. MEADOR:   Yes, Your Honor.

8                       CROSS EXAMINATION

9    BY MR. MEADOR:

10   Q.    Ms. Vazquez, my name is John Meador.

11   A.    Yes.

12   Q.    Let me ask you, so you would agree that Carl Hays

13   offered to open -- or did open his office at least one

14   weekend -- what was your testimony on -- as far as meeting

15   him at his office and bringing witnesses down?

16         Did he open his office on the weekends for you?

17   A.    He did it one time.

18   Q.    And do you recall the witnesses that -- the names of the

19   witnesses that you brought down?

20         I think you mentioned that you said you brought a couple

21   of witnesses?

22   A.    Yes.

23   Q.    And who were they?

24   A.    Antonio Garza, and -- I believe it was Antonio Garza and

25   Lucy Montoya.

1  Q.    And they both testified at trial, right?  Correct?

2  A.    I believe so.  I wasn't in there, so I can't actually

3  say that.

4  Q.    Now, you said you -- you worked with John Rosa.  Did you

5  ever ride around with him interviewing witnesses, going from

6  house to house talking to folks?

7  A.    Yes, I did, because that's the only time that he would

8  go talk to people.

9      He would call me and tell me, you know, just let me know

10  when's a good time, when you get off of work we can go visit

11  some of these people.  And, yeah, I rode around with him.

12  Q.    And how often did you do that, do you recall?

13  A.    Not that often.

14  Q.    But more than one time you think?

15  A.    More than once.

16  Q.    Now, you mentioned that you had given names to Carl Hays

17  of witnesses and whatnot?

18  A.    Yes.

19  Q.    Do you also recall giving an affidavit -- or writing an

20  affidavit in -- in state court?

21  A.    I don't recall.

22          MR. MEADOR:  Your Honor, may I approach?

23          THE COURT:  You may.

24          MR. MEADOR:  And just to be clear, I'm referring to

25  my tab 10.

1     Could you collect some of these?  And maybe we won't

2  have any more witnesses walking off.

3  BY MR. MEADOR:

4  Q.    Could you identify that document, just how it's titled

5  at the top?

6  A.    Affidavit of Julie A. Vazquez.

7  Q.    Would that be you?

8  A.    That's me.

9  Q.    Do you recall that now?

10  A.    Recall this form?

11  Q.    Do you recall writing that?

12  A.    I recall not writing it but typing it up.

13  Q.    Yeah.  Well, I mean, that is your affidavit?

14  A.    Yeah.

15  Q.    Do you want to go to the last page and make sure that's

16  your signature?

17  A.    Yeah.  Let me look at that.

18      Yes, that's my signature.

19  Q.    At one point in your affidavit you said that you had

20  spoken with a potential witness and that you actually -- let

21  me find the quote exactly here.

22      I think it was that -- oh, you said, "I found out later

23  that a young girl that went to my church was at the party.  I

24  went to see her, and it was obvious she was devastated

25  because her friend was killed.  I asked her if she saw QT.

1    And she said no, I didn't know he was there.  At that point I

2    told her that he was being accused of the shooting.  I told

3    her that someone would be coming to get a statement from her

4    and she said that was fine.  Carl Hays, my son's trial

5    attorney never subpoenaed her.

6         What -- do you remember what her name was?

7    A.   Priscilla Rodriguez.

8    Q.   It was Priscilla?

9    A.   Um-hum.

10   Q.   And what do you think at that time -- what did she tell

11   you?

12   A.   Well, when I -- when I went to see her she was obviously

13   severely depressed.  She was in a dark room, curled up,

14   crying.  Grandmother had -- had --

15   Q.   Well, let me -- at the time that you saw her at church,

16   what did she tell you?

17   A.   I didn't see her at church.  I saw her at her house.

18   Q.   Okay.  I found out that the young lady --

19   A.   I know her from my church.

20   Q.   Okay.  Beg your pardon.  Go ahead.  I'm sorry.

21   A.   Okay.

22   Q.   Go ahead, I'm sorry.

23   A.   At that time when I went to see her -- because I was

24   shocked that -- that Quintin was being accused, and I went to

25   see her and she was in her room.  The grandmother let me in

1    and -- because we know the family.  I've known them -- we've

2    known them for a long time.

3          Went in her room, it was dark and she had a big shirt on

4    with Santos Gauna's picture on it.  And I talked to her and I

5    asked her, you know, what happened.

6          And she was crying.  And she said that -- that they

7    had -- that he was shot.  And I asked her, I said do you know

8    who did it.  And I said -- and she said -- she did tell me it

9    was Licho Escamilla.

10         And I said, well, okay, somebody is going to come and

11   talk to you, because, you know, Quintin is being accused.

12   And I said did you see him at the party that night.

13         And she was -- she said, no, I didn't see him.

14         And she agreed that she would -- when she spoke to me

15   that she would talk to somebody.

16         And then that was it when I left.

17   Q.    And were you by yourself or was --

18   A.    I was by myself.

19   Q.    Okay.  Now, you're also aware, you've had a chance to

20   look at the different exhibits, that she has provided a

21   police statement and affidavit and whatnot?

22   A.    Yeah.

23   Q.    And she said that she saw Quintin throwing bottles?

24   A.    Yeah.  I know.  I was -- I didn't understand that.

25   Q.    So it's kind of curious --

1    A.    I had to understand that when somebody dies in front of

2    you it's devastating and sometimes you can just -- I mean, I

3    know how that can be.  And when she said that, and then I see

4    that statement, I didn't know what happened, was she

5    distraught, or what, or maybe she wasn't really paying

6    attention to me, or what, so I can't speak on her behalf.

7    Q.    Did she indicate to you at the time that she had spoken

8    with the police?

9    A.    She did tell me that she went to the police department.

10   Q.    And gave a statement?

11   A.    And gave a statement.

12   Q.    So you just can't explain why her -- so you said you

13   couldn't really explain why her statement to you in the dark

14   room when she was crying was different than the one that she

15   actually put in the affidavit?

16   A.    Yeah.

17   Q.    So is it -- is it your contention that Quintin wasn't at

18   the party at all?

19   A.    I -- what do you mean?

20         Repeat that again.

21         Is it my what?

22   Q.    Is it your -- did Quintin ever tell you he was at the

23   party?

24   A.    Later, yeah.  Not at the time, before the party, he

25   didn't -- Quintin didn't live with me.  I didn't find out

1    until the next day.

2    Q.    The next day after the shooting?

3    A.    The next day after the shooting.

4    Q.    Okay.  So it was that weekend.  But it wasn't -- it

5    wasn't a long time that he told you?

6    A.    No.

7    Q.    So when you talked to Priscilla, did that not seem odd

8    to you that she would have said that she didn't remember

9    seeing him there?

10   A.    No, it didn't seem odd.  Because if there were a lot of

11   people there and it was 1:00 o'clock in the morning, and

12   there were people coming and going to a party, sometimes you

13   don't see people there.  Sometimes, you know -- I mean,

14   they're just not out in the open where everybody could see

15   them.

16   Q.    So you kind of believe her -- both her statements, that

17   she saw him and that she didn't see him; is that what you're

18   saying?

19   A.    Yeah.

20   Q.    You believe both of her statements?

21   A.    Right.  Maybe she didn't see him in the beginning.  I

22   don't know.

23          MR. MEADOR:  Excuse me, Your Honor.

24   BY MR. MEADOR:

25   Q.    Now, you also said you also worked with William Cox, he

1   was the attorney -- did you hire him to work on the state

2   habeas?

3   A.   Yes.

4   Q.   Okay.  Now, and the documents that he had were provided

5   by you; is that correct?

6   A.   Yes.

7   Q.   And the documents you had were provided by Carl Hays?

8   A.   Yes.

9   Q.   Now, is there any way of knowing that everything that

10  you got from Carl Hays was everything that was in the file?

11  A.   No.

12  Q.   He just represented that --

13  A.   Yes.

14  Q.   It was a copy?

15  A.   Yes.

16          MR. MEADOR:  As far as the open records request --

17  are those still up there?  The exhibits?

18          MR. BIGGS:  Which ones?

19          MR. MEADOR:  10, 11, 12, and 13.  Have those been

20  tendered to the court?

21          THE COURT:  I have 10, 11, 12, and 13 as being

22  admitted.

23  BY MR. MEADOR:

24  Q.   I just have a question.

25      On Exhibits 11 and 13 where you actually received the

1   documents and it says -- let me back up.

2       In Exhibit 10 you made a request for all three cases,

3   right, there were three case numbers?

4   A.   Right.

5   Q.   And then you got documents, like, for example, Exhibit

6   11, that sort of indicated that you didn't feel like you got

7   as much as you asked for; is that right?

8   A.   I don't remember what the document -- what 11 and --

9   what you're telling me.  I don't know what --

10  Q.   It was the receipts.

11          MR. MEADOR:   Thank you.

12      Your Honor, may I approach?

13          THE COURT:   You may.

14  BY MR. MEADOR:

15  Q.   I'm showing you Exhibit -- Defendant's Exhibit 11, which

16  is the receipt and then 13 is the similar -- it's just --

17  it's just more.

18  A.   Right.

19  Q.   But you didn't -- can you tell by looking at this, just

20  the bare bones receipts, that your request was -- let me

21  rephrase that.

22      How do you know what you got wasn't responsive to what

23  you asked for?

24      I mean, do you feel like you -- you got what you asked

25  for?

1  A.   No, I really didn't.

2  Q.   So what did you do at that time?

3       Did you ask for them to reconsider, to look for

4  something else?

5  A.   No, I didn't.  Because I felt like because of where

6  I'm -- who I'm asking the documents from that they're going

7  to give me everything they have.

8  Q.   But you don't know that they didn't?

9  A.   I don't know that they didn't.

10 Q.   You just suspect that they didn't --

11 A.   I just felt like there was some -- something just

12 didn't -- I wasn't getting everything.  I can't explain it,

13 but that's how I felt.

14 Q.   And it just didn't seem like it was enough?

15 A.   It just didn't seem like it was enough.

16 Q.   But you didn't go back and ask them for -- or just raise

17 the question, hey, is there more sort of thing?

18 A.   No.

19 Q.   So are you alleging that -- well --

20           MR. MEADOR:  I'll pass the witness.

21           MR. BIGGS:  Nothing further, Your Honor.

22           THE COURT:  May Ms. Vazquez be excused?

23           MR. BIGGS:  Yes.

24           THE COURT:  Ms. Vazquez, you are free to leave.

25           THE WITNESS:  Thank you.

 1          THE COURT:   Thank you.

 2       Mr. Biggs, do you have another witness?

 3          MR. BIGGS:   Your Honor, I just have a brief

 4   request.   My client has informed me that he really needs to

 5   use the restroom, if we can possibly take a five minute

 6   recess.

 7          THE COURT:   Is that all right with our security?

 8       We'll take a five minute -- let's take a ten minute

 9   recess.

10          THE SECURITY OFFICER:   All rise.

11                (Recess taken at 2:00 o'clock.)

12                (Proceedings resumed at 2:10.)

13          THE SECURITY OFFICER:   All rise.

14          THE COURT:   Please be seated.

15       Your next witness.

16          MR. BIGGS:   Petitioner calls Joe Saal to the

17   stand.

18          THE COURT:    Just to verify, you were in the group

19   that was sworn this morning; is that correct?

20          THE WITNESS:   Yes, Your Honor.

21          THE COURT:   Please speak up into the microphone.

22                   DIRECT EXAMINATION

23   BY MR. BIGGS:

24   Q.   Mr. Saal, will you please state your name for the

25   record.

1   A.   Joe Saal, S-a-a-l.

2   Q.   And where do you work?

3   A.   I'm an investigator with the Federal Public Defender's

4   Office here in Dallas.

5   Q.   Have you been helping me investigate Mr. Alonzo's

6   petition?

7   A.   Yes, sir.

8   Q.   During your investigation, did you make a few open

9   records request from the Dallas Police Department?

10   A.   One open records request and one request through

11   subpoena.

12   Q.   Would it be fair to say you've made quite a few open

13   records requests through the years --

14   A.   Yes, sir.

15   Q.   -- with the Dallas Police Department?

16   A.   Yes, sir.

17   Q.   And that you maybe know how to gain the system, as it

18   were, a little bit better than someone who wouldn't know how

19   to obtain documents?

20   A.   Well, it's -- when it comes to how you make the specific

21   request and what you put in writing it can have a big affect

22   in what you get back.

23   Q.   All right.  Did you -- when did you make the open

24   records request in this case?

25   A.   I have a copy here.

1       January 22nd, 2010.

2   Q.    And what precisely did you request in that open records

3   request?

4   A.    Listed the name of the complainant, Israel Martinez, the

5   date of the offense, and then in the body of the request

6   please include complete offense report with all supplements,

7   photo lineups of any suspects, witness statements, all report

8   from SWIFS, which is the Southwest institute of forensic

9   sciences, prosecution report, and any other reports.

10  Q.    And how long did it take for that request to come back?

11  A.    Eight to ten weeks, roughly.

12  Q.    And when did you receive the request back?

13  A.    I believe we got it back last month, March.

14  Q.    And did you have occasion to count how many documents

15  you received?

16  A.    We got -- as a result of that request 258 pages.

17  Q.    And in that -- in that request was the document that's

18  the Petitioner's Exhibit 1 --

19          MR. BIGGS:  May I approach, Your Honor?

20          THE COURT:  You may.

21  BY MR. BIGGS:

22  Q.    Mr. Saal, I know you'll be familiar with that document.

23        Do you recall whether that document was -- Exhibit 1 was

24  found in the open records request?

25  A.    Yes, sir, it was.

1    Q.    Did you recent also subpoena documents from the Dallas

2    Police Department?

3    A.    Yes, sir, I did.

4    Q.    And when did you serve a subpoena?

5    A.    I don't have my returns with me, but I believe it was

6    last week.

7    Q.    And what was the request on the subpoena that was

8    provided?

9    A.    Complete offense report with all supplements, photo

10   lineups of any suspects, witness statements, all reports from

11   SWIFS, prosecution report, and any other reports regarding

12   arrestee Alonzo Quintin Lee.

13   Q.    Is that identical language to your first request?

14   A.    It's really close if it's not identical, yes, sir.

15   Q.    And when you picked up these documents from the Dallas

16   Police Department, when did you do that?

17   A.    Picked these up I believe it was Monday.

18   Q.    And how many documents did they provide you on that

19   request?

20   A.    44 pages.

21   Q.    And did you ask them -- did you -- about the

22   discrepancy?

23   A.    Yes, I did.

24   Q.    And what did they tell you?

25   A.    I talked with the supervisor there who indicated that we

1    had made the request through records as opposed to open

2    records and that the -- that resulted in the discrepancy.

3         However, I served a supervisor of open records with the

4    request and, you know, they're basically the same request.

5              MR. BIGGS:  Pass the witness.

6              THE COURT:  Cross-examination?

7              MS. KUYKENDALL:  No questions, Your Honor.

8              THE COURT:  Can Mr. Saal be excused?

9              MR. BIGGS:  Yes, Your Honor.

10             MS. KUYKENDALL:  Yes, Your Honor.

11             THE COURT:  Thank you very much, Mr. Saal.

12             MR. BIGGS:  Your Honor, I'd like to ask permission

13   for Mr. Saal to remain inside the -- the hearing, if that's

14   agreeable with the respondent.

15             THE COURT:  Any objection?

16             MS. KUYKENDALL:  No, Your Honor.

17             THE COURT:  All right.  Mr. Saal, you may remain

18   in the courtroom.

19             THE WITNESS:  Thank you, Your Honor.

20             THE COURT:  Call your next witness.

21        Mr. Biggs, do you have another witness?

22             MR. BIGGS:  Sorry.

23        Yes.  We'll call Jimmy Brown, Your Honor.

24             THE COURT:  All right.  Just to confirm, Mr. Brown,

25   were you among the witnesses that were sworn in this morning?

```
 1              THE WITNESS:  Yes, ma'am.
 2              THE COURT:  Please be seated, and speak into the
 3    microphone.
 4                        DIRECT EXAMINATION
 5    BY MR. BIGGS:
 6    Q.    Please state your name for the record?
 7    A.    Jimmy Brown.
 8    Q.    Where do you live?
 9    A.    2738 Grafton Road.
10    Q.    Is that the same place you lived in 2001?
11    A.    No, sir, that's not correct.
12    Q.    Where did you live in 2001?
13    A.    I was living right there off of Brandt -- Bill Harrod
14    and Clymer Street, with some friends of mine, Lane and Cesar
15    Gutierrez, right there on the corner of -- where the incident
16    took place.
17    Q.    How far away is that from the Gauna --
18    A.    It's right next door, actually.  They had like a little
19    rental -- rental -- rental space in between, but it's right
20    next door, actually.
21    Q.    I'm sure you know why we're here.
22          Do you -- do you remember June 8th and June 9th of 2001?
23    A.    Somewhat I do, yes.
24    Q.    Would you tell --
25    A.    Okay.
```

1    Q.    -- would you tell us what you remember?

2    A.    Well, this is -- I guess it was around -- it was after

3    midnight.  I don't know exactly what time, but it was after

4    midnight, I'm sure.  I was sitting on the porch.

5    Q.    Where?

6          At your house?

7    A.    No.  At the house where I was staying at, right there on

8    Bill Harrod Street.  I was sitting on the porch, myself and

9    one of the -- one of the guys that actually lives in the

10   house.  So we were just sitting there talking.

11         And then all of a sudden we hear -- I hear some shots go

12   off.  And that -- that startled us.  So I -- I -- I proceeded

13   to get up and run to -- to where the noise was coming from.

14   And by that time everyone had -- had already seemed to be

15   spreading out, commotion going on, people screaming.

16         And by the time I got there, I just saw -- happened to

17   see the person -- I don't know if it was the shooter or not,

18   but see the person -- see a man walk -- run across the street

19   to a black Cadillac -- or Cadillac.  I can't remember if it

20   was black, but it was kind of dark.  But it was kind of a

21   large car and to me -- to me had the body shape of a

22   Cadillac.

23   Q.    Let me back you up a little bit.

24   A.    Okay.

25   Q.    Did you -- did you hear gun fire?

1  A.    Yes, I did.  I heard about two or three shots, I can't
2  remember exactly how many.
3  Q.    And then did you proceed to run over there or --
4  A.    Well, instead of running away, like everybody else was
5  doing, I kind of just ran to the -- 'cause at the house where
6  I was at they have a little fenced area when you run to it
7  you can actually see where -- the house where the incident
8  took place.
9         And so when I went to the fence -- when I ran to the
10  fence I just saw the people running, and -- and some guy,
11  like I said, shoot -- running towards -- running towards that
12  vehicle.
13  Q.    And how much time do you think passed between the first
14  gunshot you heard and when you actually came into sight of
15  the home?
16  A.    It wasn't -- it wasn't very long.  I mean, it was like
17  almost -- almost simultaneously, you know.
18  Q.    And what exactly did you see?
19        You saw you said people scattering.
20  A.    Yeah, people scattering.
21        And I looked, happened to see right across the street,
22  there's a little park area there, this car that was parked,
23  and it had -- to me it had -- I know -- I know the shapes of
24  cars and it had the shape of a Cadillac.  But it was kind of
25  dark and stuff, I couldn't actually see the paint color, or

1    nothing like that.

2        But this person ran to the car and gets in the car and

3    the car spins -- spins -- spins -- spins away.

4    Q.   Did you see -- could you describe that person you saw

5    running to the car?

6    A.   Well, he was -- he wasn't a tall person.  He wasn't

7    tall.  Wasn't -- wasn't a heavyset man.  Wasn't -- I would

8    say he -- he wasn't slender either.  I guess he kind of

9    had like a -- he was a short guy with somewhat -- you know,

10   he looked like he had a little build on him, you know.  But

11   it was a short person, wasn't -- looked like a Hispanic guy.

12   He didn't look like a black guy to me or a white guy, you

13   know, with skin color.  I just saw the guy run across and I

14   was close enough to see some of -- some of -- he was wearing

15   a T-shirt.

16   Q.   What else was he wearing?

17   A.   Wow, I just saw the white T-shirt.  You know, I'm not --

18   I can't recall.

19   Q.   That's perfectly fine.

20       Did you see -- did you see him with a gun?

21   A.   Actually, you know, when I was -- I don't -- I wasn't

22   looking at his hands.  I just saw -- saw this person running

23   to the car.  That's all I saw.

24   Q.   So when you first saw him was he running away from the

25   house or towards the house or --

1   A.   No, he was running away from the house, because the

2   shots had already tooken place.

3        Again, I don't know if this person was the shooter, but

4   this person was running towards this vehicle, so . . .

5   Q.   Did you see what -- did you see what door he got in

6   of -- of the vehicle?

7   A.   I recall -- I recall him going to the left side of the

8   vehicle on the back side of the vehicle, not -- not the

9   driver's side, but the back side, get inside the vehicle.

10  Q.   Is that the rear passenger side?

11  A.   Yes, it is.  Yes, it is.

12  Q.   Did you see anyone driving the vehicle?

13  A.   I don't recall.

14  Q.   Did you see anyone else inside that Cadillac?

15  A.   I saw another head in there, but -- but, again, it was

16  dark.  It was more -- just more of a shadow pretty much is

17  what I saw.

18  Q.   And were you at that house at the time of Mr. Alonzo's

19  trial, that would have been in February of 2003?

20  A.   Was I -- was I there?

21  Q.   Were you located -- were you still living next door?

22  A.   Yes, I was.  Off and on.  But I could still be reached

23  there.

24       But, no, no one came to -- to speak with me, interview

25  me.

1        I know the day of the -- the next day of the incident

2    Channel 4, 11, 33 and Telemundo came and interviewed me, but

3    after that no one came to talk to me, to -- to question me or

4    nothing.  I was available.  I was waiting to see if anybody

5    would, and nobody -- no one came.

6    Q.    And no one from the defense --

7    A.    No.  No one.

8    Q.    And would you have been willing to testify to the things

9    you saw in the trial?

10   A.    Yes.  Of course I would have.

11           MR. BIGGS:   Okay.  Nothing further of this witness.

12           MS. KUYKENDALL:   Just a few questions.

13                        CROSS EXAMINATION

14   BY MS. KUYKENDALL:

15   Q.    Mr. Brown, my name is Leslie Kuykendall.

16         Okay.  So I just want to make sure that I got your

17   testimony correctly.

18         So basically, if I understood what you said, you were at

19   a house nearby, and you were sitting on the porch, you heard

20   shots first and then you saw somebody running across the

21   street towards this what you think was a Cadillac.

22   A.    Yes.  Well, actually you can't -- you can't deny the --

23   that it was a Cadillac, even thought was kind of dark.  But

24   it was -- there was this person and other people were running

25   as well, but -- but this guy, whoever -- whoever this person

1   was, seemed to be -- seemed to be from where the shots --

2   when the shots took place this person was coming from the --

3   from the area where the shots took place.  And this is one --

4   this is afterwards when I talked to people.

5   Q.   Okay.  So -- all right.  But you did -- but you

6   didn't -- you didn't see the shots?

7   A.   No, I didn't.  I just heard them, ma'am.

8   Q.   I'm sorry.  I'm sorry to speak over you.

9   A.   That's fine.  That's fine.

10  Q.   All right.  And you said you heard about two to three

11  shots?

12  A.   Yes, I did.

13  Q.   Okay.  And then after -- after that you see someone

14  running.

15  A.   Yeah.  It was -- it was within seconds, too, that --

16  Q.   Okay.

17  A.   You know.

18  Q.   So he's running across the street to the Cadillac.  And

19  if I recall correctly you saw -- you got a glimpse of what he

20  was wearing.

21  A.   Yeah.

22  Q.   And you -- you think that was a white shirt.

23  A.   It was -- it was a white shirt.

24  Q.   Okay.

25  A.   You can tell, because white T-shirts stand out even in

1    the dark.

2    Q.    It was pretty dark out there?

3    A.    It was.  It was.  At that time of night it is.  But not

4    enough where you can't tell a white T-shirt, you know.

5    Q.    Right.  Sure.

6          Okay.  But you didn't see his face?

7    A.    No, I didn't, ma'am.

8    Q.    Okay.  And you didn't see his hands.  You don't know --

9    I'm sorry, that's two questions.

10         Go ahead.  You didn't see his hands.

11   A.    No -- no I didn't.  I was -- I wasn't looking at the

12   time at his hands.

13   Q.    Okay.  So you don't know whether he was carrying a gun

14   or not?

15   A.    I don't recall, ma'am.

16   Q.    All right.  So the defenses' theory of the case was

17   basically that the defendant here fired shots and that the

18   shots that came later were fired by other people.  And would

19   you agree with me that what you would have testified to, you

20   know, that you heard shots and then you saw someone running,

21   would not necessarily be inconsistent with what the State was

22   thinking happened?

23   A.    Um-hum.  Um-hum.

24   Q.    Okay.  All right.

25   A.    Um-hum.

1          MS. KUYKENDALL:  All right.  I -- I have -- well,

2     I'll pass the witness.

3          THE COURT:  Anything else?

4          MR. BIGGS:  Nothing further, Your Honor.

5          THE COURT:  May the witness be excused?

6          MR. BIGGS:  No objection from the petitioner.

7          MS. KUYKENDALL:  None from the State.

8          THE COURT:  All right.  Sir, you're free to leave.

9          THE WITNESS:  Thank you, ma'am.

10          THE COURT:  Call your next witness.

11          MR. BIGGS:  Petitioner calls Francisco Perez.

12          THE COURT:  All right.  All right, sir.  Let me

13     confirm, were you in the group this morning that was sworn?

14          THE WITNESS:  Yes.

15          THE COURT:  All right.  Please be seated.  Please

16     speak up into the microphone.

17                         DIRECT EXAMINATION

18     BY MR. BIGGS:

19     Q.   Hi.

20     A.   Hello.

21     Q.   Please state your name for the record.

22     A.   Francisco Perez.

23     Q.   Do you know Mr. Alonzo?

24     A.   Yes.

25     Q.   How do you know him?

1   A.   From around the neighborhood.

2   Q.   Where did you live?

3   A.   In Arcadia park.

4   Q.   And is that in West Dallas?

5   A.   It's in --

6   Q.   Or Oak Cliff?

7   A.   Oak Cliff area, and Jefferson.

8   Q.   When was the last time you've spoken with Mr. Alonzo?

9   A.   About ten years ago, I guess.   Nine years ago.

10  Q.   Been a long time?

11  A.   Yeah.

12  Q.   And do you recall the evening of June 9th, 2001?

13       June 8th and June 9th, 2001?

14  A.   A little bit.

15  Q.   And were you at the party hosted by Santos Gauna?

16  A.   Yes, I was.

17  Q.   Where he was shot, you were at the party?

18  A.   Yes.

19  Q.   And who did you come with, to the party?

20  A.   Two friends.

21  Q.   And where -- where were you when -- well, let's just go

22  back a little bit.

23       Did the party begin to get a little bit out of control?

24  A.   Yes, it did.

25  Q.   And what do you remember happening that started

1    sending --

2    A.    I remember people started talking towards the front.

3    Q.    Who -- who was that?

4    A.    I guess everybody.  Everybody at the party.

5    Q.    Where -- where were you located?

6    A.    I was in the backyard, by the garage.

7    Q.    And had you had anything to drink that night?

8    A.    No.

9    Q.    And how many people do you think were there?

10   A.    Probably about 50.

11   Q.    And what do you remember happening?

12   A.    I remember I started walking towards the front to take

13   off and then there was a couple of guys got there and some

14   cars came out and got out the car and started chunking

15   bottles towards the crowd.  And then the shooting started.

16   Q.    Were -- were you walking --

17   A.    I was walking towards the front of the house.

18   Q.    Were you leaving because things had gotten -- had

19   escalated?

20   A.    Yeah.

21   Q.    Or were you leaving anyway?

22   A.    I think they said for everybody to leave.

23   Q.    Did you remember hearing that?

24   A.    No.  I just remember everybody taking off, so I

25   followed.

1    Q.    Prior to you coming forward to the front of the house

2    did you see anyone fighting in the back?

3    A.    No.

4    Q.    Did -- did you hear anything?

5          Did you hear a commotion?

6    A.    No.  I don't remember.

7    Q.    So when you walked to the front, what did you -- what

8    did you see?

9          You said you saw some people throwing bottles?

10   A.    Yeah.

11   Q.    Do you know who up saw throwing bottles?

12   A.    I don't -- I don't know.  The guys that were chunking

13   bottles, they just -- it was a whole bunch of 'em.

14   Q.    Do you know -- do you know how many people were throwing

15   bottles at each other?

16   A.    I think about 20, 20, 30 people.

17   Q.    And where exactly were -- were you in conjunction with

18   the house?

19         Were you in the front door --

20   A.    Right in the front -- on the sidewalk, towards the front

21   of the house.

22   Q.    Were you inside the fence?

23   A.    Yes.

24   Q.    And what did you see next?

25   A.    Just guys started shooting.

1    Q.    Did --

2    A.    They got there in the car and I think it was a truck

3    behind them.

4    Q.    How many people did you see shooting?

5    A.    I think around five or six.

6    Q.    Did you see anyone you recognized shooting?

7    A.    No.

8    Q.    Is there anyone -- you didn't -- you didn't know anyone

9    that was shooting?

10   A.    No, I didn't know 'em.

11   Q.    How were the -- can you describe any of the shooters and

12   what they were wearing?

13   A.    No, I don't remember.

14        I just remember them getting there in a -- in a car and

15   started shooting.

16   Q.    Do you remember -- Who do you remember?

17        Did you see shooting before people got in the cars?

18   A.    Before?

19   Q.    Yes.  You saw people throwing bottles?

20   A.    Yeah.

21   Q.    And then later you saw people in cars.

22        Did -- what happened between then.

23   A.    Well, see the cars were already there when they were

24   chunking bottles.  They were parked in the front, blocking

25   off the street.

1    Q.    Did you see anyone shooting guns -- a gun?

2    A.    I seen three people shooting guns.

3    Q.    Do you remember whether they were inside a car when they

4    were shooting or they were standing outside?

5    A.    I remember one guy hanging out a car shooting and one

6    standing.   The rest of 'em standing outside.

7    Q.    Can you -- can you describe what any of those people

8    were wearing?

9    A.    No, I cannot.

10   Q.    And do you recall the direction of the gunfire?

11   A.    Yeah.   From the street towards the -- towards the house.

12   Q.    Did you recall anyone shooting from the house towards

13   the street?

14   A.    No.

15   Q.    Do you remember whether the -- everyone started shooting

16   at once or was it in consequence or what do you remember?

17   A.    I think it was all at once, yeah.

18   Q.    And what did you do after that?

19   A.    I ran.

20   Q.    Did you -- did you speak to the police that night?

21   A.    No.

22   Q.    Were you ever interviewed by the police?

23   A.    No.

24   Q.    Did you ever -- were you ever interviewed by Quintin

25   Alonzo's investigator, John Rosa?

1    A.    Yes.

2    Q.    And were you subpoenaed to testify?

3    A.    Yes.

4    Q.    Did you come to court --

5    A.    Yes.

6    Q.    -- to testify?

7          And was it your understanding that you were going to

8    testify at trial?

9    A.    Yes, it was.

10   Q.    Were you ever told why you did not testify?

11         Or let me just back up.

12         Did you testify?

13   A.    No.

14   Q.    And were you ever told why you did not testify?

15              MR. MEADOR:   Object to the hearsay.

16              THE COURT:   Overruled.   He asked whether.

17              THE WITNESS:   No.

18   BY MR. BIGGS:

19   Q.    Did you -- so it was just you didn't get called to the

20   stand?

21   A.    Yes.

22   Q.    Okay.   Did you see Quintin Alonzo at that party?

23   A.    Yes.

24   Q.    Where did you see him?

25   A.    On the way when we were -- when we -- when we got there,

1  he was there.  And on the way out.

2  Q.  Did you spend -- were you friends with Quintin?

3  A.  I knew him.

4  Q.  Did you hang out with him at the party at all or --

5  A.  I didn't -- I got there with two other friends, so, no,

6  we didn't hang out.  We shook each other's hand and that was

7  about it.

8  Q.  Did you see him in the front yard when the shooting was

9  occurring?

10  A.  Yeah.  I seen him in front of me.

11  Q.  Did you see him firing a gun?

12  A.  No.

13  Q.  Can you say that with certainty?

14  A.  Oh, he was standing right in front of me.

15  Q.  And what happened when the shooting started?

16  A.  I ran towards the side of the house behind a tree, and I

17  seen him run also.

18  Q.  Where did you run?

19  A.  Towards the side of the house, towards the left of the

20  property, behind a tree.

21  Q.  Did you run to the -- did you run all the way to the

22  back or did you stay at the side?

23  A.  No.  Towards -- towards the side.

24  Q.  Did anyone else run in that direction?

25  A.  Yeah.  A few people.

```
 1   Q.   And what did you do then?
 2        Did you take cover?
 3   A.   Yes.
 4   Q.   What -- how did you -- where did you take cover?
 5   A.   Behind a tree.
 6   Q.   Did you crouch down or --
 7   A.   Yes, I crouched down.
 8   Q.   Did you see where Mr. Alonzo -- Alonzo went when you --
 9   A.   He ran -- he ran towards the back, I think, back of the
10   house.
11   Q.   Did you see him?
12   A.   Yeah.  When -- whenever I was taking cover I looked back
13   and I seen a couple of people running and I seen him running,
14   too.
15   Q.   Did you see him running in front of you?
16   A.   Behind me.
17   Q.   And he was -- and did he run the same direction as you,
18   towards the left side of the house?
19   A.   He ran towards the left back.
20   Q.   Did you see where he ultimately stopped running or
21   crouched?
22   A.   No.
23   Q.   Did you see him again that night?
24   A.   No.
25   Q.   Are you still friends with Mr. Alonzo?
```

1    A.    Yeah.

2    Q.    Do you talk to him?

3          Do you correspond with him -- do you write letters with

4    him?

5    A.    No.

6    Q.    Do you talk to him on the phone?

7    A.    No.

8    Q.    Do you talk to his family?

9    A.    No.

10   Q.    And when was the last time you said you've seen Mr.

11   Alonzo?

12   A.    Nine, ten years ago.

13             MR. BIGGS:   No further questions.

14             THE COURT:   Cross-examination?

15             MR. MEADOR:   Yes, Your Honor.

16                       CROSS EXAMINATION

17   BY MR. MEADOR:

18   Q.    Hi, Mr. Perez.

19         Do you recall giving a statement to a John Rosa, an

20   investigator?

21   A.    Yeah.   Do you recall saying that when the shooting

22   started I ran back towards the garage and took cover behind a

23   tree and Quintin was standing right next to me taking cover?

24         Was he with you behind the tree taking cover?

25   A.    No.

1    Q.    Okay.  So that's not correct?

2    A.    He was like a few feet behind me.

3    Q.    How do you -- if he was behind you, how do you know he

4    was behind you?

5    A.    I glanced back.

6    Q.    Okay.

7    A.    I seen -- I seen I guess the shirt he was wearing.

8    Q.    Okay.  So where were you again then when -- when he was

9    behind you?

10        Out front, you were --

11   A.    Out front in front of -- behind the tree.

12   Q.    So you -- you were behind a tree.

13        And where was he in relation to that tree?

14        Well, let me make sure.

15             MR. MEADOR:  Your Honor, may I approach real quick?

16             THE COURT:  You may.

17   BY MR. MEADOR:

18   Q.    I'm referring --

19             MR. MEADOR:  Your Honor, there's some diagrams in

20   my tab 13 that were actually exhibits at the trial.

21   BY MR. MEADOR:

22   Q.    This is a diagram that was admitted at trial.  Take a

23   second to look at that.

24   A.    There's another tree over here, (indicating)

25   Q.    Okay.  In that diagram then there's a tree that's

1    marked.  It says tree, right?

2    A.    Yeah.

3    Q.    Okay.  But the tree that you were behind was further --

4    A.    Here (indicating)

5    Q.    On the other side, on another property?

6    A.    No.  Same property.

7    Q.    Okay.  What are those?

8    A.    Curb.

9    Q.    So there was a curb in the middle of the property?

10   A.    No.  I don't remember seeing --

11   Q.    Okay.

12   A.    -- a curb.

13   Q.    So this was the garage (indicating).

14        This is the tree that's marked in that diagram

15   (indicating).

16        And there's another tree that you were behind?

17   A.    Yeah.  I wasn't behind that tree (indicating).

18   Q.    In relation to this -- where this tree was, let's say

19   it's -- it's to the right looking at the diagram, right over

20   here, where did the shooting take place?

21        Can you -- in relation to the house can you see it?

22   A.    That's this (indicating)?

23        Oh, Okay.  It happened right here, right in the street.

24   Q.    Right here (indicating)?

25        You think that might be just a car parked there?

1        Does that look like a car to you?

2   A.    No.

3   Q.    It doesn't.

4        Okay.  So how far away from the shooting do you think

5   you were?

6   A.    I don't know.  About 10, 20 feet.

7   Q.    10, 20 feet.

8        So what -- do you remember what time of night it was?

9   A.    No.

10  Q.    You don't recall what time of night?

11  A.    No, I don't.

12  Q.    Was it, I mean, around midnight?

13  A.    Yeah.  It was late.

14  Q.    You mentioned that it was dark.

15  A.    Yeah.

16  Q.    I mean, how can you be sure, you know, where anybody

17  was, if it was real dark?

18  A.    It was lit up.

19  Q.    In what way?

20  A.    There's a park right across the street and it's got

21  heavy light.

22  Q.    Now, is -- is it your testimony that the guys throwing

23  bottles were the ones that actually initiated the shooting?

24  A.    Um-hum.

25  Q.    Okay.  So they drove up, started throwing bottles, and

1   they're definitely the ones that started shooting?

2   A.   Yeah.

3   Q.   All right.  So as far as the -- the -- the statement

4   that you gave to John Rosa then, if the statement were to say

5   that Quintin was taking cover behind the same tree that I was

6   at while the shooting was taking place, that would be

7   incorrect?

8   A.   He was -- I don't know if he was trying to take cover

9   behind the tree, but he was behind it a few feet.

10  Q.   So, but he's -- you were sort of hunkered down there by

11  the tree and he wasn't hunkered down there with you?

12       He was maybe a few feet behind you?

13  A.   Um-hum.

14  Q.   So you said you saw 20 or 30 people throwing bottles.

15  A.   There was a lot.  I couldn't count, you know.

16  Q.   Just -- and you said there were about 50 people there,

17  so nearly half the people were throwing bottles?

18  A.   It seemed like it.

19  Q.   So were they throwing them towards the street and from

20  the street towards the house and from the house towards the

21  street?

22       So everybody -- it was just a big bottle fight?

23  A.   Yes.

24            MR. MEADOR:  Pass the witness.

25            THE COURT:  Mr. Biggs.

1            MR. BIGGS:  Nothing further.

2            THE COURT:  All right.  May the witness be excused?

3            MR. BIGGS:  Yes, Your Honor.

4            MR. MEADOR:  Yes, Your Honor.

5            THE COURT:  Any objection?

6        All right.  Sir, you're free to leave.

7        Thank you.

8        Next witness.

9            MR. BIGGS:  Petitioner calls Sandra Cazares.

10           THE COURT:  Ma'am, if you would please come forward

11   to the witness stand.

12       And let me just confirm, were you in the group this

13   morning that got sworn?

14           THE WITNESS:  Um-hum.

15           THE COURT:  Okay.  Is that a yes?

16           THE WITNESS:  Yes.

17           THE COURT:  Please be seated and speak up into the

18   microphone.

19       You may proceed.

20                       DIRECT EXAMINATION

21   BY MR. BIGGS:

22   Q.   Hello, Ms. Cazares.  I'm William Biggs.  Have we ever

23   met before?

24   A.   No.

25   Q.   And do you live in Dallas?

1   A.   Yes.

2   Q.   Do you -- are you friends with Quintin Alonzo?

3   A.   We weren't friends, but I knew who he was.

4   Q.   And how long has it been since you've seen Mr. Alonzo?

5   A.   Nine, ten years.

6   Q.   Have you stayed in touch with him at all?

7   A.   No.   No.

8   Q.   Were you at the party at Santos Gauna's the night of the

9   shooting?

10  A.   Yes.

11  Q.   And who did you -- do you remember that night

12  distinctly?

13  A.   A little bit.

14  Q.   It's been a long time?

15  A.   Yeah.

16  Q.   Do you remember what time you got to the party?

17  A.   No, I don't.   It was maybe 9:00, 10:00 o'clock.

18  Q.   Do you remember when the party sort of started getting a

19  little out of hand?

20  A.   It was pretty late.   I'm not sure what time, but it was

21  pretty late.

22  Q.   And where were you when things started to -- what do you

23  remember seeing things started to get out of hand?

24  A.   Me and a couple of friends, we needed to go to the

25  restroom and we couldn't go inside, so we went to a gas

1   station down the street.

2      When we came back there was like a commotion going on,

3   and we parked at the park across the street.  And as we were

4   walking back towards the party, that's when I heard -- we

5   heard the shooting.

6   Q.   And how far away were you from -- from the house when

7   you heard shooting?

8   A.   Maybe about 40 yards, 50 yards.

9   Q.   Could you see the house from --

10  A.   Yeah.

11  Q.   And who were you with?

12  A.   Just a couple of friends of mine.

13  Q.   What did you -- what did you do when you heard gunshots?

14  A.   We ran back to our car and ducked, because we didn't

15  know where the bullets were coming from.

16  Q.   Did you -- did you see anything?

17  A.   I distinctly remember seeing guys running to a car.  It

18  was a Cadillac, like an older Cadillac.  It was a -- dark

19  colored.  I don't remember, it was maybe like black, blue,

20  green.  But it was a dark color.  It was an older car, like

21  the big ones, and a guy just coming up and down, you know, I

22  could see the guy flashing.

23  Q.   When you say "coming up and down," what do you -- what

24  do you mean?

25  A.   Kind of like he would go up and then he would, you know,

1   duck back down.

2   Q.   Are you saying that he was behind the car?

3   A.   Yeah, he was behind the vehicle.

4   Q.   He was outside of the vehicle?

5   A.   Um-hum.

6   Q.   And how many people did you see --

7   A.   I seen --

8   Q.   -- near the vehicle?

9   A.   -- two.

10  Q.   When did you first see those people?

11  A.   When we were -- we were starting to walk back to the

12  house, we seen them running towards the car.  And so

13  that's -- a little bit when they were running towards the

14  car, that's when the shooting started.

15  Q.   Did you see what those people were wearing?

16  A.   I remember one, he was wearing like dark blue jean pants

17  and a white shirt.  And that's -- I don't even remember what

18  the other guy was wearing.

19  Q.   And do you remember anything else -- any physical

20  descriptions of --

21  A.   He was a Latin male.  But --

22        MR. MEADOR:  I didn't understand that.

23        MR. BIGGS:  Latin male.

24        MR. MEADOR:  Okay.  Thank you.  Sorry.

25  BY MR. BIGGS:

1    Q.    Did you recognize him?

2    A.    No, I had never seen him before.

3    Q.    Did you see anyone shooting?

4          Did you see anybody firing their gun?

5    A.    This particular guy was the one where I seen the flashes

6    coming from.

7    Q.    When you say you saw flashes, what do you mean?

8          Be more specific, please.

9    A.    Kind of what a gun would do, like flash (indicating).

10   When he would shoot it there was a bright flash.

11              THE COURT:  Can you speak up just a little bit?

12        I'm having a hard time hearing you.

13              THE WITNESS:  Okay.

14              THE COURT:  Thank you.

15   BY MR. BIGGS:

16   Q.    Which direction would the flash go?

17         Which -- which direction were they shooting --

18   A.    It was going towards the house.

19   Q.    Towards the house?

20   A.    Um-hum.

21   Q.    Did you see that person running to the -- the Cadillac

22   or did you see -- first see them behind the Cadillac?

23   A.    I seen them running towards the Cadillac.

24   Q.    And you said you saw two individuals?

25   A.    Um-hum.

1  Q.   Did you see the -- what the other individual was doing

2  at that time?

3  A.   I don't remember.

4  Q.   Do you know exactly how the Cadillac was parked?

5       Just where exactly was he crouching behind the Cadillac?

6  A.   The back -- the back end of the car, towards like the

7  rear passenger seat.

8  Q.   The rear passenger side?

9  A.   Um-hum.

10 Q.   And did you see him -- what did you see him doing,

11 specifically?

12 A.   After he ran to the car I seen him like come up, like --

13 like stand near the car and then just duck back down.  Like

14 this, duck down (indicating).

15 Q.   And did you say you saw flashes?

16 A.   Yes.

17 Q.   From near that direction?

18 A.   Um-hum, from like in his area.

19 Q.   Did you see -- did you see a gun?

20 A.   No, I don't remember seeing a gun.

21 Q.   Did you see anyone else shooting a gun from where you

22 were?

23 A.   I heard gunshots coming the other way, but I didn't see

24 who it was.  I didn't even see where it was coming from.

25 Q.   Did you see -- did you see that person get into a

1   Cadillac eventually?

2   A.    Um-hum.   They left in that Cadillac.

3   Q.    How long were you observing this before you took cover?

4   A.    Well, we took cover and we could still -- from where we

5   were parked at, we were parked at an angle from where we

6   could still see everything but we were still covered.

7   Q.    And how long did the shooting go on for?

8   A.    About five, ten minutes, maybe.   It was not that long.

9   Q.    Did you see -- who did you see get inside that Cadillac?

10  A.    The -- the two males that I seen running towards the

11  car.

12  Q.    Did -- did you see what -- you said you did not see what

13  the other man was doing at that time?

14  A.    No.

15  Q.    Did you see where those individuals -- did you see where

16  they got in the car, which one got -- who got in driver's or

17  passenger's seats or whatever?

18        Did you see any of that?

19  A.    The one with the white shirt, he got in the back.

20  Q.    Did he get in on the same side that he was -- did he get

21  in on the passenger side or the driver's side in the back?

22  A.    The passenger.

23  Q.    Did you see the other individual get in the car?

24  A.    No.   I don't -- I don't remember.

25  Q.    Were you -- did you go down to the police station that

1   evening?

2   A.    No.  I was across the street.  My brother was actually

3   still at the party.  He was -- I was across the street at the

4   park; he was at the house.  So I waited for him for a little

5   bit, but the cops said they were keeping him.  So they kept

6   him.  When they brought him home they picked me up, and I

7   went to the station and gave my statement.

8   Q.    And did you -- did anyone contact you after you gave

9   that statement, either the -- well, first, did the police

10  contact you after that?

11  A.    I remember somebody coming to the house, but I don't

12  remember if like -- what was said.  I just remember

13  somebody -- after I took the statement somebody did come to

14  my house, but I don't remember what was exactly done.

15  Q.    Did you -- did you ever speak with anyone for the police

16  after -- after that night that you gave a statement?

17  A.    I don't remember who this person was, if they were -- or

18  who they were with.

19  Q.    Did you speak to that person?

20  A.    Yeah.  Does -- but I don't remember what we spoke about.

21  Q.    How long after the incident was that?

22  A.    I don't remember.

23  Q.    Did you ever speak with anyone who was working on behalf

24  of Mr. Alonzo?

25        Did you ever speak to an investigator?

```
 1   A.    No.

 2   Q.    Did you speak with an attorney?

 3   A.    No.

 4   Q.    Were you living in Dallas?

 5   A.    Yes.

 6   Q.    Were you subpoenaed to testify?

 7   A.    No.

 8   Q.    Were you subpoenaed to testify for either side?

 9   A.    No.

10   Q.    Were you available to testify --

11   A.    Yes.

12   Q.    -- if you were needed?

13   A.    Yes.

14   Q.    Were you willing to come in and testify to what you saw?

15   A.    Yes.

16   Q.    Do you know -- Did you know or do you know Licho

17   Escamilla?

18   A.    I didn't know him, but I had heard of him around the

19   neighborhood but I didn't know who he was.

20   Q.    And did you live in the same neighborhood as him?

21   A.    I don't think so.

22   Q.    Where -- where did you live -- what neighborhood do you

23   live?

24   A.    I live in Western Park.  It's by -- it's in Oak Cliff.

25   Our division was called Western Park.
```

1    Q.    Would you consider yourself at that time friends with

2    Quintin Alonzo or acquaintances or --

3    A.    I knew some of his friends, had spoke to some of his

4    friends, but me and him, we personally didn't know each

5    other.

6    Q.    Did you remember seeing him at the party?

7    A.    No, I don't.

8    Q.    Either before or after you left for the gas station?

9    A.    No.

10   Q.    And what time did you remember leaving for the gas

11   station?

12   A.    I don't remember.

13   Q.    And -- and -- but you don't remember seeing him?

14   A.    No, I don't remember seeing him.

15   Q.    Did you remember seeing Licho Escamilla at the party?

16   A.    No.  I -- I didn't know what he looked like, so I

17   couldn't tell you if he was there or not.

18              MR. BIGGS:  Nothing further.

19         Pass the witness.

20              THE COURT:  Mr. Meador.

21                          CROSS EXAMINATION

22   BY MR. MEADOR:

23   Q.    Is it Cazares?

24   A.    Cazares.

25   Q.    Okay.  Thank you.

1    You did get -- you did give a written statement to
2    police, correct?
3    A.    Yes.
4    Q.    And in that statement you indicated that you were at the
5    party I think, and then the statement said around 12:20 you
6    had to go to the restroom, you decided to get your keys and
7    you went to the Fina Mart does that sound about right?
8    A.    Um-hum.
9    Q.    And prior to that you had seen the Cadillac pull up and
10   it was there?
11   A.    Yeah.  I remember seeing it parked there, like right in
12   front of the house.
13   Q.    And then you left and you came back and it was still
14   there; is that correct?
15   A.    Yes.
16             MR. MEADOR:  Your Honor, may I approach again?
17             THE COURT:  You may.
18   BY MR. MEADOR:
19   Q.    I'm going to refer again to the diagrams in my tab 13,
20   just for some reference.
21        These are some diagrams that were admitted at trial.
22        I just wanted to see if you could -- and I'm looking
23   at -- let's see, Exhibit -- State's Exhibit 31-A, it's sort
24   of the one that gives the -- about where did you park?
25   A.    We were parked like right here (indicating).

1    Q.    Okay.   So in this diagram there is the word playground

2    and then there looks like to be an opening.   Is that the

3    parking lot?

4    A.    Yeah, that's the parking lot.

5    Q.    And then it says numbers 2, 5, 1, 3, and 4 are sort of

6    right at the mouth of the parking lot; is that correct?

7    A.    Um-hum.

8    Q.    I just want to sort of give some reference to the court.

9          So you would have come back and you pulled in and parked

10   here and sort of facing that way.

11         And when you drove by I think you indicated that you

12   thought there was going to be a fight --

13   A.    There looked like there was commotion like around the

14   driver area.

15   Q.    And so you drove on by and just pulled in and parked?

16   A.    Yeah.

17   Q.    And I think you said that was about 40 yards?

18   A.    I want to say 40 yards, 50 yards.   I'm not sure.

19   Q.    Do you remember how dark a night it was that night?

20   A.    There was light because of the park across the street.

21   In the recreation's parking lot there's lights there.

22   Q.    But it was dark enough that you could see muzzle

23   flashes?

24   A.    Um-hum.

25   Q.    So it wasn't like daylight when you might not be able to

1   see --

2   A.   Yeah, it wasn't daylight.

3   Q.   But you couldn't identify any of the people that were

4   shooting; is that correct?

5   A.   Yes.

6   Q.   Didn't recognize any of them?

7   A.   I didn't recognize anybody, didn't know who they were.

8   Q.   Did you hear additional shots at all?

9   A.   I heard additional shots, like coming from the house,

10  but I didn't know who was shooting.

11  Q.   Back towards the Cadillac?

12  A.   Um-hum.

13  Q.   And the folks near the Cadillac?

14  A.   Yes.

15  Q.   Now, you also indicated in your statement you saw a

16  person with a red T-shirt.  You're certain it was red?

17  A.   I don't remember.

18  Q.   Are you certain it was a T-shirt?

19  A.   Yes.

20  Q.   It was a T-shirt as in --

21  A.   T-shirt.

22  Q.   What sort of T-shirt?

23  A.   I want to say just a regular, plain T-shirt.

24  Q.   Do you know if it had the straps over the shoulders or

25  it was just sort of a full T-shirt down -- halfway down the

```
 1   arm or --

 2   A.    Just a regular T-shirt.

 3   Q.    Do you know what sort of T-shirt I'm talking about?

 4   A.    Just like what an undershirt T-shirt would look like?

 5   Q.    Okay.  Good.  Okay.  An undershirt.  All right.  Thank

 6   you.

 7        So was it a sleeveless undershirt or did it have the

 8   sleeves?

 9   A.    It had the sleeves.

10   Q.    Sleeves that go like halfway down the bicep or so?

11   A.    Yes.

12   Q.    Okay.  That's all I wanted.

13              MR. MEADOR:  I pass the witness.

14              THE COURT:  Anything else, Mr. Biggs?

15              MR. BIGGS:  Nothing further.

16              THE COURT:  May the witness be excused?

17              MR. MEADOR:  Yes, Your Honor.

18              MR. BIGGS:  That's fine with petitioner.

19              THE COURT:  Ms. Cazares, you may leave.  You're

20   free to go.  Thank you very much.

21        You may call your next witness.

22              MR. BIGGS:  The petitioner calls Alejandra

23   Rodriguez.

24              THE COURT:  All right.  How many more witnesses

25   after this, Mr. Biggs, just for reference?
```

1    I know you said five more but I forgot at which --

2         MR. BIGGS:   We might have one more.

3         THE COURT:   After Ms. Rodriguez?

4         MR. BIGGS:   Yes.

5         THE COURT:   Okay.  And Mr. Meador?

6         MR. MEADOR:   Your Honor, it's hard for us to say

7    right now, but I'm thinking we may not call anyone.

8         THE COURT:   Okay.  I just wanted to get a gauge,

9    especially if there were witnesses who could not be here

10   tomorrow.

11        All right.  Ma'am, were you part of the group that was

12   sworn in this morning?

13        All right.  Please raise your right hand.

14                    (Witness sworn.)

15        THE COURT:   All right.  Please sit down in the

16   chair and please be sure to talk into the microphone, so we

17   can hear you.

18        You may proceed.

19                    DIRECT EXAMINATION

20   BY MR. BIGGS:

21   Q.   Good afternoon.  Could you please state your name for

22   the record?

23   A.   Alejandra Rodriguez.

24   Q.   And have we met before?

25   A.   Yes.

1    Q.    How many times have we met?

2    A.    Once.

3    Q.    When was -- when was that?

4    A.    Friday, last week.

5              THE COURT:  You need to speak up just a little bit,

6    Ms. Rodriguez.

7              THE WITNESS:  I'm sorry.

8              THE COURT:  Thank you.

9              THE WITNESS:  On Friday last week.

10   BY MR. BIGGS:

11   Q.    You came into the office?

12   A.    Yes.

13   Q.    Do you know Mr. Alonzo?

14   A.    Yes, I do.

15   Q.    When was the last time that you've seen Mr. Alonzo?

16   A.    Years ago.  More than ten years ago, probably.

17   Q.    Do you keep in touch with him?

18   A.    No.

19   Q.    All right.  Do you consider yourself friends with Mr.

20   Alonzo?

21   A.    Back in the day, yes.

22   Q.    Do you stay in touch with anyone in his family?

23   A.    No.

24   Q.    When was the last time you've spoken with anyone in his

25   family?

1    A.    About three years ago.

2    Q.    And when -- when -- what were the circumstances

3    surrounding that encounter?

4    A.    We used to go to church together.

5    Q.    Did you go to church -- the same church back in 2001 --

6    A.    Yes.

7    Q.    -- as Quintin?

8    A.    Yes.

9    Q.    What church is that?

10   A.    Bill Harrod Baptist.

11   Q.    Do you still go to that church?

12   A.    No, not anymore.

13   Q.    And do you -- I'm sure you're aware of why we're here

14   today.

15        Do you remember the party at Santos' house when he was

16   shot

17   A.    Yes.

18   Q.    And what time did you arrive at that party?

19   A.    I was there like around 9:30, 10:00.

20   Q.    And how was the party at the beginning of the party?

21   A.    This was before everything was even getting set up.  It

22   was just like, what, five of us.

23   Q.    Were you close friends with Santos?

24   A.    Yes.

25   Q.    And how -- how well did you know him?

1    A.    I grew up with him.

2    Q.    Where did you live?  At that time?

3    A.    At that time I was on a street called Abilene staying

4    with friends.

5    Q.    Is that near where Santos lives?

6    A.    No.  Sort of.  Not really.

7    Q.    How did you know Santos?

8          When did you first meet Santos?

9    A.    At the park across the street from his house.

10   Q.    And -- and when was that?

11         How old were you?

12   A.    I don't even remember.  I was probably like 12 years

13   old, 11.

14   Q.    Did you spend a lot of time with Santos?

15   A.    Yes.

16   Q.    Who else was over there before the party began?

17   A.    There was just me and maybe like two or three of his

18   friends, his mom, his dad, and that's it, and the DJ, who was

19   setting up.

20   Q.    Did you -- what do you remember, did -- did the party

21   get out of control a little bit?

22   A.    Not really.  Just when all the commotion started.

23   Q.    Well, when did you remember the commotion first

24   starting?

25   A.    We got back -- I got back from going to the restroom,

1    there was a conflict in the street and --

2    Q.    Is this in the front yard or the backyard?

3    A.    This is in the street in front.

4    Q.    Had anything happened prior to that that was --

5    A.    No.

6    Q.    -- that made you uncomfortable?

7    A.    No.

8    Q.    Just a normal party?

9    A.    Yeah.  And there was one guy who showed up and he -- of

10   course, everybody was like he's going to start trouble.

11   Q.    And Who was that?

12   A.    Licho Escamilla.

13   Q.    Do you know Licho Escamilla or did you know Licho

14   Escamilla?

15   A.    Yes.  Yes, I did.

16   Q.    How did you know him?

17   A.    I went to school with him.

18   Q.    Did you -- were you friends with Licho Escamilla?

19   A.    No.  Not friends.

20   Q.    Did you know his brothers?

21   A.    Yes.  I knew his youngest brother.

22   Q.    Were you friends with him?

23   A.    Yes.

24   Q.    At the time of this party were you friends with his

25   brother?

1    A.    Yes.

2    Q.    Did you remember -- did you remember when he arrived?

3          Did you see him when he arrived?

4    A.    Yes, I did.

5    Q.    What was he doing?

6    A.    They just came in.

7          MS. KUYKENDALL:  Oh, I'm sorry.  Your Honor --

8    could you just clarify -- could you clarify who is him?

9    BY MR. BIGGS:

10   Q.    All right.  When Mr. Escamilla arrived were you -- when

11   did you first see him?

12   A.    It was like an hour into the party.  They just arrived.

13   Q.    So you went to the restroom and then what did you -- did

14   you go out to the front or the backyard?

15   A.    To the front.

16         We had to leave to go to the restroom because it was --

17   they had messed it up or something.  I'm not sure.

18   Q.    So did you leave the house to go to the restroom?

19   A.    Yes.

20   Q.    Where did you go to the restroom?

21   A.    To the Exxon down the street.

22   Q.    Did you go by yourself?

23   A.    No.  It was me and my little sister and two other

24   boys.

25   Q.    And who's your little sister?

1    A.    Priscilla Rodriguez.

2    Q.    And who are the two little boys?

3    A.    I don't -- I don't remember.

4    Q.    And then what happened when you were walking back?

5          What did you see?

6    A.    Well, when we arrived there was two boys leaving.  One

7    of 'em his -- his name is Jesse Baron, and we asked him what

8    was wrong, why was he leaving.

9          And he was just all like they're going to start

10   shooting, they're going to start fighting.

11         And we're like, no, you know, this is my friend's party,

12   I don't think they're going to do that.  So they left.

13   Q.    Who -- who is they?

14   A.    Jesse Baron and a friend of his.

15   Q.    How many people were in the front yard?

16   A.    When we arrived --

17   Q.    When you had that conversation?

18   A.    -- back from the restroom there was nobody, hardly.

19   Q.    And what happened next?

20   A.    That's when we entered the gate to the front and I guess

21   the commotion started in the street.  And Santos started

22   telling everybody to go to the back of the house.

23   Q.    Let me stop you right there.

24         What -- what kind of commotion did you see?

25   A.    Just like a group of people getting together.  You know,

1  like they were going to start trouble or something.

2  Q.   Did you see anyone -- how many people were getting into

3  a commotion?

4  A.   Well, the -- what I know of is one of 'em, which was

5  Edward Guzman, he was in the middle of people surrounding

6  him, which then he called a friend, which was Licho

7  Escamilla, to come over and help him out, like, you know, get

8  his back.

9  Q.   Did you see how many people were -- well, what were they

10  doing in the commotion?  And how many people were there?

11       Well, I'll take one question at a time.

12       How many people did you see in a commotion?

13  A.   Maybe like 10.

14  Q.   And what were they doing?

15       You say they were surrounding somebody?

16  A.   Yeah.   Yes.

17  Q.   And, well, did you hear anything?

18       What did you see?

19  A.   No.   That's all I seen, was them surrounding him, and

20  then Santos started asking us to go to the back of the

21  house.

22  Q.   And where exactly were you standing when you saw this?

23  A.   I wasn't even like three feet away, four feet away.

24       They were right by the entrance of the gate and I was on

25  the other side of the gate

```
 1   Q.   You were on the inside of the gate?

 2   A.   Yes, inside of the gate.

 3   Q.   And so was your back to the house, --

 4   A.   Yes.  Yes.

 5   Q.   -- you were looking out to the street.

 6        Were they in the street?

 7   A.   Yes.

 8   Q.   And how close were they to the fence?

 9   A.   Not -- two feet.

10   Q.   And what happened next?

11   A.   Santos started asking us to go to the back.

12        And I ran to the back.  And it was me, my little sister,

13   Priscilla, Santos right next to her.  And I ran to the back,

14   and that's when they started -- I started hearing shooting.

15   Q.   Did Priscilla run to the back with you?

16   A.   No.  She didn't.

17   Q.   Okay.  Then there was -- what did you hear?

18   A.   Well, I was in the back.  They started shooting.  And,

19   of course, I'm looking for my little sister.  And she comes

20   to the back with blood on her shirt.  And she -- I'm standing

21   next to Santos' little cousin, little sister.

22        And she tells me, "Santos."

23        And I'm like what's wrong.

24        And she didn't want to tell me, because his little

25   cousin and sister were right next to me and she was like
```

1    never mind.    She ran back to the front and ran back and she
2    was like he's down, you know, he's down.
3         And as soon as everybody left, that's when we ran back
4    to the front and we seen Santos on the floor.
5    Q.    Did you see Mr. Alonzo in the front yard when everyone
6    was pushing?
7    A.    I didn't see him at all that day.
8    Q.    Didn't see him?
9    A.    No.
10   Q.    And you went to the backyard.   How much time passed
11   before your sister ran back to the backyard?
12   A.    Not even three minutes.
13   Q.    And what was the atmosphere like?
14   A.    Everybody was running, trying to get away, hiding.
15   Q.    And then what happened when Priscilla came over to you?
16   A.    She had told me that Santos had got shot.
17   Q.    Okay.   And did she tell you anything else?
18   A.    Well, she -- she told me that she had seen everything
19   that she was standing right next to Santos.
20        And I asked her, you know, was it who I think it was,
21   which was Licho Escamilla?
22        And she just nodded, said yes.
23        And we just, you know, started crying, because I
24   couldn't believe that.
25   Q.    And did you -- why did you -- why did you say is it who

1    I thought it was?

2    A.    Because we know how he was.  We -- we've been to parties

3    around him and he -- he would start fights and start beating

4    up people that he didn't even know and start shooting and

5    acting crazy.

6    Q.    And were you scared of Licho Escamilla?

7    A.    Yes, I was.

8    Q.    And based on your relationship with your sister, I mean,

9    was your sister also scared of him?

10   A.    Yes.

11   Q.    What did you do after that?

12         Did you talk -- did you go home with your sister or --

13   A.    No.  We actually got taken to the -- where you get --

14   you know, by the detectives.

15   Q.    You went down to the police station?

16   A.    Yes.

17   Q.    Did you give a statement?

18   A.    Yes.

19   Q.    Did your -- do you know whether your sister gave a

20   statement?

21   A.    No, she didn't.

22         She did, actually, and she just said she didn't see

23   nothing.

24   Q.    Did you -- did she tell you that?

25   A.    Yes.

1   Q.   She told you she didn't say anything?

2   A.   Yes.

3   Q.   And did you tell her she should tell, she should -- she

4   should say what she saw?

5   A.   No.  At the time, you know, we were scared, so, you

6   know, I had to give my little sister -- you know, be a big

7   sister, and I told her, well, you know, we know how it was.

8   Q.   How old were you at this time?

9   A.   17.

10   Q.   And how old was Priscilla?

11   A.   16.

12   Q.   Did you tell Priscilla not to say anything?

13   A.   If you want, yes, I did.  Yeah.

14   Q.   And what happened after that?

15        Did you go home?

16   A.   Yes.  They took me home like around 7:00, 8:00 in the

17   morning.

18   Q.   And where did you live at that time?  Did you live with

19   anyone?

20   A.   Yes.  With friends.

21   Q.   And -- and what friends did you live with?

22   A.   There were Four girlfriends.

23   Q.   Do you remember their names?

24   A.   Yelonda Ramirez and -- I can't remember the other ones.

25   Q.   Did you not live with Priscilla?

1    A.    No.   At the time, no.

2    Q.    Where did she live?

3    A.    She lived down the street from Santos with my

4    grandmother.

5    Q.    Would you see her -- did you see her a lot at that time?

6    A.    Yes.

7    Q.    Were you close sisters?

8    A.    Yes.   Very close.

9    Q.    What happened after that?

10         You went home and went to sleep?

11   A.    No.   I was actually crying and down.

12   Q.    And did anything happen that morning?

13   A.    Yes.   30 minutes from when I got there Licho showed up

14   at the house and --

15   Q.    Let me back up real fast.

16         What time did you get home?

17   A.    Around 7:00, 7:30.

18   Q.    All right.   Continue.

19         You said Licho showed up at the house?

20   A.    And he looked real scared, real pale.   And, of course, I

21   answered the door scared too.   And he was looking for his

22   little brother, because his little brother would always come

23   over.   And I just said, no, he's not here.   And he left.

24   Q.    And what was his demeanor like?

25         What was -- what was he -- how did he appear to you?

```
 1          Did he appear to be scared or --
 2   A.    Yes.  He looked real pale, real scared.
 3   Q.    And anything else stand out to you about did his
 4   appearance or -- did he come inside?
 5   A.    No.  It was just the front door.
 6   Q.    And how long -- how long did you interact with him?
 7   A.    Not even two minutes.
 8   Q.    Were you scared when he was at the door?
 9   A.    Yes.
10   Q.    You were?
11   A.    I wanted to attack him, but, of course, you know . . .
12   Q.    Do you know what he was wearing?
13   A.    No.  I don't remember.
14          You know what, I think he changed.  He went and changed.
15   Q.    Did you -- after that do you know -- did your sister
16   remain in Dallas?
17   A.    Yes.  For a while, yes.
18   Q.    And when did she leave?
19          Do you remember when she left?
20   A.    I don't really remember.
21   Q.    Do you know where she may have gone?
22   A.    They had sent her to a boot camp or something in
23   Houston.
24   Q.    Did you -- did you write her letters?
25          Did you keep in touch with her?
```

1    A.    No.

2    Q.    Did your grandmother know where she lived?

3    A.    Yes.

4    Q.    And did your grandmother send her to the boot camp?

5    A.    Yes.

6    Q.    Did she go drive her down there to the boot camp?

7    A.    Yes.

8    Q.    And when did you see her after that?  Just periodically?

9    I mean, did she ever --

10   A.    After she -- after she graduated.  I don't remember what

11   month, but when she graduated from this boot camp they let

12   her come home.

13   Q.    How long do you think she was in -- she was in boot

14   camp?

15   A.    I think it was six months.

16   Q.    And do you remember -- and you're not sure exactly when

17   she went to boot camp?

18   A.    No.

19   Q.    Do you remember your sister ever speaking to the police

20   again?

21   A.    Yes.  Yes.

22   Q.    And I -- I don't -- I need -- I need to rewind a little

23   bit.

24         Prior to her going off to boot camp.

25         What do you remember exactly?

1   A.    I remember getting home and she was speaking to the

2   detective that was investigating all this, I guess.

3   Q.    Well, what did the detective look like?

4   A.    He was short, with white hair, and old.

5   Q.    And where were they speaking?

6   A.    Outside in front of the house.

7   Q.    And where were you?

8   A.    I was coming home.  I was going to my grandmothers.

9   Q.    Did you go and talk to the detective or did you --

10  A.    No.  I just passed by them while they were talking.

11  Q.    Where -- where were they talking exactly?

12  A.    In front of my grandma's house, outside, on the porch.

13  Q.    And did you just go inside?

14  A.    Yes.

15  Q.    And what did you find out -- did you -- did you watch

16  them talk through a window or did you just go do your own

17  thing?

18  A.    Yes.

19  Q.    Which -- I'm sorry --

20  A.    Oh, I just went in and did my thing.

21  Q.    Okay.  Did you speak to your sister after the detective

22  left?

23  A.    Yes.  And I asked her what was going on.  And she told

24  me she was finally going to tell the truth, which she had

25  did, told him what she seen.

1    Q.    Had you spoken to her about that before, about coming

2    forward and telling the truth?

3    A.    We thought about it, yes.

4    Q.    Did you have any idea that she wanted to do that before

5    she spoke with the detective?

6    A.    No.

7    Q.    And what did she say after that?

8          Did she -- did the detective appear to take that --

9    bring her down for more questioning or --

10   A.    I would think.  I would think they would have, because I

11   was kind of waiting for them to do something about it, but

12   nothing ever happened.  And I would think they would take

13   something like that seriously.

14   Q.    And did your -- did you, the night after the shooting,

15   ever encounter Licho Escamilla's brother?

16   A.    Yes.  He actually showed up the next day, around 3:00,

17   4:00 o'clock in the afternoon.

18   Q.    So you had gotten home about 6:00 or 7:00.  And then

19   Licho showed up.

20         And then what -- and do you mean that day, 3:00 or 4:00

21   in the afternoon on that day?

22   A.    Yes.

23   Q.    And what were you doing at the time?

24   A.    I was laying down in bed.

25   Q.    And what happened?

1   A.    His brother came in and started yelling out that they

2   were shooting at people --

3              MS. KUYKENDALL:  Your Honor, I'm going to object as

4   hearsay.

5              THE COURT:  Response?

6              MR. BIGGS:  Your Honor, this goes to actual

7   innocence and, you know, based on the Supreme Court in Schlup

8   v. Delo anything goes.  And, you know, the court can accord

9   it whatever weight it -- it chooses to, but the rules of

10  hearsay or admissibility at trial don't apply in determining

11  whether my client is actually innocent of this crime for the

12  fundamental miscarriage of justice exception, and the court

13  can afford it whatever weight it chooses.

14             MS. KUYKENDALL:  Your Honor, hearsay may be

15  admissible in a -- on an actual innocence claim, but at the

16  same time it must be reliable and credible and we would argue

17  that it's neither.

18             THE COURT:  You can go into that on

19  cross-examination.

20        Ms. Rodriguez, I do need you to speak up a little bit

21  more though.

22             THE WITNESS:  Okay.

23  BY MR. BIGGS:

24  Q.    Okay.  And what -- what do you remember?

25        What did -- what did he say?

1   A.    Well, he came in saying that they were shooting and that

2   they -- his brother had killed somebody last night, which was

3   the next day.

4         And I had a friend there, whose name was Raphael

5   (phonetic), who started telling him to leave, because Santos

6   was his cousin.

7         And he took it, you know, bad, and he left.

8   Q.    Who all -- let me back you up.

9         Who was at the house at that time?

10  A.    It was just me, my friend Raphael and my friend Yoli

11  (phonetic).

12  Q.    And was Yoli your roommate?

13  A.    Yes.

14  Q.    And who was Raphael?

15        Was that a good friend of yours?

16  A.    Yes.

17  Q.    Was Raphie friends with Santos?

18  A.    He was his cousin.

19  Q.    Okay.  I'm sorry.  You've said that.

20        And -- and were you friends with -- which -- which

21  brother is this?

22        Is this Juan Escamilla?

23  A.    Yes.

24  Q.    Were you friends with Juan at the time?

25  A.    Yes.

```
 1    Q.    Did you continue to be friends with Juan after that?
 2    A.    No.   No.
 3    Q.    Did you ever -- did you just stop talking to him?
 4    A.    Yes, I did.
 5    Q.    Did you ever start talking to him again?
 6    A.    We did, actually.  I can't remember how long from the
 7    time, but we would always get together, and one day we did.
 8    And he was actually asking all of us for forgiveness for what
 9    he did and that he didn't know that it was -- that that was a
10    friend of ours.
11    Q.    And when you say "what he did," what do you mean?
12    A.    Which was they were shooting and his brother killed my
13    friend.
14    Q.    Well, did -- was it your understanding that Juan was
15    also shooting?
16    A.    Yes.
17    Q.    Was he apologizing for (sic) you for also shooting?
18    A.    Yes.
19    Q.    Do you know Michael Torres?
20    A.    Yes, I do.
21    Q.    And how -- how do you -- how did you know him?
22    A.    We grew up together, too.
23    Q.    Were you close friends with him?
24    A.    Yes.
25    Q.    Do you -- did you -- was Michael Torres at the party
```

1   that night?

2   A.   No.   No.

3   Q.   And I know there -- did you -- did you interact with

4   Michael Torres at all after this incident?

5   A.   No.

6   Q.   And when did you find out that he had been shot?

7   A.   Like a couple of days after.   A day.   A day after.

8   Q.   How -- how did you find out?

9   A.   I was actually living down the street from where he was

10  at, and they had told me that Licho Escamilla killed him

11  because he was trying to -- I guess, you know, that he killed

12  his cousin and he tried to confront him about it.

13          MS. KUYKENDALL:   Your Honor, I'm sorry.   Object on

14  relevance grounds.   I mean, whatever Michael Torres may have

15  thought about who killed his cousin is not relevant to

16  whether -- to whether Licho Escamilla actually killed his

17  cousin.

18          THE COURT:   I'm having trouble hearing you.

19          MS. KUYKENDALL:   I'm sorry.

20      Whatever -- whatever Michael Torres' reasons for or

21  grudge against Licho Escamilla, his belief as to what Licho

22  may or may not have done is not relevant to whether Licho

23  actually did that and whether -- and not relevant to the

24  actual innocence claim.

25          THE COURT:   Mr. Biggs.

1          MR. BIGGS:  Your Honor, I believe that she -- when

2    she came to learn about this shooting that she did learn some

3    information that might pertain to his actual innocence claim,

4    and I -- I -- I agree that while what he thought had

5    occurred -- what Michael Torres thought had occurred might

6    not be what in fact occurred, the fact remains that she has I

7    believe some information regarding Licho Escamilla's state of

8    mind when he shot Michael Torres.

9          THE COURT:  Now I'm confused.

10         MR. BIGGS:  I got --

11         THE COURT:  Who shot who?

12         MR. BIGGS:  I got confused myself.

13         THE COURT:  We're on a different shooting now?

14         MR. BIGGS:  Yes, we are.  We are on a different

15    shooting.

16        And, basically, this -- this was an issue that was

17    raised at trial but it was excluded from evidence.  And

18    the -- it appears to be undisputed that Licho Escamilla

19    killed Michael Torres, who is Santos Gauna's cousin.  And at

20    trial it was elicited that it appeared that Michael Torres

21    had -- was seeking to avenge his cousin's death and was going

22    after Mr. Escamilla, and Mr. Escamilla did in fact shoot him.

23    And it was excluded on the basis that we don't know what

24    exactly Mr. Escamilla -- you know, just because he might have

25    shot him for what Michael Torres thought had happened doesn't

1   mean that it actually did happen.

2           THE COURT:  So what does that have to do with Mr.

3   Alonzo's actual innocence claim?

4           MR. BIGGS:  Well, I believe that there were some

5   statements made to her that suggest that he had actually in

6   fact shot Santos as well and that that could be elicited by

7   her learning about this murder as well.

8           THE COURT:  Well, let's -- let's get to those

9   statements.

10          MR. BIGGS:  Well, I -- I was trying to.

11          THE COURT:  Well, let's just go ahead.

12      I can sort this out, we don't have a jury here, but

13  let's try to focus on Mr. Alonzo's claim.

14  BY MR. BIGGS:

15  Q.    Okay.  Who -- who told you -- who told you about Michael

16  Torres being killed?

17  A.    A friend of mine.

18  Q.    Who is a friend of yours?

19  A.    A couple of friends that were there with them.  I don't

20  remember their names.  But I knew them, 'cause this was a

21  dope house, you want to call it, everybody knew who they

22  were.

23  Q.    And did you ever hear anything from Juan Escamilla or

24  Licho Escamilla about that -- that killing?

25  A.    No.

1   Q.   Okay.   And I have one more question.

2        The night of the shooting did you -- this is of Santos

3   Gauna, did you see Mr. Escamilla, Licho Escamilla, carrying a

4   gun?

5   A.   No.

6   Q.   You did not see him?

7   A.   No.

8   Q.   Did you -- did you see him?

9        Did you see him that night?

10  A.   Yes.

11  Q.   Prior to the shooting?

12  A.   Yes.

13  Q.   And can you describe what he was wearing?

14  A.   I don't -- I don't really remember, but I know he was

15  wearing a baseball hat.

16  Q.   Did you see him arrive in a car or did he walk or --

17  A.   They were actually -- it was him and friends.   They were

18  in a Cadillac.   I can't remember, it was black or green or --

19  I know it was dark colored.   And then his friends in a

20  Suburban, green and white Suburban.

21  Q.   And how many people did he arrive with?

22  A.   Maybe -- there was maybe like eight of 'em.

23            MR. BIGGS:   Pass the witness.

24            THE COURT:   Ms. Kuykendall.

25                         CROSS EXAMINATION

1   BY MS. KUYKENDALL:

2   Q.   Ms. Rodriguez, all right, I just wanted to clarify.

3        Now, when you spoke to police right after the shooting

4   occurred, you told them that you didn't see the shooting; is

5   that correct?

6   A.   Yes.

7   Q.   Okay.  And is that what you're maintaining today, that

8   you didn't -- you didn't see the shooting?

9        You're not telling us that you saw the shooting?

10  A.   Um-hum.

11  Q.   Okay.  So you have no personal knowledge of who shot

12  Santos?

13  A.   Just by my little sister.

14  Q.   Okay.  So what she -- I'm sorry.  Go ahead.

15  A.   Yes, because she was right next to Santos.

16  Q.   But you didn't --

17  A.   No.

18  Q.   So your opinion on who shot Santos is all -- all comes

19  from what your sister allegedly told you?

20  A.   Yes.

21  Q.   Okay.  So -- all right.  And so if you can take me

22  through the timeline again.  And I'm sorry if I didn't catch

23  this the first time, but -- so after the shooting -- you

24  came -- you came home -- that was the day after the shooting,

25  you came home and you got -- you got home around 6:00 or 7:00

1    in the morning; is that right?

2    A.    Yes.

3    Q.    Okay.  And then was it that evening that Licho came to

4    see you or was it --

5    A.    No.

6    Q.    -- what time?

7    A.    That same time, 30 minutes after I left --

8    Q.    Okay.  30 minutes.  Okay.

9         I'm very sorry.  I'm talking over you.

10        So about 30 minutes after you got home Licho showed up

11   at your door?

12   A.    Yes.

13   Q.    Okay.  And you said that he looked pale, or -- or --

14   now, tell me again.  He looked you said sort of pale or

15   shaky?

16   A.    Yes.

17   Q.    That kind of thing.

18        So scared I think was a word --

19   A.    Scared, yes.

20   Q.    -- that you used.

21        But you were scared of Licho?

22   A.    Yes.

23   Q.    Okay.  Why -- he doesn't sound so scary from what you're

24   saying.

25        He's -- he's the one who's scared.  Why were you scared

1   of him?

2   A.   Just the thought of him, you know, the way he was.   He's

3   always been bad.   He was real cold-hearted.   He didn't -- I

4   kind of wanted to tell him, you know, why'd you shoot my

5   friend, and I was scared, of course, that he would have

6   probably shot me right there, too.

7   Q.   Okay.   Was he carrying a gun?

8   A.   Not at that time, no.

9   Q.   Okay.   You didn't -- he didn't threaten you; is that

10  correct?

11  A.   Um-hum.

12  Q.   Okay.   So he didn't threaten you.

13       He looked scared.

14  A.   Yes.

15  Q.   Okay.   No gun.

16       All right.   And so you said that your sister went to TYC

17  for about six months?

18  A.   No.   It was just a boot camp.

19  Q.   I'm sorry.   I misspoke.   A boot camp for about six

20  months.

21  A.   Yes.

22  Q.   And you say that you were close to your sister.

23  A.   Yes.

24  Q.   Okay.   And because of that closeness, that caused her

25  you say to confide in you what she saw the night of the

1    party.

2    A.    Yes.

3    Q.    Okay.  But you didn't write to her when she was away.

4    A.    No.

5    Q.    But I thought you were close to her?

6    A.    Yeah, I was, but at the time I was, you know, in my own

7    world and she was trying to get her life straight.

8    Q.    Okay.  So Licho's brother, Juan, showed up a little

9    later that day; is that right?

10        I'm sorry, taking you back.

11   A.    Yes.

12   Q.    Okay.  Did he threaten you?

13   A.    No.

14   Q.    Okay.  Were you scared of him?

15   A.    No.

16   Q.    Okay.  All right.  So Licho didn't threaten you?

17   A.    No.

18   Q.    Okay.  Juan didn't threaten you?

19   A.    No.

20   Q.    But -- and they didn't threaten Priscilla either?

21   A.    I wouldn't say they would -- they didn't.  Because --

22   because there -- there was a time that my little sister had

23   told me that he went to the house and told -- Licho Escamilla

24   told her, I know you seen me, I know what you seen.  And my

25   little sister --

1          MS. KUYKENDALL:  Your Honor, I object on hearsay

2   grounds.

3       I'm sorry.

4          THE COURT:  Overruled.

5   BY MS. KUYKENDALL:

6   Q.   So do you know when this was?

7   A.   This was maybe two months maybe after Santos's shooting.

8   Q.   Okay.

9          MS. KUYKENDALL:  May I have a moment, Your Honor?

10          THE COURT:  You may.

11          MS. KUYKENDALL:  Your Honor, I'll pass the witness.

12          THE COURT:  Mr. Biggs.  If you have any questions.

13   I didn't mean that you had to question her.

14       Do you have any redirect?

15          MR. BIGGS:  Briefly.

16          THE COURT:  Okay.

17                    REDIRECT EXAMINATION

18   BY MR. BIGGS:

19   Q.   You testified that you were scared of Mr. Escamilla?

20   A.   Yes.

21   Q.   And did you -- did Mr. Escamilla threaten your sister?

22   A.   I would say yes.

23   Q.   What happened exactly?

24   A.   They showed up at my grandmother's house with a stolen

25   car, which was Licho Escamilla and a friend of his, Michael.

1   And my little sister and my big sister went out there, which

2   is Vanessa and Priscilla Rodriguez.

3       And my little sister told -- recalled a moment that they

4   were in the front seat of the stolen car and that Licho had

5   told her I know you seen me, I know what you seen.

6       And -- and my little sister told me she was scared to

7   death, she didn't know what to say, so she just told him, you

8   know, I don't know what you're talking about, I don't know

9   what -- and she got out of the car.

10  Q.    Is your -- is your sister still scared of Licho

11  Escamilla?

12  A.    I don't know.  I don't know.

13              MR. BIGGS:  No further questions.

14              THE COURT:  Any redirect -- recross?

15              MS. KUYKENDALL:  I have a brief.

16                      RECROSS EXAMINATION

17  BY MS. KUYKENDALL:

18  Q.    The event that you just spoke about when Licho came to

19  the house in the stolen car --

20  A.    Yes.

21  Q.    -- was this -- was this before or after Priscilla gave

22  her second statement to the police?

23  A.    I'm thinking this was before.

24  Q.    This was before?

25      And yet she still gave that statement to the police?

1    A.    She never mentioned his name.  She just pointed him out

2    in a picture.

3    Q.    If your sister was scared of Licho, why would she,

4    herself, and take your other sister, why would they go out to

5    the car when they showed up?

6    A.    One of my -- well, actually, she didn't even know he was

7    in the car.  Michael, which was a friend that was with him,

8    was dating my sister.

9    Q.    Okay.  So you're -- you're surmising that she actually

10   went out there not realizing that Licho was there?

11   A.    Yes.

12   Q.    And so she also couldn't see that he was in the car and

13   so got in the car with Licho?

14   A.    I guess so.  Yeah.

15   Q.    Okay.  All right.

16          MS. KUYKENDALL:  No further -- well, I pass the

17   witness.

18          MR. BIGGS:  Nothing further, Your Honor.

19          THE COURT:  Can this witness be excused?

20          MR. BIGGS:  Yes, Your Honor.

21          MS. KUYKENDALL:  Yes, Your Honor.

22          THE COURT:  All right.  Ms. Rodriguez, thank you

23   very much.

24      You are free to leave.

25      You may call your next witness.

1          MR. BIGGS:  May I have just one moment to confer

2     with my client?

3          THE COURT:   Why don't we take a short ten minute

4     break while you confer with your client.

5          MS. KUYKENDALL:  Your Honor, if I may make a

6     suggestion.

7      If Mr. Alonzo decides to testify I think that we may

8     need to re-call Mr. Hays, and if we -- if we take maybe

9     another break so that we could go ahead and call Mr. Hays

10    after they have made their decision.

11     I don't know if you want to break now and take another

12    break.  I'm sorry.

13         THE COURT:  Well, I -- I assume you need a few

14    minutes to talk to your client, Mr. Biggs?

15         MR. BIGGS:  Yes, Your Honor.

16         THE COURT:  I hate to sit here and watch them

17    confer when everyone else could take a break and then we'll

18    know if we need another break.

19     All right.  We'll be in recess.

20               (Recess taken at 3:35.)

21               (Proceedings resumed at 3:48.)

22         THE SECURITY OFFICER:  All rise.

23         THE COURT:  Please be seated.

24     All right.  Mr. Biggs, do we have another witness?

25         MR. BIGGS:  Your Honor, the petitioner rests.

```
 1              THE COURT:  All right.

 2              MR. MEADOR:  Respondent rests.

 3              THE COURT:  All right.  Would the parties like to

 4     make closing statements?

 5              MR. MEADOR:  I don't have any closing.

 6         Well, you go first.

 7              MR. BIGGS:  Your Honor, I would like to move for

 8     leave to file a brief in light of the evidentiary hearing, if

 9     possible.

10              THE COURT:  All right.  How much time do you need

11     to file your brief?

12              MR. BIGGS:  Two weeks.  A week, two weeks.

13              THE COURT:  All right.  Mr. Meador.

14              MR. MEADOR:  If we could do a two week/two week

15     sort of thing.

16              THE COURT:  All right.  14 days/14 days for

17     response.  Do you want to reply?

18              MR. BIGGS:  Yes.

19              THE COURT:  All right.  14/14 and 10.

20         I will issue an order to that effect.

21         Is there anything else that we need to address?

22              MR. BIGGS:  I'll defer all my arguments, Your

23     Honor, to the briefing.

24              THE COURT:  All right.  Mr. Meador, anything else

25     that we need to address?
```

1           MR. MEADOR:  Just --

2           THE COURT:  All right.

3           MR. MEADOR:  No.

4           THE COURT:  Let me just remind you that you have no

5    copies of the exhibits, so to the extent that you want them

6    considered you should attach them to your briefs.

7        I have as admitted Petitioner's 1, 4, 2, 5, 6, 7, 10,

8    11, 12, and 13, anyone have anything different as far as

9    petitioner's exhibits?

10       And I take it the parties will be jointly ordering the

11   transcript and citing to the transcript with your

12   supplemental briefing?

13          MR. BIGGS:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. MEADOR:  Your Honor, can I ask, how long will

16   it take to transcribe the hearing?

17          THE COURT:  This is the lady you need to ask right

18   here (indicating).

19          MR. MEADOR:  Won't that impact the briefing

20   schedule?

21          THE COURT:  How about 14 days after the transcript

22   is filed?

23          MR. MEADOR:  Thank you.

24          THE COURT:  All right.  For respondents I have 3,

25   4, and 5.

1              MR. MEADOR:  That's right.

2              THE COURT:  All right.  Thank you very much.

3        We are adjourned.

4              THE SECURITY OFFICER:  All rise.

5                    (Proceedings ended at 3:50.)

```
 1                            INDEX

 2    Witness Name                                    Page   Line

 3    BILL COX

 4        DIRECT EXAMINATION BY MR. BIGGS ................... 12     1

 5        CROSS EXAMINATION BY MR. MEADOR ................... 15     17

 6
      CARL HAYS
 7
          DIRECT EXAMINATION BY MR. BIGGS ................... 21     5
 8
          CROSS EXAMINATION BY MR. MEADOR ................... 59     16
 9
          REDIRECT EXAMINATION BY MR. BIGGS ................ 71     16
10
          RECROSS EXAMINATION BY MR. MEADOR ................ 76     24
11

12    JOHN ROSA

13        DIRECT EXAMINATION BY MR. BIGGS ................... 79     20

14        CROSS EXAMINATION BY MR. MEADOR ................... 82     7

15
      DAVID ALEX
16
          DIRECT EXAMINATION BY MR. BIGGS ................... 86     4
17
          CROSS EXAMINATION BY MS. KUYKENDALL .............. 126    17
18
          REDIRECT EXAMINATION BY MR. BIGGS ................ 134    14
19
          RECROSS EXAMINATION BY MS. KUYKENDALL ........... 138    14
20

21    JULIE VAZQUEZ

22        DIRECT EXAMINATION BY MR. BIGGS ................... 141    5

23        CROSS EXAMINATION BY MR. MEADOR ................... 158    13

24
      JOE SAAL
25
          DIRECT EXAMINATION BY MR. BIGGS ................... 168    25
```

JIMMY BROWN

    DIRECT EXAMINATION BY MR. BIGGS ................... 173      6

    CROSS EXAMINATION BY MS. KUYKENDALL .............. 178      13


FRANCISCO PEREZ

    DIRECT EXAMINATION BY MR. BIGGS ................... 181      17

    CROSS EXAMINATION BY MR. MEADOR ................... 190      15


SANDRA CAZARES

    DIRECT EXAMINATION BY MR. BIGGS ................... 195      18

    CROSS EXAMINATION BY MR. MEADOR ................... 204      16


ALEJANDRA RODRIGUEZ

    DIRECT EXAMINATION BY MR. BIGGS ................... 209      13

    CROSS EXAMINATION BY MS. KUYKENDALL .............. 232      13

    REDIRECT EXAMINATION BY MR. BIGGS ................ 237      3

    RECROSS EXAMINATION BY MS. KUYKENDALL ............ 238      2


Rule Invoked                                      Page   Line

                                                    3      24


Plaintiff Rests                                   Page   Line

...................................................... 240      11


Defendant Rests                                   Page   Line

...................................................... 240      13


Exhibits Preadmitted                              Page   Line

2 .................................................... 36      21

```
 1              PETITIONER EXHIBITS

 2
        Exhibit    Description              Identified Admitted
 3

 4      1          Police report...................             15

 5      10         Open records request ........... 151         151

 6      11         DPD receipt ..................... 153         153

 7      12         Open records request ........... 155         156

 8      13         Receipt ......................... 156         156

 9      2          State Transcripts............... 39          40

10      4          1/16/2003 Motion ................ 31          31

11      5          Prosecution letter.............. 40          40

12      6          Investigative report ........... 124         124

13      7          Priscilla affidavit ............ 149         149

14

15              RESPONDENT EXHIBITS

16
        Exhibit    Description              Identified Admitted
17
        3          Subpoena......................... 66          66
18
        4          Contract......................... 68          68
19
        5          Alexandra Rodriguez info ...... 127          127
20                 sheet

21

22

23

24

25
```

< Dates >
1/16/2003.
36: 24
1/17/03 39: 13
12/3/02. 154: 7
2003, February
2003 17: 24
April 1, 2010
1: 18
April 21st,
2005 47: 24
April, 2010.
244: 8
December 3rd,
2002 153: 2
January '03
53: 6
January '03,
june '02 53: 5
January 16th,
2003. 31: 13
January 16th.
31: 12
January 17th,
2003. 31: 11
January 2003
53: 8
January 22nd,
2010. 170: 3
January. 97: 1
June '02 53: 8
June 27 14: 19
June 27th, 2001
17: 4
June 8th
173: 24, 182: 13
June 9th 173: 24
June 9th, 2001
182: 12, 182: 13
June, 2002.
50: 13
March. 170: 15
May 5th, 2004.
156: 13
may. 16: 4,
20: 22, 22: 2,
30: 25, 36: 19,
39: 19, 42: 19,
42: 24, 43: 13,
66: 11, 68: 3,

69: 19, 70: 13,
80: 8, 87: 24,
100: 15, 103: 8,
106: 17, 123: 24,
126: 14, 134: 10,
147: 21, 148: 16,
149: 5, 150: 24,
152: 20, 155: 15,
160: 3, 166: 17,
170: 22, 191: 15,
205: 12, 236: 21
$1,000 58: 21
$4. 20 153: 24
$5,000 58: 23,
58: 24


< 0 >
07-CV-399-0 3: 9
07-CV-399-0-BH
1: 6


< 1 >
1 1: 21, 3: 2,
16: 21, 22: 4,
37: 9, 117: 2,
135: 25, 137: 21,
147: 19, 156: 20,
157: 12, 158: 4,
170: 20, 170: 25,
205: 25, 241: 18
1. 14: 12,
80: 10, 96: 14,
106: 3, 135: 24,
137: 4, 157: 23
10 78: 7,
112: 18, 120: 1,
151: 1, 151: 10,
151: 12, 165: 23,
165: 25, 166: 6,
193: 5, 193: 6,
241: 18
10. 160: 5,
216: 4, 241: 5
10: 00 196: 14,
211: 13
10: 25. 59: 13
10: 35. 59: 14
10th 50: 13

11 41: 18,
153: 12, 153: 14,
165: 23, 165: 25,
166: 4, 166: 10,
166: 12, 166: 19,
178: 2, 241: 18
11. 16: 7,
16: 13, 19: 18,
112: 17, 212: 7
1100 2: 38
11th 18: 3
12 65: 15, 97: 2,
116: 18, 155: 17,
155: 18, 156: 8,
165: 23, 165: 25,
212: 6, 241: 19
12. 70: 15
12: 15. 126: 7
12: 20 204: 25
13 114: 23,
155: 17, 155: 25,
156: 8, 165: 25,
166: 4, 166: 20,
191: 19, 205: 14,
241: 19
13. 9: 12,
165: 23
138 8: 20
14 241: 2, 242: 7
14/14 241: 5
15 24: 1, 25: 13,
53: 17, 53: 24,
117: 2, 117: 4,
117: 6
1535 2: 38
15th 2: 7, 2: 17,
244: 8
16. 220: 2
160s 118: 23
163 118: 13
164 119: 21,
119: 22
165 119: 21,
119: 22
165. 120: 1
167 9: 11,
114: 23
168 9: 21,
118: 9, 118: 25,
119: 8

168. 118: 13
16th 89: 11
17 115: 11,
115: 22, 116: 5,
116: 20, 117: 6,
118: 3, 119: 16,
120: 12
17. 219: 25
17th 89: 11
18 119: 25
19 153: 21
199 116: 25,
117: 2, 117: 4
1: 00 126: 8,
164: 16


< 2 >
2 8: 25, 40: 2,
40: 5, 88: 1,
120: 1, 205: 25,
241: 18
2. 36: 21
20 23: 17,
23: 21, 23: 23,
24: 2, 25: 13,
53: 14, 53: 17,
53: 24, 55: 21,
56: 1, 108: 19,
184: 15, 193: 5,
193: 6, 194: 12
200 117: 2
200. 116: 25
2000s 17: 23
2001 14: 20,
31: 21, 32: 12,
34: 11, 35: 6,
173: 12, 173: 14,
173: 24, 210: 24
2001. 31: 22,
69: 4
2002 32: 16,
34: 11, 35: 6,
36: 1
2002. 32: 20,
35: 19, 35: 21
2003 17: 24,
32: 13, 34: 11,
90: 16, 177: 19
2003. 46: 2

2004 125: 6
2005 48: 2,
125: 6
2006 125: 6
2006.  18: 3
2007 124: 17,
125: 4, 125: 6
2007.  122: 25
20th 98: 12
21 119: 25
214.662.1557
2: 40
214/767-2746
1: 36
22 9: 1, 118: 9,
119: 9
23 153: 22
25 9: 21, 23: 17,
23: 21, 23: 23,
55: 21, 56: 1,
117: 2, 117: 4,
118: 9
25.  119: 9
258 170: 18
2738 173: 11
2:00 168: 14
2: 10. 168: 15
2nd 9: 2


< 3 >
3 1: 6, 3: 9,
8: 19, 9: 11,
9: 21, 37: 12,
66: 15, 86: 9,
114: 23, 118: 8,
118: 11, 118: 22,
118: 25, 119: 8,
205: 25, 242: 10
3.  8: 25, 118: 21
30 53: 14,
108: 19, 184: 15,
194: 12, 221: 4,
233: 20, 233: 21,
233: 23
300 2: 7, 2: 17
31-A 205: 18
33 178: 2
3:00 225: 5,
225: 9

3: 35.  240: 6
3: 48.  240: 7
3: 50.  242: 16
3rd 9: 2


< 4 >
4 31: 7, 31: 9,
37: 11, 68: 14,
115: 10, 116: 25,
118: 23, 119: 20,
178: 2, 205: 25,
241: 18, 242: 10
4.  31: 2, 68: 4,
68: 12, 86: 9,
119: 21, 119: 24
40 197: 5,
206: 12, 206: 13
44 171: 22
45 126: 5
4:00 225: 6,
225: 9


< 5 >
5 40: 2, 40: 5,
117: 3, 127: 4,
127: 12, 205: 25,
241: 18
5.  39: 21,
106: 19, 127: 4,
242: 11
50 126: 5,
194: 14, 197: 5,
206: 13
50.  183: 10
512/936-1400
2: 9, 2: 20
525 1: 33


< 6 >
6 18: 4, 124: 1,
124: 10, 124: 12,
241: 18
6.  124: 9
612 108: 4
629 1: 34
648.  156: 16
6:00 225: 7,

233: 13


< 7 >
7 135: 18,
135: 22, 149: 7,
149: 16, 149: 18,
149: 23, 241: 18
7.  100: 17,
149: 6, 149: 9
75204 1: 35
75242 2: 39
78701 2: 8, 2: 19
7:00 220: 7,
221: 8, 233: 13
7:00. 225: 7
7: 30. 221: 8


< 8 >
8 103: 10
8:00 220: 7
8th 2: 18


< 9 >
9 9: 11, 114: 23,
116: 25
9.  43: 15, 44: 8
9:00 196: 14
9: 30 211: 13


< A >
Abilene 211: 22
able 19: 14,
23: 19, 49: 8,
49: 11, 51: 4,
52: 22, 55: 19,
68: 22, 77: 14,
93: 12, 98: 1,
101: 9, 108: 19,
123: 10, 133: 1,
145: 7, 206: 19
Absolutely
26: 3, 42: 17,
52: 10, 67: 3,
130: 23, 143: 6
access 91: 25
accident 92: 15,

148: 18
accord 76: 1,
225: 22
accorded 75: 23
According
24: 14, 28: 17,
39: 9, 47: 24,
50: 25, 84: 2,
128: 19
accountable
93: 11, 93: 14
accused 161: 7,
162: 4, 162: 16
acquaintances
203: 23
across 23: 5,
23: 14, 24: 19,
63: 6, 102: 5,
174: 20, 175: 22,
176: 14, 178: 20,
179: 18, 193: 19,
196: 25, 201: 23,
201: 24, 206: 15,
212: 3
acting 218: 21
action 3: 9
active 96: 3
activity 65: 2,
82: 15, 82: 25,
83: 4, 84: 2
actual 225: 20,
226: 4, 229: 13,
229: 17, 230: 17
adding 121: 14
addition 19: 13,
26: 25, 118: 6
additional
37: 23, 51: 21,
52: 17, 52: 18,
52: 23, 53: 9,
77: 13, 207: 2,
207: 3
additionally
114: 5
address 51: 24,
51: 25, 52: 5,
52: 8, 52: 9,
52: 12, 67: 1,
67: 2, 67: 7,
77: 14, 241: 7,

241: 11
addresses 67: 5
adjourned
242: 14
administered
118: 4
administration
90: 22
admissibility
14: 23, 225: 24
admissible
226: 4
admission
149: 15
admit 68: 12,
127: 3, 149: 9,
151: 9, 153: 11,
156: 7
Admitted 14: 25,
15: 1, 31: 7,
31: 9, 40: 2,
40: 5, 66: 21,
68: 14, 124: 8,
124: 12, 127: 6,
133: 2, 148: 20,
149: 3, 149: 18,
151: 12, 153: 14,
156: 10, 166: 1,
191: 21, 205: 16,
241: 18
admitting 44: 4
advance 113: 6
affect 62: 6,
62: 11, 169: 23
affected 60: 1,
60: 3, 60: 15,
127: 13
Affidavit 17: 9,
17: 17, 18: 2,
20: 1, 34: 10,
59: 19, 82: 12,
82: 14, 82: 15,
82: 21, 99: 14,
99: 15, 99: 16,
99: 21, 100: 2,
100: 4, 100: 7,
100: 9, 100: 11,
100: 20, 101: 15,
104: 1, 130: 21,
130: 25, 131: 2,

135: 17, 148: 9,
148: 13, 149: 12,
156: 17, 159: 24,
159: 25, 160: 11,
160: 18, 160: 24,
163: 1, 163: 20
affidavits
19: 21, 20: 4,
32: 24, 100: 23,
100: 24, 100: 25,
101: 1, 101: 4,
101: 6, 128: 9,
143: 23, 144: 1,
144: 21, 144: 23,
146: 2, 146: 15
affirmatively
26: 10, 27: 8,
27: 15
afford 226: 2
afternoon
11: 14, 123: 13,
145: 5, 209: 15,
225: 6, 225: 10
afterwards
45: 10, 58: 19,
179: 4
agencies 92: 6,
95: 22
agency 93: 16
aggravated
9: 24, 21: 22,
86: 23, 118: 16,
119: 13
ago 12: 16,
14: 5, 80: 13,
88: 11, 90: 14,
157: 14, 182: 9,
190: 11, 210: 10,
210: 20
agreeable
172: 16
agreed 8: 2,
8: 7, 8: 8, 8: 22,
162: 19
agreement 6: 13,
58: 22, 142: 1
ahead 5: 15,
43: 1, 59: 4,
77: 19, 123: 13,
123: 21, 126: 4,

161: 25, 162: 2,
180: 10, 230: 25,
233: 2, 239: 20
ahold 83: 6,
146: 3
Alejandra
57: 11, 126: 23,
127: 17, 208: 16,
209: 17
Alex 4: 3, 4: 8,
4: 15, 9: 13,
9: 21, 38: 18,
41: 17, 54: 11,
54: 13, 64: 11,
64: 13, 85: 16,
85: 17, 85: 21,
86: 6, 86: 22,
123: 6, 123: 18,
126: 20, 134: 16,
136: 16, 140: 10,
140: 14
Alexandra
83: 25, 124: 15,
125: 14, 125: 23,
126: 23, 126: 25,
127: 9, 127: 17,
128: 2
allegations
21: 19, 87: 16,
87: 18
alleged 61: 23
allegedly 233: 7
alleging 167: 23
allowing 114: 5,
138: 4, 138: 8
almost 142: 20,
175: 18
alone 27: 12,
83: 22
already 22: 5,
37: 24, 85: 1,
114: 2, 126: 15,
149: 3, 152: 23,
174: 16, 177: 2,
185: 22
altercation
77: 3
altered 18: 6,
43: 25
Among 33: 16,

53: 14, 53: 24,
173: 2
amount 43: 17,
44: 1, 56: 9,
111: 11, 143: 12
anal 98: 5
analysis 10: 8
angle 201: 2
angry 133: 9
anonymous
129: 23
Answer 92: 13,
99: 23, 115: 15,
116: 8, 134: 25,
136: 16, 142: 13
answered 28: 20,
28: 22, 29: 17,
113: 9, 221: 12
answering 35: 23
answers 105: 21
Antonio 54: 12,
159: 4
anybody 9: 22,
84: 1, 84: 6,
116: 15, 117: 19,
118: 15, 119: 11,
120: 2, 120: 12,
120: 16, 136: 11,
178: 4, 193: 15,
199: 1, 207: 1
anyway 123: 13,
183: 21
apart 102: 9,
113: 11, 138: 4
apartment 69: 14
apologize 9: 4,
14: 13, 119: 6,
135: 12, 135: 24,
147: 22, 158: 2
apologizing
228: 6
apparently
25: 25, 46: 9,
50: 2, 89: 7
appear 31: 4,
36: 25, 37: 1,
153: 4, 221: 16,
221: 17, 224: 22
appearance
221: 20

appearances
3: 11
appeared 155: 8,
230: 9
appears 107: 6,
151: 2, 230: 7
apply 225: 24
appoint 48: 25
appointed
31: 17, 48: 16,
58: 4
appointments
70: 10
approach 14: 15,
14: 16, 16: 3,
17: 20, 20: 21,
22: 1, 30: 24,
36: 18, 39: 18,
42: 23, 43: 12,
66: 10, 68: 2,
70: 12, 80: 7,
86: 8, 87: 23,
100: 14, 103: 6,
106: 16, 123: 23,
126: 13, 147: 20,
147: 23, 148: 15,
149: 4, 150: 23,
152: 19, 155: 14,
160: 2, 166: 16,
170: 21, 191: 14,
205: 11
Approximately
31: 14, 78: 16
April 124: 16
Arcadia 182: 3
area 175: 7,
175: 23, 179: 3,
182: 7, 200: 15,
206: 9
argue 29: 15,
226: 5
argued 29: 12
argument 4: 2,
8: 15, 10: 3,
10: 13, 27: 3,
27: 10, 28: 25,
29: 13, 30: 3,
116: 25, 117: 22,
134: 6
arguments

118: 7, 241: 8
arm 207: 19
arrest 69: 12,
102: 23, 103: 25,
104: 1, 153: 18,
153: 21
arrested 32: 19,
141: 16
arrestee 92: 1,
171: 14
arrive 211: 12,
232: 4, 232: 9
arrived 7: 11,
51: 7, 213: 20,
213: 21, 214: 3,
214: 5, 214: 23,
215: 8
Ashley 54: 10
asks 9: 13, 9: 21
assault 21: 22,
86: 23
assaults 9: 24,
118: 17, 119: 13
assistance 4: 5
assistant 98: 17
associated
99: 15, 126: 24
assortment
19: 20
assume 33: 20,
101: 21, 239: 24
assumed 19: 2,
155: 2
assuming 56: 3,
98: 4
assumption 56: 6
atmosphere
218: 4
attach 15: 24,
241: 17
attached 15: 11,
19: 5, 19: 21,
19: 23, 99: 20,
100: 2, 130: 23,
131: 5
attack 222: 2
attempt 17: 6,
64: 5, 66: 23
attempted 60: 5,
66: 7, 85: 2

attended 61: 24,
61: 25
attention
24: 15, 39: 15,
74: 6, 74: 9,
97: 6, 97: 7,
116: 24, 119: 18,
146: 8, 147: 18,
163: 11
Attorney 2: 6,
2: 16, 4: 16,
33: 22, 46: 10,
97: 5, 97: 7,
97: 8, 104: 23,
113: 5, 130: 17,
135: 7, 135: 14,
141: 13, 150: 6,
161: 9, 165: 5,
202: 23
Austin 2: 8,
2: 19, 7: 16
authenticating
44: 14
authenticity
39: 23, 44: 5,
124: 7, 149: 10
Autopsy 37: 7
available
24: 10, 33: 8,
48: 23, 62: 10,
71: 9, 71: 22,
72: 1, 72: 2,
72: 10, 74: 7,
110: 22, 112: 5,
140: 11, 178: 4,
203: 6
avenge 230: 10
avoid 11: 16
aware 26: 18,
27: 17, 27: 18,
27: 20, 27: 25,
28: 18, 29: 14,
29: 17, 29: 19,
29: 22, 29: 25,
30: 2, 30: 7,
33: 24, 84: 16,
87: 16, 87: 18,
100: 10, 121: 18,
121: 21, 121: 22,
121: 23, 122: 21,

127: 17, 129: 14,
130: 10, 136: 24,
137: 1, 139: 24,
144: 3, 144: 6,
145: 9, 162: 24,
211: 7
awareness 28: 12
away 133: 10,
173: 19, 175: 5,
176: 4, 176: 24,
177: 1, 193: 3,
197: 3, 216: 14,
218: 5, 235: 14

< B >
backwards 63: 6
backyard 183: 6,
212: 20, 214: 7,
218: 1, 218: 2
bad 49: 17,
57: 9, 121: 13,
226: 21, 234: 15
Ballistic 37: 10
Baptist 211: 4
bare 36: 11,
166: 24
Baron 127: 22,
214: 24, 215: 6
base 144: 21
baseball 232: 3
Based 6: 14,
23: 24, 24: 9,
24: 13, 25: 23,
56: 14, 58: 11,
74: 16, 90: 12,
128: 15, 144: 23,
218: 24, 225: 21
basically
30: 21, 63: 6,
107: 12, 123: 16,
128: 13, 132: 12,
172: 6, 178: 18,
180: 17, 230: 5
basis 13: 1,
40: 24, 56: 7,
56: 17, 69: 23,
70: 7, 125: 20,
230: 12
battle 116: 9,

117: 13
bear 70: 19
beating 218: 19
became 143: 4
bed 225: 13
beforehand
108: 8, 108: 10
Beg 161: 25
began 39: 17,
142: 15, 212: 10
begin 10: 24,
10: 25, 182: 23
beginning 62: 2,
106: 21, 117: 4,
119: 25, 128: 16,
142: 8, 142: 9,
142: 10, 164: 25,
211: 14
behalf 12: 21,
61: 21, 163: 11,
202: 19
Behind 58: 13,
58: 15, 62: 13,
62: 19, 77: 5,
134: 2, 143: 1,
143: 5, 143: 7,
143: 13, 185: 2,
188: 15, 188: 19,
189: 4, 189: 15,
190: 21, 190: 23,
191: 1, 191: 2,
191: 3, 191: 8,
191: 10, 191: 11,
192: 2, 192: 15,
192: 16, 194: 4,
194: 7, 194: 10,
197: 24, 197: 25,
199: 19, 200: 2
beings 92: 8,
92: 17
belief 229: 10
believed 23: 12,
139: 14
below 152: 25
besides 135: 13
best 111: 7,
111: 9, 115: 20,
129: 10, 129: 12,
134: 24, 135: 1,
135: 8, 135: 15,

138: 10
better 113: 19,
169: 20
beyond 58: 3,
81: 19, 103: 20
bicep 208: 4
big 131: 18,
162: 8, 169: 23,
194: 20, 197: 18,
219: 22, 237: 12
bilingual
64: 24, 64: 25
Bill 11: 20,
82: 16, 150: 3,
150: 5, 150: 6,
173: 15, 174: 10,
211: 4
binder 43: 1
birth 98: 6
birthday 101: 11
bit 87: 9,
104: 16, 130: 12,
141: 22, 142: 16,
169: 20, 174: 24,
182: 14, 182: 22,
182: 23, 196: 10,
198: 10, 199: 8,
202: 1, 209: 24,
212: 15, 223: 12,
226: 9
black 98: 10,
110: 9, 110: 10,
174: 21, 174: 22,
176: 13, 197: 16,
232: 6
blame 22: 16,
23: 4
Bldg 2: 18
blocking 185: 23
blood 217: 11
blue 197: 16,
198: 13
body 170: 7,
174: 23
boneheaded
116: 8
bones 36: 11,
166: 24
bono 31: 19
boot 222: 13,

222: 19, 222: 21,
223: 1, 223: 3,
223: 6, 223: 13,
235: 5, 235: 6
borrowing
143: 15
bottle 133: 8,
136: 7, 139: 15,
139: 20, 139: 22,
139: 24, 140: 3,
194: 20
bottles 60: 14,
60: 19, 133: 6,
136: 2, 136: 5,
136: 10, 136: 12,
138: 18, 138: 19,
139: 9, 163: 3,
183: 14, 184: 8,
184: 10, 184: 12,
184: 14, 185: 18,
185: 23, 193: 22,
193: 24, 194: 12,
194: 15
bottom 151: 5,
156: 5, 158: 1
box 101: 13,
116: 19
boxes 13: 16
boys 214: 16,
214: 19, 214: 23
Brady 30: 21,
31: 24, 35: 13,
38: 19, 39: 1,
63: 16, 63: 18,
88: 20, 107: 7,
107: 14, 129: 15,
137: 24
brain 122: 13
brand-new 104: 4
Brandt 173: 15
break 44: 21,
59: 9, 79: 11,
111: 6, 111: 18,
123: 13, 123: 22,
126: 4, 126: 5,
127: 1, 239: 15,
239: 20, 239: 22,
239: 23, 240: 3,
240: 4
breaks 11: 18

brief 71: 15,
168: 7, 238: 1,
240: 19, 240: 22
briefing 241: 9,
241: 23, 242: 5
Briefly 14: 1,
134: 13, 237: 1
briefs 241: 17
bright 199: 7
bring 7: 13,
12: 25, 13: 5,
19: 10, 30: 3,
30: 5, 43: 1,
43: 3, 74: 6,
75: 6, 97: 5,
146: 5, 146: 8,
224: 22
bringing 64: 20,
65: 13, 158: 20
brit 12: 20
brother 201: 23,
213: 14, 213: 18,
221: 13, 225: 4,
225: 15, 226: 16,
227: 10, 228: 1,
235: 19
brothers 213: 13
brought 13: 4,
24: 15, 74: 9,
97: 7, 116: 21,
117: 6, 133: 20,
134: 5, 158: 24,
158: 25, 202: 2
Brown 172: 25,
173: 1, 173: 9,
178: 15
build 176: 11
building 111: 22
bullets 197: 12
bunch 106: 12,
184: 12
business 90: 13
But-- 22: 20


< C >
Cadillac 63: 5,
134: 2, 174: 21,
174: 23, 175: 25,
177: 14, 178: 21,

178: 23,  179: 18,
197: 15,  199: 18,
199: 19,  199: 20,
200: 1,  200: 2,
200: 23,  200: 24,
201: 6,  205: 4,
207: 5,  207: 7,
232: 6
calculated
22: 15
called 4: 22,
46: 5,  50: 3,
62: 3,  72: 10,
72: 19,  73: 1,
73: 2,  74: 3,
74: 8,  85: 17,
128: 2,  128: 8,
146: 1,  146: 22,
147: 2,  187: 18,
203: 21,  211: 22,
215: 23
calling 7: 7,
30: 14,  49: 15,
57: 7,  67: 22,
104: 18,  128: 11,
129: 22,  142: 24
callings 142: 14
calls 26: 6,
52: 25,  70: 4,
70: 5,  81: 24,
129: 4,  129: 23,
130: 3,  142: 22,
168: 19,  181: 11,
195: 7,  208: 16
camp 222: 13,
222: 19,  222: 21,
223: 1,  223: 3,
223: 6,  223: 13,
235: 5,  235: 6
car 108: 21,
174: 23,  175: 23,
176: 3,  176: 4,
176: 6,  176: 23,
183: 14,  185: 1,
185: 13,  186: 2,
186: 4,  192: 24,
192: 25,  197: 11,
197: 14,  197: 17,
197: 24,  198: 9,
198: 10,  200: 3,

200: 9,  200: 10,
201: 7,  201: 12,
201: 19,  232: 4,
237: 11,  237: 15,
237: 20,  238: 5,
238: 16,  238: 18,
238: 23,  238: 24
card 84: 7,
84: 10,  84: 18,
106: 24
care 143: 11
career 34: 8,
109: 10
Carl 4: 2,  4: 13,
4: 21,  4: 23,
13: 4,  17: 18,
18: 9,  18: 13,
20: 23,  81: 4,
83: 13,  98: 23,
99: 2,  110: 21,
134: 16,  138: 4,
141: 13,  145: 1,
145: 4,  146: 13,
150: 15,  150: 19,
158: 17,  159: 21,
161: 9,  165: 11,
165: 14
carrying
180: 13,  231: 16,
234: 19
cars 175: 25,
183: 14,  185: 16,
185: 20,  185: 22
cases 34: 4,
35: 3,  64: 12,
64: 13,  96: 6,
131: 12,  166: 6
catch 112: 14,
233: 10
catchall 113: 16
categories
99: 9,  99: 25
categorize
36: 16
category
100: 24,  106: 7
cause 6: 10,
32: 24,  34: 10,
175: 6,  231: 9
caused 62: 14,

235: 11
Cazares 195: 7,
195: 20,  204: 18,
204: 19,  208: 13
central 130: 21
Century 98: 12
certain 4: 6,
11: 6,  36: 14,
78: 4,  86: 12,
87: 6,  96: 9,
99: 6,  112: 1,
143: 12,  207: 10,
207: 12
certainly
45: 13,  46: 13,
60: 24,  77: 7,
110: 18,  118: 6,
129: 14
certainty
188: 12
certify 244: 2,
244: 5
Cesar 173: 16
cetera 39: 1
chair 209: 10
challenge 124: 7
chance 12: 12,
13: 24,  15: 3,
16: 18,  16: 21,
40: 9,  40: 13,
87: 4,  100: 18,
107: 3,  108: 7,
148: 5,  149: 20,
162: 24
change 30: 5,
30: 8,  94: 4,
113: 22,  125: 9,
128: 11
changed 75: 1,
83: 2,  93: 21,
93: 22,  93: 23,
93: 25,  94: 8,
94: 24,  222: 5
Channel 178: 2
charge 80: 3
charges 152: 14
charging 46: 7
check 100: 4
chief 77: 18,
86: 22,  87: 1,

90: 21,  92: 24,
123: 8
children 143: 11
choice 77: 1,
134: 19,  134: 20,
134: 22,  134: 23
chooses 225: 23,
226: 2
chosen 65: 3,
134: 16,  134: 17
chronological
129: 8
chunking
183: 14,  184: 11,
185: 23
church 161: 3,
161: 20,  161: 22,
161: 24,  210: 23,
210: 24,  211: 3,
211: 5
circumstances
45: 23,  98: 19,
137: 11,  210: 21
citing 241: 22
civil 3: 9
claim 4: 5,  4: 8,
4: 23,  10: 4,
10: 5,  10: 7,
17: 10,  17: 11,
17: 13,  226: 4,
229: 13,  229: 17,
230: 17,  231: 2
claimed 53: 21
claims 4: 3,  4: 4
clap 147: 8
clarify 130: 15,
214: 1,  232: 15
clear 9: 15,
114: 25,  140: 25,
160: 4
clear-cut 95: 4
clearly 127: 24
Clements 2: 18
client 64: 20,
134: 24,  135: 8,
135: 15,  168: 8,
225: 25,  239: 13,
239: 15,  239: 25
Cliff 182: 6,
182: 7,  203: 20

clipped 106:10
close 16:25,
78:21, 171:16,
176:14, 211:17,
216:24, 220:23,
220:24, 228:12,
235:9, 235:16
closeness
235:11
closing 8:14,
9:8, 10:3,
10:13, 27:3,
27:10, 28:25,
29:13, 30:3,
116:24, 117:22,
118:6, 134:6,
240:15, 240:16
clothing 37:15
Clymer 173:16
code 91:13
cold 114:18
cold-hearted
234:15
collect 107:23,
160:6
collected 9:18,
115:3
colloquy
119:19, 120:20
color 110:10,
176:1, 176:14,
197:17
colored 197:16,
232:7
combating
116:10
comes 8:19,
9:11, 96:8,
102:4, 102:17,
169:22, 217:10,
233:6
comfortable
96:5
coming 7:13,
24:19, 79:5,
125:3, 125:16,
125:22, 161:8,
164:17, 174:15,
179:2, 183:25,
197:12, 197:18,

197:20, 199:3,
200:20, 200:21,
202:7, 207:3,
223:22, 224:15
commencing
40:16
Commerce 2:38
committed 9:24,
26:4, 118:16,
119:13, 125:17,
125:24
commotion
174:17, 184:4,
196:24, 206:8,
212:16, 212:17,
215:13, 215:16,
215:20, 216:1,
216:3
communicated
142:13
compare 44:10,
44:22
compelled 67:15
complainant
128:7, 139:3,
170:6
Complete 86:14,
152:5, 170:8,
171:11
completely
23:13, 27:6
complex 69:14
complied 112:20
comply 244:5
computer 2:46
concern 40:24,
44:9, 44:12,
44:14, 60:21
concerned
40:21, 40:25,
67:1
concerning
63:16
conclude 56:7
conclusion 26:7
conduct 144:18
confer 239:12,
239:15, 240:2
Conference
244:6

Conferring 9:1
confession
95:10
confide 235:12
confident 90:1,
95:25, 96:7,
97:15, 98:21,
110:4, 137:8
confirm 43:8,
43:24, 173:1,
181:13, 195:10
conflating
117:23, 118:2,
120:24
conflict 212:19
confront 229:1
confused 157:1,
229:23, 230:1
conjunction
184:16
connected
107:23
consequence
186:15
consider 74:14,
203:22, 210:13
considerable
43:17, 44:1,
56:9, 111:11
considered
137:24, 241:17
considering
24:24
consistent
100:4, 134:1
constantly
125:11
constitute
27:12
contact 46:1,
46:2, 46:16,
84:10, 84:14,
202:4, 202:5
contacted
12:21, 46:9
contacting
125:7, 125:11
contained
19:20, 45:6
contains 34:13

content 107:12
contention
163:22
context 9:15,
114:18, 114:25,
115:10, 116:17,
119:15
continuance
74:12, 74:14
Continue
142:18, 221:9,
227:15
continued 18:13
contract 59:1,
59:2, 67:24,
68:8, 68:9,
141:25, 142:2
contradicted
24:8, 59:23,
60:10
contradicting
62:16
control 182:23,
212:15
conversation
14:4, 14:20,
25:9, 25:12,
50:17, 112:18,
124:20, 124:22,
125:1, 125:12,
215:9
conversations
48:13
conveyed 25:18
convinced
128:15
cooperative
49:7
copied 95:25,
107:24
copies 13:20,
13:22, 45:19,
46:4, 46:6,
46:8, 46:12,
46:14, 47:2,
47:3, 47:12,
48:8, 48:10,
89:2, 89:3,
91:1, 103:3,
110:11, 113:21,

144: 2,  146: 2,
146: 25,  147: 13,
150: 17,  155: 6,
156: 16,  241: 16
cops 202: 1
copy 13: 22,
45: 12,  45: 13,
45: 15,  45: 24,
46: 19,  46: 25,
81: 4,  86: 9,
86: 11,  90: 23,
91: 24,  93: 1,
93: 6,  95: 13,
96: 4,  100: 20,
103: 11,  106: 20,
107: 25,  146: 17,
146: 22,  148: 20,
148: 23,  149: 1,
150: 14,  150: 17,
150: 18,  155: 18,
165: 18,  170: 2
core 22: 12
corner 127: 22,
173: 17
correctly
130: 20,  130: 22,
178: 17,  179: 19
correspond
190: 2
corroborated
60: 16,  60: 25,
133: 12
Counsel  3: 11,
4: 6,  4: 17,
10: 23,  41: 21
count 78: 14,
170: 16,  194: 13
County 6: 4,
33: 1,  33: 4,
33: 7,  33: 9,
33: 11,  33: 22,
34: 8
couple 8: 2,
14: 2,  14: 3,
71: 21,  129: 4,
138: 13,  141: 19,
141: 23,  145: 14,
146: 23,  158: 25,
183: 13,  189: 12,
196: 21,  197: 9,

228: 21,  231: 8
course 58: 9,
72: 24,  82: 1,
89: 18,  178: 10,
213: 3,  217: 10,
221: 11,  222: 2,
234: 17
courtesy 108: 7,
114: 6,  114: 9
Courthouse
7: 12,  78: 5,
88: 22
courtroom 6: 20,
21: 1,  172: 20
courts 93: 3
cousin 217: 12,
217: 15,  226: 20,
227: 7,  229: 1,
229: 4,  229: 6,
230: 8,  230: 10
cousins 122: 9
cover 189: 1,
189: 3,  189: 11,
190: 21,  190: 22,
190: 23,  194: 4,
194: 6,  200: 25,
201: 1
covered 201: 3
Cox 11: 20,
11: 22,  12: 3,
14: 4,  15: 19,
20: 17,  82: 16,
150: 3,  150: 5,
150: 6,  150: 8,
150: 12,  153: 25,
154: 8,  154: 12,
154: 14,  165: 4
crazy 218: 21
created 88: 18
creates 102: 15
credibility
59: 18,  60: 1,
74: 19
credible 24: 7,
24: 10,  55: 20,
74: 23,  75: 1,
75: 5,  76: 7,
121: 5,  121: 15,
121: 17,  137: 15,
137: 17,  226: 5

crime 77: 8,
225: 25
Criminal  1: 16,
51: 16
CROSS 15: 17,
59: 16,  82: 7,
111: 18,  114: 12,
126: 17,  136: 21,
158: 13,  178: 13,
190: 15,  204: 16,
232: 13
Cross-examinati
on 133: 21,
158: 11,  172: 8,
190: 13,  226: 8
crouch 189: 5
crouched 189: 6,
189: 20
crouching 200: 2
crowd 183: 15
Crowley 88: 22
CRR 2: 37,
244: 13
crying 161: 19,
162: 11,  163: 19,
218: 14,  221: 2
CSR 244: 2
cull  111: 12
Curb 192: 7,
192: 8,  192: 11
curious 163: 5
curled 161: 18
custodian 35: 5,
124: 5
Cynthia 9: 19,
86: 24,  115: 5,
117: 16,  120: 14,
120: 17


< D >
D. A.  98: 12,
111: 23
dad 212: 12
Dallas 1: 3,
1: 12,  1: 35,
2: 39,  6: 3,
33: 1,  33: 4,
33: 9,  33: 11,
34: 8,  103: 12,

104: 21,  124: 5,
128: 24,  149: 12,
150: 20,  151: 2,
152: 16,  152: 22,
155: 19,  169: 6,
169: 11,  169: 17,
171: 3,  171: 17,
182: 4,  195: 23,
202: 25,  222: 7,
244: 16
dark 138: 23,
161: 18,  162: 8,
163: 18,  174: 22,
176: 1,  177: 16,
178: 23,  180: 1,
180: 2,  193: 13,
193: 16,  197: 15,
197: 17,  198: 13,
206: 14,  206: 17,
232: 7
date 17: 22,
18: 1,  31: 11,
39: 11,  89: 23,
128: 19,  143: 10,
152: 10,  153: 2,
154: 2,  154: 10,
154: 11,  156: 12,
170: 7
dated 14: 19
dates 98: 6
dating 238: 19
daughter 144: 7
David 4: 2,  4: 8,
4: 15,  64: 11,
85: 16
day 37: 20,
37: 21,  39: 5,
39: 8,  50: 4,
50: 13,  51: 5,
51: 7,  68: 24,
88: 23,  138: 5,
164: 6,  164: 7,
164: 8,  178: 1,
210: 15,  217: 23,
225: 5,  225: 9,
225: 10,  226: 17,
227: 21,  228: 21,
233: 12,  235: 20,
244: 8
daylight

206:19, 206:21
days 14:2,
14:3, 146:24,
147:2, 157:14,
228:21, 241:2,
242:7
days/14 241:2
dead 112:23
deal 69:7,
112:6
dealing 64:11
death 230:10,
237:18
decide 48:10,
102:7
decided 75:1,
75:6, 109:10,
205:1
decides 239:18
decision
127:13, 239:21
Defendant 9:23,
14:12, 14:13,
103:10, 116:13,
118:15, 119:12,
120:10, 120:16,
125:8, 125:18,
128:10, 132:10,
133:5, 133:8,
133:9, 133:24,
135:22, 135:25,
139:18, 139:21,
166:19, 180:17
Defender 1:32,
169:5
Defense 4:16,
22:13, 22:15,
33:9, 33:22,
58:11, 61:4,
72:25, 75:1,
80:4, 89:1,
99:11, 106:2,
108:5, 109:20,
112:4, 113:5,
113:17, 132:9,
135:3, 135:7,
135:14, 137:21,
138:22, 178:6
defenses 180:16
defer 241:8

definitely
18:6, 193:25
definition
130:16
Delo 225:22
demeanor 221:15
demonstrated
29:6
denied 154:19
deny 178:22
Department
1:15, 34:14,
35:5, 36:13,
101:16, 101:18,
101:20, 102:14,
103:13, 104:21,
128:24, 149:12,
150:21, 151:3,
152:9, 152:17,
152:23, 155:20,
163:14, 169:11,
169:17, 171:4,
171:18
depend 33:12,
93:19
depended 90:20,
131:7
depending
101:21
depends 19:7,
35:9, 102:25,
104:12, 104:13
depressed
161:18
describe 70:22,
155:25, 176:5,
185:10, 186:6,
232:1
describes
135:23
descriptions
198:17
designated 5:9
detailing 68:17
details 105:12
detectives
103:2, 104:15,
124:14, 219:5
detention 51:10
determination

5:2, 5:4, 74:20
determine 48:5,
55:19
determining
225:24
devastated
161:4
devastating
163:7
diagram 191:21,
191:24, 192:13,
192:18, 205:21
diagrams
191:18, 205:14,
205:16
didn't. 120:15
dies 163:6
differ 104:22
different 5:7,
8:15, 60:8,
60:9, 62:21,
62:23, 88:25,
90:15, 90:16,
90:20, 91:12,
92:11, 92:18,
93:24, 98:14,
105:21, 135:4,
148:14, 149:25,
162:25, 163:19,
230:2, 230:3,
241:19
differently
36:16, 81:22
difficult 63:3,
105:17
digital 91:24
digressing
106:9
dimly 138:24
dire 39:17,
106:21
DIRECT 12:1,
21:5, 42:21,
79:20, 86:4,
94:20, 111:8,
114:12, 116:24,
118:8, 119:7,
119:18, 123:11,
123:22, 136:23,
137:8, 137:11,

137:14, 141:5,
147:18, 168:25,
173:6, 181:17,
195:18, 209:13
directed 140:1
directing 57:19
direction
186:9, 188:23,
189:16, 199:13,
199:14, 200:14
directions 52:3
directly 50:20,
101:16
Director 1:15,
49:25
disagree 30:17,
30:19, 135:9
disappeared
62:3, 62:4
disarray 66:3
discover 17:7
discovered
49:20
discovering
56:11
discovery
63:23, 90:19,
91:22
discrepancy
171:24, 172:4
discuss 7:2,
25:17, 38:21
discussed 7:4,
54:24, 130:11
discusses
107:12
discussing
25:16
dispute 9:7,
39:23, 149:10
disregards
115:15
distinctly
196:9, 197:14
distinguished
24:20
distraught
163:10
District 1:1,
1:2, 1:24,

104: 23, 244: 15
Division 1: 3,
1: 17, 203: 21,
244: 16
DJ 62: 17, 77: 5,
212: 12
DNA 37: 13,
37: 14
documentation
72: 3, 72: 12,
99: 19
Dog 133: 2
doing 32: 19,
88: 25, 94: 15,
109: 5, 128: 13,
145: 9, 175: 6,
199: 23, 200: 7,
201: 9, 213: 23,
216: 1, 216: 5,
225: 12
done 26: 19,
35: 6, 35: 10,
87: 21, 91: 2,
97: 25, 135: 5,
202: 10, 229: 11
door 173: 20,
173: 22, 177: 5,
177: 21, 184: 18,
221: 12, 221: 21,
221: 24, 233: 24
dope 231: 9
double-check
109: 10
doubt 52: 7
doubting 129: 1
draw 39: 15
drink 183: 7
drive 222: 21
driver 98: 7,
177: 9, 201: 12,
201: 17, 206: 9
driving 177: 12
drove 193: 24,
206: 6, 206: 10
duck 197: 23,
200: 10, 200: 11
ducked 197: 11
During 25: 20,
61: 13, 72: 24,
79: 11, 95: 1,

119: 20, 169: 10
duties 129: 15,
129: 17
duty 109: 15,
109: 17, 109: 19

< E >
e-mail 124: 2
e-mailed 88: 8
earlier 45: 3,
53: 17, 58: 13,
74: 16, 76: 9
Early 17: 23,
35: 19, 35: 21,
69: 23
easier 139: 1,
139: 6
easy 9: 16,
132: 22
Edward 54: 13,
215: 22
effect 88: 9,
241: 6
efforts 6: 6
Eight 51: 21,
93: 3, 170: 13,
232: 10
Either 4: 19,
5: 1, 5: 8, 6: 20,
24: 8, 27: 20,
54: 1, 54: 16,
56: 5, 60: 7,
61: 5, 111: 7,
120: 13, 120: 17,
131: 4, 176: 9,
202: 5, 203: 4,
204: 3, 236: 6
elicited 230: 9,
230: 20
eliciting 10: 5,
10: 12
eliminate 117: 8
em 53: 19,
88: 13, 147: 6,
147: 7, 184: 12,
185: 9, 186: 5,
214: 24, 215: 21,
232: 10
Email 1: 37,

2: 10, 2: 21
encounter
210: 22, 225: 4
encountered
83: 5
encouraged
69: 15
end 135: 2,
135: 3, 200: 3
ended 242: 16
enforcement
124: 21
English 64: 23
enough 167: 18,
167: 19, 176: 14,
180: 4, 206: 17
entered 67: 24,
148: 21, 215: 12
entire 93: 25
entitled
102: 15, 104: 22,
135: 14, 244: 4
entrance 216: 15
Eric 87: 2,
87: 3, 98: 16
escalated
183: 19
escorting
139: 21
especially
209: 3
established
26: 7
estimate 11: 4
et 39: 1
evening 182: 12,
201: 22, 233: 16
event 75: 24,
238: 4
Eventually
44: 18, 200: 23
Everybody 98: 9,
164: 19, 175: 5,
183: 4, 183: 22,
183: 24, 194: 20,
213: 3, 215: 14,
217: 19, 218: 5,
231: 10
everyone
174: 16, 186: 14,

217: 21, 240: 3
evidence 5: 5,
9: 14, 9: 17,
10: 14, 23: 12,
24: 9, 27: 7,
31: 7, 33: 18,
88: 20, 109: 4,
113: 3, 114: 22,
114: 24, 115: 3,
129: 9, 148: 20,
148: 21, 149: 3,
151: 10, 153: 12,
156: 8, 230: 6
Evidentiary
1: 22, 3: 2,
3: 10, 240: 19
evidently 89: 21
evolve 95: 3
evolved 95: 2
exact 23: 22,
24: 25, 148: 23,
151: 23, 152: 3,
154: 10
exactly 32: 18,
36: 3, 37: 21,
90: 10, 136: 6,
151: 15, 151: 20,
161: 1, 174: 5,
175: 3, 175: 19,
184: 16, 200: 1,
200: 2, 202: 10,
216: 13, 223: 5,
223: 14, 223: 25,
230: 12, 237: 9
EXAMINATION
12: 1, 15: 17,
21: 5, 59: 16,
71: 16, 76: 24,
79: 20, 82: 7,
86: 4, 126: 17,
134: 14, 138: 14,
141: 5, 158: 13,
168: 25, 173: 6,
178: 13, 181: 17,
190: 15, 195: 18,
204: 16, 209: 13,
232: 13, 237: 3,
238: 2
examinations
123: 14

example 63:5,
64:14, 94:12,
98:3, 110:7,
166:9
except 5:23,
83:3
excepting 4:19
exception 226:1
exceptions 4:1
excerpt 10:6
excerpts 16:8,
86:12, 86:15,
87:6
exclude 9:23,
118:15, 119:12,
120:16
excluded 4:7,
6:17, 7:1,
230:6, 230:12
Exculpatory
27:7, 27:14,
30:22, 33:18,
41:19, 41:20,
41:23, 42:2,
42:8, 42:12,
42:15, 63:17,
63:21, 63:23,
109:4, 109:13,
109:22, 112:3,
112:21, 112:25,
113:3, 113:12,
113:15, 114:2,
129:9, 129:18,
129:20, 137:18,
137:20, 137:21,
137:24
Excuse 68:22,
165:2
excused 20:13,
20:17, 77:11,
85:9, 85:11,
85:13, 168:1,
172:10, 181:5,
194:25, 208:10,
239:5
execute 51:4,
52:22
Exhibits 16:8,
40:2, 148:18,
155:17, 156:8,

157:1, 162:25,
165:21, 166:4,
191:19, 241:16,
241:20
existence 17:8,
97:13, 97:15,
97:16
exonerate
23:13, 48:19,
61:11
exonerated 63:7
exonerates 27:7
exonerating
4:22
exoneration
27:11, 27:12
expense 91:1
experience
64:11, 83:10,
109:8, 131:20
experimented
98:11
expert 4:9
experts 5:9,
5:13
explain 94:7,
94:9, 105:18,
115:13, 127:15,
163:17, 163:18,
167:16
explained 46:3,
62:25, 63:1
explaining
87:22
explore 29:5
extent 241:16
Exxon 214:14
eye 138:25
eyes 147:8,
157:10
eyewitnessed
30:11


< F >
face 180:6
facility 49:25
facing 206:5
fact 25:18,
27:21, 29:14,

38:23, 45:9,
45:17, 51:11,
64:24, 74:12,
84:24, 89:10,
92:16, 100:11,
105:19, 110:21,
121:25, 122:12,
122:22, 229:20,
230:11, 230:20
facts 139:11
failed 19:9
failing 10:12
failure 4:6,
17:12
fair 21:18,
23:24, 49:18,
56:6, 71:1,
76:14, 105:24,
130:15, 133:19,
169:14
fairly 111:10
fall 99:9,
143:1, 143:7
fallen 106:7
false 10:5,
10:12, 25:23,
26:11, 27:25,
28:13, 28:16,
30:8, 115:6,
135:14
falsity 30:8
familiar 17:10,
17:14, 21:18,
33:3, 88:3,
170:24
family 12:23,
12:24, 13:9,
13:13, 13:15,
18:23, 18:25,
56:24, 125:7,
133:11, 162:6,
190:7, 210:16,
210:19
far 16:18,
62:22, 63:16,
66:6, 67:1,
67:9, 76:17,
78:6, 83:18,
142:15, 157:16,
158:19, 165:20,

173:19, 193:3,
194:2, 197:3,
241:19
fast 221:6
father 46:18,
70:4
favorable
109:19, 113:18,
113:20, 113:24,
130:9
faxed 88:8
faxing 14:9,
80:12
February 18:3,
177:19
Federal 1:32,
169:5
fee 142:3
feel 46:8,
143:4, 166:10,
167:3
feeling 130:7
fees 142:19,
244:5
feet 22:16,
133:10, 138:25,
191:1, 193:5,
193:6, 194:7,
194:10, 216:14,
216:25
Fell 58:13,
58:15, 143:5
fellow 83:19
felony 95:3
felt 65:18,
96:5, 96:6,
110:4, 167:9,
167:15, 167:17
fence 175:10,
175:11, 184:21,
216:24
fenced 175:7
few 5:20,
11:18, 21:11,
31:24, 40:7,
40:10, 43:2,
80:1, 84:14,
84:24, 113:4,
148:18, 157:14,
169:10, 169:14,

178:12, 188:24,
191:1, 194:7,
194:10, 239:24
fight 139:20,
194:20, 206:7
fighting 184:1,
215:2
fights 218:19
figure 134:20,
134:25
filed 12:12,
13:11, 31:4,
33:20, 39:6,
39:9, 89:10,
107:9, 107:13,
112:19, 112:20,
154:19, 242:8
files 19:3,
47:14, 65:7,
147:1, 154:20,
154:23
Filing 12:17,
12:18, 12:20,
12:21, 15:5,
15:21, 15:22,
31:11, 32:3,
32:4, 35:13,
35:25, 92:6,
95:22
fill 126:22
Fina 205:2
finally 46:15,
46:18, 48:21,
224:13
find 5:15,
49:8, 49:19,
51:15, 52:18,
52:23, 52:25,
57:17, 58:1,
68:10, 70:5,
74:22, 92:10,
108:19, 109:25,
143:24, 145:1,
146:3, 150:8,
161:1, 164:5,
224:4, 228:20,
228:22
finding 83:8
fine 78:19,
140:14, 142:11,

142:13, 161:9,
176:19, 179:9,
208:12
finger 84:15
finish 11:7,
11:8, 123:22,
124:23
finished 154:25
fire 175:1
fired 180:17,
180:18
firing 188:10,
199:1
first 3:20,
4:4, 8:19,
9:10, 11:19,
12:21, 22:17,
31:21, 32:7,
32:14, 37:5,
45:11, 48:4,
58:4, 61:3,
80:21, 96:23,
97:2, 139:1,
157:10, 171:15,
175:14, 176:24,
178:20, 198:7,
199:19, 202:5,
212:2, 212:17,
214:4, 233:11,
240:17
five 78:15,
78:16, 133:10,
138:25, 168:9,
168:11, 185:4,
201:5, 208:20,
211:16
flash 199:6,
199:7, 199:13
flashes 199:2,
199:4, 200:12,
206:17
flashing 197:19
Floor 2:18,
217:20
focus 231:2
folder 93:1,
93:5, 102:4,
102:12, 113:6,
131:15, 131:21
folks 81:24,

85:1, 159:11,
207:7
follow 50:2
follow-up
125:21, 127:13
followed 183:24
following
117:3, 124:2
foregoing
244:2, 244:3
forensic 170:10
forgiveness
227:22
forgot 208:20
form 104:2,
148:14, 160:15
formal 88:24,
91:2
formality 32:4,
64:2, 89:12,
89:14
formalized 93:7
format 244:5
formatted
149:25
forth 135:14
forward 79:13,
124:16, 125:3,
125:17, 125:22,
183:25, 195:8,
224:16
found 73:7,
73:25, 74:25,
75:4, 76:6,
88:4, 88:7,
146:7, 161:2,
161:23, 171:1
Four 12:16,
14:5, 62:22,
103:15, 103:16,
156:15, 216:14,
220:13
fourth 8:17,
112:12
frame 95:1
Francisco
54:11, 62:8,
181:11, 181:22
Frank 22:17,
22:21, 58:9,

58:11, 61:5,
61:9, 61:10,
61:11, 61:12,
61:14, 61:17,
95:11, 116:6,
120:7, 130:2,
130:6
frankly 108:23
fray 60:12
free 4:23,
91:23, 168:3,
181:8, 195:4,
208:13, 239:10
Friday 209:23,
210:3
friend 150:9,
150:10, 161:5,
215:3, 215:6,
215:23, 226:18,
226:24, 227:4,
227:24, 228:2,
231:6, 231:7,
234:17, 237:11,
238:18
friends 173:16,
182:20, 188:1,
188:4, 189:24,
195:25, 196:1,
196:21, 197:9,
203:22, 203:24,
203:25, 210:13,
211:17, 211:23,
212:12, 213:11,
213:12, 213:15,
213:17, 220:11,
220:12, 227:6,
227:9, 227:13,
227:15, 228:12,
231:8, 232:5,
232:7
fugitive 32:18,
69:14
full 207:19
fundamental
226:1
fundraisers
142:18


< G >

gain 169:19
Galveston 49:9
game 31:23
gang 65:2,
139:18
garage 77:5,
183:6, 190:21,
192:12
Garza 54:12,
159:4
gas 196:22,
204:3, 204:5
gate 139:15,
215:12, 216:15,
216:16, 216:17,
216:18
gather 145:7
gauge 209:2
Gauna 9:19,
9:24, 14:22,
22:10, 23:7,
24:5, 24:17,
24:23, 25:23,
30:12, 30:15,
54:6, 75:15,
80:16, 86:25,
115:4, 117:8,
117:12, 117:16,
118:16, 119:13,
120:4, 120:6,
120:14, 120:18,
124:19, 148:4,
162:9, 173:19,
182:15, 196:6,
230:8, 231:16
gave 17:3,
32:2, 38:2,
38:21, 38:22,
45:13, 46:22,
46:23, 49:12,
54:20, 58:8,
63:8, 88:13,
96:1, 100:20,
101:10, 101:11,
101:13, 106:14,
110:25, 114:16,
132:21, 139:2,
143:23, 144:1,
150:19, 152:9,
152:11, 154:16,

154:17, 155:7,
163:15, 163:16,
194:3, 202:3,
202:4, 202:12,
219:10, 238:7,
238:11
gears 122:25,
146:16
General 2:6,
2:16, 29:10,
36:8, 46:10,
97:5, 97:7
generally 34:24
Generals 97:8
generated
34:14, 36:13,
92:1, 93:15,
102:2, 102:21
germane 109:14
gets 176:3
Getting 57:8,
61:3, 81:25,
83:6, 142:21,
167:16, 185:13,
196:15, 211:15,
215:17, 215:19,
223:15
Giglio 17:13
girl 82:17,
161:3
girlfriends
220:13
Given 13:14,
23:3, 28:16,
32:5, 43:9,
45:10, 45:16,
45:19, 47:19,
53:17, 54:18,
56:1, 61:14,
61:17, 65:20,
75:25, 90:7,
90:9, 101:6,
111:10, 132:19,
149:13, 153:25,
154:17, 155:4,
155:8, 159:21
gives 205:19
giving 13:23,
89:22, 104:19,
159:24, 190:18

glanced 14:1,
191:4
glimpse 179:19
goal 135:2,
135:3, 135:5,
135:7
gotten 34:1,
34:2, 99:5,
99:6, 99:7,
107:24, 131:17,
145:25, 150:19,
183:18, 225:7
government
149:2
graduated
222:25, 223:1
Grafton 173:11
grammatically
115:7
granddaughter
49:16, 57:8,
83:20, 83:21
grandma 67:10,
83:16, 83:20,
224:1
Grandmother
49:6, 49:12,
49:13, 49:15,
52:12, 57:4,
67:16, 67:19,
67:21, 161:19,
162:5, 220:20,
222:17, 222:19,
237:10
grandmothers
223:22
grasp 87:20
green 197:17,
232:6, 232:8
grew 211:20,
228:11
Griffin 1:33
ground 5:3
grounds 94:14,
229:3, 236:13
group 5:18,
11:23, 139:18,
140:20, 168:21,
181:13, 195:10,
209:5, 215:17

grudge 229:10
guardian 67:18
guess 6:15,
17:2, 17:8,
17:25, 61:19,
83:4, 88:23,
111:7, 111:9,
136:21, 174:4,
176:9, 182:9,
183:4, 191:6,
215:12, 223:16,
228:25, 238:25
guidance 90:21,
95:4
gun 61:12,
61:13, 61:14,
61:17, 175:1,
176:20, 180:13,
185:25, 188:10,
199:1, 199:6,
200:16, 200:17,
200:18, 231:17,
234:19, 235:2
gunfire 186:9
guns 185:25,
186:1
gunshot 175:15
gunshots
197:10, 200:20
Gutierrez
173:17
guy 84:15,
136:6, 136:8,
138:25, 175:11,
176:10, 176:12,
176:13, 176:14,
178:25, 186:4,
197:18, 197:19,
198:15, 199:2,
213:2
guys 139:19,
174:11, 183:13,
184:11, 184:24,
193:21, 197:14
Guzman 54:13,
121:11, 122:10,
122:16, 133:3,
139:5, 215:22

< H >
H. 19:22
habeas 12:9,
154:9, 165:6
habit 89:6
hair 223:18
half 32:1,
194:15
halfway 207:19,
208:4
hall 95:9,
132:18
hand 5:21,
63:22, 82:2,
108:4, 131:22,
157:12, 188:5,
196:16, 196:20,
209:7
handled 76:18,
98:15, 106:12
handling 123:10
hands 6:23,
176:22, 180:8,
180:10, 180:12
handwriting
71:11, 88:11
hang 188:3,
188:5
hanging 186:4
happen 27:21,
95:15, 111:20,
118:23, 129:3,
221:3, 230:15
happened 28:7,
95:15, 99:22,
125:16, 128:17,
128:25, 129:2,
129:22, 132:11,
132:16, 132:20,
136:6, 136:13,
145:12, 151:25,
152:1, 152:10,
162:10, 163:9,
174:18, 175:22,
180:22, 185:21,
188:14, 192:22,
212:22, 214:21,
215:11, 217:1,
218:6, 220:5,
220:25, 225:1,

225:14, 230:14,
237:9
happening
125:20, 127:25,
129:3, 182:25,
183:11
hard 101:3,
142:23, 199:9,
208:25
harder 82:2
hardly 215:10
harm 10:7
Harrod 173:15,
174:10, 211:4
hat 56:12,
232:3
hate 106:9,
240:2
head 177:15
hear 4:7,
174:13, 175:1,
184:3, 184:4,
207:2, 209:11,
216:8, 217:8,
231:11
heard 54:4,
76:10, 127:21,
175:2, 175:15,
178:19, 179:7,
179:10, 180:20,
197:1, 197:2,
197:4, 197:10,
200:20, 203:14,
207:3
Hearing 1:22,
3:2, 3:11,
6:10, 7:1,
7:21, 45:22,
172:15, 183:23,
199:9, 217:5,
229:7, 240:19,
242:2
hearsay 144:9,
187:14, 225:18,
225:23, 226:3,
236:12
heart 22:12
heat 116:9,
117:13
heavy 193:19

heavyset 176:8
heels 125:14
held 93:10,
93:14
Hello 79:23,
141:7, 141:8,
181:20, 195:20
help 60:6,
62:15, 64:21,
86:13, 110:15,
143:24, 215:24
helped 61:1,
146:2
helping 122:16,
133:5, 144:7,
169:7
Hernandez
22:18, 22:21,
58:9, 58:12,
61:6, 61:9,
61:10, 61:11,
61:12, 61:14,
61:17, 95:11,
120:7, 130:2,
130:6
herself 238:15
hiding 138:20,
218:5
hire 64:17,
65:18, 145:18,
165:5
hired 65:18,
69:3
hiring 144:3
Hispanic 63:5,
176:12
home 49:12,
70:2, 175:16,
202:2, 219:3,
220:6, 220:7,
221:1, 221:7,
223:2, 223:15,
223:22, 225:7,
233:12, 233:13,
233:23
honest 88:15,
93:20, 96:2,
104:14
honestly 11:6,
87:7, 98:25

HONORABLE 1:23
hosted 182:15
hostile 29:4,
29:7
hour 111:21,
214:5
hours 68:17
household 84:2,
84:5
housings 37:16
Houston 222:13
human 92:8,
92:16
hundred 23:1,
45:21, 66:3,
88:17
hunkered 194:8,
194:9
husband 69:25


< I >
ID 7:13, 131:2
idea 58:2,
81:11, 224:18
identical
16:24, 171:15,
171:16
identification
22:13, 98:7
identifications
117:24
identified
14:21, 25:22,
26:11, 28:14,
28:15, 30:1,
30:15, 37:2,
53:11, 53:12,
55:5, 63:4,
81:12, 96:13,
117:15, 120:5,
121:19, 136:3,
148:3
identifies
22:10, 23:6,
45:4, 80:16
identify 38:18,
63:21, 68:7,
68:22, 120:2,
120:13, 126:20,

157: 21, 160: 9,
206: 22
identifying
24: 11, 25: 11,
55: 1, 101: 14,
105: 25
imagine 108: 24
immediately
39: 16, 40: 15,
41: 2, 106: 20
impact 242: 5
impeach 26: 22
impeached
26: 25, 132: 23,
133: 21, 133: 23
impeaching
100: 5
impeachment
55: 14
important 88: 7,
109: 3, 130: 5
impress 56: 13
impression
42: 1, 62: 15,
67: 12, 84: 21
impressions
91: 16
in. 213: 24
incarcerated
49: 9, 49: 21,
50: 15, 51: 10,
51: 13, 52: 20,
58: 9, 69: 25,
83: 12
incarceration
52: 19
incident
102: 22, 103: 24,
105: 11, 117: 23,
118: 3, 152: 10,
173: 17, 175: 8,
178: 1, 202: 17,
228: 18
include 33: 10,
99: 18, 102: 2,
102: 23, 103: 1,
170: 8
Included 102: 3,
102: 21, 103: 24,
104: 2, 105: 12,

105: 22, 105: 24,
106: 4, 106: 13,
108: 11
includes 105: 15
including
82: 22, 99: 2,
102: 6, 120: 21,
128: 9
inconsistent
180: 21
incorrect 67: 5,
194: 5
incredible
122: 6
independent
56: 17, 74: 19,
145: 10
independently
13: 9, 34: 7,
34: 19, 109: 2
indicate 61: 8,
163: 12
indicated
17: 16, 19: 8,
49: 4, 49: 14,
50: 1, 61: 10,
65: 20, 66: 7,
69: 1, 71: 5,
73: 17, 166: 10,
172: 2, 204: 24,
206: 6, 207: 9
indicates 9: 18,
115: 3
indicating
28: 24, 55: 9,
108: 1, 131: 18,
131: 24, 191: 23,
192: 3, 192: 12,
192: 14, 192: 16,
192: 21, 192: 23,
199: 6, 200: 11,
205: 20, 242: 4
indication
111: 14, 111: 17
individual
199: 23, 201: 19
individuals
199: 21, 201: 11
ineffective
4: 5, 29: 3

inferring
98: 19, 137: 10
influence
76: 14, 76: 17
influenced 75: 6
inform 4: 23
information
49: 7, 56: 8,
70: 9, 81: 14,
83: 13, 98: 7,
101: 14, 112: 4,
113: 12, 120: 21,
124: 17, 124: 18,
125: 24, 126: 21,
127: 19, 128: 3,
129: 5, 144: 22,
229: 17, 229: 21
informed 75: 14,
168: 8
informing 128: 2
initial 58: 18,
69: 13
Initially
53: 23, 54: 10,
54: 16, 58: 4,
58: 11, 65: 5,
69: 4, 69: 23,
70: 7
initiated
193: 22
innocence
225: 21, 226: 4,
229: 13, 229: 17,
230: 17
innocent 225: 25
inquiry 4: 19
inside 172: 15,
177: 9, 177: 14,
184: 21, 186: 2,
196: 22, 201: 6,
216: 17, 216: 18,
221: 20, 224: 2
instance 89: 20,
108: 17
instances 84: 24
instead 48: 10,
75: 7, 175: 5
institute
170: 10
Institutional

1: 17
instructed
57: 13, 57: 16,
57: 25
instructions
50: 25, 65: 4
intend 77: 16
intended 5: 13,
71: 4, 72: 6
intends 6: 20
intention 95: 14
intentional
120: 25
interact
221: 22, 228: 17
interest 135: 8,
142: 25
interested
143: 4
interesting
92: 5, 132: 8
interregnum
53: 5, 53: 8
interrupt 123: 2
interview
19: 10, 81: 24,
83: 15, 84: 15,
85: 3, 148: 2,
177: 24
interviewed
56: 14, 60: 4,
60: 5, 68: 21,
69: 1, 74: 25,
75: 4, 75: 8,
82: 12, 82: 22,
82: 24, 83: 24,
84: 1, 115: 12,
119: 16, 178: 2,
186: 21, 186: 23
interviewing
84: 6, 159: 10
intimidated
19: 11
introduced
145: 24
investigate
18: 14, 144: 5,
169: 7
investigated
76: 15, 81: 22

investigating 80: 3, 81: 9, 223: 16
investigation 9: 14, 36: 12, 49: 8, 65: 2, 114: 21, 115: 11, 115: 22, 116: 2, 116: 3, 116: 4, 117: 24, 144: 19, 145: 10, 169: 10
investigative 75: 13, 124: 2
Investigator 5: 24, 7: 14, 25: 10, 25: 12, 38: 6, 47: 20, 48: 14, 48: 16, 48: 25, 49: 1, 57: 13, 57: 25, 64: 25, 73: 5, 80: 3, 98: 16, 106: 24, 107: 18, 107: 20, 108: 13, 138: 5, 145: 18, 145: 20, 145: 23, 145: 25, 169: 5, 186: 24, 190: 19, 202: 21
investigators 93: 9
invoice 152: 22, 153: 4, 156: 1, 156: 2
invoke 3: 24
invoked 3: 23, 6: 25
involved 57: 8, 65: 1, 65: 2, 84: 11, 93: 19
IRMA 1: 23
irrelevant 5: 3, 5: 7
Israel 9: 16, 9: 19, 86: 24, 115: 1, 115: 4, 117: 16, 120: 14, 120: 17, 133: 6, 133: 8, 170: 6
issue 50: 2,

50: 3, 50: 21, 51: 12, 52: 1, 52: 3, 66: 7, 66: 23, 67: 6, 67: 7, 87: 16, 230: 5, 241: 6
issued 49: 21, 50: 12, 50: 13, 52: 21, 66: 7, 67: 5
issues 87: 19, 87: 20, 87: 21, 87: 22
issuing 50: 1
items 37: 2, 113: 4
itself 8: 16, 22: 20


< J >
J.  2: 37, 244: 2, 244: 12, 244: 13
jail 58: 5, 65: 5
jean 198: 13
Jefferson 182: 7
Jesse 127: 21, 214: 24, 215: 6
Jimmy 172: 25, 173: 9
job 87: 21, 107: 22
Joe 5: 23, 54: 12, 168: 19, 169: 3
John 3: 13, 15: 19, 64: 17, 65: 18, 78: 25, 82: 9, 82: 10, 158: 15, 159: 9, 186: 24, 190: 18, 194: 3
jointly 241: 21
JON 2: 5
jon.meador@oag. state.tx.us 2: 10
Jose 120: 10
Juan 54: 12, 61: 23, 71: 18,

95: 10, 120: 10, 130: 7, 227: 11, 227: 13, 227: 15, 228: 3, 231: 11, 235: 19, 236: 4
JUDGE 1: 8, 1: 24, 89: 14, 111: 21
Judicial 244: 6
Julia 65: 21
Julie 140: 19, 141: 10, 160: 11
July 69: 4
jump 118: 9
jumping 119: 6
jumps 84: 16
June 53: 5
jury 27: 4, 27: 16, 27: 21, 29: 12, 29: 25, 62: 14, 73: 25, 231: 1
Justice 1: 16, 135: 5, 226: 1
juvenile 49: 23, 50: 22, 51: 10, 51: 11
juveniles 51: 13


< K >
K.  2: 15
keep 13: 11, 106: 9, 210: 11, 222: 15
keeping 202: 1
kept 64: 20, 142: 21, 202: 1
key 4: 18
keys 205: 1
killed 9: 23, 118: 16, 119: 12, 161: 5, 226: 16, 228: 1, 228: 24, 228: 25, 229: 4, 229: 5, 230: 7, 231: 5
killing 231: 12
Kind 33: 11, 33: 17, 33: 20,

33: 21, 81: 25, 83: 14, 83: 22, 91: 17, 91: 19, 91: 22, 98: 5, 105: 17, 122: 13, 122: 19, 129: 5, 132: 8, 140: 3, 142: 3, 163: 5, 164: 20, 174: 22, 175: 6, 175: 25, 176: 9, 178: 23, 197: 22, 199: 6, 215: 16, 224: 25, 234: 4, 234: 16
knowing 139: 3, 139: 25, 165: 13
knowingly 135: 13
knowledge 53: 22, 107: 8, 114: 1, 129: 11, 129: 12, 140: 2, 146: 10, 146: 11, 232: 24
known 52: 9, 162: 6, 162: 7
knows 113: 17
Kuykendall 2: 15, 3: 14, 21: 16, 87: 10, 126: 11, 126: 12, 178: 15, 232: 12


< L >
lady 161: 23, 242: 3
laid 157: 10
Lane 173: 16
language 171: 15
large 174: 23
last 10: 3, 10: 6, 14: 2, 14: 3, 52: 9, 69: 21, 96: 19, 96: 22, 96: 24, 97: 2, 158: 4, 160: 20, 170: 15, 171: 8, 182: 8, 190: 9, 209: 23,

210: 3,  210: 9,
210: 18,  226: 16
late 31: 23,
193: 12,  196: 17,
196: 18
Later 11: 16,
109: 6,  121: 11,
122: 7,  139: 4,
161: 2,  164: 4,
180: 18,  185: 20,
235: 19
Latin 198: 18,
198: 20
law 52: 5,  64: 7,
124: 21
lawyer 19: 2,
19: 4,  87: 19,
91: 16,  108: 5,
111: 20,  134: 20,
135: 3,  142: 19
lawyers 86: 1,
95: 8
laying 22: 16,
225: 13
lead 29: 5,
87: 1,  107: 22,
108: 3
leading 28: 21,
29: 1
learn 229: 16
learned 83: 11
learning 230: 21
least 8: 14,
17: 3,  23: 17,
23: 21,  24: 1,
26: 4,  52: 15,
53: 17,  64: 4,
87: 8,  107: 7,
140: 11,  158: 18
leave 6: 11,
46: 17,  83: 22,
84: 10,  84: 18,
84: 22,  85: 4,
85: 13,  168: 3,
181: 8,  183: 22,
195: 4,  208: 13,
214: 9,  214: 11,
222: 9,  226: 19,
239: 10,  240: 19
leaving 183: 18,

183: 21,  204: 5,
214: 23,  214: 25
Ledbetter
139: 19
ledge 141: 1
Lee 1: 6,  3: 7,
171: 14
left 38: 24,
46: 18,  51: 5,
62: 6,  84: 7,
127: 23,  162: 21,
177: 7,  188: 18,
189: 17,  189: 18,
200: 24,  204: 3,
205: 8,  215: 4,
217: 19,  221: 14,
222: 10,  224: 11,
226: 21,  233: 20
leg 65: 10
legal 5: 2,  5: 4,
8: 14,  9: 6,
26: 6,  66: 23,
98: 17
legally 91: 13
Leslie 2: 15,
3: 14,  123: 10,
178: 15
leslie.kuykenda
ll@oag.state.tx
.us 2: 21
less 133: 10,
143: 4
letter 40: 1
letters 190: 2,
222: 14
Lexis 108: 18
LF 101: 11
license 98: 7
lied 27: 8
life 235: 18
light 5: 5,
74: 12,  94: 4,
193: 20,  206: 15,
240: 19
lights 206: 16
likelihood
88: 21
likely 93: 15,
93: 18,  110: 1
limited 6: 4

line 94: 2,
115: 10,  118: 8
lines 9: 11,
9: 21,  77: 2,
83: 5,  114: 23,
116: 25,  117: 1,
117: 2,  118: 9,
119: 8,  119: 25,
120: 1
lineup 24: 12,
24: 16,  55: 2,
55: 6,  81: 12,
120: 7,  120: 21,
121: 6,  122: 7,
133: 3
lineups 110: 7,
110: 11,  117: 14,
117: 17,  117: 21,
118: 4,  120: 9,
120: 25,  121: 15,
170: 9,  171: 12
list 33: 18,
37: 4,  49: 3,
53: 17,  54: 14,
54: 15,  54: 18,
54: 20,  54: 23,
57: 23,  68: 25,
73: 1,  77: 13,
95: 6,  99: 10,
100: 23,  100: 24,
101: 7,  101: 9
Listed 68: 23,
123: 9,  170: 6
listening 139: 5
lists 102: 1
lit 138: 24,
193: 17
live 164: 5,
173: 10,  173: 14,
182: 2,  195: 23,
203: 16,  203: 18,
203: 19,  203: 20,
211: 21,  220: 9,
220: 12,  220: 16,
220: 18
lived 83: 18,
173: 12,  220: 19,
222: 17
lives 127: 22,
174: 11,  211: 24

living 49: 5,
52: 13,  173: 15,
177: 21,  202: 25,
228: 23
locate 13: 17,
49: 1,  49: 5,
49: 10,  49: 11,
50: 7,  52: 25,
53: 9,  57: 25,
65: 8,  68: 22,
70: 3,  82: 3,
83: 10
located 49: 25,
177: 21,  183: 5
locating 66: 6
location 51: 14,
62: 21,  108: 21
long 11: 4,
78: 19,  98: 22,
111: 21,  140: 14,
162: 7,  164: 10,
170: 12,  175: 17,
182: 10,  196: 2,
196: 11,  200: 25,
201: 4,  201: 5,
202: 17,  221: 22,
223: 3,  227: 20,
242: 1
longer 123: 3,
123: 5
looked 19: 1,
79: 9,  90: 4,
91: 13,  110: 2,
110: 21,  110: 25,
111: 8,  133: 3,
138: 25,  147: 16,
175: 22,  176: 10,
176: 12,  189: 11,
204: 11,  206: 8,
221: 11,  221: 18,
234: 1,  234: 2,
234: 25
Looking 16: 7,
38: 1,  44: 3,
61: 4,  65: 24,
65: 25,  68: 9,
84: 3,  88: 17,
89: 25,  108: 10,
108: 18,  110: 24,
111: 2,  112: 23,

132: 13,   139: 10,
166: 23,   176: 22,
180: 11,   192: 18,
205: 17,   216: 21,
217: 10,   221: 12
looks 37: 16,
205: 22
losing 142: 24
lost 70: 2
lot 43: 17,
81: 23,   82: 2,
87: 20,   90: 20,
92: 22,   93: 7,
102: 25,   105: 12,
109: 8,   131: 6,
132: 2,   132: 18,
164: 15,   194: 13,
205: 23,   205: 24,
206: 1,   206: 16,
212: 8,   220: 21
lots 117: 14,
117: 15,   122: 2,
130: 3
Lucio 54: 12,
61: 24,   71: 18,
72: 5,   72: 15,
73: 23
Lucy 54: 11,
82: 18,   82: 25,
83: 2,   132: 12,
132: 19,   159: 5
lunch 79: 11,
111: 21,   126: 5
lying 29: 20


< M >
Machine 156: 16
Mad 133: 2,
136: 7
MAGISTRATE 1: 8,
1: 24,   104: 2
main 57: 23
Mainly 22: 23,
56: 16
maintaining
232: 20
male 63: 5,
198: 18,   198: 20
males 201: 7

man 61: 23,
62: 8,   117: 11,
117: 15,   138: 24,
174: 20,   176: 8,
201: 9
manager 46: 23
manual 91: 11
marked 191: 24,
192: 13
marker 98: 10
Mart 205: 2
Martinez 9: 16,
9: 19,   54: 10,
54: 12,   86: 24,
115: 1,   115: 5,
117: 16,   117: 17,
120: 14,   120: 17,
128: 7,   133: 6,
133: 8,   139: 21,
139: 22,   140: 1,
170: 6
Martinez. 9: 19,
115: 5
material 30: 22,
31: 24,   35: 13,
38: 18,   38: 19,
39: 1,   53: 1,
63: 16,   63: 17,
63: 18,   64: 15,
107: 7,   107: 14,
137: 24
matter 3: 7,
7: 3,   38: 23,
64: 24,   89: 18,
113: 11,   124: 21,
138: 8,   244: 4
matters 3: 18,
7: 22,   10: 18
Meador 2: 5,
3: 13,   8: 7,
11: 9,   15: 19,
21: 15,   59: 15,
79: 12,   82: 6,
82: 9,   87: 10,
88: 5,   123: 6,
149: 15,   158: 15,
204: 15,   208: 24,
240: 24,   241: 10
meaning 91: 12,
109: 7

means 7: 1
meant 72: 18
measures 52: 18,
58: 2
mechanical 2: 45
medical 47: 18
meet 65: 5,
65: 7,   69: 9,
69: 21,   145: 4,
145: 7,   150: 12,
212: 2
meeting 22: 9,
48: 17,   69: 13,
69: 15,   157: 14,
158: 19
meetings 21: 15,
38: 14,   48: 15,
48: 16,   48: 20,
65: 14
member 48: 12,
66: 5
memo 68: 17,
68: 20,   68: 23,
68: 24
memorandum
19: 22
memory 89: 24,
90: 1,   96: 2,
97: 4,   110: 23,
128: 23
mental 91: 16
mention 27: 9,
67: 19,   135: 22
mentioned
18: 21,   19: 16,
61: 4,   64: 1,
67: 9,   67: 24,
68: 20,   69: 3,
143: 14,   158: 25,
159: 21,   193: 13,
238: 12
mentions 116: 13
mercy 92: 6
message 46: 18
messages 46: 17
messed 214: 10
met 12: 7,   21: 9,
21: 13,   31: 21,
61: 3,   69: 14,
70: 7,   79: 24,

79: 25,   87: 10,
87: 13,   145: 24,
195: 20,   209: 18,
209: 20
Michael 228: 8,
228: 14,   228: 18,
229: 3,   229: 9,
229: 19,   229: 22,
230: 7,   230: 9,
230: 14,   231: 4,
237: 11,   238: 18
microphone
21: 4,   79: 10,
85: 25,   101: 5,
140: 24,   168: 24,
173: 5,   181: 16,
195: 16,   209: 10
middle 60: 12,
192: 8,   215: 22
midnight 174: 5,
174: 6,   193: 11
mileage 51: 17
mind 23: 10,
28: 2,   59: 23,
103: 14,   116: 14,
124: 23,   128: 4,
128: 5,   128: 6,
132: 17,   133: 4,
217: 16,   229: 22
mindset 120: 22,
121: 3,   122: 20
mine 173: 16,
197: 9,   231: 6
mingling 77: 5
minimize 77: 20
minor 67: 13
minute 5: 11,
59: 10,   90: 14,
103: 14,   126: 5,
144: 13,   168: 9,
168: 11,   239: 14
minutes 40: 10,
78: 4,   78: 7,
201: 5,   218: 3,
221: 4,   221: 23,
233: 20,   233: 21,
233: 23,   239: 25
miscarriage
226: 1
misconduct 4: 4,

10: 5, 10: 12,
17: 11
misdemeanor
105: 6
misleading
8: 13, 8: 17,
9: 5, 9: 11,
9: 20, 17: 12,
27: 15, 27: 21,
114: 16, 116: 19,
120: 20, 120: 22,
121: 16, 121: 17
misnomer 102: 18
missing 45: 20,
47: 14, 47: 16,
47: 19, 47: 20,
47: 21, 48: 5,
66: 2
misspoke 235: 6
mistake 65: 24,
92: 21
mistaken 22: 13,
84: 22
mixed 82: 17
mom 85: 1,
125: 9, 125: 18,
128: 10, 212: 12
moment 40: 7,
42: 18, 69: 18,
99: 1, 100: 5,
134: 9, 236: 20,
237: 14, 239: 12
Monday 171: 19
money 142: 18,
143: 14, 143: 15,
143: 16
month 170: 15,
223: 1
monthly 125: 20
months 14: 5,
51: 22, 97: 2,
141: 20, 141: 23,
143: 17, 223: 4,
235: 4, 235: 7,
236: 18
Montoya 54: 11,
82: 18, 83: 1,
83: 2, 132: 12,
132: 19, 159: 5
monumental 81: 5

Morning 3: 4,
3: 10, 21: 7,
21: 8, 59: 9,
79: 16, 85: 19,
85: 20, 86: 6,
86: 7, 140: 21,
145: 8, 145: 14,
164: 16, 168: 22,
173: 2, 181: 13,
195: 11, 209: 6,
220: 8, 221: 3,
233: 14
mostly 69: 7,
129: 8
mother 45: 19,
48: 17, 64: 20,
65: 12, 65: 21,
67: 25, 128: 14,
141: 12
motion 30: 20,
30: 21, 32: 3,
32: 4, 33: 21,
35: 13, 35: 25,
39: 2, 39: 6,
39: 9, 53: 2,
64: 1, 88: 20,
89: 10, 107: 9,
107: 13, 112: 13,
112: 21, 112: 25
motions 33: 14,
112: 19
Mountain 87: 2,
87: 3, 98: 16
mouth 206: 1
Move 5: 23,
6: 18, 11: 17,
14: 25, 31: 6,
40: 2, 40: 7,
66: 18, 68: 12,
70: 2, 74: 12,
124: 8, 127: 3,
149: 9, 151: 9,
153: 11, 156: 7,
240: 18
moved 13: 16
moving 74: 14
MR. OGAN 3: 16
MS. KUYKENDALL
3: 14, 94: 13,
123: 18, 124: 10,

126: 15, 126: 18,
127: 3, 127: 7,
133: 18, 134: 8,
134: 11, 138: 13,
138: 15, 140: 6,
140: 11, 172: 9,
172: 12, 172: 18,
178: 12, 178: 14,
181: 1, 181: 7,
213: 25, 225: 17,
226: 3, 229: 2,
229: 8, 232: 14,
236: 12, 236: 16,
236: 20, 236: 22,
238: 1, 238: 3,
239: 2, 239: 7,
239: 16
multiple 63: 12,
132: 9, 132: 15
murder 18: 14,
21: 22, 23: 4,
86: 24, 125: 17,
125: 25, 131: 12,
131: 19, 230: 21
muzzle 206: 17
myriad 108: 22
myself 92: 8,
109: 11, 144: 25,
162: 23, 174: 10,
230: 1


< N >
name 15: 19,
49: 13, 53: 18,
56: 1, 56: 12,
61: 23, 62: 8,
74: 3, 74: 8,
82: 9, 82: 12,
82: 17, 83: 1,
116: 13, 117: 19,
122: 8, 122: 9,
135: 23, 139: 2,
141: 9, 158: 15,
161: 11, 169: 2,
170: 6, 173: 8,
178: 15, 181: 21,
209: 15, 214: 24,
226: 18, 238: 12
named 82: 17

names 53: 20,
54: 22, 82: 24,
83: 3, 100: 24,
158: 23, 159: 21,
220: 14, 231: 9
Napue 17: 13
nature 32: 25,
33: 19, 110: 6,
145: 22
near 133: 24,
138: 20, 198: 5,
200: 10, 200: 14,
207: 7, 211: 24
nearby 178: 19
nearly 16: 24,
194: 15
Necessarily
24: 1, 29: 3,
54: 23, 137: 18,
180: 21
need 4: 24,
10: 19, 11: 15,
17: 20, 30: 2,
30: 5, 33: 15,
40: 10, 44: 2,
79: 8, 92: 25,
93: 1, 93: 2,
105: 14, 141: 3,
141: 21, 209: 24,
223: 11, 226: 9,
239: 18, 239: 24,
240: 4, 240: 21,
241: 7, 241: 11,
242: 3
needed 7: 7,
7: 22, 46: 3,
64: 21, 65: 18,
151: 21, 151: 25,
196: 21, 203: 8
needing 143: 14
needs 78: 8,
168: 8
neighborhood
182: 1, 203: 15,
203: 16, 203: 18
neither 226: 6
nervous 83: 16
new 66: 14,
68: 5, 90: 22,
94: 9

news 49:17,
57:9
Next 20:19,
73:6, 74:3,
78:2, 78:23,
85:14, 140:17,
164:6, 164:7,
164:8, 168:18,
172:22, 173:20,
173:22, 177:21,
178:1, 181:10,
184:23, 190:22,
195:6, 208:15,
215:11, 217:1,
217:4, 217:12,
217:16, 218:10,
225:5, 226:17,
233:3, 239:11
night 59:24,
100:21, 101:1,
115:12, 115:23,
116:3, 116:5,
116:12, 116:14,
116:22, 117:14,
117:18, 117:21,
117:23, 118:2,
119:16, 120:24,
122:13, 122:14,
128:21, 132:20,
139:4, 149:13,
162:17, 180:3,
183:7, 186:19,
189:22, 193:7,
193:9, 196:6,
196:9, 202:12,
206:14, 225:3,
226:16, 228:15,
231:15, 231:22,
235:12
Nine 182:9,
190:11, 196:3
No. 9:25,
120:19
nobody 116:12,
116:13, 116:15,
136:11, 178:5,
215:10
nodded 218:13
noise 174:15
None 9:17,

115:3, 117:7,
117:8, 117:11,
117:15, 181:7
nonetheless
139:7
nonresponsive
72:20, 136:15
normal 32:9,
32:11, 51:12,
213:1
Normally 32:14,
84:9, 84:19
Northern 1:2,
244:15
notation 71:6
note 71:8,
95:12, 99:14,
99:17, 100:4,
124:23
notebook 16:6,
16:7, 40:18,
40:19, 40:20,
41:3, 41:6,
41:9, 41:12,
41:15, 41:18,
41:22, 41:24,
42:8, 42:13,
42:16, 107:18,
107:20, 108:1,
108:5, 109:21,
109:25, 110:2,
110:3, 110:4,
110:11, 110:16,
110:22, 111:4,
111:5, 112:24,
113:11, 114:6,
129:24, 130:4,
130:9, 138:5,
138:9
notebook.
112:22
notes 40:21,
40:23, 41:5,
99:20, 122:2
Nothing 10:22,
20:11, 41:18,
41:19, 41:22,
42:7, 43:25,
58:18, 72:15,
76:12, 85:7,

140:8, 167:25,
176:2, 178:4,
178:11, 181:4,
194:24, 204:13,
208:9, 219:14,
225:1, 239:4
notice 5:12,
78:20
noticed 23:14
notified 32:10
noting 36:24
notion 41:19,
53:11, 104:18
Nowadays 90:22
nowhere 73:7,
125:15, 133:24,
138:20
Number 12:19,
13:16, 24:24,
37:11, 37:12,
38:14, 38:15,
45:20, 48:18,
49:12, 60:4,
64:19, 64:22,
65:14, 68:14,
68:23, 70:23,
78:4, 79:3,
96:6, 106:11,
128:8, 149:16,
149:18, 151:12,
153:14
numbers 98:6,
152:7, 152:9,
152:11, 152:12,
157:25, 166:7,
205:25


< O >
o'clock 164:16,
196:14, 225:6
o'clock. 126:8,
168:14
Oak 182:6,
182:7, 203:20
Object 26:1,
26:12, 26:19,
29:1, 72:20,
111:2, 133:15,
136:14, 144:9,

187:14, 225:17,
229:2, 236:12
objecting 26:25
Objection
14:24, 29:7,
31:8, 40:3,
40:4, 66:19,
66:20, 68:13,
78:17, 79:5,
94:13, 108:10,
124:10, 127:5,
149:15, 151:11,
153:13, 156:9,
172:17, 181:6,
195:3
objections
11:13, 113:8
objectively
28:13, 28:15
obligation
63:18
observing
200:25
obtain 17:7,
34:18, 35:3,
75:22, 169:21
obtained 13:7,
13:8, 17:17,
35:12, 49:21,
51:20, 75:19,
101:15, 101:19,
103:11, 124:4,
146:13, 149:11,
150:14, 153:5,
154:8
obtaining 34:7,
34:23, 35:24,
45:24, 94:24,
95:21
obvious 161:4
obviously
89:15, 109:16,
131:16, 161:17
occasion 68:16,
68:25, 114:12,
145:4, 170:16
occasions 49:1,
128:8
occur 24:13,
145:16

occurred 4:23,
32:13, 90:17,
90:18, 95:24,
139:15, 141:18,
229:19, 229:20,
232:17
occurring 188:8
odd 164:12,
164:15
offense 61:5,
116:12, 153:19,
153:21, 170:7,
170:8, 171:11
offer 48:7,
113:5
offered 158:17
Office 1:32,
2:6, 2:16,
13:14, 34:19,
38:4, 46:10,
46:23, 47:3,
48:22, 65:6,
65:15, 78:6,
78:18, 81:4,
90:18, 93:25,
98:12, 104:23,
140:12, 145:5,
145:7, 147:3,
147:4, 158:18,
158:19, 158:21,
169:6, 210:5
OFFICER 3:3,
3:6, 26:15,
27:23, 28:2,
29:14, 41:5,
55:1, 59:12,
105:3, 105:7,
105:8, 105:11,
126:9, 149:14,
168:13, 168:16,
240:8, 242:15
officewide
93:22
Official 244:14
often 69:21,
142:14, 142:22,
159:17, 159:18
Oftentimes
92:10, 92:14,
92:16

Ogan 1:31, 3:16
old 212:5,
212:6, 219:24,
220:1, 223:18
older 197:15,
197:17
omnibus 30:20,
39:2, 53:2,
88:20, 89:10
one. 102:23,
178:7
ones 8:6, 8:24,
71:23, 152:11,
165:22, 193:22,
193:25, 197:18,
220:15
open 6:3, 33:1,
33:3, 33:4,
33:6, 33:23,
103:12, 124:5,
149:11, 150:20,
151:2, 155:10,
155:19, 158:18,
158:21, 164:19,
165:20, 169:10,
169:12, 169:14,
169:25, 170:4,
171:1, 172:3,
172:5
opening 10:23,
48:21, 205:22
opinion 4:9,
24:24, 33:4,
52:14, 53:19,
115:24, 233:6
opportunity
38:8, 38:11,
38:17, 107:18,
108:6, 144:14
opposed 4:19,
10:8, 20:7,
94:16, 98:2,
172:3
option 93:4
order 19:1,
78:10, 79:7,
89:8, 129:8,
241:6
ordered 89:16
ordering 241:21

orders 89:14
organized 99:14
original 44:24,
46:21, 47:8,
65:22, 110:8,
146:25, 147:8,
147:10
others 36:12
otherwise 4:9,
8:10
outcome 4:11,
5:2
outset 142:5
Outside 5:18,
5:19, 7:7,
186:3, 186:5,
198:1, 223:20,
224:1
Overruled
72:21, 187:15,
236:15
overwhelmed
64:19
own 91:1,
99:19, 144:19,
224:5, 235:17


< P >
package 37:18,
37:19, 37:22,
38:21, 38:22,
38:24
Page 8:19,
9:11, 9:21,
37:5, 41:18,
44:11, 103:17,
105:13, 112:12,
112:15, 112:17,
112:18, 116:18,
117:2, 117:3,
117:4, 118:9,
118:13, 118:25,
119:8, 120:1,
124:3, 124:4,
160:20
pages 40:8,
103:15, 103:16,
108:17, 108:19,
116:25, 118:13,

118:22, 119:20,
153:20, 153:21,
156:14, 156:15,
170:18, 171:22
paid 31:20,
46:8, 46:12,
46:13, 58:16,
58:25
paint 176:1
pale 221:11,
221:18, 234:1,
234:2
pam_wilson@txnd
.uscourts.gov
2:41
PAMELA 2:37,
244:2, 244:13
pan 56:4
panned 56:4
pants 198:13
paper 7:25
parameters 10:4
Pardon 157:20,
161:25
parent 143:12
parents 143:16
Park 175:23,
182:3, 193:19,
196:25, 201:25,
203:20, 203:21,
205:19, 206:15,
212:3
parked 175:23,
185:23, 192:24,
196:25, 200:1,
201:2, 205:6,
205:20, 206:4,
206:10
parking 205:23,
205:24, 206:1,
206:16
Part 10:11,
11:23, 16:16,
16:17, 38:16,
91:18, 106:15,
106:23, 108:24,
116:14, 129:21,
209:5
participating
77:3

participation
68:18
particular
15:20, 17:6,
53:16, 64:12,
67:1, 71:2,
73:2, 76:1,
89:20, 92:1,
125:21, 199:2
particularly
74:23, 76:7,
137:15
parties 14:22,
218:18, 240:14,
241:21
parts 133:22
party 61:12,
61:14, 81:16,
144:24, 161:3,
162:17, 163:23,
164:3, 164:4,
164:17, 182:15,
182:17, 182:19,
182:23, 183:4,
187:21, 188:3,
196:6, 196:13,
196:15, 197:1,
201:24, 204:1,
204:10, 204:25,
211:9, 211:12,
211:14, 212:10,
212:14, 213:1,
213:17, 214:5,
215:3, 228:14,
235:12
Pass 15:14,
20:9, 59:7,
71:13, 85:5,
126:3, 134:11,
140:7, 158:10,
167:24, 172:7,
181:2, 194:22,
204:14, 208:7,
232:11, 236:22,
239:2
passed 83:12,
111:6, 111:17,
175:14, 218:1,
223:24
passenger

177:10, 200:4,
200:5, 201:13,
201:17, 201:18
Pause. 40:11,
107:1
pay 46:3, 46:6,
46:12, 142:3,
142:17, 142:18,
143:13, 153:23
paying 142:17,
142:21, 143:12,
163:10
payment 58:17,
58:18
payments 58:14,
143:1, 143:5,
143:8
penciled 18:4
penned 18:6
per 16:8
percent 23:1,
45:21, 66:4,
88:17
percolating
32:1
Perez 54:11,
62:8, 62:9,
62:11, 62:12,
181:11, 181:22,
190:17
perfect 94:12,
98:3, 110:7
perfectly
176:19
perhaps 78:3
period 32:17,
46:15, 47:9,
50:8, 142:17,
143:13
periodically
222:23
perjured 25:21
perjury 26:5
Permission
22:1, 172:14
permitted
40:17, 112:22
personal 41:5,
53:21, 93:21,
93:25, 110:23,

126:21, 232:24
personally
46:22, 52:25,
54:5, 203:25
Personnel
155:11, 155:20,
156:15
perspective
138:16
pertain 229:17
pertaining
154:13
peruse 108:8
petition 12:10,
12:12, 12:15,
12:17, 13:1,
13:11, 13:15,
13:25, 14:7,
154:9, 154:19,
169:8
Petitioner 1:7,
1:30, 3:15,
3:16, 10:22,
14:12, 22:4,
31:2, 31:7,
31:9, 36:21,
39:21, 80:10,
85:10, 85:16,
88:1, 96:14,
100:17, 103:10,
106:19, 124:1,
147:18, 149:6,
151:1, 151:9,
153:12, 156:8,
168:19, 170:20,
181:6, 181:11,
195:7, 208:12,
208:16, 240:11,
241:18, 241:20
phone 12:5,
21:11, 46:17,
52:25, 70:3,
70:5, 87:13,
127:9, 142:14,
142:22, 190:5
phonetic
226:19, 226:25
photo 24:12,
24:16, 55:1,
55:6, 81:12,

117:14, 117:17,
117:21, 117:23,
118:4, 119:16,
120:25, 131:2,
136:1, 136:3,
170:9, 171:11
photographs
110:13, 110:14
physical 198:16
pick 39:8,
47:5, 47:23,
65:6, 147:3,
147:6, 147:12,
154:23, 155:1
Picked 24:16,
39:4, 39:5,
39:10, 39:13,
47:12, 47:24,
147:7, 153:9,
154:24, 171:17,
171:19, 202:2
Picking 59:18
picture 63:8,
162:9, 238:13
pile 38:20
pinning 22:23
pinpoint 63:23
pistol 133:10
place 13:17,
60:9, 77:8,
94:9, 94:23,
118:19, 127:23,
138:24, 173:12,
173:18, 175:9,
177:2, 179:2,
179:3, 192:19,
194:5
placed 139:8,
139:14
places 60:8,
62:23
placing 138:18,
140:3
plain 207:17
plan 132:3
planning 11:3,
123:3, 132:6
players 4:18
playground
205:21

Please 3:5,
5:17, 6:22,
7:6, 7:18,
11:25, 18:17,
21:3, 45:23,
70:16, 79:13,
79:18, 85:24,
106:22, 126:10,
140:23, 141:9,
147:25, 151:14,
168:17, 168:24,
169:2, 170:8,
173:4, 173:8,
181:15, 181:21,
195:8, 195:15,
199:5, 209:7,
209:9, 209:10,
209:15, 240:9
pluck 109:3
plural 20:7
Plus 73:5
point 18:1,
19:8, 19:15,
40:18, 48:21,
65:12, 69:24,
70:1, 82:11,
89:16, 98:11,
109:10, 110:25,
112:24, 132:17,
136:5, 138:23,
146:1, 146:17,
147:5, 160:24,
161:6
point. 119:4
pointed 116:15,
136:1, 238:12
pointing 122:17
points 116:12,
133:20, 134:5
policies 101:24
policy 33:3,
33:6, 33:23,
34:9, 90:19,
90:23, 91:3,
91:11, 91:21,
93:21, 93:22,
93:24, 94:3,
94:5, 94:9,
94:24
poor 71:1, 75:9

porch 174:6,
174:10, 178:19,
224:1
portion 82:21
position 24:9
positively
120:2
possessed 75:13
possession
26:17, 95:16,
113:3, 113:15,
114:3, 129:20,
150:18, 154:13
possibility
47:13
possible 25:1,
25:3, 25:4,
25:6, 41:14,
41:16, 47:11,
58:6, 65:22,
66:25, 75:19,
75:21, 106:14,
109:12, 109:24,
110:19, 110:20,
137:1, 240:20
possibly 65:23,
66:2, 69:4,
123:11, 168:9
postponed
142:21, 143:10
potential
38:19, 76:17,
160:25
potentially
4:22
pounded 82:2
practice 32:9,
32:11, 33:7,
88:12, 88:14,
88:25, 100:3,
108:2, 131:10
precipitated
139:17
precisely 170:4
prefer 10:24,
10:25, 77:7
preferred 77:6,
138:17
prehearing
3:17, 10:18

prejudice 6:10,
10:7
preparing 38:12
prescribed
244:6
present 49:22,
62:9, 75:2,
77:19, 135:15,
138:17
presented 76:11
pretrial 30:20,
30:21, 33:21,
53:2, 64:1,
88:20, 88:23,
88:24, 107:13,
112:13, 112:19,
113:4
pretty 16:25,
31:19, 32:2,
32:4, 36:8,
57:19, 81:5,
83:16, 85:3,
90:1, 95:24,
116:8, 177:16,
180:2, 196:17,
196:18
previous 115:21
previously
52:13
primarily
87:19, 113:21
printed 102:11
Prior 5:9,
15:5, 15:21,
32:3, 35:12,
35:25, 40:15,
41:2, 45:17,
48:15, 53:1,
88:24, 89:22,
94:23, 97:17,
97:18, 106:20,
107:8, 115:9,
143:22, 144:3,
146:13, 149:2,
158:7, 183:25,
205:4, 212:22,
223:13, 231:24
pro 31:19
probability
4:10, 4:11, 5:6

probable 32:24,
34:9
probative 76:7
problem 60:6,
64:23, 73:19,
105:4, 109:5,
129:21
problems 8:3,
69:25
procedure
49:24, 50:2,
50:22, 50:23,
50:24, 51:1,
51:9, 101:23
procedures
58:10, 93:24,
93:25, 94:2,
94:4, 94:8,
94:23, 95:2,
95:3, 95:21
proceed 21:4,
51:12, 59:15,
86:3, 126:11,
175:4, 195:17,
209:12
proceeded
174:14
proceeding
29:2, 41:25,
45:18, 149:2
Proceedings
2:45, 59:14,
111:15, 126:8,
168:15, 240:7,
242:16, 244:3
process 67:2,
121:13
produced 2:46
product 33:24,
90:23, 91:4,
91:12, 91:14,
91:15, 130:11,
130:12, 130:16,
130:17
promised 40:17,
48:18, 112:21
prongs 10:8
proper 50:2,
58:10
property 60:23,

188: 19, 192: 4,
192: 5, 192: 8
proposed 139: 8
prosecuted
97: 10
Prosecution
27: 15, 32: 7,
37: 6, 40: 1,
102: 3, 102: 4,
102: 5, 102: 10,
102: 11, 102: 15,
102: 17, 102: 18,
102: 20, 103: 1,
103: 5, 103: 11,
103: 18, 103: 21,
103: 22, 104: 4,
104: 5, 104: 7,
104: 9, 104: 18,
104: 22, 104: 24,
105: 7, 105: 9,
105: 16, 105: 20,
105: 23, 106: 7,
106: 11, 106: 13,
109: 14, 130: 23,
131: 14, 131: 17,
170: 11, 171: 13
prosecutor
4: 15, 8: 14,
9: 8, 9: 13,
26: 4, 32: 2,
32: 10, 33: 8,
33: 12, 33: 21,
34: 19, 35: 2,
35: 25, 36: 23,
37: 18, 37: 20,
86: 22, 87: 1,
88: 2, 90: 19,
93: 10, 93: 16,
95: 3, 103: 23,
105: 19, 109: 6,
109: 7, 134: 25,
135: 3, 135: 5,
138: 16
prosecutorial
4: 4, 10: 5,
10: 11, 17: 11,
91: 6
Prosecutors
4: 14, 33: 13,
33: 14, 33: 15,

33: 16, 93: 8,
93: 9
provide 33: 11,
33: 16, 33: 17,
57: 21, 82: 11,
143: 19, 150: 14,
154: 14, 155: 5,
171: 20
Provided 16: 5,
42: 22, 43: 22,
44: 15, 52: 6,
52: 12, 54: 22,
155: 6, 162: 25,
165: 8, 165: 11,
171: 10
providing
43: 19, 70: 8,
70: 10
Public 1: 32,
169: 5
pull 97: 22,
98: 5, 205: 4
pulled 86: 12,
206: 4, 206: 10
purpose 92: 11,
112: 19
purposes 3: 10,
11: 4, 55: 14,
123: 3
pushed 133: 7,
133: 9, 136: 7,
139: 23
pushing 217: 22
put 5: 21, 7: 25,
60: 8, 60: 9,
60: 11, 60: 23,
60: 24, 62: 21,
72: 10, 72: 18,
84: 15, 107: 6,
110: 8, 110: 9,
131: 13, 132: 9,
132: 23, 133: 5,
139: 19, 163: 20,
169: 23
putting 34: 9,
135: 11, 135: 13


< Q >
QT 161: 5

qualify 135: 13
question 11: 10,
24: 18, 24: 19,
27: 11, 28: 5,
28: 6, 29: 10,
29: 18, 30: 4,
30: 5, 42: 14,
75: 16, 76: 2,
92: 5, 92: 13,
99: 12, 99: 23,
107: 10, 107: 11,
112: 9, 113: 9,
115: 9, 115: 15,
115: 21, 116: 8,
121: 4, 121: 14,
123: 16, 127: 9,
136: 16, 144: 15,
166: 3, 167: 21,
178: 3, 216: 2,
231: 14, 236: 24
questioning
224: 23
questions 7: 5,
15: 12, 15: 15,
61: 19, 76: 20,
82: 4, 116: 10,
138: 11, 172: 9,
178: 12, 180: 9,
190: 12, 236: 23,
237: 24
quick 43: 24,
191: 14
quickly 140: 15
Quintin 1: 6,
3: 7, 25: 15,
57: 8, 61: 15,
63: 7, 65: 21,
81: 18, 120: 11,
125: 18, 125: 25,
132: 10, 132: 24,
135: 20, 135: 22,
141: 11, 146: 23,
162: 4, 162: 16,
163: 3, 163: 22,
164: 2, 164: 5,
171: 14, 186: 23,
187: 21, 188: 1,
190: 22, 194: 4,
195: 25, 203: 23,
211: 1

quite 43: 2,
98: 12, 108: 23,
109: 16, 113: 4,
116: 6, 142: 14,
169: 14
quote 161: 1
quoting 62: 12


< R >
R. 2: 5
raise 6: 22,
142: 18, 167: 20,
209: 7
raised 27: 4,
230: 5
Ramirez 1: 23,
220: 15
ran 175: 6,
175: 10, 176: 3,
186: 18, 188: 15,
189: 8, 189: 18,
190: 21, 197: 11,
200: 9, 217: 3,
217: 4, 217: 17,
217: 19, 218: 2
Raphael 226: 18,
226: 24, 227: 3
Raphie 227: 6
rate 71: 1
rated 75: 8
rather 130: 17
re 154: 19
Re-call 77: 16,
78: 19, 239: 19
re-called 78: 9
re-incarcerated
70: 1
reached 177: 22
reaching 142: 23
reacquire
154: 20
reaction 80: 21
read 8: 1, 8: 4,
8: 6, 8: 18,
16: 18, 16: 21,
16: 24, 37: 4,
87: 7, 87: 9,
91: 10, 105: 9,
107: 3, 107: 4,

115: 14,   116: 7,
116: 17
reading 40: 11,
54: 14,   59: 19,
86: 13,   104: 17,
105: 11,   111: 3,
124: 23,   139: 25
ready 19: 14,
71: 8,   126: 5
real 83: 20,
191: 14,   193: 16,
221: 6,   221: 11,
221: 18,   234: 15
realize 158: 1
realizing
238: 21
really 10: 10,
29: 6,   30: 5,
56: 12,   89: 11,
91: 18,   94: 7,
96: 8,   97: 4,
107: 11,   108: 7,
128: 23,   142: 23,
143: 13,   163: 10,
163: 18,   167: 5,
168: 8,   171: 16,
211: 25,   212: 16,
222: 11,   232: 2
rear 177: 10,
200: 4,   200: 5
reason 17: 6,
39: 12,   39: 14,
42: 6,   42: 11,
51: 9,   53: 16,
62: 10,   77: 10,
85: 8,   113: 22
reasonable
4: 10,   5: 6
reasons 64: 18,
229: 9
rebut 116: 15
rebuttal
118: 14,   119: 3
recall -- 90: 14
recalled 237: 14
receipt 152: 22,
153: 4,   153: 7,
153: 16,   154: 5,
154: 6,   156: 1,
156: 2,   166: 20

receipts
166: 14,   166: 24
receive 18: 22,
25: 1,   32: 14,
33: 1,   46: 25,
75: 24,   91: 25,
92: 20,   144: 18,
152: 16,   156: 12,
170: 14
received 32: 21,
32: 23,   32: 24,
36: 2,   36: 4,
36: 22,   37: 24,
46: 24,   55: 5,
58: 17,   58: 18,
76: 3,   76: 6,
76: 13,   81: 2,
81: 14,   81: 21,
90: 21,   124: 15,
128: 1,   144: 21,
153: 17,   153: 18,
166: 4,   170: 17
receiving
32: 12,   37: 17,
37: 18,   37: 19,
53: 1
recent 171: 3
recently 13: 16,
13: 25,   36: 22,
92: 7
Recess 59: 10,
59: 13,   111: 14,
111: 15,   126: 7,
168: 9,   168: 12,
168: 14,   240: 5,
240: 6
recognize
70: 17,   107: 4,
198: 23,   206: 25,
207: 1
recognized
185: 5
recollection
116: 3,   125: 3,
137: 11,   138: 10
reconsider
167: 7
record 3: 12,
3: 21,   5: 5,
7: 20,   8: 1,   8: 4,

9: 15,   16: 8,
32: 6,   40: 16,
41: 17,   64: 4,
68: 7,   74: 1,
74: 4,   74: 11,
88: 23,   107: 7,
107: 13,   110: 24,
112: 3,   112: 19,
114: 18,   126: 15,
130: 1,   141: 9,
157: 22,   169: 2,
173: 8,   181: 21,
209: 16,   244: 3
records 6: 3,
6: 15,   13: 7,
13: 10,   13: 12,
35: 5,   47: 24,
103: 12,   111: 3,
124: 5,   149: 11,
150: 20,   151: 2,
151: 24,   153: 5,
153: 25,   154: 2,
154: 4,   154: 5,
155: 10,   155: 19,
165: 20,   169: 11,
169: 12,   169: 15,
169: 25,   170: 4,
171: 1,   172: 3,
172: 4,   172: 5
recount 45: 23
recounted 22: 9
recounts 14: 20,
148: 2
recreate 115: 20
recreation
206: 16
RECROSS 76: 21,
76: 24,   138: 12,
138: 14,   237: 25,
238: 2
red 207: 10
redact 90: 5,
90: 6,   98: 6
redacted 90: 12,
97: 20,   97: 23,
98: 2,   98: 4,
98: 8,   98: 20,
99: 5,   99: 7,
101: 12,   101: 14,
101: 17,   101: 18,

101: 21
redaction 98: 13
redactions
90: 5,   98: 15
REDIRECT 20: 10,
71: 14,   71: 16,
85: 6,   114: 13,
119: 20,   134: 12,
134: 14,   236: 25,
237: 3,   237: 25
refer 36: 10,
70: 15,   205: 14
reference
16: 10,   41: 17,
205: 15,   206: 3,
208: 19
referencing
129: 5,   135: 17
Referred 1: 7,
150: 10
referring
40: 23,   105: 1,
105: 2,   108: 2,
117: 13,   118: 25,
157: 21,   160: 4,
191: 17
refused 46: 10
regard 6: 4,
56: 17,   137: 15
regarded 24: 7
Regarding
15: 20,   59: 20,
60: 14,   64: 7,
86: 23,   124: 17,
124: 20,   126: 23,
155: 20,   171: 13,
229: 21
regardless
76: 13
regards 13: 15,
14: 7,   21: 13,
21: 16,   34: 16,
36: 13,   40: 20,
81: 15,   87: 10,
92: 1
regular 51: 12,
63: 22,   70: 7,
207: 17,   207: 21
regularly 125: 7
related 57: 3,

57: 4, 107: 22,
108: 6, 141: 11,
143: 19
relates 115: 8
relating 99: 20
relation
191: 12, 192: 17,
192: 20
relationship
142: 5, 142: 9,
145: 22, 145: 24,
218: 24
relatively
110: 17
relay 151: 14
release 52: 19
released 49: 10,
50: 4, 50: 9,
51: 8, 51: 15,
51: 22, 70: 1,
78: 3
relevance
94: 14, 94: 19,
229: 3
relevant 4: 8,
94: 15, 123: 19,
229: 4, 229: 11,
229: 12
reliable 56: 8,
226: 5
relied 22: 23,
50: 6, 73: 16,
109: 12
religious 11: 13
relying 18: 25,
34: 6, 49: 18,
57: 21, 145: 1,
146: 4
remain 140: 10,
172: 15, 172: 19,
222: 7
remainder
123: 19
remains 229: 20
remembered
23: 5, 88: 16
remind 7: 16,
86: 1, 241: 15
rental 173: 21
Repeat 107: 10,

118: 1, 146: 12,
163: 25
rephrase 138: 2,
166: 25
reply 241: 3
reported 2: 45,
52: 20
Reporter 2: 37,
244: 14
reports 32: 25,
33: 25, 34: 1,
34: 7, 34: 21,
34: 23, 36: 5,
36: 16, 47: 18,
47: 19, 64: 7,
64: 9, 151: 19,
170: 11, 171: 12,
171: 13
represent 12: 9,
141: 13, 154: 8
representation
31: 19, 46: 13,
107: 14, 113: 14,
114: 1, 142: 6
represented
21: 21, 42: 3,
42: 4, 42: 9,
165: 16
request 6: 16,
39: 1, 48: 6,
48: 7, 103: 12,
110: 10, 124: 5,
149: 11, 150: 20,
151: 2, 151: 7,
151: 16, 154: 3,
154: 4, 155: 10,
155: 19, 165: 20,
166: 6, 166: 24,
168: 7, 169: 11,
169: 12, 169: 23,
170: 1, 170: 4,
170: 5, 170: 7,
170: 12, 170: 14,
170: 18, 170: 19,
171: 1, 171: 9,
171: 15, 171: 21,
172: 3, 172: 6
requested
30: 21, 90: 24,
101: 22, 151: 15

requesting
35: 13, 151: 21
requests 6: 3,
169: 15
required 51: 25,
52: 5, 114: 8
residing 84: 4
respond 4: 24,
81: 1, 144: 14
Respondent
1: 18, 2: 5,
3: 13, 3: 14,
5: 25, 8: 12,
8: 15, 10: 20,
36: 23, 39: 23,
66: 15, 68: 4,
68: 12, 124: 6,
127: 4, 152: 24,
172: 16, 240: 13
respondents
242: 10
responds 9: 17,
9: 25
Response 39: 1,
88: 19, 89: 8,
113: 2, 225: 19,
241: 3
responsive
167: 1
rest 53: 19,
186: 5
restrictions
51: 18
restroom 168: 9,
196: 22, 205: 1,
212: 18, 214: 6,
214: 9, 214: 11,
214: 13, 215: 10
rests 240: 11,
240: 13
result 5: 7,
9: 13, 114: 21,
116: 1, 170: 18
resulted 172: 4
resumed 59: 14,
126: 8, 168: 15,
240: 7
retain 141: 13
retained 31: 17,
150: 6, 154: 12

retainer 142: 3
retrieve 20: 21
return 70: 5,
81: 24, 84: 7,
142: 22
returns 171: 7
review 12: 12,
13: 25, 15: 3,
38: 8, 38: 12,
38: 17, 40: 9,
40: 13, 40: 18,
87: 4, 88: 5,
97: 19, 100: 18,
101: 7, 103: 14,
105: 15, 106: 22,
107: 18, 112: 22,
114: 12, 147: 14,
149: 20, 156: 18
reviewed 22: 5,
38: 15, 40: 19,
41: 3, 41: 11,
45: 22, 70: 25,
87: 6, 96: 16,
96: 19, 97: 17,
112: 24, 114: 11
reviewing 41: 9,
56: 10, 101: 3,
101: 9, 158: 4
rewind 223: 11
REYNOLDS 1: 30
Rick 1: 14, 3: 8,
96: 4, 111: 4,
111: 17
ride 159: 10
rise 3: 3,
59: 12, 126: 9,
168: 13, 168: 16,
240: 8, 242: 15
RMR 2: 37,
244: 13
Road 173: 11
rode 159: 16
Room 2: 38,
73: 1, 73: 3,
73: 25, 77: 25,
96: 20, 161: 18,
162: 5, 162: 8,
163: 19
roommate 227: 1
Rosa 38: 6,

38: 14,   49: 13,
49: 19,   50: 7,
52: 17,   52: 24,
57: 2,   57: 5,
57: 13,   64: 17,
64: 24,   65: 2,
65: 18,   68: 16,
70: 23,   78: 25,
79: 4,   79: 13,
79: 22,   82: 9,
85: 12,   106: 24,
144: 3,   145: 18,
145: 20,   145: 23,
145: 25,   146: 1,
146: 2,   146: 4,
146: 7,   159: 9,
186: 24,   190: 18,
194: 3
roughly 170: 13
rule 3: 23,
3: 24,   4: 7,
4: 20,   5: 16,
5: 24,   6: 25,
108: 3,   108: 4
rules 225: 23
rumors 23: 24,
24: 1,   54: 4,
122: 14,   139: 5
run 174: 15,
174: 20,   175: 4,
175: 7,   176: 14,
188: 16,   188: 17,
188: 20,   188: 23,
189: 16,   217: 6
running 63: 5,
63: 6,   175: 5,
175: 11,   175: 12,
176: 6,   176: 22,
176: 24,   177: 1,
177: 4,   178: 20,
178: 24,   179: 14,
179: 18,   180: 20,
189: 12,   189: 14,
189: 19,   197: 14,
198: 9,   198: 10,
199: 18,   199: 20,
201: 7,   218: 5


< S >

S-a-a-l 169: 3
s/pamela 244: 12
Saal  5: 23,
168: 19,   169: 2,
169: 3,   170: 24,
172: 10,   172: 13,
172: 15,   172: 19
Sam 1: 31,   3: 16
Sandra 54: 11,
195: 7
Santos.  217: 13
Saturday 145: 5,
145: 8,   145: 12,
145: 14
saying 23: 23,
28: 13,   54: 3,
82: 11,   122: 18,
125: 17,   128: 2,
128: 25,   129: 24,
164: 22,   190: 20,
197: 24,   226: 15,
234: 11
says 22: 11,
39: 13,   72: 15,
103: 17,   107: 17,
115: 2,   115: 25,
119: 14,   120: 19,
124: 9,   133: 8,
136: 1,   136: 18,
136: 19,   137: 5,
153: 18,   166: 5,
191: 25,   205: 25
scan 91: 2
scanned 88: 8
Scared 83: 20,
218: 22,   218: 25,
219: 21,   221: 11,
221: 12,   221: 17,
221: 18,   221: 24,
234: 5,   234: 6,
234: 8,   234: 12,
234: 17,   234: 25,
235: 25,   237: 5,
237: 17,   237: 21,
238: 14
scary 234: 10
scattering
175: 20,   175: 21
scene 138: 20,
140: 4,   152: 1

schedule 242: 6
Schlup 225: 21
school 213: 10
sciences 170: 11
screaming
174: 17
se.  16: 8
search 108: 18
seat 200: 4,
237: 15
seated 3: 5,
3: 6,   11: 25,
79: 18,   85: 24,
126: 10,   140: 23,
168: 17,   173: 4,
181: 15,   195: 15,
240: 9
seats 201: 13
second 8: 21,
9: 20,   32: 15,
90: 14,   106: 22,
131: 20,   191: 22,
238: 8
secondguess
113: 23
secondly 65: 6
seconds 179: 15
secretary
13: 22,   98: 17,
147: 5
section 110: 13
SECURITY 3: 3,
3: 6,   59: 12,
98: 6,   126: 9,
168: 10,   168: 13,
168: 16,   240: 8,
242: 15
seeing 15: 5,
22: 25,   23: 2,
25: 8,   55: 11,
81: 6,   148: 8,
148: 11,   148: 13,
156: 25,   157: 8,
164: 13,   192: 9,
196: 20,   197: 14,
200: 17,   204: 1,
204: 8,   204: 9,
204: 10,   205: 6
seeking 230: 10
seem 73: 18,

164: 12,   164: 15,
167: 18,   167: 19
seemed 142: 23,
142: 24,   174: 16,
179: 1,   194: 16
seems 5: 7
seen 15: 10,
15: 20,   21: 24,
24: 22,   80: 22,
80: 24,   157: 13,
158: 7,   186: 1,
188: 9,   188: 16,
189: 12,   190: 9,
191: 6,   196: 2,
198: 4,   198: 9,
198: 24,   199: 2,
199: 20,   200: 9,
201: 7,   205: 4,
210: 9,   216: 10,
217: 20,   218: 9,
224: 14,   236: 10,
237: 16
semantics
104: 3,   105: 3
send 48: 11,
222: 19
sending 183: 1
sense 105: 17
sent 43: 7,
80: 23,   222: 13
sentencing
29: 13
separate 74: 11,
112: 6,   113: 10,
113: 11,   138: 4
separated 91: 23
serious 92: 25
seriously 225: 2
serve 51: 5,
171: 6
served 52: 8,
172: 5
server 67: 2
session 11: 11
set 90: 24,
112: 23,   211: 15
setting 32: 15,
212: 13
seven 88: 11,
109: 6,   115: 18,

121: 2,   121: 7
several  6: 3,
16: 19,   19: 9,
37: 20,   48: 15,
48: 16,   48: 20,
49: 1,   52: 24,
82: 22
severely 161: 18
shadow 177: 16
shaky 234: 2
shape 174: 23,
175: 25
shapes 175: 24
sheet 126: 21,
127: 19
shifting
122: 25,   146: 16
shirt 162: 8,
179: 22,   179: 23,
191: 6,   198: 14,
201: 15,   217: 11
shocked 162: 4
shook 188: 5
shoot 24: 5,
24: 22,   124: 19,
139: 3,   175: 12,
199: 7,   230: 11,
234: 16
shooter 22: 10,
22: 19,   26: 12,
28: 14,   45: 5,
53: 13,   63: 9,
80: 16,   106: 1,
131: 25,   138: 25,
148: 3,   174: 19,
177: 3
shooters 63: 12,
185: 10
short 176: 10,
176: 11,   223: 18,
239: 14
Shortly 32: 9,
141: 19
shot  9: 16,
9: 18,   14: 22,
23: 7,   24: 17,
25: 22,   30: 11,
53: 25,   75: 14,
83: 19,   115: 1,
115: 4,   116: 14,

117: 12,   120: 3,
120: 13,   120: 17,
121: 10,   122: 22,
133: 10,   134: 4,
136: 8,   137: 5,
139: 23,   162: 12,
182: 17,   211: 10,
218: 7,   228: 20,
229: 22,   229: 25,
230: 13,   230: 20,
232: 24,   233: 6,
234: 18
shots 174: 13,
175: 2,   177: 1,
178: 20,   179: 1,
179: 2,   179: 3,
179: 6,   179: 11,
180: 17,   180: 18,
180: 20,   207: 2,
207: 3
shoulders
207: 18
Show 14: 11,
14: 14,   30: 6,
31: 2,   36: 21,
43: 7,   65: 16,
65: 17,   66: 13,
70: 11,   80: 10,
90: 11,   96: 13,
100: 17,   103: 10,
106: 19,   122: 25,
124: 1,   151: 1,
152: 22
showed 17: 17,
48: 19,   48: 24,
110: 3,   117: 14,
120: 7,   120: 9,
121: 5,   127: 12,
148: 19,   157: 18,
213: 2,   221: 4,
221: 10,   225: 5,
225: 8,   233: 23,
235: 19,   237: 10,
238: 16
showing 22: 4,
73: 19,   88: 1,
155: 17,   166: 19
shown 117: 17,
117: 21,   122: 7,
126: 15,   129: 2,

156: 20
shows 27: 8
sic 9: 16,
37: 16,   81: 1,
228: 6
side 6: 20,
177: 7,   177: 8,
177: 9,   177: 10,
188: 15,   188: 18,
188: 21,   188: 22,
189: 17,   192: 4,
200: 5,   201: 16,
201: 17,   203: 4,
216: 16
sidewalk 184: 19
sight 122: 8,
175: 15
sign 46: 23,
82: 19,   88: 12,
89: 6,   89: 21,
95: 7,   95: 14,
100: 11,   141: 25,
153: 7
signature
36: 25,   37: 1,
70: 20,   151: 4,
152: 25,   155: 21,
156: 5,   160: 21,
160: 23
signed 18: 1,
82: 16,   89: 4,
99: 4,   101: 1,
106: 15,   113: 5
significance
8: 14,   9: 6,
29: 24,   75: 23,
76: 1
signs 139: 18
similar 131: 21,
148: 9,   166: 20
simpler 138: 21
simultaneously
175: 18
single 58: 17,
143: 11
singular 20: 7
sister 57: 10,
124: 16,   127: 18,
155: 22,   155: 23,
214: 16,   214: 17,

217: 3,   217: 10,
217: 12,   217: 16,
218: 2,   218: 24,
218: 25,   219: 3,
219: 10,   219: 22,
222: 6,   223: 8,
224: 10,   233: 1,
233: 7,   235: 3,
235: 9,   236: 8,
236: 11,   237: 7,
237: 12,   237: 14,
237: 17,   237: 21,
238: 14,   238: 15,
238: 19
sisters 84: 4,
220: 23
sit 209: 9,
240: 2
sitting 96: 20,
174: 6,   174: 10,
174: 12,   178: 19
situation 34: 5
situations 89: 7
six 143: 11,
143: 17,   223: 4,
235: 4,   235: 6
six. 185: 4
skin 176: 13
sleep 221: 1
sleeveless
208: 1
Sleeves 208: 2,
208: 3,   208: 4
slender 176: 9
smacked 125: 18
so-called
132: 14
Social 98: 6
software 98: 13
somebody 93: 11,
95: 7,   126: 24,
128: 24,   162: 15,
162: 20,   163: 6,
178: 20,   202: 7,
202: 9,   216: 6,
226: 16
somehow 128: 3
Someone 12: 23,
12: 24,   23: 6,
23: 12,   24: 15,

25: 14,   29: 4,
45: 15,   46: 10,
47: 3,   47: 11,
52: 6,   52: 9,
53: 18,   64: 23,
77: 7,   98: 2,
122: 21,   123: 7,
127: 22,   161: 8,
169: 20,   179: 13,
180: 20
sometime 35: 25,
46: 2
Sometimes 70: 5,
70: 6,   92: 15,
99: 17,   105: 14,
163: 7,   164: 17,
164: 18
Somewhat
173: 25,   176: 10
somewhere 60: 23
son 48: 19,
134: 3,   150: 6,
154: 9,   154: 13,
161: 9
soon 217: 19
Sort 3: 21,
16: 9,   19: 14,
36: 11,   60: 11,
68: 17,   77: 1,
98: 19,   102: 18,
111: 14,   111: 15,
113: 16,   117: 22,
122: 19,   130: 16,
166: 10,   167: 21,
194: 8,   196: 15,
205: 18,   205: 25,
206: 3,   206: 5,
207: 16,   207: 19,
207: 22,   211: 25,
231: 1,   234: 2,
240: 25
soul 22: 12
sound 17: 14,
17: 24,   69: 4,
205: 2,   234: 10
sour 142: 15
source 18: 11,
18: 12,   57: 23
sources 58: 3
Southwest

170: 10
space 173: 21
speaking 28: 11,
64: 23,   91: 16,
98: 25,   101: 5,
130: 14,   137: 3,
223: 8,   223: 15,
223: 19
special 49: 23,
50: 22,   50: 23,
50: 24,   51: 1,
51: 9
specially
110: 10
specific 34: 21,
36: 9,   44: 13,
44: 16,   89: 24,
90: 1,   96: 2,
128: 23,   169: 22,
199: 5
specifically
25: 16,   28: 5,
44: 3,   45: 25,
200: 8
specifics 12: 18
speculation
133: 16
spend 188: 1,
212: 8
spent 56: 9
spins 176: 4
spoke 38: 18,
45: 3,   56: 20,
82: 19,   90: 14,
133: 2,   162: 19,
202: 16,   203: 24,
224: 19,   232: 16,
238: 4
spoken 5: 24,
12: 5,   17: 4,
21: 11,   21: 24,
67: 9,   80: 1,
87: 13,   160: 25,
163: 12,   182: 8,
210: 18,   224: 15
spreading
174: 17
St 1: 33,   2: 7,
2: 17
staff 47: 11,

48: 12,   66: 4
stand 5: 17,
11: 21,   20: 24,
25: 21,   26: 10,
27: 8,   43: 5,
53: 15,   55: 12,
78: 25,   79: 14,
85: 16,   85: 18,
93: 12,   108: 3,
132: 23,   132: 24,
134: 17,   168: 20,
179: 25,   187: 19,
195: 9,   200: 10,
221: 19
standard 27: 12
standby 78: 4
standing 95: 9,
186: 3,   186: 5,
188: 13,   190: 22,
216: 13,   217: 11,
218: 10
stands 109: 9
stapled 102: 6,
102: 20,   104: 6,
105: 16,   105: 22
star 132: 14
start 44: 19,
59: 11,   126: 6,
127: 23,   213: 3,
215: 1,   215: 2,
215: 18,   218: 19,
218: 20,   227: 19
started 32: 19,
72: 25,   88: 12,
88: 14,   95: 6,
136: 2,   182: 25,
183: 2,   183: 12,
183: 14,   183: 15,
184: 24,   185: 14,
186: 14,   188: 14,
190: 21,   193: 24,
193: 25,   196: 15,
196: 19,   196: 20,
198: 11,   212: 16,
215: 13,   216: 11,
217: 2,   217: 5,
217: 9,   218: 14,
225: 15,   226: 19
starting 97: 1,
112: 18,   198: 8,

212: 17
startled 174: 14
State 4: 22,
12: 9,   21: 13,
21: 21,   39: 24,
40: 16,   40: 17,
51: 25,   52: 5,
53: 2,   60: 16,
60: 18,   60: 25,
61: 1,   63: 17,
64: 8,   81: 17,
85: 15,   108: 4,
112: 20,   112: 21,
113: 2,   113: 6,
127: 4,   140: 9,
141: 9,   154: 9,
159: 25,   165: 5,
169: 2,   173: 8,
180: 21,   181: 7,
181: 21,   205: 18,
209: 15,   229: 21
stated 25: 14,
74: 16,   127: 24,
129: 9
statements
8: 13,   9: 5,
10: 24,   17: 1,
17: 2,   36: 3,
70: 25,   76: 10,
102: 24,   131: 14,
131: 22,   132: 19,
164: 20,   164: 24,
170: 9,   171: 12,
230: 19,   230: 23,
240: 15
States 1: 1,
1: 24,   41: 17,
244: 7
statewide 51: 17
station 92: 25,
116: 21,   117: 7,
118: 3,   196: 23,
201: 21,   202: 3,
204: 3,   204: 6,
219: 6
status 62: 1
stay 11: 15,
123: 12,   188: 21,
210: 16
stayed 196: 4

staying 174:9,
211:22
stenography
2:45
step 5:18, 7:7,
79:13
stepdad 85:3
steps 52:23,
53:9
stick 23:10
stickers 14:12
stipulate
14:22, 44:5
stipulation
8:9, 10:15
stipulations
7:24, 8:2, 8:22
stolen 237:10,
237:15, 238:5
stood 23:16,
23:20, 76:12
stop 215:15,
227:17
stopped 189:19
stories 24:8
story 125:9,
128:11
straight 235:18
straps 207:18
strategy 91:17,
91:19
Street 2:38,
63:6, 83:18,
122:14, 173:16,
174:10, 174:20,
175:22, 178:21,
179:18, 185:24,
186:10, 186:12,
192:22, 193:19,
194:17, 194:18,
194:19, 196:23,
196:25, 201:23,
201:24, 206:15,
211:22, 212:3,
212:19, 212:21,
214:14, 215:13,
216:21, 216:22,
220:19, 228:23
stuck 122:13
stuff 89:19,

90:6, 121:14,
129:25, 141:1,
176:1
styles 98:14
subdivided
102:9
subject 5:16
subpoena 35:4,
49:21, 49:24,
50:1, 50:3,
50:5, 50:11,
50:13, 50:20,
50:24, 51:7,
51:13, 51:16,
51:17, 51:20,
51:21, 52:1,
52:4, 52:8,
52:9, 52:21,
52:22, 66:7,
66:8, 66:16,
67:6, 73:19,
83:13, 169:13,
171:3, 171:6,
171:9
subpoenaed
7:15, 50:24,
73:12, 73:13,
73:14, 73:15,
161:10, 187:1,
203:2, 203:4
subpoenas 67:5
subsequent
52:18, 117:23,
118:4, 120:25,
127:9
substance
16:23, 108:25
substantive
6:5, 6:7, 6:9,
6:11, 6:16,
10:11
Suburban 232:8
successful 84:5
sudden 174:13
sufficient 17:9
suggest 27:14,
230:19
suggestion
239:17
Suite 1:34

summarize
104:19
summary 70:24
summer 31:21
summons 66:23
supervise 93:3
supervisor
172:2, 172:5
Supplement
37:9, 37:11,
37:12, 37:14
supplemental
241:22
supplements
36:4, 104:10,
170:8, 171:11
support 13:1
supports 9:14,
114:22, 114:24
supposedly
22:19
Supreme 225:21
surmising
238:20
surprised 81:3,
125:13
surrounding
45:23, 210:22,
215:22, 216:6,
216:10
surviving 128:7
suspect 167:14
suspects 170:9,
171:12
Sustained 26:8,
29:8, 133:17,
144:10
swear 3:20,
5:18, 7:20
SWIFS 37:9,
37:11, 37:12,
170:10, 171:13
switched 83:3
swore 85:21
sworn 6:23,
7:19, 7:21,
11:23, 19:21,
21:1, 61:25,
62:5, 73:21,
73:23, 79:15,

140:21, 168:22,
173:2, 181:13,
195:11, 209:6
sworn. 6:24,
209:8
system 33:2,
33:5, 90:15,
90:16, 169:19


< T >
T-shirt 176:15,
176:17, 180:4,
207:10, 207:12,
207:14, 207:15,
207:16, 207:17,
207:19, 207:21,
207:22, 207:23
T-shirts 179:25
tab 16:7,
16:13, 19:17,
43:15, 44:7,
44:8, 70:15,
86:21, 160:5,
191:19, 205:14
tag 61:5
talked 7:24,
23:18, 23:21,
23:23, 24:1,
55:18, 55:21,
58:6, 70:23,
74:21, 75:10,
117:7, 120:12,
121:9, 121:11,
122:10, 132:2,
132:20, 139:2,
142:14, 162:9,
164:12, 172:2,
179:4
talks 109:17,
126:22
tall 176:7
Tarrant 33:7
technically
8:24
Telemundo 178:2
telephone 78:22
telephonically
79:25
tells 73:18,

112:23, 217:13
ten 59:10,
65:15, 95:8,
168:11, 170:13,
182:9, 190:11,
196:3, 201:5,
210:10, 239:14
tendered 149:2,
152:23, 165:24
terms 4:21,
5:1, 28:11,
94:24, 95:21,
130:14
testified 4:12,
29:15, 58:13,
60:18, 64:9,
67:17, 71:18,
74:17, 108:4,
117:5, 132:7,
136:21, 138:22,
159:6, 180:19,
237:5
testify 6:3,
6:15, 7:2,
19:14, 70:25,
71:22, 71:24,
73:12, 123:20,
143:7, 178:8,
187:1, 187:5,
187:7, 187:9,
187:11, 187:13,
203:2, 203:4,
203:6, 203:10,
239:18
testifying
26:19, 72:16,
72:18, 113:7,
137:11
testing 97:4
Texas 1:2,
1:12, 1:15,
2:6, 2:16,
2:39, 49:9,
51:17, 64:8,
244:15
Thaler 1:14,
3:8
theory 113:23,
116:10, 116:14,
130:8, 133:24,

180:16
thinking 28:2,
91:19, 116:4,
116:7, 155:3,
157:2, 180:22,
209:1, 238:9
third 4:5, 4:8,
9:6, 10:1,
112:12, 131:20
thorough 131:11
though 25:20,
27:13, 28:24,
88:18, 226:10
thoughts
115:20, 122:3
threaten
234:21, 234:24,
235:23, 236:2,
236:4, 236:6,
237:7
Three 4:3, 9:5,
12:16, 14:5,
18:9, 18:14,
31:14, 62:22,
84:3, 105:21,
122:7, 146:24,
147:2, 152:13,
166:6, 166:7,
175:2, 179:10,
186:1, 210:20,
212:11, 216:14,
218:3
Three. 152:15
threw 133:8,
136:7, 139:22
throughout
38:12, 117:24
throwing 56:12,
60:14, 60:19,
133:6, 136:2,
136:5, 136:9,
138:18, 138:19,
139:9, 139:15,
139:17, 139:24,
140:3, 163:3,
184:8, 184:10,
184:13, 185:18,
193:21, 193:24,
194:12, 194:15,
194:17

thrown 139:21
timeline 233:10
timetable 58:24
title 104:8
titled 160:9
Today 4:19,
11:5, 11:7,
11:8, 11:16,
21:19, 43:3,
91:21, 92:2,
92:3, 92:4,
92:20, 93:3,
104:5, 121:4,
121:6, 121:7,
211:8, 232:20
together 61:12,
99:19, 102:20,
104:7, 146:1,
210:23, 215:17,
227:21, 228:11
tomorrow 11:11,
79:6, 79:8,
209:4
Tony 54:12
took 22:17,
41:14, 47:8,
52:21, 53:9,
77:8, 108:3,
111:6, 144:24,
173:18, 175:8,
179:2, 179:3,
190:21, 200:25,
201:1, 202:9,
220:7, 226:21
tooken 177:2
top 102:5,
160:10
Torres 54:13,
228:8, 228:14,
228:18, 229:3,
229:9, 229:19,
229:22, 230:8,
230:9, 230:14,
231:5
totality 139:11
totally 49:20,
88:15, 115:15
touch 196:4,
210:11, 210:16,
222:15

touched 132:4
tough 143:13
Tovar 54:11,
54:12
toward 146:16
Towards 175:12,
176:25, 177:4,
178:21, 183:2,
183:12, 183:15,
183:17, 184:19,
186:10, 186:11,
188:15, 188:18,
188:22, 189:8,
189:17, 189:18,
190:21, 194:17,
194:18, 197:1,
198:9, 198:10,
199:15, 199:16,
199:20, 200:3,
201:7, 207:5
Trace 37:15
tracked 108:20
tracking 122:2
trained 92:23
training 92:22
transcribe
242:2
TRANSCRIPT
1:22, 2:46,
39:16, 40:13,
40:15, 87:6,
87:7, 106:20,
107:12, 112:2,
112:10, 117:10,
241:22, 242:7,
244:3, 244:5
Transcripts
13:6, 39:24,
40:9, 86:9,
87:5, 111:4
treated 129:4
tree 62:13,
62:19, 77:5,
188:15, 188:19,
189:4, 190:22,
190:23, 191:10,
191:11, 191:12,
191:23, 191:24,
191:25, 192:2,
192:13, 192:15,

192:16, 192:17,
194:4, 194:7,
194:9
tricky 118:22
tried 229:1
trouble 83:6,
213:3, 215:18,
229:7
truck 185:1
true 23:12,
26:13, 26:14,
26:24, 27:2,
29:21, 42:5,
42:6, 58:14,
64:7, 82:23,
96:10, 129:10,
129:12, 135:11
truly 128:23
truth 134:21,
134:23, 135:1,
224:13, 224:16
truthful 29:15,
29:16
truthfulness
28:12, 55:15
try 3:20, 8:1,
11:15, 49:10,
50:7, 115:19,
129:7, 139:6,
143:16, 143:24,
144:25, 231:2
trying 23:4,
52:24, 52:25,
62:15, 83:10,
121:25, 125:9,
128:11, 134:20,
194:6, 218:5,
228:25, 230:24,
235:18
turn 32:7,
64:8, 64:12,
64:15, 69:15,
89:16, 90:24,
91:14, 98:8,
109:13, 109:15,
109:19, 114:8
turned 13:13,
36:24, 37:3,
37:22, 38:5,
40:22, 41:20,

42:2, 64:25,
89:11, 89:16,
90:6, 97:20,
99:1, 99:10,
100:25, 102:1,
103:22, 107:7,
107:14, 108:14,
109:1, 112:4,
113:2, 113:4,
113:15, 114:2,
129:10, 129:18,
129:19, 130:15,
130:18, 131:25,
136:22, 136:23,
137:9, 138:3,
138:6
turning 98:23,
99:1, 137:12
turns 89:15
twice 25:5,
145:15
Two 4:1, 4:4,
7:11, 31:14,
43:8, 62:22,
64:18, 64:22,
83:19, 97:8,
99:18, 105:21,
121:10, 122:6,
123:13, 124:4,
131:12, 135:3,
139:4, 146:24,
153:18, 175:2,
179:10, 180:9,
182:20, 188:4,
199:21, 201:7,
212:11, 214:16,
214:19, 214:23,
216:25, 221:23,
236:18, 240:23,
240:25
two. 198:6
TX 1:35, 2:8,
2:19
TYC 83:12,
235:3
type 104:13
typical 76:10,
131:10, 131:19
typically 90:5,
91:15, 102:17

typing 160:17
typo 20:8


< U >
ultimately
152:16, 189:19
Um-hum 150:11,
151:18, 153:3,
155:24, 161:14,
180:23, 180:25,
193:23, 194:11,
195:12, 198:2,
199:17, 199:22,
200:6, 200:15,
200:24, 205:3,
206:2, 206:18,
207:6, 232:23,
234:23
unable 51:15
unacceptable
75:9
unavailable
71:19, 71:25,
72:4, 72:7,
72:9, 72:12,
72:16, 72:17,
72:23, 74:1,
74:2
uncomfortable
212:24
undelivered
67:4
undercut 60:22
undershirt
207:23, 207:24,
208:1
understand
21:14, 30:4,
44:12, 76:2,
87:19, 109:16,
112:7, 117:12,
139:7, 163:4,
163:6, 198:19
understanding
6:14, 7:13,
8:12, 33:6,
34:13, 38:25,
41:22, 42:7,
50:14, 51:7,

51:16, 63:17,
129:17, 130:12,
155:5, 187:6,
228:3
understood
130:20, 178:18
undertake 51:1,
52:17
undertaking
146:4
undisputed
230:7
unimportant
92:11
unintentional
121:1
United 1:1,
1:24, 244:7
Unless 33:14,
41:24, 92:21,
98:7, 101:18
unredacted 98:5
unserved 52:11
until 7:2,
32:16, 32:20,
64:9, 88:23,
157:13, 164:6
upset 85:4
using 20:5,
61:13


< V >
v. 225:22
Vagos 139:18
Vanessa 237:13
varies 33:12
Vazquez 47:22,
48:17, 54:21,
54:22, 57:19,
57:21, 58:3,
58:13, 65:7,
65:20, 65:21,
66:4, 69:8,
69:21, 140:19,
140:20, 141:7,
141:10, 147:25,
149:20, 153:16,
155:17, 158:15,
160:11, 168:1,

168: 3
vehicle 175: 13,
177: 4, 177: 6,
177: 8, 177: 9,
177: 12, 197: 25,
198: 1, 198: 5
verify 20: 25,
23: 19, 168: 21
VERSUS 1: 10,
3: 7, 138: 24
victim 125: 6,
134: 3, 136: 6
view 5: 6, 8: 15,
137: 18
viewed 73: 8
visit 84: 12,
159: 15
voir 39: 17,
106: 21
Volume 1: 21,
3: 2, 8: 19,
9: 11, 9: 21,
114: 22, 116: 25,
118: 8, 118: 10,
118: 11, 118: 20,
118: 21, 118: 22,
118: 23, 118: 25,
119: 8, 119: 20,
119: 21, 119: 24
volumes 86: 9,
86: 14
voluminous
110: 17, 110: 18,
111: 10
voluntarily
73: 16
volunteer 122: 9


< W >
Wait 5: 21,
144: 13
waited 147: 2,
201: 25
waiting 79: 4,
96: 20, 178: 4,
224: 25
waived. 113: 1
waiving 111: 1
walk 111: 22,

174: 20, 198: 8,
232: 4
walked 184: 6
walking 160: 7,
183: 12, 183: 16,
183: 17, 197: 1,
214: 21
Waller 124: 15
wanted 3: 19,
16: 9, 46: 13,
57: 24, 64: 23,
65: 5, 76: 16,
89: 2, 91: 22,
95: 12, 108: 11,
111: 1, 118: 8,
119: 18, 122: 1,
128: 12, 140: 10,
143: 24, 151: 25,
152: 1, 205: 17,
208: 6, 209: 2,
222: 2, 224: 18,
232: 15, 234: 16
wants 44: 10,
113: 21
warden 50: 17,
51: 8
warrant 69: 12,
104: 1
waste 52: 15
watch 224: 4,
240: 2
Watkins 90: 22
wearing 176: 15,
176: 16, 179: 20,
185: 11, 186: 7,
191: 6, 198: 12,
198: 13, 198: 15,
222: 3, 232: 1,
232: 3
week 80: 12,
87: 8, 158: 5,
171: 8, 209: 23,
210: 3, 240: 23,
240: 25
week/two 240: 25
weekend 158: 18,
164: 9
weekends 48: 22,
48: 23, 158: 21
weekly 69: 23

weeks 31: 14,
31: 24, 37: 20,
121: 10, 122: 6,
122: 7, 139: 4,
170: 13, 240: 23
weight 225: 23,
226: 2
West 182: 4
Western 203: 20,
203: 21
Whatever 62: 9,
89: 19, 93: 6,
109: 13, 113: 21,
135: 7, 135: 10,
151: 21, 201: 13,
225: 23, 226: 2,
229: 3, 229: 9
whatnot 59: 21,
68: 18, 159: 22,
163: 1
whenever
108: 11, 189: 11
white 110: 9,
176: 13, 176: 17,
179: 22, 179: 23,
179: 25, 180: 4,
198: 14, 201: 15,
223: 18, 232: 8
white-out 98: 11
whites 110: 10
whoever 178: 25
whole 29: 2,
37: 4, 38: 19,
43: 1, 83: 17,
87: 7, 104: 8,
105: 15, 110: 12,
133: 23, 136: 11,
184: 12
whom 132: 18
why'd 234: 16
wife 128: 8,
134: 3
Will 6: 2, 7: 1,
7: 7, 8: 17,
11: 7, 11: 8,
33: 13, 33: 14,
33: 15, 44: 5,
59: 7, 59: 11,
67: 6, 68: 4,
73: 18, 77: 25,

78: 8, 79: 9,
84: 13, 86: 13,
92: 10, 93: 9,
93: 13, 99: 16,
99: 17, 99: 18,
103: 3, 105: 8,
108: 17, 111: 20,
126: 22, 141: 3,
169: 2, 241: 6,
241: 21, 242: 1
William 1: 30,
3: 15, 7: 25,
165: 4, 195: 20
william_biggs@f
d.org 1: 37
willing 19: 14,
62: 12, 77: 4,
178: 8, 203: 10
WILSON 2: 37,
244: 2, 244: 12,
244: 13
window 84: 16,
224: 5
withdraw 6: 18,
144: 15
withheld 34: 5
withhold 33: 22
Within 10: 4,
14: 2, 14: 3,
44: 16, 45: 2,
58: 24, 78: 4,
141: 19, 179: 15
Without 52: 4,
67: 6, 75: 10,
95: 4, 101: 3
witnessed 54: 5,
124: 19
witnessing
59: 20
word 20: 4,
81: 16, 124: 15,
138: 23, 138: 24,
205: 21, 234: 5
worded 121: 14
words 99: 15,
103: 17, 103: 21,
151: 23, 152: 3
work 32: 19,
33: 24, 65: 10,
90: 23, 91: 4,

91:11, 91:14,
91:15, 98:18,
130:11, 130:12,
130:16, 130:17,
145:20, 159:15,
165:5, 169:4
worked 96:5,
131:12, 159:9,
165:4
working 84:23,
130:16, 131:7,
144:4, 202:19
workroom 95:8,
111:23
world 235:18
Wow 176:17
writ 12:20,
12:21, 15:6,
15:11, 15:22,
15:24, 16:16,
16:17, 17:16,
19:6, 19:8,
19:16, 87:20,
150:7
write 68:17,
190:2, 222:14,
235:14
writing 70:20,
88:16, 88:18,
159:24, 160:16,
160:17, 169:23
written 116:18,
137:21, 148:1,
204:21
wrote 71:2,
105:23, 152:3,
152:11


< X >
Xish 99:17


< Y >
yard 135:21,
136:9, 136:12,
136:19, 140:1,
188:7, 212:20,
215:7, 217:21
yards 197:5,

206:12, 206:13
year 32:1,
96:22, 96:24,
142:20, 143:9,
143:17
Years 12:16,
12:19, 16:19,
18:9, 18:14,
88:11, 109:6,
115:18, 121:3,
121:7, 169:15,
182:9, 190:11,
196:3, 210:10,
210:20, 212:6
yelling 139:18,
139:19, 225:15
Yelonda 220:15
yesterday 28:7
Yish 99:18
Yoli 226:24,
227:1
young 161:3,
161:23
youngest 213:14
yourself 93:2,
162:22, 203:22,
210:13, 214:15


< Z >
zero 30:18
Zish 99:18
zone 115:19,
115:23

1

2                    C E R T I F I C A T I O N

3        I, PAMELA J. WILSON, CSR, certify that the foregoing is a

4    transcript from the record of the proceedings in the

5    foregoing entitled matter.

6        I further certify that the transcript fees format comply

7    with those prescribed by the Court and the Judicial

8    Conference of the United States.

9        This the 15th day of April, 2010.

10

11                              s/Pamela J. Wilson
12                              PAMELA J. WILSON, RMR, CRR
                                Official Court Reporter
13                              The Northern District of Texas
                                   Dallas Division
14

15

16

17

18

19

20

21

22

23

24

25