**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **QUINTIN LEE ALONZO,** | ) | |
| **ID #1158688,** | ) | |
| **Petitioner,** | ) | |
| **vs.** | ) | **No. 3:07-CV-0399-O (BH)** |
| | ) | |
| **RICK THALER, Director,** | ) | |
| **Texas Department of Criminal** | ) | |
| **Justice, Correctional Institutions Division,** | ) | |
| **Respondent.** | ) | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order* 3-251, this case has been automatically referred for findings, conclusions, and recommendation.

**I.  BACKGROUND**

Petitioner, an inmate currently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (TDCJ-CID), filed his petition for writ of habeas corpus under 28 U.S.C. § 2254 to challenge his February 7, 2003, convictions for murder and aggravated assault. Respondent is Rick Thaler, Director of TDCJ-CID.

**A.      Factual History**

On July 16, 2001, petitioner was indicted for murder in Cause No. F01-74583-HL and for aggravated assault in Cause Nos. F01-74559-HL, and F01-74561-HL.  (Trial Transcript I, II, III at 2-3[1]).  After pleading not guilty, he was tried before a jury on February 5-7, 2003.  (Tr. I:21; Tr. II:20; Tr. III:43; R. 5:9-10, 115-117).

Before the trial began, there was an exchange on the record regarding the pretrial motions.

---

[1] "Tr. I" refers to the transcript for cause no. F01-74559-HL, "Tr. II" refers to the transcript for cause no. F01-74561-HL, and "Tr. III" refers to the transcript for cause no. F01-74583-HL.

(R. 3:10). Defense counsel told the Court that he had filed an exculpatory evidence motion, and that he had been promised by the prosecutor that he could review the detective's notebook. (R. 3:10-11). The prosecutor responded that the State had turned over all evidence in its possession that was exculpatory, and he clarified that the offer to look at the detective's notebook was in advance of him testifying. (R. 3:11). The prosecutor also stated that the offer for review of the notebook had nothing to do with the exculpatory motion because he believed that all exculpatory evidence had been turned over to counsel. *Id.* The trial then began.

The State presented evidence that on June 8, 2001, Israel and Cynthia Martinez ("the parents") had a party at their home for their son, Santos Gauna, who had just graduated from high school and was entering the Marine Corps. (R. 3:24-27). Guests brought alcohol to the party, which began around 10:30 p.m. About 100 people were there when a fight broke out around 11:30 p.m. or 12:00 a.m. Mr. Martinez ("the father") testified that he and his son were escorting a person out of the front yard when the person threw a bottle back towards the house. After he pushed the person and told him to leave, that person turned, pulled out a revolver, and started shooting back towards the house, hitting the parents and killing their son ("the murder victim"). (R. 3:28-36, 70). There were also shots being fired towards the house from a black car. (R. 3:70). The father identified petitioner as the person who shot him from approximately five feet away. (R. 3:31-35, 40-41). He had previously identified petitioner from a photographic line-up ten days after the shooting. (R. 3:53, 60). Before seeing the line-up, the father did not know petitioner or his name. (R. 3:72). He also identified the petitioner from a video taken at the party that was admitted into evidence as the person who shot him. He testified that in the video petitioner looked as he did the night of the shooting, and that he was wearing jeans. (R. 3:44-48).

On cross-examination, the father admitted that while he was still in the hospital two days after the party, he told a reporter from the Dallas Morning News that he hoped that someone who saw something at the party would come forward with information. He did not mention during the interview that he saw the person who shot him. (R. 3:58-60). He also admitted that ten days after the shooting, he gave a written statement to the detective, and he told the detective that the shooter was wearing a dark blue shirt and dark jeans or shorts. (R. 3:60, 65-69). The statement, which was admitted into evidence, said the shooter was wearing a dark blue shirt or either black pants or shorts. (R. 3:71; State's Ex. 51). On re-direct, the father described the shirt the petitioner was wearing in the video as "dark bluish, with reddish." (R. 3:76).

Mrs. Martinez ("the mother") testified that she was inside the house around midnight when a fight started in the front yard. She came out and saw her son escorting people from the party. She then heard glass breaking, as if someone had thrown a bottle, and shooting. She heard her son say that he had been shot, and she felt a sting and realized that she had also been shot in her chest area. She did not see who shot her or her son. She heard more shooting and saw someone shooting from inside the front yard towards the street. (R. 3:82-87).

Rosie Sanchez testified that she was twenty years old, had gone to high school with the murder victim, and was at the party. At one point she was sitting at a table in the yard talking to friends when she heard a commotion, with beer bottles breaking and voices getting louder. She and her friends stood up to see what was happening, and she heard gun shots. She took cover, and she saw someone with a gun shooting. She picked petitioner out at trial as the person she saw "with a gun shooting"; she had previously identified him from a photo line-up on July 19, 2001, several weeks after the shooting. (R. 3:94-96). Sanchez acknowledged that although she only saw one

person shooting, there was a lot of shooting at the party.  (R. 3:98).  She testified that she did not talk to anyone about what happened between the shooting and the time she gave her statement.  (R. 3:97-98).  Sanchez also testified that she knew who petitioner was but had never talked with him.  (R. 3:98-99).  On cross-examination, Sanchez testified that she told the murder victim's mother and cousin Daniel what she had seen the next day.  (R. 3:100-01, 103-04).  She was not interviewed that night, and she did not contact the police with this information.  (R. 3:101).  She acknowledged that in her statement to the police, she said that she also saw a "fat guy" shooting.  (R. 3:102-103).

Detective Mike Berry ("the detective") testified that he was the lead detective in the case. He also testified that he compiled a notebook consisting of the whole case file.  (R. 3:138).  After the shootings, approximately seventeen people who attended the party were taken to the police station and questioned.  (R. 3:128, 156).  Licho Escamilla's[2] ("Escamilla") name came up immediately at the beginning of the investigation.  (R. 3:129, 132, 155-57).  Escamilla, his brothers Juan and Jose, and Frank Hernandez were named as persons that may have fired a gun at the party. (R. 3:128-29, 132, 162).  None of the seventeen witnesses stated that petitioner was the person who shot the victims, although some stated that he was at the party.  (R. 3:131, 157-59).  Escamilla's brothers later went to the police station and talked with the detective, and they gave consent to search Escamilla's car.  (R. 3:160).  A .38 caliber shell was recovered from the vehicle.  (R. 3:161, 165).  The detective was told by Escamilla's family that Escamilla had gone to Mexico.  (R. 3:160).

The detective later received an anonymous call that petitioner and Frank Hernandez had been bragging about the shooting.  (R. 3:138, 159).  He showed the father photo line-ups with pictures of the Escamilla brothers, but the father did not make an identification.  (R. 3:129, 140, 163-64).

---

[2]  In the transcript, Escamilla is referred to as "Lecho" or "Lecho Escamelia".

4

He did say that Jose Escamilla looked familiar but couldn't place him. (R. 3:164). The detective then showed him a line-up with petitioner, and he identified petitioner immediately as the person who shot him. (R. 3:132, 140). The detective interviewed petitioner, but "[n]o one else that [he] would consider a suspect", in connection with the case. (R. 3:137). The detective believed that Escamilla was shooting a gun at the party, but there was no evidence indicating that he shot the victims. (R. 3:167). He testified that none of the persons to whom he showed line-ups excluded petitioner as the person who shot the victims. (R. 3:169).

Testing revealed that the same .38 caliber gun was used to shoot all three victims, but it was never recovered. (R. 3:132-33, 135-36, 171, 178). A .38 caliber shell casing was found in the car that the Escamillas were driving, and the ballistics expert testified that one of the bullets that hit one of the victims could have come from this cartridge case, but that this could not be conclusively determined. (R. 3:176-186). The remainder of the shell casings retrieved from the street and in front of the house were .9 millimeter shell casings. The physical evidence at the scene showed that at least three guns were fired at the party. (R. 3:132, 179-81). A revolver, with which the father testified that he had been shot, would not have ejected the shell casings. (R. 3:169; *cf.* 133). Casings would be found only if the weapon was emptied. (R. 3:125).

Defense witness Daniel Barron testified that he was the murder victim's cousin. He saw someone wearing a white muscle shirt shooting towards the house from inside of the yard and the street, and he later saw this person get into a Cadillac and drive off. He did not see who shot his cousin, however. Barron acknowledged that he gave a statement to the detective after the party in which he said that he saw a man in a white muscle shirt shoot his cousin, get into a dark blue Cadillac, and drive off. (R. 4:26, 33-34, 41-40; State's Ex. 52). Barron acknowledged that his

written statement, which was admitted at trial, was inconsistent with his testimony. He maintained, however, that the statement was incorrect and that he did not see the man in the white shirt shooting until after his cousin was shot. (R. 4:23-41).

Antonio Garza testified that he knew petitioner and had been invited to the party by petitioner's friend, Lucy Montoya. He saw bottles being thrown and heard gunshots. At the time of the gunshots, he saw petitioner by the side of the house talking to Montoya. He never saw petitioner with a gun and never saw who did the shooting. (R. 4:42-49). He acknowledged on cross-examination that he was at petitioner's house when petitioner was arrested, but he denied ever telling the detective that he did not know where petitioner was when the shooting occurred. (R. 4:51-54). Garza also testified that petitioner was wearing a red shirt. (R. 4:66).

Lucy Montoya testified that she was petitioner's friend, and that she told him about the party. People at the party began making gang signs and throwing beer bottles at one point, and she walked away. A couple of guys wearing muscle shirts were saying "Ledbetter", and a couple of people on the other side were saying something else. (R. 4:76). Escamilla was from Ledbetter. (R. 4:109). She never saw petitioner throw a beer bottle or make gang signs, and he was with her by the grass when the shooting occurred. (R. 4:76-80, 86). After initially viewing a videotape from the party, she was unable to identify petitioner because he was only shown for less than a second, but she was able to identify him from a still-frame. (R. 4:80-81). Montoya described the shirt he was as wearing as red and bluish, not dark blue. (R. 4:111). On cross-examination, Montoya testified that she never contacted the police with this information because she always heard that Escamilla did the shooting, and she never thought that it was petitioner. After petitioner was arrested in June of 2001, she spoke to a defense investigator in February of 2002. (R. 4:84-87).

Joe Martinez testified that he saw the murder victim trying to kick some people out of the party. (R. 4:115-116). He then heard a gunshot and fell to the ground. (R. 4:116, 121). When he looked out to the street, he saw two or three guys shooting towards the fence, and petitioner was not one of those people. *Id.* He did not know petitioner personally, but he knew him from the neighborhood and school. (R. 4:112-13). He did not see petitioner when the shooting started, although he had seen him earlier at the party mingling and walking around, and he did not know where petitioner was when the first shot was fired. (R. 4:115-17, 120).

Petitioner's mother testified that she viewed the video and was able to identify her son. (R. 4:126). He was wearing a red checkered shirt, not a dark blue shirt. *Id.* Her friend, Dorey Ugalde, testified that there was an article in the paper with a picture, and she thought the man in the picture was Escamilla. (R. 4:134). After reading the article, she realized that it was actually a picture of petitioner. (R. 4:135). Escamilla's girlfriend, Jessica Garcia, testified that petitioner and Escamilla looked similar and had similar complexions around the time of the party. (R. 4:148-150).

On re-direct, the detective testified that he had spoken with Antonio Garza the day petitioner was arrested. On that date, Garza told him he didn't know where petitioner was at the time of the shooting, although he thought petitioner was in the back. (R. 4:156). The detective also testified that Daniel Barron's written statement was inconsistent with what Barron had told him. (R. 4:162). He again stated that the father had not identified Escamilla as the shooter from a line-up, but he had immediately identified the petitioner. (R. 4:164). He specifically testified that no one had identified Escamilla as the person who shot the murder victim, and that no one had excluded petitioner as the shooter. (R. 4:164-65). He reiterated this testimony during cross-examination. (R. 4:166).

During the rebuttal portion of closing arguments, the prosecutor argued that none of the

seventeen people who were interviewed by the police could come into court and tell the jury that

Escamilla shot the victims because they were not in a position to see the shootings. (R. 4:198).

Photo line-ups were shown to "lots of people" and none of these people identified Escamilla as

being the one who shot the victims, although Escamilla was at the party and was shooting a gun.

(R. 4:199-200). The prosecutor later stated:

> And what about this theory that the Defense counsel puts out: Lecho [sic] did it.
> Lecho Escamelia [sic] is the one who shot Santos Gauna and Mr. Israel Martinez and
> his wife. What about that? Well, we know that nobody identified him as shooting
> him. We know that. Nobody identified him as shooting him.

(R. 4:202).

The jury found petitioner guilty of all three charges and sentenced him to life in prison for

the murder and fifteen years each for the aggravated assaults, to run concurrently. (Tr. I::21; Tr.

II:20; Tr. III:43; R. 5:9-10, 115-117).

**B.**     **Procedural History**

Petitioner filed a direct appeal in all three cases raising eight points of error, including claims

that the evidence was legally and factually insufficient to support his convictions, the trial court

erred in responding to a note sent by the jury, defense counsel was ineffective for failing to make

certain objections, and the prosecutor made an impermissible jury argument. The Fifth District

Court of Appeals affirmed petitioner's convictions in an unpublished opinion. *Alonzo v. State*, Nos.

05-03-00234-CR, 05-03-00235-CR, 05-03-00654-CR (Tex. App.–Dallas, July 26, 2004, pet. ref'd).

His petitions for discretionary review were refused by the Court of Criminal Appeals on January 12,

2005. *See* PD-1306-04, PD-1307-04, PD-1308-04. On February 22, 2006, petitioner filed state

applications for writs of habeas corpus in all three cases asserting four grounds for relief. (State

Habeas Transcript[WR-64,739-01] at 7). Without adopting the trial court's findings, the Court of

Criminal Appeals denied petitioner's state applications without written order on February 7, 2007. (*Id*. at cover).

On March 2, 2007, petitioner filed his petition for federal habeas relief. Respondent filed an answer on August 22, 2007, and provided the state court records. Petitioner filed a reply brief on September 17, 2007. On February 23, 2009, the Court stayed and abated petitioner's federal case so that he could present unexhausted claims to the state court. (doc. 18). On April 16, 2009, petitioner filed subsequent state writs in his three cases, asserting claims that the prosecution committed misconduct by eliciting false testimony, counsel was ineffective for failing to object to the false statements, and he was denied due process because the trial court did not permit the defense to present evidence at trial regarding the guilt of a third party. (S.H.Tr.[64,739-04]:2, 7-9). These state writs were denied as an abuse of the writ by the Court of Criminal Appeals on August 5, 2009, under the relevant state statute. (S.H.Tr.[64,739-04; 64,739-05; 64,739-06]:covers); *see* TEX. CODE CRIM. PROC. ANN. art. 11.07 § 4(a)-(c) (Vernon 2007). On August 14, 2009, petitioner filed a motion to reopen his federal habeas case that was granted on November 17, 2009. (docs. 20, 22).

## C.   Substantive Issues

Petitioner asserts the following claims:

(1) the prosecution committed misconduct by eliciting false testimony from a State witness;

(2) his due process rights were violated when he was prevented from presenting evidence that another individual was guilty of the crime;

(3) he is actually innocent of murder;

(4) the evidence supporting petitioner's conviction is insufficient, if pretrial evidence and newly discovered evidence that was not presented at trial is considered; and

(5) trial counsel provided ineffective assistance of counsel by

-failing to adequately investigate, interview and call defense witnesses at the guilt phase;

-failing to test, object or counter the prosecutorial misconduct of eliciting erroneous testimony;

-failing to inform the trial court about defense witness intimidation;

-remaining silent during voir dire while the prosecutor made improper statements;

-failing to object to testimony given during the guilt phase regarding petitioner's gang affiliation and other bad acts and failing to request a jury instruction on this issue;

-failing to present evidence that petitioner was misidentified and evidence of another person's guilt;

-failing to object to hearsay testimony that petitioner bragged about committing the crime and failing to object to an erroneous jury instruction regarding transferred intent;

-providing ineffective assistance at the punishment phase; and

-considering all of the ineffective assistance allegations cumulatively, providing constitutionally ineffective assistance of counsel.

### D.  **Evidentiary Hearing**

The Court conducted an evidentiary hearing on April 1, 2010, concerning petitioner's claims that the prosecution committed misconduct by presenting false or misleading testimony (first ground), and that defense counsel was ineffective for failing to investigate and present additional witnesses and for failing to object to the false testimony (fifth ground, first and second parts). (*See* doc. 63).  The Court also heard evidence regarding whether petitioner could overcome any procedural bar to the consideration of these claims.  After the hearing, the parties submitted post-hearing briefs, proposed findings and conclusions, and amended findings and conclusions. (*See* docs. 69, 73, 76, 80, 82-83).

## 1.    *Prosecutorial misconduct*

The parties stipulated at the hearing that two statements made by the detective at trial were misleading:  his testimony that none of the evidence indicated that Escamilla was the one who shot the victims, and that no one excluded petitioner as being the person who killed the murder victim. (Evid. Hrg. ("EH"):9-10).

Petitioner offered a police report from the detective dated June 27, 2001, that was labeled as a follow-up report ("the June 2001 Report").  It states that the detective contacted several potential witnesses and showed them photo line-ups containing photographs of petitioner, Escamilla, his brothers Juan and Jose, and Frank Hernandez.  One witness, Priscilla Rodriguez ("Rodriguez"), identified Escamilla by name as the person who shot the murder victim.  She also told the detective that his brother, Juan, was firing a gun into the crowd, and that Jose might have also been at the party.  She said that petitioner was throwing bottles before the shooting.  (Pet. Ex. 1).

Defense attorney Carl Hays ("defense counsel") testified that he represented petitioner at his trial.  His trial strategy was to lay the blame for the shootings on Escamilla.  (EH:21-23).  He received many documents from the prosecution several weeks before trial, including police reports, and he provided all of these documents to his investigator.  (EH:37-38).  He did not remember seeing the June 2001 Report, but he could not say one hundred percent whether or not he ever saw it.  (EH:23).  Defense counsel testified that it was possible that he did not receive it or that he received it but "didn't think twice about it."  The document would not have stuck out in his mind if he seen it because he had talked to fifteen to twenty people about the shooting.  Some of them identified Escamilla as the shooter, but he did not view them as credible witnesses because their stories contradicted each other.  (EH:24-25).  He acknowledged that if he had the report in his

possession, he could have either have objected to the detective's testimony or impeached him, and he could have raised this in his closing statement. (EH:26-27). Counsel never spoke to Rodriguez. (EH:55). He did not view her as a particularly credible witness because her statement to the police placed petitioner in a different part of the party than other witnesses who testified for the defense, and she would have corroborated testimony from the State's witnesses that he was throwing bottles at the party. (EH:60-61). The June 2001 Report was not in his trial file at the time of the evidentiary hearing. (EH:45). Petitioner's mother obtained a copy of the file from him on April 21, 2005, after petitioner's trial. (EH:45-48).

John Rosa testified that he was hired as a private investigator by defense counsel ("the investigator"). The investigator testified that he never saw the June 2001 Report until it was shown to him before the evidentiary hearing. He was surprised because he had made a copy of defense counsel's file, and it was not there. He considered it a monumental document because he had no idea that Rodriguez had identified Escamilla in a photo line-up as the person who shot one of the victims. He knew only that she had been at the party and that she would state that she did not see petitioner shooting. (EH:80-82). If he had received this document, he would have tried a lot harder to locate her. (EH:82).

David Alex ("the prosecutor") testified that he was the lead prosecutor at petitioner's trial. (EH:87). He had received and reviewed the June 2001 Report before trial, and it appeared to have been redacted by him. (EH:98-99). He did not recall giving defense counsel a copy of the report or the specifics of any document production in the case. Because it was redacted, however, it would have been provided to the defense, and he was confident that the report had been provided to defense counsel. His confidence was based on his inferences from the circumstances rather than his direct

recollection. (EH:99-100, 138). The prosecutor considered the report to be exculpatory evidence. (EH:139). It would have been his practice to review the detective's notebook, and it was his responsibility to turn over to the defense any exculpatory evidence, but he had no independent recollection of doing that in petitioner's case. (EH:109-110). He also did not recall whether defense counsel reviewed the notebook; the trial record reflects defense counsel's statement before trial that he had not yet reviewed the notebook and wanted to do so, and the prosecutor's statement that he had no objection. (EH:112-114).

The prosecutor conceded that the actual testimony given by the detective could have been misleading to the jurors. (EH:117). He also agreed that when the detective testified that no one excluded petitioner as being the person who shot the victims, this testimony was not given in the context of the people who were interviewed immediately after the shootings, as the prosecutor had intended. (EH:116-120). He also conceded that the rebuttal testimony about the seventeen people that were interviewed after the shooting (including Rodriguez) and any identification of Escamilla as the person who shot the victims was misleading. He asked the detective about photo line-ups with Escamilla and his brothers in them, but none of the people who were interviewed immediately after the shootings was shown a photo line-up at that point in time. (EH:120-121). He should have instead asked the detective whether any *credible* person who was shown a photo line-up identified Escamilla. The prosecutor did not view Rodriguez as a credible witness because she did not identify Escamilla as the shooter when she went to the police station immediately after the shootings, although she identified him by name several weeks later. (EH:122-123). She would also have impeached other defense witnesses who testified that petitioner was not near the shooting. Her statement to the detective that petitioner was throwing bottles would have placed petitioner in the

13

front yard of the house where the shootings occurred.  (EH:133-135).

Alejandra Rodriguez testified that she was friends with petitioner because she attended the same church as his family, but she had not spoken to him in nine or ten years and did not stay in touch with his family.  She was at the party for the murder victim, whom she considered a close friend.  She arrived with her younger sister, Rodriguez, at the very beginning of the party before any other people.  (EH:212-214).  She recalled Escamilla's arrival at the party with his younger brother, Juan, with whom she was also friends.  Everyone believed that Escamilla would start trouble at the party.  He arrived in a dark Cadillac, and friends of his arrived in a Suburban.  There were about eight people in Escamilla's group.  (EH:215-216, 234).  At one point, she and Rodriguez and two boys went to the restroom at a gas station down the street.  (EH:216-217).  After they returned and entered the front gate, the commotion began, and the murder victim told people to go to the back of the house.  (EH:217).  She saw a person named Edward Guzman in the middle of a bunch of people about three or four feet away from her, and he asked Escamilla to come over and help him out.  She ran to the back, but her sister did not.  (EH:218-219).  After the shooting began, Rodriguez came to the back of the house with blood on her shirt and told her that the victim had been shot and was "down", and that she had seen everything.  (EH:219-220).  Alejandra asked her if it was Escamilla, and Rodriguez nodded and said yes.  (EH:220).  Alejandra was not surprised because he would come to parties and start fighting, shooting and acting crazy.  (EH:220-221).  Both she and her sister went down to the police station.  They were both scared, so she told her sister not to tell the police what she saw.  At the time of the shootings, Alejandra was seventeen, and Rodriguez was sixteen.  (EH:221-222).  Alejandra was living with friends, and Rodriguez was living with their grandmother.  (EH:223).  Alejandra never saw petitioner at the party that day.  (EH:220).

After the police brought Alejandra home at 7:00 a.m., Escamilla came by the house looking scared and pale, and he said he was looking for his little brother. (EH:223). After she told him that his brother was not there, he left. (EH:223-224). Later that afternoon, his younger brother Juan came to see her. He told her that they had been shooting, and that his brother had killed somebody the night before. Another friend who had also been friends with the murder victim was there and asked Juan to leave. (EH:228-229). A day or two later, Alejandra learned that the murder victim's cousin, Michael Torres, had been shot. She was told that Escamilla killed him because the cousin was trying to confront him about the murder victim's death. (EH:230-233). Alejandra remembered going to her grandmother's house one day and seeing her sister speaking to the detective in the case on the front porch. After he left, Rodriguez told her that she had told the truth about what she had seen. (EH:226). Rodriguez also told her that a couple of months after the shooting, Escamilla came to her house with a friend in a stolen car, and he told her that he knew what she had seen. She was scared and responded that she did not know what he was talking about. (EH:239-240). At some point later, Rodriguez went to a prison boot camp for about six months. (EH:224-225).

## 2. *Failure to Call Witnesses*

Defense counsel testified that he attempted to have Rodriguez testify at trial. After learning that she was in juvenile detention, he had her subpoenaed, but she was released before the subpoena could be served, and her grandmother would not tell either him or the investigator where she was. (EH:49-52). Juan Lucio was present to testify at trial but left before he was called as a witness. (EH:62). Francisco Perez was also present but for some reason was not available to testify. (EH:62). The defense investigator testified that he had trouble locating Rodriguez because she was incarcerated in the Texas Youth Commission ("TYC"). He interviewed her grandmother, and the

grandmother was very afraid for her granddaughter. (EH:83-84).

Jimmy Brown testified at the hearing that at the time of the shootings, he lived next door to the murder victim. After midnight on the night of the party, he was sitting on his front porch when he heard some shots, and he ran over to see what was happening. He saw a man run across the street and enter a dark-colored Cadillac on the rear passenger side. The man looked Hispanic, and he was wearing a white T-shirt. He could not tell if this was the shooter. (EH:175-179). He could have been reached at that house at the time of petitioner's trial. He was interviewed only by the television stations the day after the incident. (EH:179-180).

Francisco Perez testified that he knew petitioner from the neighborhood and that he was at the party where the murder victim was killed. When the fight began, he was in the backyard by the garage, but he began walking towards the front because everyone was told to leave. He saw twenty to thirty guys throwing bottles at each other in the front yard. Guys then began shooting guns and got into a car and a truck. (EH:183-187). He did not know any of the shooters, but he saw three men shooting guns, including one who was hanging out of the car window shooting, and others who were standing outside. (EH:188). Perez saw petitioner at the party and they shook hands, but they did not hang out together at the party. When the shooting started, he saw petitioner in front of him. Perez ran towards the side of the house behind a tree, and he saw petitioner run away from the shooting as well. Petitioner was behind him. Perez did not see petitioner fire a gun. (EH:190-193). Perez did not go to the police station that night and was never interviewed by the police. He was interviewed by the defense investigator, subpoenaed to testify, present at the courthouse and prepared to testify, but he was never called. (EH:188-189). At the time of the hearing, Perez had not spoken to petitioner or his family in nine or ten years. (EH:192).

Sandra Cazares testified that that she was at the party and that she knew petitioner, but they were not friends. (EH:197-198). At one point, she left with friends to go to the restroom at a nearby gas station. As they were walking back to the party, she heard shooting. They ran and ducked behind their car. She saw guys running to a dark, older Cadillac and a man behind the vehicle firing a gun towards the house. (EH:197-200). One was wearing a white shirt and dark jeans and was Latin. (EH:201). She heard other shots but did not know where they were coming from. (EH:202). She saw two men get inside the Cadillac; the one in the white shirt got in the back seat. She did not recognize them. (EH:203, 209). She gave a statement to the police but never spoke to anyone from the defense team. She would have been willing to testify at trial. (EH:204-205).

### 3. *Procedural Bar*

Bill Cox ("writ counsel") testified that he was hired by petitioner's family to file a state writ, and the family provided him a copy of defense counsel's file. He did not recall ever seeing the June 2001 Report stating that Rodriguez had identified Escamilla as the person who shot one of the victims. If he had seen the report, he probably would have attached it as an exhibit. (EH:12-15). He acknowledged that he did include as an exhibit an affidavit from Rodriguez stating that she spoke to the detective on June 27, 2001. (EH:17).

Julie Vasquez, petitioner's mother, testified that she retained defense counsel after petitioner's arrest. (EH:142-143). She was the person who found potential witnesses for him and his investigator. (EH:146-147). Prior to trial, the only documents she received from counsel were affidavits. (EH:148). After trial, she asked him for a copy of his file. She went to his office and picked up a copy of the file, but she never saw the original file. (EH:148-149). The June 2001 Report was not a part of the file that she received. (EH:149). She hired writ counsel to represent

petitioner in his state writ proceedings. At that time, she gave him the file she had received from trial counsel. (EH:152). The family also made two open records requests to the Dallas Police Department. She first requested the complete report on December 3, 2002, and was provided an arrest report and an offense report that totaled forty-two pages. (EH:153-155; Pet. Ex. 10, 11). On May 5, 2004, petitioner's mother received documents from a second open records request made by her sister for the detective's personnel file. It contained numerous pages, but not the June 2001 Report. (EH:156-60; Pet. Ex. 12, 13). All the documents from the open records requests were provided to writ counsel. (EH:156-160).

Joe Saal testified that he is an investigator with the Federal Public Defender's office and assisted in the investigation for petitioner's federal petition. He made an open records request to the Dallas Police Department and also subpoenaed documents from it. He testified that what is received from an open records request can depend on the words used in the written request. (EH:170-171). On January 22, 2010, when he made an open records request, he listed the complainant and the date of the offense, and he requested the complete offense report with all supplements, photo lineups, witness statements, forensic reports, the prosecution report, and any other reports. After eight to ten weeks he received 258 pages, including the June 2001 Report. (EH:172). In March, Saal subpoenaed all the same documents he requested earlier using very similar, if not identical, language. When he picked up the documents from the police department, there were 44 pages. He asked a supervisor about the discrepancy and was told that the discrepancy occurred because the second request was made through records, rather than open records. However, the supervisor of open records was the person served with his subpoena. (EH:173-174).

## II. APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed his petition after its effective date, the Act applies to it.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). Here, the denial of petitioner's state writ constitutes an adjudication on the merits. *See Ex parte Thomas*, 953 S.W.2d 286, 288-89 (Tex. Crim. App. 1997) (holding that a denial signifies an adjudication on the merits).

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*,

529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise, under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. PROCEDURAL BAR

In his initial state writ applications filed on February 22, 2006, petitioner failed to raise his claims of prosecutorial misconduct through the elicitation of false or misleading testimony (first ground), ineffective assistance of counsel for failing to object to false testimony (fifth ground, second part), and denial of due process and a fair trial because the trial court would not allow the

defense to present evidence of third party guilt (second ground).

On July 20, 2006, he submitted the June 2001 Report concerning Rodriguez' identification of Escamilla as the shooter directly to the Court of Criminal Appeals, along with other documents that were not submitted to the trial court. (S.H.Tr.[WR-64,739-02, event date 07/20/2006]:2). Without commenting on the additional evidence that petitioner submitted directly to it after the trial court's recommendation to deny his state writ, the Court of Criminal Appeals denied petitioner relief without written order. (S.H.Tr.[WR-64,739-01; WR-64,739-02; WR-64,739-03]:covers). Because these claims, with their accompanying supporting evidence, were not considered by the trial court in reaching its decision to recommend that petitioner's writ be denied, and did not appear to have been considered when the Court of Criminal Appeals denied relief, this Court stayed petitioner's federal petition to permit him to return to state court in an attempt to exhaust these claims. Petitioner filed second state writs in each of his cases on April 16, 2009, raising these claims (S.H.Tr.[64,739-04]:2, 7-9). Those writs were denied as an abuse of the writ by the Court of Criminal Appeals on August 5, 2009. Because the state court dismissed his subsequent writs under the state abuse of the writ statute, petitioner defaulted these claims.

## A.    Prosecutorial Misconduct and Ineffective Assistance Claims

When a state prisoner has defaulted a federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the petitioner can establish cause for the default and actual prejudice as a result of the alleged violation. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Under the cause and prejudice test, the cause must be something external to the petitioner that cannot be fairly attributed to him. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of external cause include where the factual or legal basis for a

claim was not reasonably available to counsel or where interference by officials made compliance impracticable.  *Id*. at 488, 492.

### 1.    *Cause and Prejudice*

Petitioner contended at the state court that he was unable to file the document earlier than when he submitted it to the Court of Criminal Appeals in July 2006.  (S.H.Tr.[WR-64,739-04]:4). He explained that the evidence had been obtained "via Public Records, Trial Attorney's File, and Investigator's File", and that he had attempted to obtain originals of police reports and sworn statements but "its like pulling teeth." (S.H.Tr.[WR-64,739-02, event date 07/20/2006]:9).

Here, the record reflects the prosecutor's representation just prior to trial that all exculpatory evidence had already been turned over to the defense.[3]  Although he believed that he had turned over the June 2001 Report because it had been redacted, he had no independent recollection of doing so. Defense counsel testified that he did not remember seeing the report, although he could have.  On the other hand, the investigator testified that the report was definitively *not* in the file at the time of petitioner's trial, petitioner's mother testified that the report was not in the copy of the file she received from counsel after the trial, and writ counsel testified that he had what all parties involved believed to be defense counsel's entire file as well as evidence obtained through two open records requests, but it did not contain the report.  Although the redacted report was probably available in the detective's notebook, the preponderance of the evidence supports a finding that the report was not separately disclosed as exculpatory evidence.  No reference was ever made to the June 2001

---

[3]  The Supreme Court has stated in the context of a *Brady* claim that the cause and prejudice exception to a procedural bar does not require a petitioner to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."  *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  Nor is a petitioner and his state writ attorney obligated to assert constitutional error on the basis of mere suspicion. *Id*., *citing Strickler v. Greene*, 527 U.S. 263, 286-287 (1999).

Report at trial. (R. 3:11). The factual or legal basis for the prosecutorial misconduct claim was therefore not reasonably available to counsel, and he was prevented from obtaining the June 2001 Report by the relevant state officials.

Respondent asserts that petitioner could and should have used Rodriguez' affidavit as factual support for a prosecutorial misconduct claim.[4] While her affidavit does state that she identified Escamilla as the shooter of the murder victim in a photo line-up shown to her by the detective, it does not reflect the existence of an actual police report acknowledging her identification. Without the June 2001 Report, petitioner had no way of knowing that proof existed that the detective knew that a witness had identified Escamilla as the shooter and that the prosecution knowingly presented false or misleading testimony. As the Supreme Court made clear in *Murray*, the test is whether the factual basis for a claim was *reasonably* available to a petitioner or when interference by officials has made compliance with the state procedure impracticable. *Id*. at 488, 492.

Here, petitioner has shown that it was impracticable for him to present his prosecutorial misconduct claim and his ineffective assistance claim for failing to object to the misconduct. He has shown cause for failing to raise these claims in his first state writ. Whether he has shown actual prejudice turns on whether his underlying claims are meritorious. *See Banks*, 540 U.S. at 698. As discussed below, petitioner has established a constitutional violation that entitles him to relief, and he has therefore also met the prejudice prong of the cause and prejudice exception to procedural

---

[4] He cites to several cases applying the federal statute of limitations where the factual predicate for a claim is discovered after a conviction is final. (Resp.'s Am. Post-Hrg Brf. at 8). These cases are distinguishable from petitioner's case because they do not address the cause and prejudice standard; they also address situations where no new evidence was presented that changed either the character of the claim or provided a new ground for the claim. *See Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998); *see also Earl v. Fabian*, 556 F.3d 717, 725-26 (8th Cir. 2009); *Johnson v. McBryde*, 381 F.3d 587, 589 (7th Cir. 2004). In contrast, the Fifth Circuit granted a certificate of appealability on the issue of whether a petitioner could establish cause for a procedural default where it was undisputed that he did not discover the existence of a pretrial exculpatory statement made by his co-defendant until five years after his trial in *Graves v. Cockrell*, 351 F.3d 143, 154 (5th Cir. 2003).

default for his prosecutorial misconduct claim. Because counsel was not ineffective for failing to object to the misconduct of which he was not aware, however, petitioner has failed to establish the prejudice prong as to this claim.

## 2. __Fundamental Miscarriage of Justice__

A state prisoner who has defaulted a federal claim in state court may also obtain federal habeas review of the claim if he demonstrates that a failure to consider the claim at the federal habeas level would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Under this exception, a petitioner must show that a constitutional violation has probably resulted in the conviction of someone who is actually innocent. Probability under this test means that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995), *citing Murray*, 477 U.S. at 496. In determining "actual innocence," a federal district court is not bound by the rules of admissibility that govern at trial and instead may consider the probative weight of evidence that was either excluded or unavailable at trial. *Schlup*, 513 U.S. at 327-28. Types of new reliable evidence that may be considered include exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial. A habeas court must consider all evidence, both old and new, incriminating and exculpatory. *House v. Bell*, 547 U.S. 518, 537 (2006). The *Schlup* standard does not require absolute certainty about a petitioner's guilt or innocence. *Id*. at 538.

At trial, the murder victim's father and Rosie Sanchez both testified that petitioner was the person who shot the victims, and the father testified that petitioner was standing five feet from him at the time. Both of these witnesses had also picked petitioner out of photo line-ups previously. The father did not know petitioner or his name before identifying him from the line-up. He admitted that

he gave an interview to a reporter two days after the shootings in which he stated that he hoped someone had seen something and would come forward; he did not state that he had actually seen the shooter from a short distance.[5]  His description of the shooter's clothing in his original written statement differed from his testimony at trial.  Rosie Sanchez did not identify petitioner as the shooter until over a month after the shootings.  She also told the victim's family, including his cousin Daniel, what she had seen the day after the shootings.

Forensic testimony established that the same .38 caliber weapon was used to shoot all three victims.  This neither inculpated nor exculpated petitioner because the weapon was never recovered, the State acknowledged that many people were shooting guns at the party, and the forensics expert acknowledged that one of the bullets that hit one of the victims may or may not have come from the .38 caliber cartridge found in Escamilla's vehicle.  A .38 caliber revolver would not have ejected casings; casings would be found only if the weapon was unloaded.

The defense presented the testimony of two people at trial who affirmatively testified that petitioner was *not* the shooter as well as testimony from Daniel Barron, who provided the police a statement the night of the shooting that the man who shot his cousin was wearing a white t-shirt and entered a dark-blue Cadillac.  While Barron recanted this statement in his testimony, his statement was admitted into evidence, and as well as testimony that Rosie Sanchez told him what she had seen the day after the party and after he gave his written statement.  It is not disputed that the man entering a dark blue Cadillac was not petitioner, that the Cadillac belonged to the Escamilla family, and petitioner was not wearing a white shirt.  Defense witnesses Antonio Garza and Lucy Montoya were admittedly friends with petitioner, and Montoya never approached the police with her

---

[5] During deliberations, the jurors sent a note to the judge indicating that they were in disagreement "about the newspaper article." (Tr. III:30).

information. The defense also presented testimony that Escamilla was initially the suspect in the murder, and that his family told the detective after the shooting that he had gone to Mexico.

The detective's June 2001 Report indicates that Rodriguez specifically identified Escamilla as the person who shot the murder victim. She knew both petitioner and Escamilla, who looked similar at the time according to two witnesses. Her February 2006 affidavit in support of petitioner's writ states that Escamilla shot the victims and ran towards a dark Cadillac. At the evidentiary hearing, the prosecutor stated that he did not view Rodriguez as a credible witness because she was questioned the night of the shootings and declined to identify anyone, but then changed her story several weeks later. He acknowledged, however, that he never spoke to her and never independently determined her credibility. Likewise, defense counsel testified that he did not view Rodriguez as a credible witness, but he also never spoke to her.

At the evidentiary hearing, Rodriguez' sister, Alejandra, provided a compelling reason for her sister's failure to identify Escamilla as the shooter: they were both afraid of Escamilla, and she advised her then sixteen-year-old sister not to tell the police what she saw.[6] Alejandra's testimony at the hearing was credible, particularly because she acknowledged that she personally did not see any of the shooting, that she was friends with both petitioner and Escamilla's younger brother, and that she was good friends with the murder victim. Because of her friendships with many of the interested parties, there is no apparent motive for Alejandra to lie about what she told her sister to tell the police after the shooting. Alejandra further testified that Juan Escamilla stated in her presence that he and his brothers had been shooting guns at the party and that his brother had killed

---

[6] Alejandra's testimony that Escamilla later threatened her sister and that he killed the murder victim's cousin to prevent retaliation has not been considered for the truth of the matter asserted. It has only been considered for the effect on Rodriguez' and her family's state of mind, i.e., as the explanation for their fear and reluctance for her to testify.

someone the night before at the party for the murder victim.

Respondent asserts that the Rodriguez sisters' information should not be considered because they were both known to the defense at the time of trial and therefore, could have been discovered through a reasonable investigation, citing *Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008). In *Moore*, however, the Fifth Circuit held that Moore had failed to prove the fundamental miscarriage of justice exception to a procedural bar with respect to a *Brady* claim where the affidavit he submitted as support for his claim contained information that would have already been personally known by him at the time of trial. The court determined that it was not newly discovered because it was "always within the reach of Moore's personal knowledge or reasonable investigation." *Id*. at 464-65. None of Alejandra's testimony or the statements made in Rodriguez' affidavit, however, would have been personally known to petitioner. Moreover, while petitioner's counsel did know of the existence of these sisters, both counsel and the investigator testified at the evidentiary hearing about the difficulty in finding Rodriguez. There is no indication in the record that a reasonable investigation prior to trial would have uncovered the relevance of Alejandra's testimony, since she was admittedly not an eyewitness to the shooting. Her testimony explains why her sister failed to initially identify Escamilla as the shooter and why the defense had such difficulty finding her. The investigator testified during the evidentiary hearing that he would have tried even harder to locate Rodriguez if he had known about the June 2001 Report. It is therefore appropriate to consider both Alejandra's testimony and Rodriguez' affidavit when determining whether petitioner has met the fundamental miscarriage of justice exception to the procedural bar.[7]

---

[7]  Francisco Perez also testified at the evidentiary hearing that he was at the party, he saw petitioner run from the shooting, and petitioner was not the person who shot the victims. While the testimony from Perez and defense counsel differed as to the reason why Perez did not testify at trial, it appears that Perez was present and prepared to testify at trial. He knew petitioner from the neighborhood, but they were not friends. Respondent also contends that the testimony of

As in *House*, this is not a case of conclusive exoneration because some of the State's evidence still supports the jury's verdict. That evidence consists solely of the testimony of two witnesses, including a victim. The testimony of the defense witnesses at trial placed the petitioner in a different area from the shooting. One witness identified a man in a white muscle shirt as the shooter, but then recanted his testimony. He was told the day after his statement that petitioner was the shooter. A new witness, who knew both petitioner and Escamilla, identified Escamilla as the shooter several weeks after the shooting but initially failed to do so because of fear. None of the witness identifications are without problems. There was no physical evidence that tied petitioner to the shooting. The only casing recovered that matched the type of weapon used in the shooting was found in Escamilla's car. His family told law enforcement that he went to Mexico after the shooting. Two witnesses testified that petitioner and Escamilla looked similar and had similar complexions at the time of the shooting. Escamilla was from Ledbetter, and the Ledbetter guys were wearing muscle shirts. Escamilla's brother told a witness that Escamilla had shot someone the night of the party. Had the jury heard the entirety of the evidence, it is more likely than not that no reasonable juror would lack reasonable doubt. *See House*, 547 U.S. at 554 (holding that House had met the fundamental miscarriage of justice test by calling into question forensic evidence presented by the State and by putting forward substantial evidence pointing to a different suspect); *Finley v. Johnson*, 243 F.3d 215, 221 (5th Cir. 2001) (holding that Finley had met the fundamental miscarriage of justice test by presenting new evidence that would have significantly bolstered his

---

Francisco Perez should not be considered because it was known to the defense at the time of trial and therefore is not newly discovered evidence. The Fifth Circuit has not yet determined whether, in determining whether a federal petitioner has met the *Schlup* standard to overcome a procedural bar, a reviewing court should consider "newly discovered" evidence or "newly presented" evidence. *Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. 2006). The Court assumes, without deciding, that this newly presented evidence should not be considered.

affirmative defense which, if accepted by a jury, would have resulted in his acquittal). Accordingly, petitioner has also shown that a fundamental miscarriage of justice would occur if his prosecutorial misconduct claim and his ineffective assistance claim based on the failure to object to false testimony were not considered on federal review.

**B.** **Due Process Claim**

Petitioner has presented no evidence that he can overcome the procedural bar with respect to the trial court exclusion of evidence (ground two). The trial court did not permit Jessica Garcia to testify about a conversation she had with Escamilla, her boyfriend at the time. Garcia would have testified that Escamilla confessed to her that he killed the murder victim's cousin "because [the cousin] was trying to kill him for killing [the murder victim]." (R. 4:140). She acknowledged that Escamilla never actually confessed to her that he killed the murder victim; he told her that there was no proof as to what he did or did not do. (R. 4:144-145). Petitioner has not shown cause for his failure to raise this claim in his initial state writ because the factual basis was available at the time of filing. He also has not met the fundamental miscarriage of justice exception. This inconclusive testimony does not have the probative weight of evidence showing that a constitutional violation has probably resulted in the conviction of someone who is actually innocent, and petitioner is procedurally barred from raising this claim in his federal habeas petition.

<h3 style="text-align:center">IV. PROSECUTORIAL MISCONDUCT</h3>

Petitioner claims that the prosecution committed misconduct by presenting false or misleading testimony by the detective that there was no evidence that another person had shot the three victims.

The Supreme Court has held that the presentation of false evidence at trial, as well as the

admission into evidence at trial of false evidence that although not solicited, is not corrected, violates a criminal defendant's due process rights, if the reliability of that witness may be determinative of guilt or innocence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). In order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, a petitioner must establish that: 1) the testimony was actually false; 2) the prosecution knew it was false; and 3) that it was material. *Id.* at 271. Knowledge of falsity is attributed to the prosecutor as the spokesperson for the government. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The Supreme Court has also stated that a new trial is dictated only when the false testimony could, in any reasonable likelihood, have affected the judgment of the jury. *Napue*, 360 U.S. at 271.

Respondent acknowledges that the detective gave misleading testimony at petitioner's trial. (Resp.'s Post-Hrg Am. Br. at 18). He argues that some of the statements were made in response to confusing questions by the prosecutor, that the prosecutor was not acting in bad faith, or that the jury "in all likelihood" would have understood the testimony in such a way that it would not have been false. (*Id*. at 18-24). Despite the detective's confusion and the prosecutor's good faith, the detective's testimony was still misleading at the very least, and it was directly contradicted his own report. He testified that there was no evidence supporting the allegation that Escamilla shot any of the three victims, and he testified three times that no one excluded petitioner as being the person who killed the victim or committed the aggravated assaults. (R. 3:167-68; 4:164-165, 166). He also testified that photo line-ups were shown to various witnesses of Escamilla, his brothers, and Frank Hernandez, and no one he interviewed immediately after the shootings positively identified Escamilla as being the person who shot the murder victim. (R. 4:164-165). No line-ups were shown to the witnesses immediately after the shootings, only during the subsequent days and weeks.

Rodriguez was one of the seventeen individuals interviewed by the police, and his June 2001 Report stated that she had identified Escamilla from a line-up as the person who shot the murder victim.

As for the second prong of *Napue,* Respondent acknowledges that the prosecutor knew or should have known that the testimony was misleading or false. (Resp.'s Post-Hrg Am. Br. at 18). The prosecutor testified that he received, reviewed, and probably redacted the June 2001 Report. (EH:98-99). He emphasized and promoted the false or misleading testimony in his closing argument, however, when he argued that none of the seventeen people interviewed by the police could come into court and tell the jury that Escamilla shot the victims because they were not in a position to see the shootings. (R. 4:198). He argued that photo line-ups were shown to "lots of people" and that none of them identified Escamilla as the victims' shooter. (R. 4:199-200, 202).

These arguments show the materiality of the testimony, the third prong of the *Napue/Giglio* standard. It was undisputed that the same gun was used to shoot all three victims. The State conceded that Escamilla was firing a gun at the party. A shell casing from which one of the bullets that struck the victims could have come was found in the Escamillas' vehicle, and Escamilla reportedly went to Mexico. The defense argued that Escamilla was, in fact, the guilty party. Two witnesses testified at trial that petitioner was the victims' shooter; two witnesses excluded him as that shooter. Each witness's testimony was challenged or subject to challenge to some degree as new, inconsistent, or biased. As an apparently neutral and reliable witness, the detective's repeated testimony about the identification of the shooter were of great importance to the State's case because it bolstered the testimony of its two identification witnesses. Under *Napue*, the presentation of false testimony violates a criminal defendant's due process rights if the reliability of that witness may be determinative of guilt or innocence.

Petitioner has shown that the false testimony could have, in any reasonable likelihood, affected the judgment of the jury. *Napue*, 360 U.S. at 271. Regardless of whether Rodriguez would have been considered a reliable witness, the State emphasized and relied on the detective's testimony about the identification of the shooter. Given the conflicting testimony about whether petitioner was the victims' shooter and the issues with each witness's testimony, the Court cannot find that his false testimony that no one had identified Escamilla as the shooter did not likely affect the jury's judgment. *See Tassin v. Cain*, 517 F.3d 770, 789 (5th Cir. 2008) (upholding relief granted pursuant to *Napue* where the State allowed a State's witness to give misleading testimony that she was not promised anything in exchange for her testimony and then emphasized this testimony during closing statements as evidence of her credibility, when in actuality she had been told that she would be rewarded for her testimony if the government was satisfied with the result of the trial).

Respondent also argues that even if petitioner met the materiality standard set forth in *Napue*, he also has to show that the trial error in this case was not harmless error under *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). The Fifth Circuit has assumed, without deciding, that a federal petitioner who raises a *Napue/Giglio* claim would have to also meet the *Brecht* harmless error standard used on federal habeas review before relief would be warranted. *Barrientes v. Johnson*, 221 F.3d 741, 755 (5th Cir. 2000).

> [U]nder *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had a substantial effect or influence in determining the verdict. We recognize, however, that if our minds are "in virtual equipoise as to the harmlessness," under the *Brecht* standard, of the error, then we must conclude that it was harmful.

*Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999) (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996)). To be entitled to federal habeas relief due to a trial error, petitioner must

show the error actually prejudiced him. *Brecht*, 507 U.S. at 637. For the same reasons that the detective's false testimony was material, petitioner has also met the *Brecht* standard to show that the testimony had a substantial and injurious effect or influence on the verdict. Petitioner should be granted relief on his first claim for relief.

## V. ACTUAL INNOCENCE

In his third ground for relief, petitioner claims that he is actually innocent of murder and aggravated assault. His fourth ground is essentially another claim that he is actually innocent because he argues that the evidence, including the newly discovered and/or presented evidence, is insufficient to support his convictions.

In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court held that a claim of actual innocence based on newly-discovered evidence is not, and has never been held to be, a basis for federal habeas relief absent an independent constitutional violation occurring in the state proceeding. The Court assumed for the sake of argument that in a capital case, a "truly persuasive" showing of actual innocence would render the execution of an individual unconstitutional and thus warrant federal habeas relief if no state avenue existed to entertain the claim. The threshold showing for such an "assumed right" would be "extraordinarily high," however. *Id.* at 417. The Court concluded that conflicting affidavits submitted eight years after a trial, when considered in light of the strong evidence presented at trial supporting guilt, did not meet this threshold. *Id.* at 417-18.

Recently, the Supreme Court again declined to hold that federal habeas courts may consider freestanding actual innocence claims. *House v. Bell*, 547 U.S. 518, 554-555 (2006). In *House*, the Supreme Court stated that while the petitioner had made a showing of possible innocence sufficient to meet the threshold necessary to overcome a procedural bar as set forth in *Schlup v. Delo*, he had

not met the extraordinarily high threshold for a hypothetical freestanding actual innocence claim. *Id.* Since *Herrera* was handed down by the Supreme Court, the Fifth Circuit has specifically rejected the argument that a showing of actual innocence would warrant habeas relief if there were no state avenue open to process such a claim. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001). Accordingly, under both Supreme Court and Fifth Circuit case law, petitioner is not entitled to federal habeas relief based on a claim of actual innocence.

Moreover, Texas does have an avenue in which to pursue actual innocence claims. In *State ex. rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 398-99 (Tex. Crim. App. 1994), the Texas Court of Criminal Appeals held that actual innocence could be a basis for state habeas relief where a petitioner established as a threshold that newly discovered evidence, if true, created a doubt as to the efficacy of the verdict sufficient to undermine confidence in the verdict. Subsequently, in *Ex parte Elizondo*, 947 S.W.2d 202, 208-09 (Tex. Crim. App. 1996), the court held that in order for a petitioner to prevail on an actual innocence claim, he must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence. Indeed, the state habeas court considered and denied petitioner's actual innocence claims on their merits.

Finally, even if the Supreme Court found that a freestanding actual innocence claim is cognizable in a federal habeas action, petitioner has failed to meet the extraordinarily high threshold for such a claim. While he has presented new evidence that another suspect was identified by a witness as the victims' shooter, two people that testified at trial and were subject to cross-examination identified petitioner as the shooter. The state court's denial of petitioner's third and fourth grounds for relief was not contrary to federal law, and relief should be denied.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

In his fifth ground for relief, petitioner claims that his trial attorney was ineffective for: 1) failing to adequately investigate, interview and call defense witnesses at the guilt phase; 2) failing to object to the prosecutorial misconduct of eliciting erroneous testimony; 3) failing to inform the trial court about defense witness intimidation; 4) remaining silent during voir dire while the trial court made improper statements; 5) failing to object to testimony given during the guilt phase regarding petitioner's gang affiliation and other bad acts and failing to request a jury instruction on this issue; 6) failing to present evidence that petitioner was misidentified and evidence of another person's guilt; 7) failing to object to hearsay testimony that petitioner bragged about committing the crime; 8) failing to object to an erroneous jury argument made by the prosecutor regarding transferred intent; and 9) providing ineffective assistance at the punishment phase. Petitioner also contends that the cumulative effect of these alleged errors resulted in ineffective assistance.

To successfully state a claim of ineffective assistance of counsel under Supreme Court precedent, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. Petitioners must "affirmatively prove prejudice." *Id.* at 693. They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations are also insufficient to obtain habeas relief. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

A.     **Failing to investigate, interview, and call witnesses**

Petitioner first alleges that his attorney was ineffective for failing to discover, interview, and call the following witnesses at his trial: Joe Martinez, Juan Lucio, Francisco Perez, Celeste Gonzales, Rodriguez, Sandra Cazares, Jaime Gonzalez, Juan Escamilla, Jose Escamilla, Tony Tovar, Enrigue Rojas, Vong Chounlamny, Jimmy Brown, Daniel Barron, Loretta Flores, Edward Rodriguez, Elisei Chavez, and Escamilla.[8] (Pet. At 8b-8d).

The affidavits from Edward Rodriguez, Elisei Chavez, and Escamilla are unsigned, so petitioner has not proffered any sworn testimony showing that they were willing and available to

---

[8] Both Joe Martinez and Daniel Barron actually testified at petitioner's trial.

testify or what they would have said. In order for a petitioner to show prejudice under *Strickland* for a failure to call witnesses, he must show not only that testimony from missing witnesses would have been favorable, but also that the witness would have testified at trial. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). When alleging that counsel was ineffective for failing to fully investigate a case, a habeas petitioner must allege with specificity what the investigation would have revealed and how this would have changed the outcome of the trial. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005). Petitioner has not met his burden as to these witnesses.

As for Sandra Cazares, Jaime Gonzalez, Juan Escamilla, Jose Escamilla, Tony Tovar, Enrique Rojas, Vong Chounlamny, Jimmy Brown, and Loretta Flores, their potential testimony either placed Escamilla at the party shooting a gun or in a Cadillac, or placed unknown persons in a Cadillac that were shooting at the party. (Pet. at 8b-8c). This testimony would have been cumulative of other testimony offered at trial, and the State did not dispute that Escamilla was in a Cadillac that was at the party and that he was firing a gun. Likewise, Celeste Gonzales' affidavit states that she was at trial, was available to testify, and that she saw someone shooting a gun who was not petitioner. (S.H.Tr.[WR-64,739-02, event date 1/26/2007]:9). While her name was not among those named in petitioner's initial state writ, her testimony would also have been cumulative of the testimony that others were shooting guns at the party. Petitioner has not shown a reasonable probability that he would not have been convicted if these witnesses had been called.

With regard to Juan Lucio and Francisco Perez, the defense's investigator submitted an affidavit at the state habeas level reflecting that he interviewed both of these witnesses before trial. (S.H.Tr.[WR-64,739-01]:107). Notes about Juan Lucio stating that petitioner was not the person who shot the victims were also submitted at the state habeas level. The typed notes contained hand-

written notations stating "very good!" and "not here." At the evidentiary hearing, defense counsel explained that these notes meant that he considered Lucio to be a good witness, but that he had disappeared when called to testify at trial. (EH:73; 62). Perez testified at the evidentiary hearing about what he saw at the party and that he was present and willing to testify but was never called as a witness. (EH:183-193). Counsel, on the other hand, testified that Perez was also not available when called as a witness; he also believed that calling Perez would have given the impression that the defense witnesses were trying to help petitioner but were placing him at different places at the party at the time of the shooting. (EH:62-63). Both Juan Lucio and Francisco Perez were sworn in as witnesses before trial (as were Celeste Gonzales and Tony Tovar). (Tr. III:16). Counsel was not ineffective for failing to call Lucio or Perez since there is credible evidence that neither was available when called to testify. Even if Perez was available, his account of the events differed from accounts given by other defense witnesses. Petitioner has not shown a reasonable probability that he would not have been convicted if Perez had testified along with the other defense witnesses.

Finally, petitioner submitted with his state writ an affidavit from Rodriguez stating that she was willing and able to testify about what she saw, but she was never contacted by the defense despite leaving messages for counsel. (S.H.Tr.[WR-64,739-01]:110). Counsel testified at the evidentiary hearing that after the investigator informed him that he had been unable to locate and speak to Rodriguez and that her grandmother was not cooperative, counsel called the grandmother, but she told him that she did not want him calling again. (EH:49). Once he discovered that Rodriguez was in TYC, he tried to subpoena her but was unable to do so because she was released on the same day that the subpoena arrived. (EH:49-51). A copy of the subpoena was admitted into evidence at the hearing. (EH:66-67, Resp. Ex. 3). After she was released, they were unable to

38

locate her, and her grandmother either did not know where she was or was unwilling to reveal this information. (EH:51, 57). The investigator also testified that they had difficulty in locating Rodriguez, that he left a card at the grandmother's house, but that he never received a return call. (EH:83-84). The testimony of counsel and the investigator that they made a number of attempts to locate Rodriguez, that she could not be located even with the assistance of a subpoena, and that she did not contact the defense team is credible. Based on this testimony, and given that it is unclear from the record whether the defense team knew that she had identified another man as the shooter to the detective, petitioner has not shown that defense counsel was ineffective for failing to investigate Rodriguez as a potential witness. This claim is without merit.

**B.**     **Failing to object to prosecutorial misconduct**

Petitioner next alleges that his attorney was ineffective for failing to object to the detective's testimony that no one had identified Escamilla as the person who shot the victims and that no one had excluded petitioner as the shooter because Rodriguez both identified Escamilla as the shooter and excluded petitioner as the shooter. This claim turns on whether defense counsel knew about the June 2001 Report stating that Rodriguez had identified Escamilla in a photo line-up. At the evidentiary hearing, counsel testified that he did not remember seeing the report, but it was possible that he had seen it. (EH:23). He also testified that he never spoke to Rodriguez personally. (EH:35). He provided everything in his file to his investigator. (EH:38). His investigator testified that he had access to and reviewed counsel's trial file, and that the report was not in the file. (EH:80-82). Finally, the prosecutor testified that he believed that he provided the report to defense counsel but admitted that he had no specific recollection. (EH:99-100, 138).

The record does not show that defense counsel actually knew about this police report.

Without a factual finding that counsel knew about the report, he cannot be considered ineffective for failing to object to contradicting testimony. This claim is therefore without merit.

## C.    Failing to inform the trial court about witness intimidation

Petitioner alleges that his attorney was ineffective for failing to report or object to witness intimidation.[9]

The Sixth Amendment guarantees a criminal defendant the right to present witnesses to establish his defense without fear of retaliation against the witness by the government. *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002). To demonstrate that the prosecution infringed on this right, the Fifth Circuit has held that a defendant must show that the conduct substantially interfered with a witness's free and unhampered choice to testify. *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997).

Petitioner submitted an affidavit from the defense investigator at the state habeas level. The affidavit states that he went out in the hall during trial because he had been told by one of petitioner's family members that some defense witnesses were being intimidated by police officers from the gang unit. He observed two officers pointing at witnesses and whispering in each other's ears. One of the defense witnesses told the investigator that he would not be able to testify because

[9]  Respondent responds that this claim is unexhausted because petitioner did not specifically claim in his state habeas petition that his attorney was ineffective for failing to object to witness intimidation, but only asserted that certain witnesses were intimidated. A petitioner must fully exhaust state remedies before seeking federal habeas relief. 28 U.S.C. § 2254(b). He must fairly present the factual and legal basis of any claim to the highest available state court for review prior to raising it in federal court. *See Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993). In Texas, a prisoner must present his claim to the Texas Court of Criminal Appeals in a petition for discretionary review or an application for writ of habeas corpus. *See Bautista v. McCotter*, 793 F.2d 109, 110 (5th Cir. 1986). Here, the administration of justice would be better served by bypassing this procedural issue and reaching the merits of the claim. *See* 28 U.S.C. § 2254(b)(2) (providing that the Court may deny a habeas petition on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998) (reaffirming pre-AEDPA law that where exhaustion is not waived, courts have discretion to decide whether the administration of justice would be better served by reaching the merits of the petition).

the officers were pointing at him and whispering, and he did not want to be arrested. The investigator did not recall the name of this witness, but he told defense counsel about this. (S.H.Tr.[WR-64,739-01]:107-108).

Petitioner has not shown that any potential witness was actually threatened with being arrested. Although the officers pointed out and whispered about a witness, petitioner has not shown that this was substantial interference with his right to present witnesses. In addition, the identity of that witness is unknown, and the probity and relevance of his/her potential testimony is also unknown. Petitioner has shown no prejudice because he has not shown that there is a reasonable probability that he would not have been convicted if his attorney had objected to any alleged intimidation and if this witness had testified. This claim is without merit.

## D. <u>Remaining silent during voir dire</u>

Petitioner also claims that his attorney was ineffective by remaining silent during voir dire while the prosecutor made improper statements.

The prosecutor stated that the State had to prove all elements alleged in an indictment, including venue; he also said that in his many years as both a prosecutor and a defense attorney, he had never seen a case where the wrong county was alleged in the indictment, but that it was an example that a person could be guilty of an offense but not guilty as charged in the indictment. (R. 2:27-30). Petitioner claims that this statement amounted to a statement that the prosecution was infallible. (Pet. at 8e). This is not what this statement suggested, and counsel was not ineffective for failing to object to a passing, inconsequential comment by the prosecutor. *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that the Fifth Circuit has consistently held that counsel is not ineffective for failing to make futile motions or objections).

The prosecutor also gave an example of a reason why a defendant might choose not to testify. He had once represented a client who chose not to testify because the State had rested in her trial for theft without proving that over $750.00 had been taken from the store, as charged in the indictment. He therefore advised her not to take the stand, even though she always steadfastly maintained her innocence. (R. 2:48-50). The prosecutor then stated to the jurors that they could not assume that a defendant chooses not to testify because he is guilty, and they would be instructed as such. (R. 2:50-51). Petitioner alleges that this was an example where a defense attorney and his client withheld the truth. (Pet. at 8e). This characterization is not supported by the record, and counsel was not ineffective for failing to object. It also did not prejudice petitioner's trial.

**E.**     **Failure to object to testimony regarding gang affiliation and request jury instruction**

Petitioner next contends that his attorney was ineffective for failing to object to testimony given during the guilt phase about petitioner's gang affiliation and other bad acts and failing to ask that a limiting instruction be given to the jury on this issue.

The record reflects that prior to trial, defense counsel made a motion in limine to preclude mention of gang activity or affiliation. The State agreed that it would not present any evidence that petitioner ever spoke to the police about anything involving gang activity. (R. 3:11-12). The State did state its intent to offer "some contextual evidence" for gang signs being thrown at the party and gang names being shouted at the party, and defense counsel raised no issue with this. *Id*. The murder victim's father testified that a videotape from the party showed people making gang signs, but it did not show petitioner participating. (R. 3:67). A police officer with the gang unit also testified about gang signs he recognized from a videotape taken at the party. (R. 3:107-110). He also acknowledged on cross-examination that he never saw petitioner on the video making gang

signs. (R. 3:110). The record also reflects that Antonio Garza testified on direct examination that he never saw petitioner throw gang signs or bottles. On cross-examination, the State questioned Garza about whether he ever told the detective that he was a member of a gang, and he denied this. Garza also testified that to his knowledge, petitioner was not a member of a gang. (R. 4:51-53, 55). The record does not reflect evidence at the guilt phase of the trial about petitioner's alleged gang affiliation or prior bad acts, only a denial that petitioner was in a gang and testimony that he was not seen making gang signs in the video. Accordingly, defense counsel was not ineffective for failing to object or for failing to request a jury instruction on the issue.

To the extent that petitioner complains that his attorney should have objected to the State's evidence at punishment of his possible gang involvement, this type of extraneous bad acts evidence is permissible at the punishment phase of a criminal trial in Texas, so long as the State provides notice of an intent to offer such evidence if requested to do so by the defense. *See* TEX. CODE CRIM. PROC. art. 37.07 § 3(g) (Vernon 2007). The State did provide this notice to the defense in this case. (Tr. III:14). Furthermore, the jury charge from the punishment phase did include an instruction that the jury was not to consider any bad acts offered at the punishment phase of the trial unless the jury believed beyond a reasonable doubt that petitioner had committed the acts. *Id*. at 39-40. The jury charge from the guilt phase of the trial also defined the term "reasonable doubt" for the jury. *Id*. at 24-25. Defense counsel was not deficient with respect to prior bad acts offered into evidence at trial.

**F.** **Failure to present evidence of another person's guilt**

Petitioner next contends that his attorney was ineffective for failing to present evidence that petitioner was misidentified and evidence of another person's guilt. Petitioner points to the affidavits in support of his claim that counsel was ineffective for failing to call certain witnesses at

trial. For the same reasons that counsel was not ineffective for failing to call those witnesses, he was not ineffective on this ground.

## G.      Failure to object to hearsay testimony

Petitioner next contends that his attorney was ineffective for failing to object to hearsay testimony that petitioner had bragged about committing the crime.

The detective testified that he received an anonymous phone call that petitioner and Frank Hernandez had been bragging about the shootings. (R. 3:138). This testimony was not hearsay, however, because it was not offered for the truth of the matter asserted, but was instead offered to show how petitioner came to be a suspect in the shootings. *See* TEX. R. EVID. 801(d); *Jones v. State*, 843 S.W.2d 487, 499 (Tex. Crim. App. 1992), *overruled on other grounds by Maxwell v. State*, 48 F.3d 196, 198-99 (Tex. Crim. App. 2001). As such, this testimony was not objectionable, and defense counsel was therefore not ineffective for failing to object to it. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (stating that counsel need not assert and pursue frivolous objections to render effective assistance of counsel).

## H.      Failure to object to jury instruction on transferred intent

Petitioner contends that his attorney was ineffective for failing to object to an erroneous jury argument about transferred intent. He complains of the prosecutor's closing argument that petitioner was guilty even if he intended to shoot only one of the victims. (R. 4:173).

The jury was instructed on the law of transferred intent in the jury charge at the guilt phase; the trial court specifically instructed the jury that a person is "criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different offense was committed or a different person or property was injured,

harmed, or otherwise affected." (Tr. III:25). Petitioner has neither alleged nor shown that this is

an improper statement of Texas law or that the argument based on this law made by the prosecutor

was incorrect. Counsel was not ineffective for failing to object to this argument. *See Green v.*

*Johnson*, 160 F.3d at 1037.

## I.      Providing ineffective assistance at the punishment phase

Petitioner also contends that his attorney provided ineffective assistance at the punishment

phase by advising him to testify.[10]

Petitioner alleges that it was poor strategy to advise him to testify at punishment because it

permitted the State to offer evidence in rebuttal about prior bad acts and gang activities. In actuality,

four of the six witnesses called by the State at punishment testified were friends and family members

of the victim who testified about their loss. (R. 5:11-26). Officer Barrett Nelson testified in the

State's case-in-chief that he was a Dallas police officer, and that he believed that petitioner was a

member of the Vagos 18 gang because petitioner admitted to associating with that gang. Nelson also

testified about prior bad acts and that he kept a gang file on petitioner. (R. 5:26-45). All of this

evidence was admitted prior to petitioner's own testimony at the punishment phase of the trial.

Petitioner testified that he was not a gang member but he associated with members of the

gang because he had grown up with them, and it was normal in the neighborhood in which he lived.

(R. 5:60-61). He testified that he had no prior criminal record and that he would obey the rules of

probation if placed on probation. (R. 5:62-65). He was then cross-examined about whether he made

certain verbal statements to the detective when questioned about the shootings and whether there

---

[10]   Respondent also asserts that this claim is unexhausted because it was not raised in petitioner's state writ. The administration of justice would be better served by bypassing this procedural issue and reaching the merits of this claim as well. *See* 28 U.S.C. § 2254(b)(2); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998).

was marijuana present in the house where he was arrested. (R. 5:66-75). He was also questioned about a prior possession of marijuana charge. (R. 5:82-83). On rebuttal, the detective testified that petitioner admitted to him that he was a gang member and maintained that he did not commit the shootings because he was not near where the shell casings were found. (R. 5:86-91).

Almost all of the testimony the State offered regarding petitioner's gang involvement was presented before petitioner testified. To the extent petitioner is complaining that because he testified, he was cross-examined and impeached through rebuttal testimony by the detective, petitioner appears to fault his attorney for the testimony he gave at trial. The Supreme Court in *Strickland*, however, recognized that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Petitioner's counsel cannot be faulted because petitioner's testimony was rebutted or contradicted. Petitioner has not shown that his attorney was ineffective for advising him to testify at punishment.

**J.      Cumulative Errors**

Finally, petitioner asserts that the cumulative effect of trial counsel's errors rendered his assistance ineffective. In *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992), the Fifth Circuit held that in order for a federal habeas petitioner to prevail on a claim of cumulative error at a state trial, he must establish that: 1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; 2) the errors were not procedurally defaulted for habeas purposes; and 3) the constitutional errors so infected the entire trial that the resulting conviction violates due process. *Id.* at 1458. As discussed, petitioner's ineffective assistance of counsel claims are without merit and therefore do not establish any constitutional errors that infected the trial such that the

alleged errors violated his due process rights. The state court's denial of this ground for relief was not contrary to federal law, and relief on this ground should be denied.

## VII. RECOMMENDATION

The Court should **GRANT** petitioner relief on the first ground, **DISMISS** the second ground as procedurally barred, and **DENY** petitioner's remaining claims with prejudice. The petition for writ of habeas corpus should be conditionally granted, and the writ should issue unless petitioner is retried within 180 days after these findings are accepted.

**SIGNED on this 14th day of March, 2011.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE